UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

GUCCI AMERICA, INC.,

            Plaintiff,

     - against -

GUESS?, INC., MARC FISHER FOOTWEAR
LLC, THE MAX LEATHER GROUP/CIPRIANI
ACCESSORIES, INC., SEQUEL AG, K&M
ASSOCIATES L.P., VIVA OPTIQUE, INC.,
SIGNAL PRODUCTS, INC. and SWANK, INC.,

            Defendants.

------------------------------------------------------------------ x

Civil Action No. 09cv4373
(SAS)(JLC)

**DECLARATION OF VANNI VOLPI**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
:
GUCCI AMERICA, INC.,                                           :   Civil Action No. 09cv4373
                                                               :   (SAS)(JLC)
           Plaintiff,                                           :
                                                               :
      - against -                                              :
                                                               :
GUESS?, INC., MARC FISHER FOOTWEAR                             :
LLC, THE MAX LEATHER GROUP/CIPRIANI                            :
ACCESSORIES, INC., SEQUEL AG, K&M                              :
ASSOCIATES L.P., VIVA OPTIQUE, INC.,                           :
SIGNAL PRODUCTS, INC. and SWANK, INC.,                         :
                                                               :
           Defendants.                                          :
                                                               :
-------------------------------------------------------------- x

      VANNI VOLPI hereby declares as follows under penalty of perjury:

      1.     I am Intellectual Property Counsel to Guccio Gucci S.p.A. ("GG") in Italy. I have served in that position since I was hired by GG in approximately July 2006.

      2.     I am a member of the Legal Department of GG. In my role as Intellectual Property Counsel, I report on all of my matters to the General Counsel of GG, Mrs. Daniela Della Rosa. I understand Mrs. Della Rosa is a member of the New York Bar.

      3.     In addition to directly reporting to the General Counsel of GG, I also discuss important matters to which I have been assigned with the General Counsel of Gucci Group, GG's parent company. The General Counsel of Gucci Group is Ms. Cheryl Solomon. I understand Ms. Solomon is a bar-admitted attorney in the U.S.

      4.     My duties as Intellectual Property Counsel are to help manage the trademark protection and enforcement program of GG. In particular, it is my job to coordinate the registration and protection of trademarks owned by GG (including the world famous GUCCI mark and other well-known word and design marks owned by GG). In addition, I work with

NY: 508227v1

internal staff and investigation teams, with law enforcement and customs and border patrol officials, and with outside counsel, on the coordination of civil, administrative, and criminal enforcement efforts related to GG's portfolio of trademarks.

5. My responsibilities as described above extend to all countries in the world where GG owns Gucci trademarks. I am not in charge of the protection and enforcement of Gucci trademarks in those countries in the world, such as the United States, where GG does not own the Gucci trademarks. In those countries, however, I do interface with the legal teams that are responsible for the protection and enforcement of the Gucci trademarks in those locations, to make sure that our protection and enforcement efforts are well coordinated.

6. I have worked extensively as a legal professional, with a particular focus on intellectual property protection and enforcement. From 1996 through 2004, I worked in the legal department of the fashion company Chanel, my title there being Intellectual Property Counsel. Thereafter, I worked from 2004 through 2006 in the legal department of the fashion company, Louis Vuitton, my title there being IP and Anti-Counterfeiting Manager. In or about middle of July 2006, I was hired by GG as Intellectual Property Counsel.

7. I also have an educational background in law. In particular, I studied law for four years at the University of Pisa in Italy, and subsequently for one year at the University of Paris, while I was working at Chanel. I do not, however, hold a degree from either of these universities. To the extent I testified at my February 23, 2010 deposition that I have such degrees, I wish to correct my testimony on this point; unfortunately, it appears I did not completely understand the questions that were being asked of me, and I misspoke.

8. While I am not a lawyer, and not a member of the Italian bar, I consider myself to be a trained legal professional. In my role as Intellectual Property Counsel, I deal with numerous

2

NY: 508227v1

legal matters of the company that are assigned to me by GG's General Counsel. Further, in all instances I carry out my duties and responsibilities in these matters, under the direction of, and only after obtaining the approval of, GG's General Counsel.

9. In order to carry out my role in the legal department of GG, and to respond to the needs and concerns of the company, I frequently communicate with employees of the company and its affiliates who are not legal professionals. It is my understanding, however, and that, I believe, of the business persons with whom I communicate, that such communications, since they are for the purpose of obtaining legal advice from GG's General Counsel, will be confidential. Further, it is my understanding of my role as in-house counsel that I am duty bound to keep and maintain all such communications in confidence.

10. Prior to the time I was hired by GG, the company did not have a member of the legal department experienced in handling intellectual property matters. Before that time, most of the work that I now do was outsourced to an outside law firm, Studio Jacobacci of Turin, Italy. While I still work with Studio Jacobacci on certain matters that require the attention of outside counsel, since I joined the company, GG has reduced its use of this outside law firm, and I am performing some of the work this firm previously performed, including supervising name searches and clearance, trademark oppositions, and anti-counterfeiting activities, all under the direction and supervision of GG's General Counsel.

11. While I have a certain degree of autonomy in carrying out my day-to-day responsibilities within the GG legal department, I do not make any important decisions, nor do I formulate or communicate any strategy or legal advice, without first consulting with, and obtaining the approval of my superiors. As for Mrs. Della Rosa, I have daily, or near daily contact with her, and report to her frequently as to the status of the matters I am working on.

3

NY: 508227v1

Further, I make no important decisions regarding legal strategy on my own, nor do I render any legal advice to the company; rather, I first review the circumstances of each matter with Mrs. Della Rosa and obtain her input and approval. Sometimes my communications with Mrs. Della Rosa on such matters is reflected in written communications such as e-mails; however, often these communications take place orally, since our offices are adjacent to each other, and, as I indicated above, I discuss important intellectual property matters of the company with her nearly every day.

12. In addition to my frequent discussions with Mrs. Della Rosa regarding the intellectual property matters of GG, I frequently communicate with Ms. Solomon, and obtain her input on matters of particular importance to the company. In particular, I will discuss significant intellectual property litigation matters, especially those which may implicate the U.S. market, with Ms. Solomon, who is an American lawyer with a background in civil litigation.

13. I first started to communicate with various persons at GG about possible legal action against Guess in or about March 2008, after being contacted by Ms. Solomon in March 2008 about a Guess product that concerned her. After communicating with Ms. Solomon and Mrs. Della Rosa and receiving their instruction to further investigate Guess' activities, I contacted personnel in the legal departments of various GG affiliates around the world, including members of the legal department at Gucci America, Inc. ("GA"), the plaintiff in this action, in an effort to gather information about Guess' activities. I was also in contact, beginning in or about mid-2008, with outside litigation counsel in a number of jurisdictions, including Mr. Pier Luigi Roncaglia of Studio Legale SIB in Florence, Italy, and Mr. Louis Ederer of Arnold & Porter LLP in New York, about the possibility of commencing legal action against Guess.

14. At all stages of my investigation of Guess' activities, I communicated with Mrs. Della Rosa, and also Ms. Solomon from time to time, about the results of my investigation, and what I had learned about Guess' activities. I then continued my investigative efforts, at their instruction, working with members of the legal departments of various Gucci affiliates, and with outside counsel.

15. In late 2008, I had a meeting with Mrs. Della Rosa in our offices in which we discussed the findings of my preliminary investigation of Guess, and my discussions with outside counsel in the U.S. and Italy. Following our discussion, Mrs. Della Rosa instructed me to move ahead with, and begin final preparation for litigation against Guess in Italy.

16. Also, in or about November 2008, I communicated with Ms. Solomon, and brought her up to date on the results of my investigation to that point, and my discussions with outside counsel. On Ms. Solomon's suggestion, I arranged for a meeting in New York in late November 2008 with our outside counsel there, to be attended by me, Ms. Solomon, members of our legal department at GA, and outside counsel. The purpose of the meeting was to review the results of my investigation of Guess' activities to that point, discuss our legal strategy with outside counsel, and determine, with Ms. Solomon's approval, our strategy for dealing with Guess in the United States.

17. A meeting was held at the offices of Arnold & Porter LLP in November 2008. I traveled to New York from Florence to attend the meeting. Ms. Solomon also attended the meeting in New York. Following a discussion of the investigation conducted to that point, GG and GA began their final preparation for litigation against Guess in Italy and the U.S., including further factual investigation of Guess' activities in both countries.

5

18. Subsequently, in early 2009, I provided Mrs. Della Rosa with a comprehensive update as to my investigation of Guess in Italy and the U.S., and the status of our preparation for litigation. Thereafter, Mrs. Della Rosa authorized me to update senior management at GG, and in particular, the new president of GG, Mr. Partrizio Di Marco, on the status of our prospective litigation strategy against Guess, on her behalf. Acting at Mrs. Della Rosa's instruction, in or about March 2009, I sent Mr. Di Marco an e-mail updating him as to the status of our prospective litigations against Guess in Italy and the U.S.

19. It is very clear in my mind that at no time in my communications concerning Guess with business people at GG, and other Gucci affiliated entities, did I communicate anything of substance that I did not first discuss with, and obtain the approval and input of Mrs. Della Rosa and/or Ms. Solomon. It has always been my practice, and the requirement of my superiors, that I do not communicate legal strategy or legal advice on any important intellectual property matter, or any matter that I work on, without first discussing the matter with one or both of them, so that they can determine the appropriate strategy or advice.

20. I understand that Guess is attempting to discover approximately 150 of my communications that GG seeks to protect from disclosure on the grounds of attorney-client privilege. The communications in question fall into two categories. The first category consists of communications I had between March and June 2007 relating to my investigation of Guess' use of the term "Twirl", a trademark used by GG for watches. The second category consists of communications I had between March 2008 and May 2009 relating to my investigation of Guess' use of the marks and designs that are the subject of this litigation. In all these instances, I was engaging in these communications at the direction and under the supervision of my superiors in the legal department, to help them formulate our legal strategy against Guess. In fact, I am not

6

aware of any communications I had with anyone within GG or any of its affiliates, relating to the work I was doing with respect to Guess in 2007, 2008 and 2009, that were not within the scope of assignments given to me by my superiors in the legal department, and in particular Mrs. Della Rosa and Ms. Solomon, and all of these communications were for the purpose of assisting them in formulating GG's legal strategy against Guess.

Declared under penalty of perjury this 31 day of March, 2010.

_____
VANNI VOLPI