UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

| | |
|---|---|
| GUCCI AMERICA, INC., | Civil Action No. 09cv4373 (SAS)(JLC) |
| Plaintiff, | |
| - against - | **DECLARATION OF DANIELA DELLA ROSA** |
| GUESS?, INC., MARC FISHER FOOTWEAR LLC, THE MAX LEATHER GROUP/CIPRIANI ACCESSORIES, INC., SEQUEL AG, K&M ASSOCIATES L.P., VIVA OPTIQUE, INC., SIGNAL PRODUCTS, INC. and SWANK, INC., | |
| Defendants. | |

------------------------------------------------------------------ x

DANIELA DELLA ROSA hereby declares as follows under penalty of perjury:

1. I am General Counsel of Guccio Gucci S.p.A. ("GG") in Italy. I have held the position of General Counsel since joining GG in September 2007.

2. A copy of my Professional Profile, as made available by GG, is annexed hereto as Exhibit A.

3. My legal education background is as follows. I received my law degree from Luiss Guido Carli in Rome, Italy in 1991. Thereafter, I matriculated in the Masters of Law (LL.M.) program at Columbia Law School in New York, New York, specializing in international law.

4. After receiving my LL.M. from Columbia Law School in 1994, I took (and passed) the New York bar examination in December 1995. I was admitted as a member of the New York Bar in the Appellate Division, Third Department, on November 26, 1996.

5. Since being admitted to the New York Bar in 1996, I have continuously maintained my New York Bar membership, and I am currently registered as a member of the New York Bar through September 2010.

6. After receiving my LL.M., I began my career in the Washington, D.C. office of Covington & Burling LLP, where I was part of a program called "Lawyers from Abroad." During this time, I primarily advised U.S. clients on European market liberalization initiatives in the technology and telecommunications sectors.

7. Thereafter, in or about the end of 1995, I joined the Brussels offices of Akin, Gump, Strauss, Hauer & Feld, LLP ("Akin Gump") as an associate in the International Law and Policy Department.

8. About four years later, I left Akin Gump to become an in-house lawyer at IBM in Brussels. During my time at IBM, I focused primarily on preparations for year 2000, and on litigation, with regional responsibility for Italy, Spain, Portugal, Israel, Greece and Turkey.

9. In 2001, I joined Levi Strauss Europe as Associate General Counsel. While at Levi Strauss Europe, I worked primarily on commercial and retail issues, as well as coordinating pan-European anti-counterfeiting activities.

10. Next, after ten years of serving in in-house positions at IBM and Levi Strauss Europe, I rejoined Akin Gump's Brussels office as Senior International Counsel. During this time, my practice focused on commercial and regulatory matters, both at the European Community and national levels.

11. In addition to my New York Bar membership, over the years I have been a member of the Italian Bar and the Belgian Bar.

12. I am not presently a member of the bar in Italy, for the reason that, according to the rules of the Italian National Bar Association, in-house counsel, such as myself, are not permitted to maintain a membership in the Bar. However, I am an Italian-qualified lawyer, and would be permitted to rejoin the Italian National Bar Association if I later practiced as an outside attorney in Italy.

13. In my current position as General Counsel of GG, I report to the General Counsel of Gucci Group, GG's parent company. The General Counsel of Gucci Group is Ms. Cheryl Solomon. I communicate frequently with Ms. Solomon on important GG legal matters, particularly litigation matters, since Ms. Solomon is an American lawyer who practiced litigation for many years. I therefore frequently seek her input and consensus on important legal matters, including the Guess matter that is the subject of this case. I also report to the Chief Executive Officer of GG, Mr. Partrizio Di Marco.

14. As GG is a multi-national company with affiliates in many countries around the world, and as GUCCI brand products are sold, altogether, in about 70 countries, GG and its affiliates have legal issues of all kinds and varieties, on a global basis. GG relies on its in-house legal department to advise it, on a day-to-day basis, as to the legal matters of the company.

15. The GG legal department, of which I am the head, is set up like a law firm. Reporting to me are legal professionals who specialize in many different areas of the law, including intellectual property, transactional matters, distribution and real estate. Altogether, there are twenty legal professionals and paralegals staffing GG's legal department. Further, GG has deliberately expanded the size of its in-house legal department, and increased the

number of legal professionals, in the last five years. Our purpose in doing this was to reduce our reliance on outside counsel, and to save costs.

16. Since GG relies on the in-house legal team to provide it with the same type of legal services GG previously outsourced to outside law firms, GG executives expect two things when they seek legal advice from me and my team of legal professionals. First, they expect us to provide the company with the best independent legal advice, notwithstanding our positions as employees, so that GG fully understands the potential legal implications of its actions before it makes any important business decisions. Second, since they are confiding in me and my team of legal professionals, and providing us with GG's most sensitive corporate information, in order to be able to have frank discussions with us about legal issues that concern the company, and to obtain the most informed legal advice, they expect that their communications with me and my team of in-house legal professionals will be kept confidential.

17. My duties as General Counsel of GG are wide-ranging, and include all legal matters that concern the company. Among other areas, I have responsibility for all intellectual property matters, including the protection and enforcement of trademarks owned by GG. All legal professionals employed in GG's in-house legal department act only under my supervision and at my direction, and within the scope of the assignments I give them. The reason for this is twofold. First, as General Counsel, it is my responsibility to sign off on every important legal strategy and decision the company must make. Second, I am the only member of the GG legal department who is currently a member of any bar (*i.e.*, the New York Bar), so I am concerned that we maintain the ability to assert attorney-client privilege with respect to all of our strategic and advisory communications in those instances where attorney-client privilege is available.

18.   One of the legal professionals in GG's in-house legal department is Vanni Volpi, who holds the title of Intellectual Property Counsel. It is my understanding that approximately nine months prior to my joining GG as General Counsel, Mr. Volpi was hired as GG's Intellectual Property Counsel to help manage GG's trademark protection and enforcement program. Specifically, Mr. Volpi was charged with coordinating the registration and protection of trademarks owned by GG, in addition to working with internal staff and investigation teams, and with law enforcement and customs and border patrol officers and outside counsel, on the coordination of civil and criminal enforcement efforts related to GG's portfolio of trademarks.

19.   It is my further understanding that prior to Mr. Volpi being hired to serve a GG's Intellectual Property Counsel, the company did not have a member of the legal department who was experienced in intellectual property matters. Accordingly, much of the work that Mr. Volpi performs today (supervising name searches and clearances, trademark oppositions, and anti-counterfeiting activities), was previously outsourced to an outside law firm, Studio Jacobacci of Turin, Italy. My understanding is that the decision to bring this work in-house, with the hiring of Mr. Volpi as Intellectual Property Counsel, was to ensure greater oversight of GG's portfolio of Gucci intellectual property rights, actively defend and protect such rights, and to reduce costs.

20.   Mr. Volpi's responsibilities at Intellectual Property Counsel extend to all countries in the world where GG owns Gucci trademarks. In those countries where the Gucci trademarks are owned by affiliated entities, Mr. Volpi interfaces with the legal teams in those locations to make sure that all Gucci protection and enforcement efforts are well coordinated. However, once again, Mr. Volpi never acts on his own, but only within the scope of the duties

that I assign to him, so that I can formulate legal strategy and render legal advice in all intellectual property matters to GG.

21.   Although Mr. Volpi has a certain degree of autonomy in carrying out his day-to-day responsibilities within the GG legal department, he does not make any important decisions, nor does he communicate any strategic legal advice, without first consulting with me and obtaining my approval. I maintain frequent, usually daily, contact with Mr. Volpi, during which time he reports directly to me on the status of the matters he is working on under my supervision. I have specifically instructed Mr. Volpi not to formulate any legal strategy, nor render any legal advice to the company, without first reviewing the circumstances of the matter with me, and obtaining my input and approval.

22.   In addition to communicating with me, I understand that Mr. Volpi frequently communicates directly with Ms. Solomon, the General Counsel of Gucci Group, to whom I report, to obtain her input in matters of particular importance to the company. In particular, I understand that Mr. Volpi discusses significant intellectual property litigation matters, especially those which may implicate the U.S. market, with Ms. Solomon.

23.   Mr. Volpi first communicated with me about possible legal action against Guess in or about March 2008. I instructed Mr. Volpi to further investigate Guess' activities, and to use the support of outside counsel to gather evidence with respect to the potential claims against Guess first identified by Ms. Solomon, so that I could make the determination whether GG should pursue legal action against Guess. I further instructed Mr. Volpi to contact and interface with outside litigation counsel in a number of jurisdictions about the possibility of commencing legal action against Guess.

24. Throughout 2008, at all stages of Mr. Volpi's investigation of Guess' activities, he communicated with me about the results of his investigation and what he had learned about Guess' activities in Italy, the U.S. and other jurisdictions. We also frequently discussed GG's potential legal strategies against Guess.

25. Thereafter, in late 2008, I had a meeting with Mr. Volpi in our offices in which we discussed the findings of his preliminary investigation of Guess. Based on that discussion, and my understanding of Mr. Volpi's discussions with outside counsel in the U.S. and Italy, I directed, subject to further investigation and gathering of evidence, that GG move ahead with, and begin final preparation for litigation against Guess in Italy. I also determined that GG should consider coordinating with the in-house legal team at our affiliate company in the U.S., Gucci America, Inc. ("GA"), about the possibility of a parallel litigation against Guess in the U.S. I therefore assigned Mr. Volpi to work on final preparations for litigation in Italy and the U.S., subject to my instructions.

26. Subsequently, in early 2009, after receiving a comprehensive update from Mr. Volpi, I determined that GG should proceed with litigation in Italy, and coordinate with GG's U.S. affiliate, GA, on a parallel litigation in the U.S. I further authorized Mr. Volpi to communicate on my behalf directly with senior management at GG, and in particular, the new president of GG, Mr. Di Marco, concerning the strategy I had approved for commencing litigation against Guess. Thereafter, to my understanding, in or about March 2009, Mr. Volpi, acting on my instruction, updated Mr. Di Marco as to the status of our prospective litigations against Guess in Italy and the U.S.

27. Since becoming the General Counsel of GG in September 2007, it has always been my policy that Mr. Volpi not communicate any legal strategy, or give any legal advice on

important intellectual property matters (the Guess matter being of particular high importance during my tenure at GG), without first discussing that strategy with me, and obtaining my approval. I am unaware of any instance where Mr. Volpi failed to follow this general policy.

Declared under penalty of perjury this 30 day of March, 2010.

                                   _____
                                           DANIELA DELLA ROSA

# EXHIBIT A

# GUCCI

Professional Profile

Daniela Della Rosa, Gucci General Counsel

At the corporate headquarters of Guccio Gucci S.p.A. in Florence, Italy, Daniela Della Rosa leads the legal team, composed of circa 20 professionals of lawyers and paralegals dedicated to corporate and legal affairs and IP matters. Collaborating with the Group's regional attorneys and the entire worldwide legal team, Daniela supports the Gucci division as well as the other Gucci Group Brands, including Sergio Rossi and Bottega Veneta.

Daniela Della Rosa graduated in Law from LUISS University in Rome and holds a Master of Laws (LL.M.) from Columbia University in New York. She joined Gucci from the Brussels-based U.S. law firm of Akin, Gump, Strauss, Hauer & Feld, where she served as Senior International Counsel of Commercial and Regulatory Issues. Previously, she acted as Associate General Counsel of Levi Strauss Europe and Litigation Counsel (Southern Europe) of IBM EMEA.

Daniela Della Rosa brings to Gucci her wide range of global expertise in corporate, intellectual property, contract, and litigation areas and is a member of the Bar in New York, Italy, and Belgium.