USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/29/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GUCCI AMERICA, INC.,                            :
                                                :
                        Plaintiff,              :        MEMORANDUM AND ORDER
                                                :
        -v-                                     :        09 Civ. 4373 (SAS) (JLC)
                                                :
GUESS?, INC., et al.,                           :        ECF Case
                                                :
                        Defendants.             :
------------------------------------------------------------X

JAMES L. COTT, United States Magistrate Judge.

        Plaintiff Gucci America, Inc. ("Gucci") commenced this action against defendant Guess?,

Inc. ("Guess") and other named parties, asserting trademark infringement and related claims arising

out of the defendants' use of certain trademarks, logos, and designs (Dkt. # 1).[1]  During the course

of discovery, Gucci submitted a privilege log that included e-mail communications of its in-house

legal counsel, Jonathan Moss ("Moss").  Declaration of Robert C. Welsh dated April 16, 2010

("Welsh Decl."), ¶¶ 5-6, Exs. D, E.  On December 1, 2009, Guess deposed Moss.  Id. at ¶ 2, Ex. A.

During the deposition, Moss testified that he was an inactive member of the California Bar and had

been so for three years.  Id..  Guess subsequently demanded that Gucci produce the Moss

communications, arguing that they are not covered by the attorney-client privilege because, given

his inactive bar status, Moss was not an attorney to whom the privilege would apply.  In a series of

letters to the Court, the parties continued to dispute Gucci's invocation of the attorney-client

---

[1] Gucci has twice amended its complaint.  See Second Amended Compl. (Dkt. # 101).

1

USDC SDNY
DATE SCANNED___6/29/10

privilege as applied to the Moss communications.

On March 26, 2010, this matter was referred to me by United States District Judge Shira A. Scheindlin for the limited purpose of resolving certain discovery disputes raised by Gucci and Guess, including the dispute regarding the Moss communications (Dkt. # 59). On March 30, I held a telephone conference with the parties, at which Gucci stated its intention to seek a protective order, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, against the disclosure of the Moss communications. I directed Gucci to file its motion and set a briefing schedule for opposition and reply papers.

On April 2, 2010, Gucci filed its motion (Dkt. # 62-70). Guess filed its opposition papers on April 16 (Dkt. # 80-81). On that date, Moss, a non-party in this action, filed an affidavit disputing certain facts asserted in Gucci's moving papers regarding his employment at Gucci and its knowledge of Moss's status as an inactive bar member (Dkt. # 79). On April 19, I granted Gucci's request for an extension of time to file its reply papers and Guess an opportunity to submit a supplemental memorandum and affidavit addressing the issues raised in the Moss affidavit (Dkt. # 87-88). On April 20, Guess filed a supplemental memorandum of law (Dkt. # 89-90). Gucci filed its reply on April 27 (Dkt. # 97).

For the reasons stated herein, Gucci's motion is denied.

## **BACKGROUND**

Moss graduated from law school in May, 1993 and was admitted to the California State Bar later that year. Declaration of Louis S. Ederer dated April 2, 2010 ("Ederer Decl."), ¶ 2, Ex. A (print-out of State Bar of California attorney search records); Welsh Decl., ¶ 2, Ex. A. Prior to working for Gucci, Moss worked in non-legal positions at Pricewaterhouse Coopers LLP and at

2

McKesson Health Solutions. Welsh Decl., ¶¶ 2-3, Exs. A, B. The extent of Moss's legal experience prior to his employment with Gucci is unclear from the record. In 2002, Gucci hired Moss to work on real estate matters in connection with Gucci's efforts to expand its retail stores in the United States. Declaration of Karen Lombardo dated March 29, 2010 ("Lombardo Decl."), ¶¶ 4-5; Declaration of Arthur Leshin dated March 22, 2010 ("Leshin Decl."), ¶¶ 4-6, 8. Moss was initially introduced to Gucci through its outside counsel, Patton Boggs LLP, though there is no evidence in the record that he ever worked at Patton Boggs. See Declaration of Timothy A. Chorba dated March 18, 2010 ("Chorba Decl."), ¶¶ 4-6.

There is some dispute as to whether Gucci hired Moss to work in a legal or non-legal capacity. Arthur Leshin ("Leshin"), then-Executive Vice-President, Finance, Real Estate and Logistics for Gucci, interviewed Moss for the position and recalls Moss telling him during the interview that he held a law degree. Leshin Decl., ¶ 6. Leshin thought that Moss's legal education and business experience made him well suited for the position, which Leshin characterized to be work "much as a paralegal might otherwise do." Id.. Such work included "financial modeling of real estate leases, preparing lease abstracts and addressing certain trademark and U.S. customs issues." Id. at ¶ 10.

In his affidavit, however, Moss states that he was hired to provide in-house legal assistance to Gucci, which at that time had no in-house legal department and outsourced the bulk of its legal work to Patton Boggs. Affidavit of Jonathan Moss dated April 16, 2010 ("Moss Aff."), ¶¶ 9, 11.[2]

---

[2] Moss, a non-party, has submitted an affidavit on his own, not at the behest of either party. In order to ensure that the record is fully developed, and that the Court's ruling considers all of the facts presented, I will, in exercising my discretion, consider the affidavit. See, e.g., Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 114-15 (S.D.N.Y. 2010) (in order to ground ruling on

3

Moss's testimony that he performed legal work from the start of his employment with Gucci is consistent with the documents presented by Gucci itself in support of its motion. Specifically, in December 2002, shortly after he was hired, Moss filed a motion for *pro hac vice* admission to represent Gucci in an action pending in the United States Bankruptcy Court, Southern District of New York. Ederer Decl., ¶ 5, Ex. D.

Gucci's contention that it hired Moss to perform administrative, non-legal work is further undermined by Moss's career path at Gucci, as he promptly ascended to various legal positions within the organization. At Leshin's recommendation, Moss was promoted to the position of legal counsel in 2003, Leshin Decl., ¶ 11, and in 2005 he became the director of legal services. Declaration of Christy Lelack dated March 26, 2010 ("Leleck Decl."), ¶ 7. In 2008, Daniella Vitale, President and CEO of Gucci, promoted Moss to Vice President, Director of Legal and Real Estate. Declaration of Daniella Vitale dated March 26, 2010 ("Vitale Decl."), ¶ 8. In his role as in-house legal counsel, Moss not only provided Gucci with legal advice, but he also appeared before courts and administrative agencies on Gucci's behalf. In 2003, he filed numerous trademark applications with the United States Patent & Trademark Office on behalf of Gucci. Ederer Decl., ¶ 7, Ex. F. In these applications, Gucci appointed Moss, an "attorney-at-law and member of the Bar of California," power-of-attorney to prosecute all matters related to the trademark. Id.. Moss also represented Gucci in employment-related matters before the Equal Employment Opportunity Commission, Leleck Decl. ¶ 5, negotiated leases and employment agreements for Gucci, and conducted legal research on certain discrete issues. Vitale Decl., ¶ 7.

---

all facts presented, court gave non-party attorney's declaration weight court, in its discretion, deemed appropriate) (citing cases).

Gucci presents six declarations from current and former executives and its outside counsel stating, collectively, that they never confirmed Moss's background or bar status as an attorney, but that they considered him to be an attorney. In essence, Gucci "perceived" Moss to be an attorney authorized to practice law. See, e.g., Vitale Decl., ¶ 9; Lombardo Decl., ¶ 10; Leleck Decl., ¶ 3. Leshin states that he did not look into Moss's qualifications to practice law because he hired Moss to perform non-legal work. Leshin Decl, ¶ 9. Similarly, Christy Leleck, the Director of Human Resources when Moss was promoted to Director of Legal Services and to Vice-President, Legal and Real Estate, states that it never occurred to her to "check [Moss's] qualifications to practice law," because "he was already perceived by senior management as the company's lawyer." Leleck Decl., ¶ 6.

Soon after Moss's deposition in December, 2009, Gucci conducted a "preliminary investigation," apparently for the first time, into Moss's bar admission status and his qualifications to practice law. Vitale Decl., ¶ 12. Contrary to his deposition testimony, at which he had testified that he had been an inactive member of the California bar for three years, Welsh Decl., Ex. A, Moss had been an "inactive" member of the California State Bar for more than 13 years. Specifically, the website for the California State Bar indicates that Moss transferred to "inactive" status on September 1, 1996. Ederer Decl., ¶ 2, Ex. A. His status was "re-activated" on February 5, 2010 – shortly after his deposition in this case. Id.. Thus, Moss was an inactive member of the California State Bar during his entire tenure as Gucci's in-house counsel and, in fact, throughout the course of his employment with Gucci. Ederer Decl., ¶ 2, Ex. A. Gucci placed Moss on administrative leave pending its investigation, ultimately terminating him on March 1, 2010. Vitale Decl., ¶¶ 12-13.

5

## ANALYSIS

A.    **Attorney-Client Privilege: General Principles**

Rule 501 of the Federal Rules of Evidence provides that federal common law governs privilege issues in federal question cases such as this one. Fed. R. Evid. 501 ("the privilege of a witness . . . shall be governed by the principles of the common law"). See also von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987); Schiller v. City of New York, 245 F.R.D. 112, 115 (S.D.N.Y. 2007); Bondi v. Grant Thornton Int'l, 04 Civ. 9771 (LAK), 2006 WL 1817313, at *2 (S.D.N.Y. June 30, 2006). The attorney-client privilege is intended to "encourage full and frank communication between attorneys and their clients." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege serves the dual purpose of shielding "from discovery advice given by the attorney as well as communications from the client to the attorney, made in pursuit of or in facilitation of the provision of legal services." Diversified Group, Inc. v. Daugerdas, 304 F. Supp. 2d 507, 512 (S.D.N.Y. 2003). For that reason, the "privilege attaches not only to communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client." Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441-42 (S.D.N.Y. 1995). The party invoking the privilege bears the burden of establishing its existence. In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); von Bulow, 811 F.2d at 144 ("[T]he burden is on a party claiming the protection of a privilege to establish those facts that are essential elements of the privileged relationship.") (internal cites omitted).

The attorney-client privilege is not without limitations. It is "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." United States v. Schwimmer, 892 F.2d

237, 243 (2d Cir. 1989). See Fisher v. United States, 425 U.S. 391, 403 (1976) ("However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose."). See also In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1980) (Because the attorney-client privilege "stands in derogation of the public's 'right to every man's evidence'. . . '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of principle.'") (quoting 8 John Henry Wigmore, Wigmore on Evidence § 2192, at 70, § 2291, at 554 (McNaughton rev. 1961)); In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000) (same). Ultimately, attorney-client privilege issues should be decided on a "case-by-case basis." Fin. Tech. Int'l, Inc. v. Smith, 99 Civ. 9351 (GEL) (RLE), 2000 WL 1855131, at *3 (S.D.N.Y. Dec. 19, 2000) (citing Upjohn, 449 U.S. at 396-97).

At the outset, the parties dispute the elements of the attorney-client privilege. Gucci urges the court to apply the standard employed by Magistrate Judge Pitman in Sec. and Exch. Comm'n v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134 (S.D.N.Y. 2004) ("Beacon Hill"). The Beacon Hill test, originally formulated by Judge Wyzanski in United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358 (D. Mass. 1950), requires that the party invoking the privilege show, *inter alia*, that the attorney "is a member of the bar of a court."[3] United Shoe Machinery has been cited with approval in the Second Circuit and remains good law. See Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962) (applying "Judge Wyzanski's much quoted formulation."); In re Rivestigmine

---

[3] The full test under United Shoe Machinery requires that "(1) the asserted holder of the privilege is or sought to be come a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." 89 F. Supp. at 358-59.

7

Patent Litig., 237 F.R.D. 69, 73 (S.D.N.Y. 2006) ("Federal courts continue to define the elements of the attorney-client privilege using the formulation that Judge Wyzanski articulated in [United Shoe Machinery]"); Fin. Tech. Int'l, Inc., 2000 WL 1855131, at *3 (applying United Shoe Machinery factors); Softview Computer Prods. Corp. v. Haworth, Inc., 97 Civ. 8815 (KMW) (HBP), 2000 WL 351411, at *2 (S.D.N.Y. Mar. 31, 2000) (same); Duttle v. Bandler & Kass, 127 F.R.D. 46, 51 (S.D.N.Y. 1989) (United Shoe Machinery provides the "commonly accepted definition of the privilege"); U.S. v. Int'l Bus. Mach. Corp., 66 F.R.D. 206, 211 (S.D.N.Y. 1974) (referring to United Shoe Machinery test as "oftquoted essential elements").

In contrast, Guess argues that Supreme Court Standard 503 ("Standard 503") provides the correct test to determine whether the attorney-client privilege attaches to the Moss communications. Standard 503, though ultimately not codified in the Federal Rules of Evidence, is regarded as a summary of the federal common law standard. 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.10, at 503-13 (2d ed. 2010). Under that standard, an attorney is "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." Supreme Court Standard 503(a)(2), reprinted in 56 F.R.D. 183, 236 (West 1972). Guess maintains that Gucci cannot prevail under Supreme Court Standard 503, as Moss was not authorized to practice law in any jurisdiction, nor did Gucci have a reasonable basis to believe that he was authorized to do so.

Gucci argues that the Beacon Hill test is satisfied because Moss was a "member" of the California bar, albeit an inactive one. The California Business & Professional Code, also known as the "State Bar Act," explicitly recognizes two classes of members: active and inactive. Cal. Bus. & Prof. Code, § 6003. An active member may voluntarily choose to transfer his or her membership

8

status to inactive, as did Moss, or may be forced into inactive status, typically for disciplinary reasons. Id. at § 6005. Thus, Moss "remained a member of the California bar when he became voluntarily inactive." Tyree v. Dance, 899 F.2d 1225, 1990 WL 40298, at *1 (9th Cir. April 4, 1990). However, the inquiry does not end here.

An essential element of the attorney-client privilege, under any standard, is that an attorney participates in the communication. An attorney is one who is "admitted to the bar of a state or federal court." In re Rivastigmine Patent Litig., 237 F.R.D. at 74 (citing A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824, at *4 (S.D.N.Y. Oct. 21, 2002)). Moreover, the "[bar] membership must be of a type that licenses one to practice law." 24 Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure § 5480, at 242 (1st ed. 1986) ("An inactive or retired membership that does not permit the member to practice law will not suffice."). See Glen Weissenberger & James J. Duane, Weissenberger's Federal Evidence § 501.5, at 233 (6th ed. 2009) (for attorney-client privilege to apply, attorney must "be authorized to practice law in some jurisdiction."). Thus, the attorney-client privilege contemplates that the client communicate with an individual who is not simply trained in the law, but actually authorized to engage in the practice of law. 8 Wigmore, § 2300, at 580 ("There is no ground for encouraging the relation of client and legal adviser except when the adviser is one who has been formally *admitted to the office of attorney or counselor* as duly qualified to give legal advice.") (emphasis in original); Malletier v. Dooney & Burke, Inc., 04 Civ. 5316 (RMB) (MHD), 2006 WL 3476735, at *17 (S.D.N.Y. Nov. 30, 2006) (attorney-client privilege does not attach to communications of in-house attorneys, neither of whom were "members of any bar" and "apparently [had] never been").

9

## B.     As an Inactive Member of the California Bar, Moss Should Not Be Considered an Attorney for Attorney-Client Privilege Purposes

Here, Moss did not possess the type of bar membership that authorized him to engage in the practice of law. California explicitly limits the practice of law to active members. Cal. Bus. & Prof. Code, at § 6125 ("No person shall practice law in California unless the person is an active member of the State Bar."); Rules of the State Bar of California, Title 2, Rights and Responsibilities of Members, Rule 2.30(B) (inactive members prohibited from "occupying a position in the employ of or rendering any legal service for an active member, or *occupying a position wherein he or she is called upon in any capacity to give legal advice or counsel or examine the law* or pass upon the legal effect of any act, document or law") (emphasis added). See also Z.A. v. San Bruno Park Sch. Dist., 165 F.3d 1273, 1275 (9th Cir. 1999) ("In the state of California, a person must be an active member of the California State Bar in order to practice law."); Kathleen O. Beitiks, "To be active or inactive? It's quite a quandary," California Bar Journal (June 1997) ("Doing any legal work requires an active membership . . . even if the work does not necessarily involve court appearances.").[4] The limitation on the practice of law by inactive members is not limited to court appearances, but extends to providing legal advice as well. Taylor v. Chaing, Civ-S-01-2407 (JAM) (GGH), 2009 WL 453050, at *3 (E.D. Cal. Feb. 23, 2009) (Under California law, the practice of law "includes legal research performed in a case, brief writing, and written or oral advice to clients in California even without appearing in court."); The State Bar of California, Transfer to Inactive Status (Inactive members are precluded from engaging in the types of activities that "call upon a member to give legal advice or

---

[4] http://www.calsb.org/calbar/2cbj/97jun/art15.htm.

10

counsel or examine the law or pass upon the legal effect on any act, document or law").[5]

Gucci nonetheless argues that Moss's choice to switch his status to "inactive" did not impact his status as a bar member, and that the California State Bar affords voluntary inactive members certain privileges denied to involuntary inactive members. For example, a voluntary inactive member may "re-activate" his or her status at any time, and such transfer is not subject to the discretion of the California bar. See The State Bar of California, Transfer to Inactive Status.[6] Gucci's argument fails for at least two reasons.

First, Gucci equates *any* type of bar membership with the type of membership authorizing one to practice law. This is clearly not the case. To find as Gucci suggests ignores a crucial distinction between the two classes of membership, *viz.*, active members pay a reduced membership fee for the privilege of practicing law in California. Inactive bar membership is provided to attorneys who choose to refrain from practicing law in California for a variety of reasons, such as retirement, appointment to the bench, or transfer to another state. Although such attorneys no longer practice law in California, they choose to remain a part of the legal community. Second, a voluntary inactive member who holds "himself or herself out as practicing or entitled to practice law," as did Moss, commits a misdemeanor offense under California law. Cal. Bus. & Prof. Code, § 6126.

Gucci argues, in the alternative, that Moss was authorized to practice law by virtue of his bar membership in the Central District and Southern District Courts of California. This argument is similarly unavailing. Although "[a]dmissions rules and procedure for federal court are independent of those that govern admission to practice in state courts," Winterrowd v. Am. Gen. Annuity Ins.

---

[5]     http://calbar.ca.gov/state/calbar/calbar_sections_generic.jsp?cid=13726&id=1029.

[6]     Id.

Co., 556 F.3d 815, 820 (9th Cir. 2009), active membership in the California State Bar is a prerequisite to membership in the federal district courts. C.D. Cal. Civ. L.R. 83-2.2 (as amended Jan. 1, 2010) ("Admission to and continuing membership in the Bar of this Court is limited to persons of good moral character who are *active* members in good standing of the State Bar of California.") (emphasis added); S.D. Cal. Civ. L.R. 83.3(c)(1)(a) (as amended June 4, 2010) (same).

Thus, although the websites for the United States District Courts for the Central and Southern Districts of California reflect that Moss has been an active member of those bars since December, 1994, Ederer Decl., ¶¶ 3-4, Exs. B, C, he was not authorized to practice in either district. By operation of law, Moss was constructively suspended from practicing in California federal courts because of his inactive status with the California State Bar. S.D. Cal. Civ. L.R. 83.3(d) ("In the event the attorney is no longer eligible to practice in another jurisdiction by reason of suspension of nonpayment of fees or enrollment as an inactive member, the attorney will immediately be suspended from practice before this court without any order of court and until the attorney becomes eligible to practice in such other jurisdiction.").

Because Moss did not possess a bar membership authorizing him to practice law in *any* jurisdiction, Gucci's communications with Moss do not satisfy any standard of the attorney-client privilege.

## C.    Gucci's Belief That Moss Was an Attorney Authorized to Practice Law Was Not Reasonable Given the Circumstances of this Case

Gucci may nonetheless avail itself of the privilege if it can demonstrate that it reasonably believed Moss was authorized to practice law. United States v. Boffa, 513 F. Supp. 517, 523 (D. Del. 1981) ("[T]he rationale behind the privilege equally supports the theory that the privilege should

12

be extended to those who make confidential communications to an individual in the genuine, but mistaken, belief that he is an attorney."); 8 Wigmore, § 2302, at 584. A client who reasonably believes that an individual is an attorney "should not be compelled to bear the risk of his 'attorney's' deception and [] should be entitled to the benefits of the privilege as long as his bona fide belief in his counsel's status is maintained." Id. See United States v. Rivera, 837 F. Supp. 565, 568 n.1 (S.D.N.Y. 1993) ("It is common ground among the parties that the attorney-client privilege attaches to confidential communications made to an individual in the genuine, but mistaken, belief that he is an attorney.") (citing Boffa, 513 F. Supp. at 523); United States v. Tyler, 745 F. Supp. 423, 425 (W.D. Mich. 1990).

In Boffa, the defendants sought to preclude the government's introduction into evidence of the defendants' communications with their attorney, who had no formal legal training and had never been admitted to the bar of any court. 513 F. Supp. at 519. In determining whether the individual clients reasonably believed that their attorney was in fact an "attorney," the court considered the following factors: (1) whether the individual "fraudulently held himself out" to the clients as an attorney; (2) whether the clients "genuinely and reasonably believed" him to be an attorney; and (3) whether, "pursuant to this belief, the [client] made confidential communications to" the individual. Id. at 523.

In Fin. Tech. Int'l Inc., Magistrate Judge Ellis applied the Boffa test in the context of a corporate client who discovered, subsequent to a deposition, that its in-house attorney was not a member of any bar. 2000 WL 1855131. Judge Ellis held that the privilege did not attach to communications with the in-house attorney, reasoning that because the corporation conducted no investigation into in-house counsel's qualification as an attorney, it did not have a reasonable basis

13

to believe that he was an attorney authorized to practice law. Id. at *6-7.

Here, Gucci three times promoted Moss to legal positions, eventually making him Vice-President, General Counsel of the company. "This is strong evidence that [Gucci] believed him to be an attorney." Fin.Tech. Int'l Inc., 2000 WL 1855131, at *6. Nevertheless, Gucci's belief cannot be characterized as reasonable. The record is devoid of evidence that, during Moss's eight years of employment with the company, Gucci made any effort to ascertain his qualifications as an attorney. "In hiring lawyers, most [corporate] institutions make some inquiry into the lawyer's background. It does not seem unreasonable to require that they inquire into professional status as part of their inquiry into professional competence." 24 Wright & Graham, § 5481, at 262 n.30. But surprisingly, there is "no indication that [Gucci] checked [Moss's] background to ascertain whether or not he was a duly licensed attorney or even asked [him] for credentials proving his bar admission." Fin. Tech. Int'l Inc., 2000 WL 1855131, at *6. Gucci was plainly in a position to confirm the extent of his qualifications as a legal professional, and failed to do so.

While Leshin states that he "did not inquire further" into Moss's legal background because he did not hire Moss to serve as an in-house attorney, Leshin Decl., ¶ 9, Moss nonetheless applied for *pro hac vice* admission to represent Gucci in court shortly after he was hired in 2002 – several months prior to Moss's transition to in-house legal counsel and while he still reported to Leshin. Ederer Decl., ¶ 5, Ex. D. Even assuming that Gucci hired Moss into a non-legal position (about which the record is hardly clear, as Gucci's employees suggest he was not, but Moss himself states that he joined Gucci with the understanding that he would be acting as an attorney), once it promoted Moss from a non-legal to a legal position, Gucci was obligated to conduct *some* due diligence to confirm his professional status as an attorney to ensure that he faced no disciplinary or administrative

14

impediment to engaging in the practice of law. It could not simply rely on representations that Moss made to the company, or the fact that he "held himself out" as an attorney. Minimal due diligence includes confirming that Moss was licensed in *some* jurisdiction, that the license he held in fact authorized him to engage in the practice of law, and that he had not been suspended from practicing, or otherwise faced disciplinary sanctions. "It is not unduly burdensome to require a corporation to determine whether their general counsel, or other individuals in their employ, are licensed to perform the functions for which they have been hired." Fin. Tech. Int'l Inc., 2000 WL 1855131, at *6. Gucci cites no authority that would relieve it of this relatively minimal undertaking.

Had Gucci visited the California State Bar website and conducted an attorney search for "Jonathan Moss," it would have discovered that Moss had been an inactive member since 1996. Ederer Decl., ¶ 2, Ex. A. Such knowledge presumably would have triggered an investigation, much like the one Gucci conducted prior to terminating Moss earlier this year. Gucci could have required Moss to transfer his bar status to "active" as a condition of continued employment and promotion, an act that would have required Moss to complete a one-page application and payment of a full membership fee, which Gucci likely would have reimbursed. In fact, Gucci had apparently already been paying Moss's bar membership fees to retain his status as "inactive." Moss Aff., ¶ 13.

In an effort to justify its mistaken belief, Gucci makes much of the fact that Moss was recommended by its outside counsel, Patton Boggs. Leleck Decl., ¶ 6; Lombardo Decl., ¶ 5; Leshin Decl., ¶¶ 4-5. Perhaps if Moss had ever worked as an attorney at Patton Boggs, then the argument might have some force. But this is not the case. The Patton Boggs attorneys knew little, if anything, about Moss other than that he was the son of a friend of the firm. Chorba Decl., ¶¶ 4-8; Boraby Decl., ¶ 5. Absent any misrepresentation by Moss, Gucci was well aware when it hired Moss that

15

he had not worked in a legal capacity for several years. Leshin Decl., ¶ 6. Gucci cannot now cloak itself under a veil of ignorance to avoid its discovery obligations.

The Court is mindful that the attorney-client privilege serves salutary purposes, and can provide significant protection to litigants. But this is not a case where Gucci is forfeiting its right to invoke the privilege due simply to the conduct of its former in-house counsel. Gucci itself bears responsibility for allowing its counsel to represent its interests without ensuring that he was authorized to do so.

## CONCLUSION

For these reasons, Gucci's application for a protective order against the disclosure of the privileged communications of Jonathan Moss on attorney-client privilege grounds is denied.

In the alternative, Gucci claims that the Moss communications are protected from discovery pursuant to the work-product doctrine. Communications that are not protected by the attorney-client privilege may nonetheless qualify for protection under the work-product doctrine. See e.g., Haugh v. Schroder Inv. Mgmt. N. Am., Inc., 02 Civ. 7955 (DLC), 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) (attorney-client privilege not applicable to public relations firm, but work-product doctrine protected communications sent to consultant by counsel). The party invoking the work-product doctrine "must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation." United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996). See Fed. R. Civ. P. 26(b)(3). As the parties have not briefed the issue of whether the work-product doctrine applies here, the Court is without sufficient information regarding the nature of the documents to ascertain whether the privilege applies. In a related Memorandum and Order that I am issuing today, I have directed Gucci to amend its privilege log to denote, with

16

specificity, the basis for its invocation of the work-product doctrine with respect to the Moss communications. The applicability of the work product doctrine will be considered following the amendments to the privilege log.

SO ORDERED.

Dated: New York, New York
      June 29, 2010

JAMES L. COTT
United States Magistrate Judge

**Copies of this Order are being sent by ECF to:**

Louis S. Ederer
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022

Robert C. Welsh
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Mark I. Peroff
Darren W. Saunders
Hiscock & Barclay LLP
7 Times Square
New York, NY 10036

Paul Fields
Leason Ellis LLP
81 Main Street, Suite 503
White Plains, NY 10601

John T. Williams
Hinkhouse Williams Walsh LLP
180 North Stetson, Suite 3400
Chicago, IL 60601

Hon. Shira A. Scheindlin

17