UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

GUCCI AMERICA, INC.,                          :

                Plaintiff,          :

     -v-                                       :

GUESS?, INC., et al.,                         :

           Defendants.          :

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/23/10

MEMORANDUM AND ORDER

09 Civ. 4373 (SAS) (JLC)

ECF Case

**JAMES L. COTT, United States Magistrate Judge.**

## I.    INTRODUCTION

In this trademark infringement action, Plaintiff Gucci America, Inc. ("Gucci") seeks a protective order against the disclosure of the communications of its former in-house counsel Jonathan Moss ("Moss"), and non-party Guccio Gucci S.p.A.'s ("GG") in-house intellectual property counsel Vanni Volpi ("Volpi"), pursuant to Rule 26(c) of the Federal Rules of Civil Procedure (Dckt. 71-77). Gucci alleges trademark infringement and related claims against several defendants, including Guess?, Inc. ("Guess"). During the course of discovery, Gucci submitted a privilege log that included the e-mail communications of Moss and Volpi. See Declaration of Robert C. Welsh in Support of Guess?, Inc.'s Opposition to Plaintiff Gucci America's Motion for a Protective Order Against the Disclosure of the Privileged Communications of Non-Party Guccio Gucci S.p.A.'s In-House Intellectual Property Counsel Vanni Volpi dated April 16, 2010 ("Welsh Decl."), ¶ 8, Ex. G (Dckt. 83). Guess subsequently demanded production of both the Moss and Volpi communications.

On March 26, 2010, this matter was referred to me by United States District Judge Shira A. Scheindlin for the limited purpose of resolving the dispute regarding Gucci's invocation of



the attorney-client privilege (Dckt. 59).  On April 2, 2010, Gucci filed two motions pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, seeking protective orders against the disclosure of the Moss and Volpi communications (Dckt. 71-77).  Guess filed opposition papers on April 16 (Dckt. 82-85), and Gucci filed its reply papers on April 27 (Dckt. 92-95).  By Memorandum and Order dated June 29, 2010, familiarity with which is assumed, I denied Gucci's motion for a protective order against the disclosure of the Moss communications, finding, inter alia, that as an inactive member of the California bar, Moss was not an attorney for attorney-client privilege purposes and therefore his communications were not protected by the privilege (Dckt. 112).

After reviewing the parties' submissions with respect to the Volpi communications, however, I determined that I could not resolve the motion related to the Volpi communications because Gucci's privilege log lacked sufficient information for the Court to conduct a choice of law analysis.  Accordingly, in a separate Memorandum and Order dated June 29, 2010, I directed Gucci to submit a revised amended privilege log (i) identifying which of the Volpi communications relate to the instant litigation and which communications relate to a parallel litigation pending in Italy; and (ii) providing a detailed description, beyond the subject matter of the document, sufficient to indicate Gucci's basis for designating each of the Volpi communications as protected from disclosure pursuant to the work-product doctrine (Dckt. 111). In addition, the parties were permitted to make further submissions addressing the application, if any, of the work product doctrine to both the Moss and Volpi communications.  Id.  Finally, I directed the parties to meet and confer, consistent with Fed. R. Civ. P. 37(b), in an effort to reduce the number of documents in dispute.  Id.

By letter dated July 16, 2010, following the parties' meet and confer, counsel for Gucci

2

represented that Guess had agreed to withdraw its challenge to Gucci's designation of Document Nos. 40, 42-56, 66, 76-77, 82-83, 121, 123, and 125-126 as work product, but continued to seek production on "substantial need" grounds. See Declaration of Louis S. Ederer in Support of Plaintiff Gucci America, Inc.'s Motions for Protective Order Against the Disclosure of Work Product, dated July 23, 2010 ("Ederer Suppl. Decl."), ¶¶ 5, 13 (Dckt. 121).

On July 19, 2010, Gucci produced the Further Revised Amended Privilege Log (the "Revised Privilege Log"). Id., Ex. B (Revised Privilege Log). On July 23, 2010, the parties submitted supplemental memoranda of law and supporting materials addressing the applicability of the work product doctrine to both the Moss and Volpi communications (Dckt. 117-121). Although Gucci and Guess substantially reduced the number of disputed communications following their meet-and-confer, significant issues remained regarding the application of the attorney-client privilege and the work product doctrine to the Volpi communications, and the application of the work product doctrine to the Moss communications. Accordingly, by Memorandum and Order dated July 28, 2010, I directed Gucci to submit the documents in the Revised Privilege Log for in camera review to enable the Court to address the objections raised by Guess on a full record (Dckt. 122).

By the Court's count, 102 documents remain in dispute, nine of which reflect communications pre-dating October, 2008 involving a review by Volpi and others at Gucci and/or GG of Guess products allegedly infringing upon several Gucci trademarks (some of which are the subject of this lawsuit). The remaining 93 documents reflect communications that took place between November, 2008 and April, 2009 involving an investigation Volpi and others conducted concerning the alleged trademark violations giving rise to this lawsuit.

## II.   FACTUAL BACKGROUND

### A. Volpi's Background and Role at GG

GG, an Italian affiliate of Gucci (together with other Gucci affiliates, the "Gucci companies"), is a multi-national company owning trademarks in approximately 70 countries. Declaration of Daniella Della Rosa dated March 30, 2010 ("Della Rosa Decl."), ¶ 14 (Dckt. 74). Although GG does not own any trademarks in the United States, it ensures that its protection and enforcement efforts are coordinated with those in the United States. Declaration of Vanni Volpi dated March 31, 2010 ("Volpi Decl."), ¶ 5 (Dckt. 73). In the summer of 2006, GG hired Volpi to fill the newly-created position of Intellectual Property Counsel. Id., ¶ 6; Della Rosa Decl., ¶ 19; Declaration of Cheryl Solomon dated March 30, 2010 ("Solomon Decl."), ¶ 8 (Dckt. 75); Deposition of Vanni Volpi ("Volpi Dep."), attached as Exhibit A to the Declaration of Louis S. Ederer dated April 2, 2010 ("Ederer Decl."), at 13:7-13 (Dckt. 72).

Volpi, who despite his title as counsel is not an attorney, considers himself to be a "trained legal professional" in the field of intellectual property. Volpi Decl., ¶ 8. Prior to joining GG, he worked as an intellectual property specialist for approximately ten years in the legal departments of other high-end fashion designers. Volpi Decl., ¶ 6; Solomon Decl., ¶ 8. In May, 2009, Volpi received the In-House Counsel of the Year award by World Trade Review, an international, intellectual property trade publication. Welsh Decl., ¶ 6, Ex. E. Although he does not hold a law degree, Volpi studied law for five years at the University of Pisa and the University of Paris. Volpi Decl., ¶ 7.

In his role as Intellectual Property Counsel, Volpi assists in managing GG's trademark protection and enforcement efforts in every country in which GG owns trademarks. Ederer Decl., Ex. A (Volpi Dep. at 17:2-17); Volpi Decl., ¶¶ 4-5; Della Rosa Decl., ¶¶ 18, 20. As part

of this effort, he communicates with legal professionals and personnel at GG affiliates around the world, customs and border patrol agencies, law enforcement, and outside counsel in an effort to coordinate global enforcement of GG's trademark portfolio.  Volpi Decl., ¶¶ 4-5; Della Rosa Decl., ¶ 18.

GG's in-house legal department is comprised of "legal professionals and paralegals" who are directly supervised by general counsel Daniella Della Rosa ("Della Rosa").  Della Rosa Decl., ¶ 15.  Della Rosa is admitted to the bar of New York and has been a member of the Italian and Belgian bars.  Id., ¶ 11.  Della Rosa describes GG's in-house legal department as organized similar to a law firm, except for one critical distinction.  Id., ¶ 15.  Of the approximately 20 individuals comprising GG's in-house legal department, Della Rosa is the only bar-admitted attorney.  Id., ¶¶ 4, 15, 17.  Notwithstanding the dearth of licensed attorneys in its legal department, GG relies heavily on its in-house staff to provide substantive advice regarding intellectual property matters.  Id., ¶¶ 14, 16.  Although Volpi provides advice regarding intellectual property matters, Gucci submits that he neither makes important legal decisions nor provides legal advice without first consulting Della Rosa.  Ederer Decl., Ex. A (Volpi Dep. at 55:3-5); Volpi Decl., ¶ 11; Della Rosa Decl., ¶¶ 17, 20-21, 27.

Although GG does not own any trademarks in the United States, products bearing GG marks are sold in the United States.  Ederer Decl., Ex. A (Volpi Dep. at 17:2-17).  Accordingly, Volpi's responsibilities necessitate that he interact with his United States counterparts at Gucci in an effort to protect GG trademarks in the United States.  Volpi also reports to and frequently communicates with Cheryl Solomon, General Counsel for Gucci Group in London,[1] regarding intellectual property issues.  Solomon Decl., ¶¶ 8-9.  Solomon is an attorney admitted to the bars

---

[1] Gucci Group is based in London, England.  Solomon Decl., ¶ 1. Gucci Group, N.V. is the holding company of Gucci Group and is the parent company of GG and plaintiff Gucci.  Id..

of New York and the District of Columbia. Id., ¶ 3.

Although Volpi reports directly to Della Rosa and communicates with her on an almost daily basis, he performs certain functions autonomously. Della Rosa Decl., ¶ 21. In April, 2007, for example, Volpi sent a cease-and-desist letter to Guess and GUESS Watches Inc. in the United States arising from Guess's allegedly infringing use of the Twirl mark, a trademark owned by GG. See Reply Declaration of Louis Ederer dated April 27, 2010 ("Ederer Reply Decl."), Ex. C (Dckt. 96). Volpi testified at his deposition that the letter was reviewed and edited, though minimally, by Moss. Ederer Decl., Ex. B (Volpi Dep. at 71:3-9, 79:13-80:11).

### B. The Investigation Leading Up to this Action

In March, 2008, Della Rosa instructed Volpi to commence an investigation into Guess's alleged infringement of certain trademarks. Della Rosa Decl., ¶¶ 23-25; Volpi Decl., ¶ 13. As part of his investigation, Volpi communicated with outside counsel in the United States and Italy, and with personnel at Gucci affiliates around the world. Della Rosa Decl., ¶¶ 23-25; Volpi Decl., ¶ 13. After meeting with Volpi in late 2008 regarding the results of his investigation, Della Rosa determined that GG should coordinate with its affiliates around the world, including Gucci in the United States, to commence a trademark infringement action against Guess in Italy. Della Rosa Decl., ¶ 25; Volpi Decl., ¶ 15.

Accordingly, Volpi traveled to New York in November, 2008 to participate in a meeting with Gucci Group general counsel Solomon, Gucci's outside United States counsel Louis Ederer ("Ederer"), and other individuals at Gucci to discuss the findings of Volpi's investigation and to consider filing a parallel infringement action in the United States (the "November 2008 meeting"). Solomon Decl., ¶ 12; Volpi Decl., ¶ 17. As a result of the November 2008 meeting, the Gucci companies decided to conduct a more in-depth, factual investigation into Guess's

6

activities in an effort to file suit against Guess in the United States. Solomon Decl., ¶ 13; Volpi Decl., ¶ 17. Between November, 2008 and April, 2009, Volpi communicated with outside counsel in the United States and Italy, and worked with personnel at Gucci affiliates worldwide, including in the United States, Italy, Great Britain, Japan, Hong Kong, and France. Della Rosa Decl. ¶¶ 23-25; Volpi Decl., ¶ 13; Suppl. Ederer Decl., Ex. B (Revised Privilege Log). Volpi also supervised other members of GG's in-house intellectual property department as they assisted with the investigation. Ederer Decl., Ex. B (Volpi Dep. at 82:22-24).

On May 5, 2009, GG sued Guess and its Italian affiliate in Milan for trademark infringement and related claims. See Welsh Decl., Ex. A (English-language translation of Complaint filed by Guccio Gucci S.p.A. against Guess?, Inc and Guess Italia S.r.L.). Four days later, Gucci filed the complaint in this action concerning the same trademarks that are the subject of the Italian litigation (Dckt. 1).

## III.   ANALYSIS

### A.  Legal Standard for Protective Orders

Rule 26(c) of the Federal Rule of Civil Procedure provides that a federal district court may issue "an order to protect a party or person [from whom discovery is sought] from annoyance, embarrassment, oppression, or undue burden or expense." The rule serves in part to protect parties' privacy interests. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 n.21 (1984). The district court has "broad discretion . . . to decide when a protective order is appropriate and what degree of protection is required." Id. at 36; see also Dove v. Atl. Capital Corp., 963 F.2d 15, 20 (2d Cir. 1992) ("[T]he grant or denial of a protective order lies within the sound discretion of the district court.").

"The party seeking a protective order bears the burden of establishing that good cause for

the order exists." Duling v. Gristede's Operating Corp., 266 F.R.D. 66, 71 (S.D.N.Y. 2010). See Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004); Penn Group, LLC v. Slater, No. 07 Civ. 729 (MHD), 2007 WL 2020099, at *13 (S.D.N.Y. June 13, 2007); Condit v. Dunne, 225 F.R.D. 113, 115 (S.D.N.Y. 2004). Good cause is established by "demonstrating a particular need for protection." Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121 (3d Cir. 1986); see In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) ("Ordinarily, good cause [for a protective order] exists when a party shows that disclosure will result in a clearly defined, specific and serious injury.") (internal citations omitted).

### B. The Attorney-Client Privilege

#### 1. Choice of Law Analysis

Pursuant to Rule 501 of the Federal Rules of Evidence, questions of privilege are "governed by the principles of common law." Golden Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 521 (S.D.N.Y. 1992) (citing Fed. R. Evid. 501). The common law includes "choice of law" questions. Astra Aktiebolag v. Andrx Pharm., Inc., 208 F.R.D. 92, 97 (S.D.N.Y. 2002) ("Astra"). The parties agree that the Volpi communications implicate foreign law. They disagree, however, on which country's law should be applied, with Gucci advocating for American law and Guess contending that Italian law governs. Accordingly, the Court must conduct a choice of law analysis.

In determining which country's law applies to claims of privilege involving foreign documents, courts in the Second Circuit have adopted the "touch base" approach applied in Golden Trade. 143 F.R.D. at 522. In Golden Trade, the defendant sought production of communications between a non-party Italian corporation and its patent agents located in Norway, Germany, and Israel, each of whom had rendered advice regarding patent law in their respective

8

countries. Id. at 511, 520-22.  Applying traditional principles of comity, Magistrate Judge

Dolinger found that the communications did not "touch base" with the United States because

they "related to matters solely involving" foreign countries, and therefore the communications

were governed by the laws of Norway, Germany, and Israel. Id. at 520-22.  He reasoned that the

country with the "predominant interest in whether [the] communications should remain

confidential" was "the place where the allegedly privileged relationship was entered into."  Id. at

521.

     In Astra, Judge Jones emphasized that the "touch base" analysis hinges on a

determination as to which country has the most compelling or predominant interest in whether

the communications should remain confidential:

> Where, as here, alleged privileged communications took place in a foreign
> country or involved foreign attorneys or proceedings, this court defers to the
> law of the country that has the "predominant" or "the most direct and
> compelling interest" in whether those communications should remain
> confidential, unless that foreign law is contrary to the public policy of this
> forum.

Astra, 208 F.R.D. at 98 (citing Golden Trade, 143 F.R.D. at 522; Bayer AG and Miles, Inc. v.

Barr Labs., Inc., No. 92 Civ. 0381 (WK), 1994 WL 705331, at *4 (S.D.N.Y. Dec. 16, 1994); In

re Ampicillin Antitrust Litig., 81 F.R.D. 377, 391 (D.D.C. 1978); McCook Metals LLC v. Alcoa

Inc., 192 F.R.D. 242, 256 (N.D. Ill. 2000)).  In resolving the choice of law issue before her,

Judge Jones applied American law to communications between Swedish employees and outside

American counsel, and between Swedish in-house counsel and other Swedish employees

"relating to the prosecution of patent applications or the conduct of litigation in the United

States." Astra, 208 F.R.D. at 99.

     The principles of Astra and Golden Trade instruct that communications relating to legal

proceedings in the United States, or that reflect the provision of advice regarding American law,

"touch base" with the United States and, therefore, are governed by American law, even though the communication may involve foreign attorneys or a foreign proceeding. See, e.g., In re Philip Services Corp. Sec. Litig., No. 98 Civ. 0835, 2005 WL 2482494, at *2 (S.D.N.Y. Oct. 7, 2005) (American law applies to opinion letters authored by American and Canadian attorneys concerning securities offering in United States); Johnson Matthey, Inc. v. Research Corp., No. 01 Civ. 8115, 2002 WL 1728566, at *9 (S.D.N.Y. July 24, 2002) (British law applies to communications between British patent agent and American client regarding British proceeding; New York law governed communications concerning obligations arising under United States contract). Such communications have a "more than incidental" connection to the United States. VLT Corp. v. Unitrode Corp., 194 F.R.D. 8, 16 (D. Mass. 2000).

Conversely, communications regarding a foreign legal proceeding or foreign law "touch base" with the foreign country. See, e.g., Kiobel v. Royal Dutch Petroleum Co., No. 02 Civ. 7618 (KMW) (HBP), 2005 WL 1925656, at *3 (S.D.N.Y. Aug. 11, 2005) (applying British law to documents relating to prospective litigation in England); Tulip Computers Int'l B.V. v. Dell Computer Corp., Civ. A. 00-981 (MPT), 2002 WL 31556497, at *3 (D. Del. Nov. 18, 2002) (applying Dutch law to documents containing legal advice regarding Dutch law and Dutch patents); VLT Corp., 194 F.R.D. at 17-19 (applying Japanese law to letter concerning Japanese law; British law to letter pertaining to British patent); Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 306 (E.D.N.Y. 1992) (applying British law to communications between British patent agent and American attorney regarding European patent application).

Gucci argues that the Volpi communications "touch base" with the United States because Volpi participated in a global litigation strategy that resulted in the filing of parallel lawsuits in Italy and the United States. Gucci April 2, 2010 Mem. of Law, at 6 (Dckt. 77). Gucci opposes

the application of Italian law to the instant litigation, arguing that applying Italian law would offend the public policy of this forum because Italy does not recognize attorney-client confidentiality as a *privilege*. Id., at 12-14.  Gucci argues, in the alternative, that even if the Court were to apply Italian law, the Volpi communications would not be discoverable in an Italian litigation.  Id. at 12.  In support of its position, Gucci submits expert testimony in the form of the Declaration of Fausto Pocar, a professor of international law at the University of Milan, dated March 31, 2010 ("Pocar Decl.") (Dckt. 76); the Reply Declaration of Fausto Pocar, dated April 25, 2010 ("Pocar Reply Decl.") (Dckt. 93); and the Reply Declaration of Adriano Vanzetti, an emeritus professor of intellectual property law at the Universitá Cattolica of Milan, dated April 23, 2010 ("Vanzetto Reply Decl.") (Dckt. 94).

In contrast, Guess urges the Court to apply Italian law because Volpi is located in Italy, his e-mails are maintained on a server in Italy, and his communications relate to the Italian litigation.  Guess April 16, 2010 Mem. of Law, at 4 (Dckt. 82).  Guess asserts that, under Italian law, the attorney-client privilege does not extend to in-house counsel (or their agents) such as Volpi and Della Rosa, and consequently such communications would be subject to disclosure in an Italian litigation.  Id., at 6.  In support of its position, Guess also submits expert testimony in the form of the Declaration of Silvia Giudici, a professor of industrial law at the University of Milan, dated April 14, 2010 ("Guidici Decl.") (Dckt. 84), and the Declaration of Franco Ferrari, a professor of international law at Verona University School of Law and at New York University School of Law, dated April 15, 2010 ("Ferrari Decl.") (Dckt. 85).  In the alternative, Guess argues that even under American law the Volpi communications are not privileged because GG had no reasonable expectation of privacy in its communications with him.  Guess April 16, 2010 Mem. of Law, at 2.

Applying the principles of Golden Trade, Astra, and the other cases set forth above, I conclude that for choice of law purposes the Volpi communications "touch base" with the United States. The Volpi communications arise from two investigations in which he participated. The first, involving communications that took place before October, 2008 (the "pre-October, 2008 communications"), relates to GG and Gucci's investigation into Guess's allegedly infringing activity concerning the "Twirl," "repeating Guess Quattro G pattern," and "interlocking G" trademarks in 2007, as is reflected in the Revised Privilege Log. Ederer Suppl. Decl., Ex. B (Revised Privilege Log). Although the dispute regarding the Twirl mark was resolved, the repeating Guess Quattro G pattern and interlocking G trademarks are the subject of the instant lawsuit. See Complaint filed May 6, 2009 (Dckt. 1). Indeed, the Revised Privilege Log reflects myriad communications among Gucci's outside United States counsel, Gucci employees in the United States, and Volpi. That the communications "touch base" with the United States is further evidenced by the Twirl cease-and-desist letter sent to Guess in the United States and in Italy, to which Guess responded from its United States office. Ederer Reply Decl., ¶¶ 27-28, Exs. C-D.

The second investigation, conducted by Volpi and others, concerns the alleged trademark violations giving rise to this lawsuit. The communications took place between November, 2008 and April, 2009 (the "post-October, 2008 communications"). The Court's in camera review of the documents, together with the declarations of Volpi, Della Rosa, and Solomon, demonstrate that GG and Gucci engaged in a joint litigation strategy beginning in November, 2008. As attested to by Della Rosa, litigating against Guess in the United States was essential to Gucci's overall litigation strategy because it would not be able to obtain injunctive relief in Italy. Reply Declaration of Daniella Della Rosa dated April 23, 2010 ("Della Rosa Reply Decl."), ¶¶ 4-5

(Dckt. 95). Thus, Gucci and GG embarked on a common endeavor: to commence parallel trademark infringement actions against Guess in the United States and Italy.

Accordingly, Volpi attended the November, 2008 meeting in the United States to share the results of GG's preliminary investigation regarding Guess's activities with Gucci and its outside United States counsel. Volpi Decl., ¶ 17; Solomon Decl., ¶ 12. The documents reviewed in camera demonstrate that from November, 2008 to April, 2009, GG and Gucci communicated regularly regarding the joint effort to prepare for litigation; collected evidence on a global basis that would provide support for claims in both actions; and drafted a joint press statement reviewed by outside counsel in both the United States and in Italy. The documents also reflect that in early 2009, GG budgeted monies for both litigations, including the cost of Gucci's outside United States counsel. Ederer Suppl. Decl., Ex. B (Revised Privilege Log). Ultimately, the United States action was commenced within days of the Italy action. Welsh Decl., Ex. A (Italian Complaint). Indeed, it is undisputed that the same marks are the subject of both the Italian litigation and this litigation.

Contrary to Guess's contention, the "touch base" analysis must not necessarily be focused on where particular documents are located, or even where a particular person is situated at the time the communication is sent or received. Guess April 16, 2010 Mem. of Law, at 4. While these factors may be relevant, they are not dispositive. Rather, the analysis is fact-specific and focuses on whether documents have a "more than incidental" connection with the United States. VLT Corp., 194 F.R.D. at 16. Accord Bayer AG and Miles, Inc., 1994 WL 705331, at *5 ("touch base" analysis is "fact-specific"). To that end, the Court cannot ignore that the pre-October, 2008 communications concern United States trademarks, and that the post-October, 2008 communications concern the conduct of litigation in the United States regarding trademarks

registered in the United States. Compl., ¶¶ 13, 18.

Although Italy may have an interest in the communications, none of the documents reflect that advice was requested or rendered regarding Italian law. At best, Italy's interest in the Volpi communications may be considered equal to that of the United States. Such interest does not trump that of the United States in applying its laws to communications concerning the conduct of an action pending in a United States court, the subject of which notably involves trademarks registered in the United States Patent & Trademark Office. Compl., ¶¶ 13, 18.

Moreover, applying the law of this forum to the Volpi communications does not offend principles of comity. As evidenced by the declarations submitted by the parties' experts, it is unsettled whether Italian attorney-client confidentiality provisions are comparable to the attorney-client privilege in the United States. Italian statutes clearly impose a secrecy obligation on attorneys not to disclose confidential client information. Pocar Decl., at ¶¶ 17, 18 (citing Article 9.1 of the Attorneys' Code of Conduct – Duties of Secrecy and Confidentiality). But a professional secrecy obligation is not an evidentiary privilege – a critical distinction. As Judge Patterson has observed, simply because "'a [foreign] statute requires a party to keep clients' affairs secret does not mean that a privilege exists." Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95 Civ. 8833 (RPP), 1998 WL 158958, at *3 (S.D.N.Y. Apr. 2, 1998). A foreign tribunal may compel "disclosure if it determines the need for the information is sufficient to outweigh the secrecy obligation, while the privilege, in contrast, is absolute and inviolate." In re Rivastigmine Patent Litig., 237 F.R.D. 69, 75 (S.D.N.Y. 2006) ("Rivastigmine II").

Guess cites Article 200 of the Italian Code of Criminal Procedure as providing such a privilege. Guidici Decl., ¶¶ 18-19. Article 200 prohibits a court from compelling "attorneys, private investigators, expert witnesses and notaries" from "testify[ing] in court with respect to

the confidential information they have knowledge of due to their [. . .] office or profession."
Pocar Decl., ¶ 12.   Although the statute permits "outside lawyers [to] refuse to testify regarding
confidential information received from their clients," Guidici Decl., ¶ 26, there is no indication
that the same testimonial immunity extends to a client in either a civil or criminal context – a key
element of the privilege under American law.  See Astra, 208 F.R.D. at 100-01 (fact that Korean
attorney may not testify in court regarding confidential communications received from client
does not demonstrate existence of privilege held by client); Bayer, 1994 WL 705331, at *5
(communications with professional cannot be deemed privileged under foreign law "simply
because" provision of foreign law grants professional "the right not to testify about information
she obtains in the course of her duties"); Alpex Comp. Corp. v. Nintendo Co., No. 86 Civ. 1749
(KMW), 1992 WL 51534, at *2 (S.D.N.Y. Mar. 10, 1992) (no privilege for communications with
patent agents under Japanese law simply because Japanese statute grants patent agents right not
to testify).

The scope of discovery in the foreign country is also a valid consideration in resolving
choice of law issues.  In Astra, Judge Jones found that a specific set of documents "touched
base" with Korea, but declined to apply the law of that country because the documents would not
have been discoverable in a Korean litigation.  Id. at 102.  She reasoned that an analysis of
"Korean privilege law, or the lack thereof, in a vacuum – without taking account of the very
limited discovery provided in Korean civil cases – would offend the very principles of comity
that choice-of-law rules were intended to protect."  Id.  In finding that the application of Korean
law would offend the public policy of this forum, she stated that "[u]nder these circumstances,
where virtually no disclosure is contemplated, it is hardly surprising that Korea has not

developed a substantive law relating to attorney-client privilege and work product that is co-extensive with our own law." Id.

The analysis of Astra is instructive. Although Guess urges the Court to apply Italian law to the Volpi communications, it is unclear whether such communications would be discoverable in an Italian lawsuit. While the parties' experts disagree as to the scope of permissible discovery in Italy, they agree that Italian civil procedure statutes provide limited discovery powers. See Guidici Decl., ¶ 12 ("It has, thus, to be concluded that discovery powers provided to the [Italian] Court by general rules of civil procedure are not particularly strong."); Ferrari Decl., ¶ 4 ("discovery powers in the Italian system are less extensive than in the U.S. system"); Pocar Decl., ¶ 7 ("in civil litigation in Italy, the rules of disclosure are such that only minimal pretrial discovery is allowed"). Civil discovery in Italy is by court order,[2] and even then a party may

---

[2] The Italian statutes governing document production are Articles 118 and 210 of the Code of Civil Procedure (the "CPC"), which provide as follows:

*Article 118 cpc – Order for inspection of persons and things.*

1. The Court may order a party to the proceedings or a third party to consent to the inspection of their body or a thing in their possession insofar as the inspection is necessary for the ascertainment of the facts of the case, and provided that the inspection is carried out without causing serious harm to the requested party or the third party, and enforcement thereof does not result in a breach of one of the duties of secrecy set forth by Articles [200] and [201] of the Code of Criminal Procedure.

2. If the requested party refuses to comply with an order of inspection without cause, the Court may draw adverse inferences against that party pursuant to Article 116.2.

3. If the requested third party refuses to comply with an order for inspection, that third party shall be ordered to pay a fine varying from Euro 250.00 to Euro 1.500.

*Article 210 cpc – Order for production of documents to a party to the proceedings or to a third party.*

1. Upon request of a third party to the proceedings, the Court may order the other party or a third party to produce a document or a thing which the court regards as necessary for the outcome of the case, provided that the requirements set

refuse to comply with such order, the penalty for non-compliance being either an adverse inference instruction or the payment of a nominal fee. Guidici Decl., ¶¶ 9, 11-12 (citing Articles 118 and 210 of the Code of Civil Procedure); Pocar Decl., ¶¶ 8, 10 (same).

Moreover, the Italian Supreme Court has construed provisions of the CPC governing document production to mean that a court may direct a party to produce a document "about which the requesting party 'knows, or purports to know, the *specific content*, which must be relevant and material for the resolution of the dispute.'" Pocar Decl., ¶ 9 n.1 (citing <u>Corte di Cassazione</u>, September 8, 2003, No. 13072; <u>Corte de Cassazione</u>, May 25, 2004, No. 10043 and December 20, 2007, No. 26943) (emphasis added). Thus, an Italian court likely would not grant categorical requests for the production of documents "*as known in Common Law countries.*" Pocar Decl., ¶ 9 (citing The Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters) (emphasis in original). The threshold requirement that a litigant demonstrate to the court the existence and relevancy of a specific document prior to obtaining its disclosure is contrary to the liberal discovery permitted by the Federal Rules of Civil Procedure. See <u>Retail Brand Alliance, Inc. v. Factory Mut. Ins. Co.</u>, No. 05 Civ. 1031 (RJH) (HBP), 2008 WL 62280, at *5 (S.D.N.Y. Mar. 7, 2008) ("Federal Rules set very liberal limits on the scope of discovery").

Guess's expert, Professor Guidici, cites the Italian Intellectual Property Code (the "IPC") as expanding the scope of pre-trial discovery in intellectual property actions such as the instant

---

> forth in article 118 with respect to the inspection of things in the possession of a party or a third party are complied with.
>
> 2. In ordering the production of a document or a thing, the court shall give the directions with respect to the time, place and mechanics of the production.
>
> 3. In any event the requesting party shall advance any costs that may be incurred by the other party or the third party in connection with the production.

Guidici Decl., ¶ 9.

case. Guidici Decl., ¶ 16. Under Articles 121.2[3] and 121.1 *bis*[4] of the IPC, an Italian court may

direct a defendant to produce information, including documents and other tangible evidence,

regarding the allegedly infringing activity. Guidici, ¶¶ 14-15. But the IPC appears to be more

narrowly tailored than the CPC. A party seeking discovery pursuant to the IPC must identify to

the court each document request by referencing its "precise date, author and subject matter," and

by demonstrating that the documents are "relevant and necessary to the outcome of the action."

Vanzetti Reply Decl., ¶¶ 10, 11. Moreover, as noted by Professor Vanzetti, it appears that only a

plaintiff may avail itself of the IPC, as only the alleged infringer has the ability to "supply the

elements for the identification of the persons involved in the production and distribution of the

---

[3] The full text of Article 121.2 provides:

When a party has provided a series of circumstantial evidence establishing its requests and has identified documents, elements or information held by the other party confirming such circumstantial evidence, it may obtain an order that the other party disclose the documents or provide the information. Furthermore, it may also obtain an order that the other party provide data for the identification of subjects involved in the production and distribution of the products or of the services constituting violation of the industrial property rights.

Guidici Decl., ¶ 14.

[4] The full text of Article 121.1 *bis* provides:

[T]he competent judicial authorities may order that information on the origin and distribution networks of the goods and services which infringe an intellectual property right be provided by the infringer and or any other person who:

(a)    was found in possession of the infringing goods on a commercial scale;

(b)    was found to be using the infringing services on a commercial scale;

(c)    was found to be providing on a commercial scale services used in infringing activities.

The information in paragraph hereinabove may also include names and addresses of the manufacturers and producers, retailers, suppliers and prior holders of the products or services, wholesalers, distributors as well as information on the quantities produced, manufactured, delivered, received or ordered and on the price of the products and services in questions.

Guidici Decl., ¶ 15.

products or services alleged to infringe the industrial property right." Id., ¶¶ 7, 15 (citing IPC Article 121.1 *bis*). Finally, as with Articles 118 and 210 of the CPC, an order compelling discovery under the IPC "is not coercible and, as such, imposes no enforceable obligation on the party to which it is addressed." Id., ¶ 13.

Finally, Guess argues that the Court need not consider the scope of discovery in Italy, and should instead follow the analysis employed by Magistrate Judge Francis in Rivastigmine II. 237 F.R.D. 69. Guess April 16, 2010 Mem. of Law, at 8-9 (Dckt. 82). In that case, however, the parties agreed that Swiss law governed, and therefore no choice of law analysis was conducted. Id. at 75. Here, absent definitive evidence that Italy recognizes an attorney-client privilege scheme analogous to the evidentiary privilege recognized by federal common law – that is, a privilege held by the *client* – application of Italian law would violate the public policy of this forum (just as application of Korean law in Astra would have offended principles of comity that choice of law rules were designed to protect). In any case, it is not clear that the Volpi communications would be discoverable in an Italian litigation.[5]   Accordingly, I will look to American law to resolve the privilege dispute.

   2.   Application of American Attorney-Client Privilege Law

      a.   General Principles

The attorney-client privilege "is one of the oldest recognized privileges for confidential communications." Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998). "By assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation."

---

[5] Neither party disputes that Italian confidentiality provisions exempt in-house counsel such as Della Rosa and Solomon. Pocar Decl., ¶ 15; Giudici Decl., ¶ 8. Nonetheless, the issue remains that a professional confidentiality obligation is not the equivalent of an evidentiary privilege.

Mohawk Indus., Inc. v. Carpenter, 130 S. Ct. 599, 606 (2009) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). See also In re Omeprazole Patent Litig., M-21-81 (BSJ), MDL 1291, 2005 WL 818821, at *7 (S.D.N.Y. Feb. 18, 2005) ("The attorney-client privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice."). Nevertheless, the privilege is construed "narrowly because it renders relevant information undiscoverable." In re Cnty. of Erie, 473 F.3d 413, 418 (2d Cir. 2007).

It is well-settled that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." Upjohn, 449 U.S. at 396; In re Six Grand Jury Witnesses, 979 F.2d 939, 944 (2d Cir. 1992). A party invoking the attorney-client privilege must demonstrate that there was "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." In re Cnty. of Erie, 473 F.3d at 419. See United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995) ("Adlman I") ("The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements.").[6]

In a corporate context, in-house counsel can serve as the client when communicating with outside counsel, or as "attorney-legal advisor" when communicating with personnel within the organization. United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1073-74 (N.D. Cal.

---

[6] The three-part test cited herein is a "truncated" version, Schanfield v. Sojitz Corp. of Am., 258 F.R.D. 211, 213 n.3 (S.D.N.Y. 2010), of the eight-part test that originated with Professor Wigmore and has been cited by the Second Circuit. See, e.g., In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1036 (2d Cir.1984) ("(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.") (quoting 8 John Henry Wigmore, Wigmore on Evidence § 2292 at 554 (McNaughton rev. 1961)).

2002).  See Ovesen v. Mitsubishi Heavy Indus. of Am. Inc., No. 04 Civ. 2849 (JGK) (FM), 2009

WL 195853, at *3 (S.D.N.Y. Jan. 23, 2009).  Communications with in-house counsel in the role

of attorney-advisor are afforded the same protection as outside counsel, although

communications conveying business (as opposed to legal) advice are excluded from the

privilege.  See Upjohn, 449 U.S. at 394; In re Grand Jury Subpoena Duces Tecum Dated Sept.

15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984) ("[T]he privilege is triggered only by a client's

request for legal, as contrasted with business advice.").

In United States v. Kovel, 296 F.2d 918 (2d Cir. 1961), the Second Circuit extended the

attorney-client privilege to communications between a client and an accountant hired to assist the

attorney in representing the client.  Id. at 922.  Kovel recognized a privilege derivative of the

attorney-client privilege where a third party clarifies or facilitates communication between

attorney and client in confidence "for the purpose of obtaining legal advice" from the attorney.

Id. at 922.  The caveat to the Kovel rule, however, is that the advice rendered must be that of the

attorney, not the agent.  See, e.g., United States v. Ackert, 169 F.3d 136, 139-40 (2d Cir. 1999)

(communications between attorney and investment banker who provided attorney with factual

client information held not privileged); Orbit One Commc'n, Inc. v. Numerex Corp., 255 F.R.D.

98, 104 (S.D.N.Y. 2008) ("the privilege operates to protect confidential communications made

by corporate agents who supply needed information to the corporation's counsel");

ChevronTexaco Corp., 241 F. Supp. 2d at 1071 (applying Kovel to find no privilege where

accountant hired "to give additional legal advice about complying with the tax code").

Kovel has been construed broadly to include individuals who assist attorneys in providing

legal services, such as "secretaries and law clerks," In re Grand Jury Subpoenas Dated March 24,

2003, 265 F. Supp. 2d 321, 325 (S.D.N.Y. 2003), "investigators, interviewers, technical experts,

accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences." Louisiana Mun. Police Emp's. Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 311 (D.N.J. 2008) (citations omitted). See also United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (accountant); United States v. Alvarez, 519 F.2d 1036, 1045-46 (3d Cir. 1975) (psychiatrist); Rivastigmine II, 237 F.R.D. at 81-82 (patent agent).

Factual investigations conducted by an agent of the attorney, such as "gathering statements from employees, clearly fall within the attorney-client rubric." Lugosch v. Congel, 1:00-CV-0784, 2006 WL 931687, at *14 (N.D.N.Y. Mar. 7, 2006) (citing Upjohn, 449 U.S. at 390-91). Thus, courts have frequently extended the attorney-client privilege to communications made to investigators who have provided necessary assistance to attorneys, as Volpi provided to Della Rosa here. See, e.g., United States v. McPartlin, 595 F.2d 1321, 1335-36 (7th Cir. 1979) (statements made to investigator acting as attorney's agent); Sanchez v. Matta, 229 F.R.D. 649, 660 (D.N.M. 2004) (employee communications to investigator acting as agent of employer's counsel); Welland v. Trainer, No. 00 Civ. 0738 (JSM), 2001 WL 1154666, at *3 (S.D.N.Y. Oct. 1, 2001) (employee serving as investigator was attorney's agent); Carter v. Cornell Univ., 173 F.R.D. 92, 95 (S.D.N.Y. 1997) (communications to employee whose duties normally did not include conducting investigations for in-house counsel specifically asked to conduct investigation), aff'd 159 F.3d 1345 (2d Cir. 1998) (summary order). As one commentator has noted, were an attorney required to exclude investigators from the circle of confidentiality in order to maintain the privilege, providing legal advice to clients would be difficult, if not in some cases impossible. Paul R. Rice, Attorney-Client Privilege in the United States § 3:3 (2d ed. 2010). See generally 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, Evidence § 5482 (1986) (discussing "representatives of the lawyer," including

investigators, for privilege purposes).

     b.  <u>Post-October, 2008 Communications</u>

    The Court finds that Volpi acted as an agent of Della Rosa with respect to the post-October, 2008 communications for attorney-client privilege purposes. The documents reviewed <u>in camera</u> by the Court confirm that Volpi, during the course of his investigation, acted at the direction of Della Rosa to assist in-house and outside counsel to prepare for litigation against Guess in the United States and in Italy. Specifically, Volpi coordinated Gucci and GG's global efforts to assemble evidence supporting claims in both jurisdictions. He communicated with Della Rosa at every step of his investigation and continued each phase solely at Della Rosa's instruction. Della Rosa Decl., ¶ 24; Volpi Decl., ¶ 14. As the Della Rosa declaration makes clear, Volpi was deputized to gather information from Gucci employees to assist in the litigation, and the Court's <u>in camera</u> review of the documents confirms this arrangement. <u>See</u> <u>Alexander Grant & Co. Litig.</u>, 110 F.R.D. 545, 547 (S.D. Fla. 1986) (information collected by "deputized employee" acting at behest of in-house counsel privileged because obtained to provide legal advice from counsel).

    Guess argues that Volpi does not satisfy the standard set forth in <u>Kovel</u> because he neither possesses "highly specialized knowledge" that assists the attorney in representing the client, nor did he perform ministerial tasks as might a stenographer or legal secretary. Guess April 16, 2010 Mem. of Law, at 11. But Guess proposes too rigid an application of <u>Kovel</u>. "[C]ommunications among non-attorneys in a corporation may be privileged if made at the direction of counsel, to gather information to aid counsel in providing legal services." <u>Rivastigmine II</u>, 237 F.R.D. at 80. <u>See</u> <u>In re Copper Mkt. Antitrust Litig.</u>, 200 F.R.D. 213, 218 (S.D.N.Y. 2001) (communications "between an attorney and the agent or employee of a

corporation may be privileged where the agent 'possessed the information needed by the corporation's attorneys in order to render informed legal advice'").   Indeed, the documents demonstrate that Volpi played an integral role in providing hands-on assistance to in-house and outside counsel in gathering evidence from Gucci affiliates around the world.

Guess further argues that the attorney-client privilege should not extend to Volpi because he is not a licensed patent agent or other similarly licensed professional.   Guess April 16, 2010 Mem. of Law, at 11.   The fact that he is not a licensed professional is not outcome determinative. The standard is whether the third-party agent is supervised directly by an attorney and whether the communications were intended to remain confidential.   See Cargill, Inc. v. Sears Petroleum & Transport. Corp., No. 03 Civ 0530 (DEP), 2003 WL 22225580, at *4 (N.D.N.Y. Sept. 17, 2003) (communications of patent agent supervised by patent attorney found to be privileged); In re Rivastigmine Patent Litig., No. 05 MD 1661 (JCF) (HB), slip op. (S.D.N.Y. Jan. 5, 2006) ("Rivastigmine I") (communications of client's in-house patent agent supervised by attorney privileged); Rivastigmine II, 237 F.R.D. at 82 (privilege may extend to non-attorney employee of client "if directly supervised by a licensed attorney or patent agent"); Byrnes v. Empire Blue Cross Blue Shield, No. 98 Civ. 8520 (BSJ) (MHD), 1999 WL 1006312, at *4 (S.D.N.Y. Nov. 4, 1999) (no privilege for work of consultant "undertaken without a request by the attorney to assist her").   Volpi's attendance at the November, 2008 meeting in New York indicates an expectation by Gucci that its communications with him would remain confidential and that he was an essential part of the litigation team.

Neither party disputes that Volpi is not an attorney under American law.   Guess suggests, however, that Volpi acted as a *de facto* attorney.   Guess April 16, 2010 Mem. of Law, at 11.   The documents do not reflect that Volpi conveyed any independent legal advice.   Although his

responsibilities clearly extended beyond ministerial tasks, it is not necessary that Della Rosa and Solomon have "observ[ed] and approve[d] every minute aspect of [his] work." Rivastigmine II, 237 F.R.D. at 81. The privilege extends to an agent proceeding autonomously, including "gathering information from the client without involving the attorney every step of the way." Id. See also Rivastigmine I, slip op at 6 ("supervision cannot mean that, in order to preserve the privilege, counsel must direct each individual act of a professional from whom the attorney is receiving assistance"). This approach is consistent with the rationale of the privilege and reflects the reality that adequate legal representation often necessitates the assistance of skilled practitioners in various fields. As observed by Magistrate Judge Dolinger:

> Communications to an administrative practitioner or to a patent agent who is not a lawyer, though not in themselves privileged[,] should be protected if they were made in confidence at the direction of a lawyer who is employing the practitioner to assist him in the rendition of legal services.

Golden Trade, 143 F.R.D. at 518 (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503(a)(3)[01] at 503-26 to 27 (1990)).

The documents demonstrate that Gucci and GG personnel – as the client – engaged in, what they believed to be, confidential communications with Volpi, GG's in-house Intellectual Property Counsel acting at the direction of, and reporting to, Della Rosa, General Counsel of GG and a member of the New York bar. Della Rosa Decl., ¶ 5. Thus, the attorney-client privilege extends to Volpi's post-October, 2008 communications.

### c. Pre-October, 2008 Communications

The pre-October, 2008 documents, however, are a different matter. Four of the pre-October, 2008 documents, each dated June 4, 2007, are Volpi communications. The Court is not persuaded that Volpi acted as an agent of an attorney during this time period. Gucci proffers little evidence demonstrating that Volpi acted at the behest of an attorney during the Twirl

investigation and prior to Della Rosa's September, 2007 arrival at GG.  Della Rosa Decl., ¶ 7.

Indeed, Volpi's deposition testimony indicates that he may not have been involved in the

investigative aspect of the Twirl matter:

> Q.    Did you personally do any investigation into this Twirl watch issue?
>
>        MR. EDERER:   You can answer that yes or no.
>
> A.    No.

Ederer Decl., ¶ 3, Ex. B (Volpi Dep. at 70:15-19).

Solomon sheds little light on the organizational structure of GG's in-house intellectual

property group during this period.  She merely states that Della Rosa's predecessor at GG was

Carlo Imo ("Imo"), with whom Solomon was "in near daily e-mail contact regarding various

legal issues that concerned GG."  Solomon Decl., ¶¶ 5-7.  Without Gucci conclusively saying as

much, the Court is left to speculate whether Volpi reported directly to Imo prior to September,

2007.   Notably absent from the Volpi and Solomon declarations, however, is information

evidencing direct supervision by Imo of Volpi, a fact essential to the attorney-agent analysis.  In

this regard, Guess's argument that Volpi acted as a *de facto* attorney has some merit, as Volpi

declares that, prior to his hiring in 2006, GG "did not have a member of the legal department

experienced in handling intellectual property matters."  Volpi Decl., ¶ 10.  Accordingly, the

Court finds that Volpi did not act as an attorney-agent with respect to the pre-October, 2008

communications, and the attorney-client privilege does not apply to these communications.

## C. The Work Product Doctrine

### 1.  General Principles

Gucci also invokes the work product doctrine as to each of the communications in the

Revised Privilege Log.  The work product doctrine is codified in Rule 26(b)(3) and exempts

from discovery "documents and tangible things that are prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). Because the doctrine is procedural in nature, the rules of the forum court apply and it is therefore not subject to a choice of law analysis.[7] See Astra, 208 F.R.D. at 103-04, 105 (applying Rule 26(b)(3) standard to foreign documents). See also Byrnes, 1999 WL 1006312, at *1 (work product doctrine "is always assessed under federal law in the federal courts").

The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) ("Adlman II") (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947)). Thus, opinion work product, including an attorney's "interviews, statements, memoranda, correspondence, briefs, [and] mental impressions" receives a heightened degree of protection. Hickman, 329 U.S. at 510. Although "factual material, including the result of a factual investigation," falls within the ambit of the work product doctrine, In re Initial Pub. Offering Sec. Litig., 249 F.R.D. 457, 459 (S.D.N.Y. 2008), it does not receive the heightened protection afforded opinion work product. Adlman II, 134 F.3d at 1197.

The work product doctrine applies to "(1) a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." In re Omeprazole Patent Litig., 2005 WL 818821, at *8 (citing In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)). See also 2 Michael C. Silberberg, Edward M. Spiro, Civil Practice in the Southern District of New York, § 15.04 at 15-11 (2d ed. 2009). The party asserting the privilege bears the burden of

---

[7] Even if a choice of law analysis were required, the Court's finding that the Volpi communications "touch base" with the United States precludes application of Italian law.

demonstrating that the documents or materials were prepared in anticipation of litigation. <u>United States v. Constr. Prods. Research</u>, 73 F.3d 464, 473 (2d Cir. 1996); <u>Adlman II</u>, 134 F.2d at 1202; <u>In re Grand Jury Subpoena Dated July 6, 2005</u>, 510 F.3d 180, 184 (2d Cir. 2007).

The mere "possibility of litigation is insufficient to" obtain work-product protection. <u>Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP</u>, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *5 (S.D.N.Y. Feb. 14, 2007) (citing cases). Instead, the party seeking such protection must demonstrate that, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'" <u>Adlman II</u>, 134 F.3d at 1202 (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 <u>Federal Practice & Procedure</u> § 2024, at 343 (2d ed. 1994)) (emphasis in original). Accordingly, documents prepared in the ordinary course of business, or that otherwise would have been prepared absent the prospect of litigation, do not receive work product protection. <u>See</u> <u>Adlman II</u>, 134 F.3d at 1202; <u>see also</u> <u>William A. Gross Constr. Assoc., Inc. v. Am. Mfr. Mut. Ins. Co.</u>, 262 F.R.D. 354, 360 (S.D.N.Y. 2009).

Unlike the attorney-client privilege, the work product doctrine does not require that the documents be prepared at the behest of counsel, only that they be prepared "because of the prospect of" litigation. <u>Adlman</u>, 134 F.3d at 1202. In <u>United States v. Nobles</u>, 422 U.S. 225, 238-39 (1975), the Supreme Court recognized that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial," and therefore "the doctrine protect[s] material prepared by agents for the attorneys as well as those prepared by the attorney for himself." <u>Id.</u> at 238-39. Indeed, the doctrine has been held to protect work performed by those "enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparation for litigation." <u>Costabile v. Westchester, New York</u>, 254

F.R.D. 160, 164 (S.D.N.Y. 2008) (private investigator retained by counsel to prepare report in anticipation of litigation).  See also Sec. & Exch. Comm'n v. Strauss, No. 09 Civ. 4150 (RMB) (HBP), 2009 WL 3459204, at *6 (S.D.N.Y. Oct. 28, 2009) (interview notes prepared by non-attorney SEC employees acting at direction of attorneys found to be work product).

Nobles is consistent with the core purpose of the doctrine, which is to "prevent exploitation of a party's efforts in preparing for trial" by precluding the adversary from obtaining such material absent substantial need. Admiral Ins. Co. v.  United States Dist. Court for the Dist. of Ariz., 881 F.2d 1486, 1494 (9th Cir. 1988).  As a result, judges in this district have extended the doctrine to work product produced by a client at the direction of counsel in anticipation of litigation. See, e.g., Kayata v. Foote, Cone & Belding Worldwide, LLC, No. 99 Civ. 9022 (VM) (KNF), 2000 WL 502859, at *2-3 (S.D.N.Y. Apr. 26, 2000) (documents prepared by client during independent investigation at direction of outside counsel upon learning of EEOC charge filed against company); Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 107-09 (S.D.N.Y. 2007) (denying work product protection to documents related to investigation conducted by attorney for business reasons).

Because the work product doctrine is a qualified privilege, Nobles, 422 U.S. at 237-38, the protection can be overcome with respect to fact work product if the party seeking such discovery shows that it (1) has "substantial need for the materials," and (2) cannot obtain the substantial equivalent "without undue hardship." Fed. R. Civ. P. 26(b)(3)(A)(ii).  A substantial need exists "where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." Nat'l Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (substantial need demonstrated where data compiled

by defendants was "directly probative on many of the issues in the case" and same information could not be obtained absent undue hardship). See Weber v. Paduano, No. 02 Civ. 3392 (GEL), 2003 WL 161340, at *14 (S.D.N.Y. Jan. 22, 2003) (substantial need for reports prepared by insurance company shortly after fire where "plaintiff had no means of obtaining" substantially equivalent information).

### 2. Pre-October, 2008 Communications

The Court finds that none of the pre-October, 2008 documents are protected by the work product doctrine. There is no evidence that GG or Gucci took affirmative steps in anticipation of litigation during this time period beyond sending the Twirl cease-and-desist letter to Guess. According to Volpi, such cease-and-desist letters are "standard," and therefore issued in the ordinary course of GG's business as a luxury goods company. Ederer Decl., ¶ 3, Ex. B (Volpi Dep. 77:17-24). Thus, to find that the Twirl cease-and-desist letter was sent "because of" the prospect of litigation would effectively mean that Gucci and GG are in a perpetual state of anticipated litigation. To the extent the documents reflect that GG and Gucci considered the possibility of litigation had Guess responded negatively to the warning letter, such possibility is insufficient to trigger the protection of the work product doctrine within the scope of Rule 26(b)(3). Kingsway Fin. Servs., Inc., 2007 WL 473726, at *5. See In re Application Pursuant to 28 U.S.C. Section 1782, 249 F.R.D. 96, 102-03 (S.D.N.Y. Apr. 1, 2008); Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp., No. 00 Civ. 9212 (DF), 2002 WL 31729693, at *10 (S.D.N.Y. Dec. 5, 2002).[8]

### 3. Post-October, 2008 Communications

Unlike the earlier set of communications, the post-October, 2008 communications are

---

[8] Gucci itself acknowledges that "[t]he October[,] 2008 date coincides with the time GA and GG began to prepare for the simultaneous filing of parallel infringement actions in the U.S. and Italy." Ederer Suppl. Decl., ¶ 12 (emphasis added).

eligible for work product protection because they were prepared by Gucci and GG, their agents, or attorneys in anticipation of litigation. Specifically, the documents were created between November, 2008 – after Gucci set out to collect evidence supporting its claims against Guess – and April, 2009 – weeks before the complaints were filed in the United States and Italy litigations. The Court finds no evidence that these documents were prepared in the ordinary course of business, or that they would have been created for any reason other than "because of" the prospect of litigation. Adlman II, 134 F.3d at 1202.

The documents, together with the declarations of Volpi, Della Rosa, and Solomon, provide a chronology supporting November, 2008 as the date by which the Gucci companies transitioned from a posture of preliminary investigation to one of anticipated litigation. See In re Veeco Instruments, Inc. Sec. Litig., No. 05 MD 01695 (CM) (GAY), 2007 WL 724555, at *8 (S.D.N.Y. Mar. 9, 2007) (affirming magistrate judge's finding of work product protection based, in part, on affidavits of defendant's CFO and outside counsel providing "extensive background on their own personal knowledge"). Given the time frame in which the documents were created, there is little doubt they were generated "with an eye toward litigation." Adlman II, 134 F.3d at 1196. See Sanchez, 229 F.R.D. at 657-58 (report prepared revealing "investigator's mental processes while he was acting as the attorney's agent" found to be work product). The fact that litigation ensued soon thereafter, though not dispositive, supports this conclusion.

With this background in mind, the Court next considers whether Gucci has properly invoked the attorney-client privilege or the work product doctrine as to each document still in dispute in the Revised Privilege Log.

31

### D. Analysis of Specific Communications

#### 1.  Pre-October 2008 Communications

The pre-October, 2008 Communications consist of Document Nos. 1, 3-5, and 34-38. As discussed previously, supra, in section III(C)(b), these documents do not qualify for work-product protection.  Moreover, the Court has already determined that neither the Moss communications nor the Volpi pre-October, 2008 communications are protected by the attorney-client privilege.  See Memorandum and Order dated June 29, 2010, at 16, and supra, at section III(B)(2)(c).  Thus, Gucci's invocation of the attorney-client privilege with respect to communications by GG or Gucci non-attorneys with Moss and/or Volpi are not privileged, unless they make reference to confidential communications with counsel.

Document No. 1 is a September, 2004 e-mail from Gucci paralegal Jessica Murray ("Murray") to Moss.  In the e-mail, Murray opines that a particular Guess product may infringe on a Gucci trademark, and requests Moss's opinion regarding the same.  The communication does not seek the advice of counsel (as Moss is not an attorney for attorney-client privilege purposes), and a paralegal's opinion that a product may infringe on a trademark does not meet the standard contemplated by the privilege.  Accordingly, Document No. 1 should be produced.

Document No. 5 is not covered by the attorney-client privilege for the same reasons that the privilege does not extend to Document No. 1.  Specifically, Document No. 5 is a May, 2006 e-mail from Imo, then-General Counsel of GG, asking Moss's opinion as to whether Gucci should pursue action against Guess.  GG's Italian outside counsel, Patrizia Franceschina ("Franceschina") of Jacobacci & Partners, is copied on the e-mail.  Imo directs Franceschina to forward a copy of certain legal opinions to Moss.  Gucci has submitted no information to the Court as to whether Imo is an attorney in any jurisdiction, and therefore it has failed to establish

that an attorney participated in the communication. The fact that Franceschina is copied on the e-mail does not cloak the communication with privilege, as Imo neither requests advice from Franceschina, nor is there any reference to advice she has provided. Although the e-mail refers to "legal opinions," it reveals no substantive information about the opinions. Accordingly, Document No. 5 should be produced.

Document Nos. 3 and 4 are April and May, 2006 e-mails from Gucci's outside attorneys to Moss and Murray regarding a Guess product bearing the "repeating Guess Quattro G pattern," the "elongated G," and the "interlocking G's." The first two paragraphs of each e-mail appear to be irrelevant to the claims in this action, and for that reason need not be produced. The third paragraph in each document is privileged because it contains the advice of outside counsel. Accordingly, Document Nos. 3 and 4 are privileged from disclosure.

Document Nos. 34-38 are a series of June 4, 2007 e-mails among Moss, Murray, and Volpi concerning the Twirl mark and Guess products containing the "repeating Guess Quattro G pattern." Reference to these products is initially made in a June 3, 2007 e-mail among Gucci's outside counsel, Moss, and Volpi, which is listed on Gucci's Amended Privilege Log.[9] See Welsh Decl., Ex. G (Dckt. 83).

Document No. 34 is an e-mail from Moss thanking Volpi for forwarding to him Guess's response to the Twirl cease-and-desist letter. The communication is not privileged and should be produced.

Document No. 35 is an e-mail from Volpi to Moss discussing Guess's response to the Twirl cease-and-desist letter, which is apparently attached to the e-mail (though not produced for in camera inspection). The third full paragraph beginning "Regarding Lou's memo" should be

---

[9] Guess does not seek access to the June 3, 2007 e-mail.

redacted, as it implicates the advice of outside counsel. The balance of the document should be produced, as it contains neither the advice of counsel nor a request for such advice. The redacted e-mail and the attachment should be produced.

Document No. 37 is nearly identical to Document No. 35, except that it does not contain the paragraph beginning "Regarding Lou's memo."[10]   Thus, Document No. 37 should be produced in its entirety (as essentially a duplicate of redacted No. 35).

Document No. 36 is an e-mail from Moss to Volpi, as clients, discussing the advice of Gucci's outside United States counsel and is therefore privileged in its entirety.

Document No. 38, an e-mail from Moss to Murray with copy to Volpi, is privileged in part. The sentence beginning "Also, Lou Ederer raised . . ." should be redacted because it implicates the advice of outside counsel. The remaining portion of the e-mail relating to the Twirl cease-and-desist letter should be produced.

## 2. Post-October 2008 Communications

I have broken down the post-October, 2008 communications into 12 categories, which I discuss *seriatim*:

a. As previously noted, Document Nos. 40, 42-56, 66, 76-77, 82-83, 121, 123, and 125-126 are documents to which Guess has withdrawn its challenge to Gucci's designation as work product. Ederer Suppl. Decl., ¶¶ 5, 13. Guess maintains it is entitled to production of some or all of these documents under Rule 26(b)(3) because it has substantial need for them. As discussed below, infra, section III(D)(3), Guess has not demonstrated "substantial need" for any documents that the Court finds are covered by the work product doctrine. Accordingly, these documents have been properly withheld.

---

[10] There are also different times noted on the two e-mails. Document No. 35 was sent at 11:48 a.m., while Document No. 37 was sent at 7:48 a.m.

b. <u>Document Nos. 62, 65, 67-70, 79-81, 84-85, 114, 116, 145-147, and 152-153</u> consist of communications involving Volpi and (i) GG employees, including members of the legal department; (ii) Gucci personnel in the United States; (iii) Gucci's outside counsel; or (iv) personnel at Gucci affiliates in other foreign countries, regarding the collection of evidence and development of a legal strategy for the Italy and United States lawsuits. The attorney-client privilege does not extend to these communications because they do not contain the advice of counsel, nor do they contain a request for such advice. However, the documents are protected from disclosure by the work product doctrine because they reflect work performed by Gucci, GG, and their agents in anticipation of litigation against Guess in both the United States and Italy. Accordingly, Document Nos. 62, 65, 67-70, 79-81, 84-85, 114, 116, 145-147, and 152-153 have been properly withheld as work product.

c. <u>Document Nos. 107, 108, and 113</u> are communications among GG non-attorneys, copying Volpi and GG paralegal Claudia Pelli ("Pelli"), in February and March, 2009. These e-mails are not protected by the attorney-client privilege because they are not communications with counsel. Document Nos. 107 and 108 purportedly attach confidential documents related to the litigation against Guess. Document No. 107 is an e-mail from Ilaria Fumigalli ("Fumigalli") of GG's Corporate Image Department, to GG paralegal Laura Ceccherini ("Ceccherini"). In the e-mail, Fumigalli states that she has attached a confidential document regarding the Guess action, but it is impossible to discern the specific content of the attachment because it has not been provided for <u>in camera</u> inspection.

Similarly, Document No. 108, an e-mail from Ceccherini to Silvia Crescioli ("Crescioli") of GG's WW Footwear Business Unit, attaches a section of a PowerPoint presentation regarding footwear products. Both Document Nos. 107 and 108 indicate that the files were attached at

some point, but eventually eliminated as attachments.[11]  Specifically, each file name is proceeded by a notation stating "eliminated by," followed by the name of the individual who apparently eliminated the attachment, thus indicating that the attachments are no longer available (and presumably the reason they were not provided for in camera inspection).  Nonetheless, the e-mails themselves constitute work product because the individuals discuss the gathering of evidence in anticipation of litigation.  Accordingly, Document Nos. 107 and 108 are covered by the work product doctrine and have been properly withheld.

Document No. 113 is a March, 2009 e-mail from Ceccherini to Crescioli, copying Volpi and Pelli, wherein Ceccherini proposes an in-person meeting the following day.  The communication reveals no substantive information regarding work performed in preparation for the lawsuit or any attorney-client information.  Accordingly, Document No. 113 should be produced.

d.  Document No. 160 is an April 28, 2009 e-mail from Volpi to Patrizio DiMarco ("DiMarco"), President and CEO of GG, enclosing draft complaints in the United States and Italy litigations, and the Guess Financial Report for the 2008 fiscal year, for DiMarco's review.  A draft document "prepared for the purpose of obtaining legal advice and/or contain[ing] information a client considered but decided not to include in the final version" may be considered privileged.  Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *8 (S.D.N.Y. Nov. 1, 2001) (quoting United States Postal Serv. v. Phelps Dodge Ref. Co., 852 F. Supp. 156, 163 (E.D.N.Y. 1994)).  The draft complaints, presumably drafted by GG and Gucci's outside attorneys, are privileged from disclosure.  The Guess Financial Report, however, is not the work product of Gucci or its outside counsel.  Accordingly, the first four

---

[11] Several communications reviewed in camera attach files that appear to have been "eliminated."  Gucci's submissions fail to shed light on this issue, including whether the attachments were purged automatically by GG's servers and no longer exist.

paragraphs of the e-mail should be redacted, but the sentence beginning "Finally, I attach . . ." and everything beneath it should be disclosed.  Gucci should produce the redacted version of Document No. 160 and the Guess 2008 Financial Report.

e.  Document Nos. 61, 105-106, and 117-118 are December, 2008 e-mails regarding a Powerpoint presentation prepared by Volpi comparing Gucci and Guess products.  The e-mail communications enclose the presentation as an attachment and discuss the substance of the presentation in connection with Gucci's overall litigation strategy.  Gucci's selection and classification of Guess products as potentially infringing on Gucci trademarks represents Volpi's mental impressions regarding the strength of Gucci and GG's claims – information to which their adversaries are not entitled.  See United States v. Dist. Council of New York City and Vicinity of the United Brhd. of Carpenters and Joiners of Am., No. 90 Civ. 5722 (CSH), 1992 WL 208284, at *10 (S.D.N.Y. Aug. 18, 1992) ("How a party, its counsel and agents choose to prepare their case, the efforts they undertake . . . is not factual information to which an adversary is entitled.").  The presentation itself is protected by the work product doctrine, as are the e-mail communications discussing its substance.  These documents are properly withheld as work product.

f.  Document Nos. 129-132, 136-138, 140-143, 154, 156-158, 161, and 166-167 relate to a press statement prepared by GG's in-house corporate communications department.  The communications are between Volpi and members of GG's communications and marketing departments, including Niccolo Moschini ("Moschini").  Specifically, the documents concern a joint communications strategy relating to the United States and Italy litigations, but do not reflect litigation strategy, the advice of counsel, or attorney mental impressions.  Instead, the discussions focus on anticipated press coverage, potential media outlets, and draft press

statements.

Several documents in this category refer to statements made by counsel regarding press coverage that the lawsuits could attract and how press calls should be handled. Generally, "public relations advice, even if it bears on anticipated litigation, falls outside the ambit" of the work product doctrine. Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). See Rivastagmine II, 237 F.R.D. at 82 (communications regarding media and business matters must be disclosed). Press-related communications may be protected by the work product doctrine if drafted by counsel. See Haugh v. Schroder Inv. Mgmt. N. Am. Inc., No. 02 Civ. 7955 (DLC), 2003 WL 21998674, at *4 (S.D.N.Y. Aug. 25, 2003) (documents drafted by counsel and sent to public relations consultant not privileged but subject to work product protection). The documents reviewed in camera demonstrate that Gucci's publicity strategy was treated as a business concern and was handled almost exclusively by its in-house corporate communications department. Although the draft press statement may have been reviewed by Gucci's outside counsel, there is no indication that counsel drafted the statement or rendered legal advice in connection with such review. With the exception of a portion of Document No. 156, Guess's objection to the withholding of these documents is sustained, and therefore Gucci should produce Document Nos. 129-132, 136-138, 140-143, 154, 157-158, 161, 166-167. As to Document No. 156, the portion of the first sentence beginning "as I fear" through the end of the paragraph should be redacted because it implicates the advice of outside counsel. The balance of the document should be produced.[12]

------

[12] Document Nos. 131 and 132 are internal communications among GG and Gucci personnel scheduling a conference call related to the press statement. Such communications are privileged if they reveal confidential communication between attorney and client. AIU Ins. Co. v. TIG Ins. Co., No. 07 Civ. 7052 (SHS) (HBP), 2008 WL 4067437, at *5 (S.D.N.Y. Aug. 28, 2008) (e-mails scheduling conference call with outside counsel privileged where references made to document reviewed in preparation for meeting with witness). But the documents herein

g. <u>Document Nos. 98 and 99</u> are e-mails between Volpi and Moschini that include what appear to be draft statements prepared by GG's corporate communications department regarding the protection of Gucci trademarks and the threat of counterfeit products generally. Nothing in these e-mails suggests that they are related to either the United States or Italy litigations. Instead, they were drafted by GG's corporate communications department, and appear to have been prepared in the ordinary course of business. Accordingly, they are covered by neither the attorney-client privilege nor the work product doctrine and should be disclosed.

h. <u>Document Nos. 87 and 111</u> are covered by the attorney-client privilege and the work product doctrine. Document No. 87 is a February 4, 2009 e-mail from Volpi to several GG executives, including Della Rosa and Solomon, discussing litigation strategy and the strength of the evidence against Guess. Similarly, Document No. 111 is a March 1, 2009 e-mail from Volpi to DiMarco discussing the strength of the evidence against Guess, and Gucci and GG's litigation strategy. The e-mails are privileged because they are communications with Volpi (an agent of an attorney), and reflect his opinion regarding Guess' infringement and the dilution of Gucci trademarks. The communications are also protected by the work product doctrine because they discuss, in specific detail, action to be taken in preparation for litigation against Guess. The e-mails also enclose the presentation comparing Gucci and Guess products, a document which I have already determined is protected by the work product doctrine. Accordingly, Document Nos. 87 and 111 have been properly withheld.

i. <u>Document Nos. 109 and 110</u> are March 1, 2009 e-mails between DiMarco's assistant,

---

reveal no underlying legal advice, and the fact that a conference call took place, even if it were with outside counsel, is not privileged. <u>See</u> <u>Softview Comp. Prods. Corp. v. Haworth, Inc.</u>, No. 97 Civ. 8815 (KMW) (HBP), 2000 WL 351411, at *14 (S.D.N.Y. Mar. 31, 2000) ("fact that counsel had a conference with the patent examiner" not privileged).

Angela Turnbull ("Turnbull"), and Volpi requesting an update on the status of litigation. The e-mails reveal no confidential client information, nor do they contain work product. For these reasons, Document Nos. 109 and 110 should be produced.

j. <u>Document Nos. 64, 72, 73, 75, 101-104, 120, and 127</u> are transmittal e-mails attaching Powerpoint files that appear to have been created by Gucci or GG, but are no longer attached to the e-mails. "Transmittal documents themselves are not privileged unless they reveal the client's confidences." <u>Renner</u>, 2001 WL 1356192, at *5. With the exception of certain portions of Document Nos. 64 and 73, the e-mails in this category do not reflect the provision of, or request for, legal advice, nor do they include attorney mental impressions or facts prepared in anticipation of litigation. Accordingly, they are neither privileged nor protected by the work product doctrine. <u>See</u> <u>Retail Brand Alliance, Inc.</u>, 2008 WL 622810, at *4 ("The email itself is just a transmittal document. It does not disclose client confidences, does not seek legal advice and does not disclose any litigation strategy. It contains nothing protectable under either the attorney-client privilege or the work-product doctrine."). Accordingly, Document Nos. 72, 75, 101-104, 120, and 127 should be produced. The last sentence of Document No. 64 (beginning "I must point out") should be redacted, and the portion of the last sentence of Document No. 73 beginning "regarding," through the end, should be redacted. The remaining portions of Document Nos. 64 and 73 should be produced.

k. <u>Document Nos. 88, 92 and 148-150</u> are budget-related documents and have been properly withheld. Document Nos. 88 and 92 are February, 2009 e-mails between Volpi and GG Global Financial Director Micaela Le Divelec regarding the allocation of a budget for the United States and Italy litigations. Document Nos. 148-150 are April 17, 2009 e-mails between Volpi and Crescioli, with copy to Pelli, Ceccherini, and Rigucci, regarding the billing of work

performed by Crescioli. A review of these e-mails demonstrates that they were prepared in anticipation of litigation, and they are work product protected. See LaSalle Bank N.A. v. Mobile Hotel Props., LLC, Civ. A.03-2225, 2004 WL 902169, at *7 (E.D. La. Apr. 23, 2004) (budget document found protected under work product doctrine). In addition, these documents do not relate to any claims or defenses. Accordingly, they may be withheld.

l. Document No. 63 is a December 15, 2008 e-mail from Volpi to Massimo Rigucci ("Rigucci"), Gucci WW Shoe Business Unit Director. The communication consists of a two-sentence e-mail thanking Rigucci for performing certain work. Accordingly, neither the attorney-client privilege nor the work product doctrine extends to Document No. 63 and it should be produced.

3.     Substantial Need

As to the documents which the Court has identified as covered by the work product doctrine, on the present record Guess has failed to show substantial need and that it cannot obtain the substantial equivalent absent undue hardship. Guess argues that the documents support its defenses of "laches, estoppel, acquiescence, and trademark misuse," and seeks discovery as to when the Gucci companies "first learned of Guess's use of any of the [d]esigns" that are the subject of this litigation. Guess July 23, 2010 Mem. of Law, at 2; Ederer Decl., Ex. D (Transcript of May 2, 2010 hearing before Hon. Shira A. Scheindlin), at 37-38. Guess is already in possession of such information, however, and can obtain additional facts supporting its defenses through deposition discovery.

First, the Revised Amended Privilege Log itself provides the dates Gucci learned of specific Guess products bearing the marks at issue. The log plainly demonstrates that in as early as 2004, the Gucci companies investigated Guess products that appeared to infringe on Gucci

41

trademarks, including the "repeating Guess Quattro G pattern," which is "the subject of this suit" and "believed to be Guess SKU #SI502290." Ederer Suppl. Decl., Ex. B (Revised Privilege Log). As reflected in the Revised Privilege Log, Gucci again investigated the "repeating Guess Quattro G pattern" in 2007. Id. at Doc. No. 1. Indeed, counsel for Guess has declared that "upon receipt of the [Revised] Privilege Log," he was able to "put together what we believe, based on the information available to us, are the products referenced in the 2007 communications between Moss, Volpi, and [Gucci's counsel]." Welsh Suppl. Decl., ¶ 8. The Court understands Guess's concern regarding the incomplete descriptions in previous versions of Gucci's privilege log, but the Revised Privilege Log now describes accurately and with specificity the subject of the communications reviewed in camera by the Court.

Guess's argument that it cannot obtain substantially comparable evidence is belied by the fact that Guess has subpoenaed the deposition testimony of Murray, and has subpoenaed Moss for a continued deposition. Guess July 23, 2010 Mem. of Law, at 10; Ederer Suppl. Decl., Exs. F, H. No substantial need exists where a party can obtain the information it seeks through discovery devices such as interrogatories or deposition testimony. Costabile, 254 F.R.D. at 167. See Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1988) (no substantial need for attorney notes where plaintiff could obtain underlying factual information from deposition testimony of persons present at meeting); West v. E.I. DuPont De Nemours and Co., No. 05 Civ. 0534A (SR), 2010 WL 891007, at *3 (W.D.N.Y. Mar. 9, 2010) (substantial need shown "where witnesses are no longer available or can be reached only with difficulty"); In re Veeco Instruments, Inc. Sec. Litig., No. 05 MD 01695 (CM) (GAY), 2007 WL 724555, at *11 (S.D.N.Y. Mar. 9, 2007) (no substantial need shown where witnesses interviewed still available for deposition); Sec. & Exch. Comm'n v. Treadway, 229 F.R.D. 454, 456 (S.D.N.Y. 2005) (no

substantial need for attorney interview notes where information could be obtained from depositions); Xerox v. I.B.M. Corp., 64 F.R.D. 367, 382 (S.D.N.Y. 1974) (plaintiff required to depose witness to show inability to obtain substantial equivalent of information sought prior to obtaining work product). Although Guess's statute of limitations and laches defenses relate to events that may have taken place some time ago, this case does not present a scenario in which the lapse in time makes it impossible for Guess to obtain the facts from other sources.

Finally, Guess has not shown undue hardship. While undue hardship does not require the party seeking discovery of work product to show that it is "absolutely impossible" to "obtain[] the information elsewhere," it must demonstrate "that it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source than from factual work product of the objecting party." Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 67 (E.D.N.Y. 2007) (citation omitted). Guess has not met this burden, and ordering production of the documents will reveal the details of the steps taken by Gucci to initiate this action. Accordingly, Document Nos. 40, 42-56, 66, 76-77, 82-83, 121, 123, and 125-126, to which Guess has withdrawn its objection of work product, need not be disclosed, as Guess has not established a substantial need for them.

IV.    **CONCLUSION**

To summarize, the Court has made the following rulings. First, the communications of Vanni Volpi "touch base" with the United States, and therefore the applicability of the attorney-client privilege is governed by American law. Second, the attorney-client privilege extends to the post-October, 2008 communications of Vanni Volpi because he acted as an agent of attorney Daniella Della Rosa during this time period. Third, the post-October, 2008 communications of Vanni Volpi and Jonathan Moss are eligible for protection from disclosure pursuant to the work

product doctrine because the documents reflect that Gucci and GG performed work "because of" the prospect of litigation between November, 2008 and April, 2009. Fourth, neither the attorney-client privilege nor the work product doctrine extends to the pre-October, 2008 communications of Vanni Volpi or Jonathan Moss, and therefore these documents (with the exception of Document Nos. 3, 4, 36 and a portion of Document No. 38) should be produced. Finally, the Court finds that Guess has not demonstrated substantial need as to the post-October, 2008 documents which the Court has identified as containing work product.

Accordingly, Gucci's application for an order protecting the Volpi communications in Docket No. 71 is GRANTED IN PART AND DENIED IN PART, and its application for an order protecting the Moss communications in Docket No. 62 is GRANTED IN PART AND DENIED IN PART. Gucci is directed to produce the documents identified in the attached Schedule "A" in accordance with the instructions therein by no later than the expiration of the 14-day period under Rule 72(a), if no objections are filed. If either side files objections, any requests for further relief, including any stay applications, should be made to Judge Scheindlin.

SO ORDERED.

Dated: New York, New York
       September 23, 2010

                                         JAMES L. COTT
                                         United States Magistrate Judge

**Copies of this Order are being sent by ECF to:**

Louis S. Ederer
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000 x1102
Fax: (212) 715-1399
louis.ederer@aporter.com

Matthew Thomas Salzmann
Arnold & Porter, LLP
399 Park Avenue
New York  NY 10022
(212) 715-1000
Fax: (212) 715-1399
Matthew.Salzmann@aporter.com

Robert C. Welsh
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 246-6700 x6712
Fax: (310) 246-6779
rwelsh@omm.com

Andrew Jay Frackman
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212) 326-2000
Fax: (212) 326-2061
afrackman@omm.com

Daniel M. Petrocelli
O'Melveny & Myers, LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067-6035
(310) 246-6700 x6850
Fax: (310) 246-6779
dpetrocelli@omm.com

Darren W. Saunders
Hiscock & Barclay LLP
7 Times Square

New York, NY 10036
(212) 784-5800
Fax: (212) 784-5777
dsaunders@hblaw.com

Alpa V. Patel
Hiscock & Barclay, LLP (ROCH)
2000 HSBC Plaza, 20th Flr.
Rochester, NY 14604
(585) 295-4438
Fax: (585) 295-8459
apatel@hblaw.com

Paul Fields
Leason Ellis LLP
81 Main Street, Suite 503
White Plains, NY 10601
(914) 288-0022
Fax: (914) 288-0023
fields@leasonellis.com

John T. Williams
Hinkhouse Williams Walsh LLP
180 North Stetson, Suite 3400
Chicago, IL 60601
(312) 268-5767
Fax: (312) 268-5801
jwilliams@hww-law.com

Abigail Anne Rubinstein
Steptoe & Johnson, LLP (DC)
1330 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 429-3068
Fax: (202) 261-0595
arubinstein@steptoe.com

Atul R. Singh
Darby & Darby, P.C. (NYC)
7 World Trade Center
New York, NY 10007-0042
(212) 527-7700 X7735
Fax: (212) 527-7701
asingh@rpl-law.com

Hon. Shira A. Scheindlin

SCHEDULE "A"

| Document Nos. | Instructions |
|---|---|
| *Pre-October, 2008 Communications* | |
| 1, 5, 34, 37 | Produce. |
| 3, 4, 36 | Properly withheld as privileged. |
| 35 | Redact third full paragraph beginning "Regarding Lou's memo" and produce remaining portions. |
| 38 | Redact sentence beginning "Also…" and produce remaining portions. |
| *Post-October, 2008 Communications* | |
| 40, 42-56, 66, 76-77, 82-83, 121, 123, 125-126 | No challenge to work product; substantial need not demonstrated; properly withheld. |
| 62, 65, 67-70, 79-81, 84-85, 114, 116, 145-147, 152-153 | Properly withheld as work product. |
| 107, 108 | Properly withheld as work product. |
| 113 | Produce. |
| 160 | Redact first four paragraphs, but sentence beginning "Finally, I attach . . ." and everything beneath it should be produced, along with the Guess 2008 Financial Report. |
| 61, 105-106, 117, 118 | Properly withheld as work product. |
| 129-132, 136-138, 140-143, 154, 157-158, 161, 166-167 | Produce. |
| 156 | Redact portion of first sentence beginning "as I fear . . ." through the end. Remaining portions should be produced. |
| 98, 99 | Produce. |
| 87, 111 | Properly withheld as privileged and work product. |
| 109, 110 | Produce. |

SCHEDULE "A"

| 72, 75, 101-104, 120, 127 | Produce. |
|---|---|
| 64 | Redact last sentence beginning "I must point out . . ." Remaining portions should be produced. |
| 73 | Redact portion of last sentence beginning "regarding . . ." Remaining portions should be produced. |
| 88, 92, 148-150 | Properly withheld as work product. |
| 63 | Produce. |
| | |