UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| GUCCI AMERICA, INC., | : | Civil Action No. 09cv4373 |
|  | : | (SAS)(JLC) |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
| GUESS?, INC., MARC FISHER FOOTWEAR | : |  |
| LLC, THE MAX LEATHER GROUP/CIPRIANI | : |  |
| ACCESSORIES, INC., SEQUEL AG, K&M | : |  |
| ASSOCIATES L.P., VIVA OPTIQUE, INC., | : |  |
| SIGNAL PRODUCTS, INC. and SWANK, INC., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

---------------------------------------------------------------- x


**PLAINTIFF GUCCI AMERICA'S MEMORANDUM OF LAW IN SUPPORT
OF ITS RULE 72(a) OBJECTIONS TO THE JUNE 29, 2010 MEMORANDUM
AND ORDER OF MAGISTRATE JUDGE JAMES L. COTT DENYING IN
PART PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER AGAINST
THE DISCLOSURE OF THE WRITTEN COMMUNICATIONS OF ITS
FORMER IN-HOUSE ATTORNEY JONATHAN MOSS**


ARNOLD & PORTER LLP
Louis S. Ederer, Esq.
399 Park Avenue
New York, New York 10022
Tel: (212) 715-1000
Fax: (212) 715-1399

*Attorneys for Plaintiff
Gucci America, Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS .....................................................................................................2

PRIOR PROCEEDINGS ...............................................................................................4

ARGUMENT .................................................................................................................7

    I.      Standard of Review..........................................................................................7

    II.    The June 29 Order Is Clearly Erroneous and Contrary to Law .......................7

          A.    Moss, a Member of the California Bar and the Bars of the U.S.
                District Courts for the Southern and Central Districts of California,
                Was an "Attorney" for Purposes of Invoking the
                Attorney-Client Privilege.......................................................................7

          B.    The Court Misapplied The "Reasonable Belief" Exception.................16

          C.    If Upheld, the Magistrate Judge's Decision Has
                Far-Reaching Implications...................................................................23

CONCLUSION.............................................................................................................24

## TABLE OF AUTHORITIES

### FEDERAL AND STATE CASES

*Applebaum v. Rush Univ. Med. Ctr.*,
   231 Ill. 2d 429 (Ill. 2008)...........................................................................12, 13, 15

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
   2002 WL 31385824 (S.D.N.Y. Oct. 21, 2002)...........................................................14

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
   160 F.R.D. 437 (S.D.N.Y. 1995).................................................................................8

*Bulko v. Morgan Stanley DW Inc.*,
   450 F.3d 622 (5th Cir. 2006).......................................................................................12

*Dabney v. Inv. Corp. of Am.*,
   82 F.R.D. 464 (E.D. Pa. 1979)....................................................................................20

*Fin. Tech. Int'l, Inc. v. Smith*,
   2000 WL 1855131 (S.D.N.Y. Dec. 19, 2000) ................................................... *passim*

*Freeman v. Indian Spring Land Co.*,
   2007 WL 127699 (Conn. Super Ct. Jan. 8, 2007)......................................................19

*Georgia-Pacific Plywood Co. v. U.S. Plywood Corp.*,
   18 F.R.D. 463 (S.D.N.Y. 1956) ..................................................................................10

*Hustedt v. Workers' Comp. Appeals Bd.*,
   636 P.2d 1139 (Cal. 1981) ..........................................................................................14

*In re Comverse Tech. Inc. Sec. Lit.*,
   2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) ..................................................................7

*In re Grand Jury Subpoena Duces Tecum*,
   112 F.3d 910 (8th Cir. 1997) .......................................................................................16

*In re Kandekore*,
   460 F.3d 276 (2d Cir. 2006).........................................................................................14

*In re Rivastigmine Patent Litig.*,
   237 F.R.D. 69 (S.D.N.Y. 2006) ..............................................................................13, 14

*In re Rose*,
   993 P.2d 956 (Cal. 2000) .............................................................................................14

*In re Ruffalo*,
   390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968)...............................................12

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   220 F.R.D. 235 (S.D.N.Y. 2004) ...................................................................................7

*Malletier v. Dooney & Burke, Inc.*,
   2006 WL 3476735 (S.D.N.Y. Nov. 30, 2006).............................................................11

*Mohawk Indus., Inc. v. Carpenter,*
   130 S. Ct. 599 (2009)..................................................................................1

*NXIVM Corp. v. O'Hara,*
   241 F.R.D. 109 (N.D.N.Y. 2007)...........................................................23

*Paper Converting Co. v. FMC Corp.,*
   215 F. Supp. 249 (E.D. Wis. 1963)........................................................10

*People v. Pope,*
   944 P.2d 689 (Colo. App. 1997).......................................................12, 13

*Reese v. Peters,*
   926 F.2d 668 (7th Cir. 1991)............................................................13, 14

*S.E.C. v. Beacon Hill Asset Mgmt. LLC,*
   231 F.R.D. 134 (S.D.N.Y. 2004)................................................... *passim*

*Status Time Corp. v. Sharp Elec. Corp.,*
   95 F.R.D. 27 (S.D.N.Y. 1982)..................................................................10

*Swidler & Berlin v. United States,*
   524 U.S. 399 (1998)..................................................................................17

*Theard v. U.S.,*
   354 U.S. 278, 77 S. Ct. 1274, 1 L. Ed. 2d 1342 (1957)..........................14

*Trammel v. U.S.,*
   445 U.S. 40 (1980)....................................................................................16

*Tyree v. Dance,*
   1990 WL 40298 (9th Cir. Apr. 4, 1990) ......................................9, 12, 15

*Upjohn Co. v. U.S.,*
   449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)..........................16

*U.S. v. Boffa,*
   513 F. Supp. 517 (D. Del. 1981).......................................................19, 20

*U.S. v. Dumas,*
   796 F. Supp. 42 (D. Mass. 1992)......................................................14, 15

*U.S. v. Gillock,*
   445 U.S. 360 (1980)..................................................................................16

*U.S. v. Hoffman,*
   733 F.2d 596 (9th Cir. 1984)............................................................13, 15

*U.S. v. Int'l Bus. Mach. Corp.,*
   66 F.R.D. 206 (S.D.N.Y. 1974)................................................................10

*U.S. v. Mullen & Co.,*
   776 F. Supp. 620 (D. Mass. 1991)...........................................................16

*U.S. v. Ostrer,*
   422 F. Supp. 93 (S.D.N.Y. 1976)..............................................................16

*U.S. v. Rivera,*
    837 F. Supp. 565 (S.D.N.Y. 1993) ...........................................................................16

*U.S. v. Steele,*
    53 M.J. 274 (C.A.A.F. 2000) .................................................................................12

*U.S. v. United Shoe Mach. Corp.,*
    89 F. Supp. 357 (D. Mass. 1950) .....................................................................*passim*

*Zenith Radio Corp. v. Radio Corp. of Am.,*
    121 F. Supp. 792 (D. Del. 1954) ............................................................................10

## RULES AND SECONDARY AUTHORITY

FED. R. CIV. P. 72 ............................................................................................................1, 7

28 U.S.C. § 636(b)(1)(A) ..................................................................................................1

S. REP. No. 93-1277 (1974) ...........................................................................................16

CAL. BUS. & PROF. CODE, § 6003 ...................................................................................14

CAL. BUS. & PROF. CODE, § 6005 ...................................................................................14

CAL. BUS. & PROF. CODE, § 6006 ...................................................................................14

*Rules and Regulations of the State Bar of California,* Art. I, § 2(a) ..............................14

*Rules and Regulations of the State Bar of California,* Art. I, § 3 ..................................14

Supreme Court Standard 503(a)(2), 56 F.R.D. 183 (1973) ..............................................9

24 Charles A. Wright & Kenneth W. Graham,
    *Federal Practice and Procedure,* § 5480 (1st ed. 1986) ......................................10

Glen Weissenberger & James J. Duane,
    *Weissenberger's Federal Evidence* § 501.5 (6th ed. 2009) ..............................10, 11

8 John Henry Wigmore,
    *Wigmore on Evidence* § 2300 (McNaughton rev. 1961) ......................................11

Ben Hallman, *Head Spinning Yet? If Gucci's Lawyer Isn't a Lawyer,*
    *Does Privilege Work?,* The American Lawyer (Apr. 14, 2010),
    http://www.law.com/jsp/cc/PubArticleCC jsp?id=1202447984398&Head
    _Spinning_Yet_If_Guccis_Lawyer _Isnt_a_Lawyer_Does_Privilege_Work ...........13, 14, 21

Stephen Gillers, *Gucci, Guess?, Moss,* Legal Ethics Forum
    (June 29, 2010, 9:50 PM), http://www.legalethicsforum.com/blog/
    2010/06/gucci-guess-moss.html...........................................................................2, 21, 22, 23

## PRELIMINARY STATEMENT

Plaintiff Gucci America, Inc. ("Gucci"), pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Federal Rules of Civil Procedure, respectfully objects to the June 29, 2010 Memorandum and Order of Magistrate Judge James L. Cott (the "June 29 Order"), denying in part Gucci's motion for a protective order against the disclosure of written communications of its former in-house legal counsel, Jonathan Moss. Dkt. 112.

If upheld by this Court, the June 29 Order will undermine the core purpose of the attorney-client privilege, the most important privilege a client possesses when it communicates with its attorney — the ability to speak frankly and openly about its legal matters without fear that its communications will later be discovered.[1] For all seven years he served as Gucci's in-house counsel, Jonathan Moss was an attorney, a member of not one but three bars. Under clearcut Second Circuit law, that is all Gucci needs to show to avail itself of this sacred privilege. The consequences, if any, of Moss having practiced law while on inactive status at the California bar — a status he could have changed at any time (and later did) by writing a $300 check — should be suffered by him, not his client. The Magistrate Judge, however, failed to appreciate this, instead penalizing the client and subjecting seven years of confidential communications to discovery — literally a "first" in the history of federal jurisprudence.

Indeed, if the June 29 Order is upheld, it will result in several unfortunate jurisprudential "firsts":

- The first case in the history of federal jurisprudence where a client was stripped of the attorney-client privilege when its

---

[1] As Magistrate Judge Cott notes, "[b]y assuring confidentiality, the [attorney-client] privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation." Dkt. 126 at 19-20 (quoting *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 606 (2009)).

> attorney was a member of a bar at the time he engaged in the
> disputed communications.

- The first case in the history of federal jurisprudence where a client was deprived of the attorney-client privilege where the putative attorney was not a *poseur* — someone who had never been a member of any bar, much less a current bar member.

- The first case in the history of federal jurisprudence where an attorney's inactive status at the bar caused his client to be negatively impacted in litigation in any way.

In addition, if upheld, the June 29 Order could have far-reaching implications — essentially obligating the client to continuously check its attorney's bar status prior to communicating with him. Such a result could not possibly have been intended when the doctrine of attorney-client privilege was formulated.

Accordingly, and for the reasons set forth below, Gucci's objections to the June 29 Order should be sustained, as the Magistrate Judge erred as a matter of law in determining (i) that Moss was not an attorney for purposes of applying the attorney-client privilege, and (ii) alternatively, that Gucci did not have a reasonable belief that Moss was an attorney when it communicated with him. As Professor Stephen Gillers of New York University Law School, a well-known expert in such matters, said, "[t]he district judge gets the final say. I hope she rejects [the Magistrate Judge's decision]."[2]

## RELEVANT FACTS

The facts supporting Gucci's position are fully set forth in the declarations submitted by Gucci in support of its motion for protective order. Dkt. 63-69. For the Court's convenience, they are summarized below.

---

[2] *See* Stephen Gillers, *Gucci, Guess?, Moss*, LEGAL ETHICS FORUM (June 29, 2010, 9:50 PM), http://www.legalethicsforum.com/blog/2010/06/gucci-guess-moss.html (hereinafter, "Gillers, *Gucci, Guess?, Moss*").

In 1993, Moss graduated from Fordham University School of Law. Dkt. 63 at ¶2, Ex. A. Following graduation, Moss passed the California bar examination and, on December 14, 1993, was admitted to the California bar. *Id.* In December 1994, Moss became a member of the bars of the U.S. District Courts for the Southern and Central Districts of California. *Id.* at ¶¶3-4, Exs. B, C. On September 1, 1996, after being hired into a non-legal position at PricewaterhouseCoopers, Moss voluntarily changed his California bar status to inactive, but remained a bar member at all times, each year paying the required fee to maintain inactive status. *Id.* at ¶2, Ex. A. During this same period, Moss remained a member of the bars of the Southern and Central Districts of California. *Id.* at ¶¶3-4, Exs. B, C.

In 2002, Moss, having been referred to Gucci by its outside counsel, Patton Boggs LLP, was hired by Gucci into a non-legal position. Dkt. 65 at ¶¶5-6; Dkt. 66 at ¶¶4-6, 8, 10; Dkt. 68 at ¶¶4-5. Since he was hired as a non-lawyer, Gucci did not inquire as to Moss' bar status at the time of Moss' hiring. Dkt. 66 at ¶9; Dkt. 68 at ¶7. Gucci understood, however, based on statements Moss and Patton Boggs made prior to his hiring, that he held a law degree, had previously worked as a lawyer in California, and was authorized to practice law. Dkt. 66 at ¶¶6, 11; Dkt. 68 at ¶5.

During the period he was employed by Gucci as a non-lawyer, Moss continued to hold himself out to fellow employees and to Gucci management as an attorney authorized to practice law. Dkt. 67 at ¶¶2-3; Dkt. 68 at ¶10. He also did so externally, in 2002, submitting papers in a bankruptcy proceeding in which he represented under oath he was a member in good standing of the California bar and the U.S. District Court for the Southern District of California. Dkt. 63 at ¶5, Ex. D.

In 2003, after having established himself as a trusted employee, Moss was promoted to

the position of Legal Counsel. Dkt. 66 at ¶¶10-11; Dkt. 68 at ¶8. Given that Moss had performed his duties well, had been referred by Gucci's outside counsel, had worked with Gucci's outside counsel on a number of matters, and had consistently held himself out to be a bar member and an attorney authorized to practice law, Gucci did not investigate his bar status at that time. Dkt. 68 at ¶¶8, 10.

Following his promotion to Legal Counsel, Moss continued to hold himself out as a bar member and an attorney authorized to practice law. Dkt. 63 at ¶6, Ex. E; Dkt. 67 at ¶¶3, 5, 7; Dkt. 68 at ¶¶9-10; Dkt. 69 at ¶¶5-9. In his new role, Moss took on a range of legal responsibilities. Dkt. 67 at ¶¶3-5, 7; Dkt. 69 at ¶¶6-9. Among other things, he represented Gucci in legal proceedings before the EEOC, negotiated leases and employment agreements, and filed papers in the U.S. Trademark Office in which he represented under oath that he was an attorney admitted to the California bar. Dkt. 63 at ¶7, Ex. F; Dkt. 67 at ¶¶5, 8; Dkt. 69 at ¶7. Having comported himself well, in 2005 Moss was promoted to the position of director of legal services, and later was appointed General Counsel, heading up the Gucci legal department. Dkt. 67 at ¶7.

In January 2010, when Gucci learned that Moss, although a member of the California bar, had been on inactive status during the period of his employment, Gucci placed him on administrative leave. Dkt. 69 at ¶¶10-11. Thereafter, Gucci met with Moss, and he admitted he was aware of his inactive status, and had not informed Gucci of this. *Id.* at ¶12; Dkt. 67 at ¶8. Subsequently, Gucci terminated Moss for cause, effective March 1, 2010. Dkt. 69 at ¶¶10-13.

## PRIOR PROCEEDINGS

The relevant prior proceedings are as follows. On April 2, 2010, Gucci filed two separate motions for protective order. The first sought an order against the disclosure of Moss' written communications. Dkt. 62-70. The second requested an order against the disclosure of the written communications of Guccio Gucci, S.p.A.'s intellectual property specialist, Vanni Volpi.

4

Dkt. 71-78. Both motions sought protection on the grounds that Moss' and Volpi's communications were attorney-client privileged and work product-protected.

On June 29, 2010, Magistrate Judge Cott issued the June 29 Order (Dkt. 112), denying, in part, Gucci's motion for protective order against the disclosure of Moss' communications, finding that Moss was not an attorney for the purpose of applying the attorney-client privilege. The June 29 Order did not address the question whether any of Moss' communications were protected from disclosure on work product grounds.

In a separate June 29, 2010 Memorandum and Order (Dkt. 111), Magistrate Judge Cott issued an order (i) directing Gucci to submit a revised amended privilege log identifying those Volpi communications that related to the instant litigation and those relating to a parallel litigation pending in Italy, and providing more detailed descriptions of Volpi's communications; (ii) directing the parties to meet and confer in an effort to reduce the number of documents remaining in dispute; and (iii) permitting the parties to make further submissions addressing the question whether the Moss and Volpi communications were work product-protected.

Thereafter, by Order dated July 2, 2010 (Dkt. 115), Magistrate Judge Cott granted Gucci's request for a stay of the Rule 72(a) objection period with respect to the June 29 Order until such time as he decided whether any of Moss' communications were protected from disclosure as work product.

On July 19, 2010, Gucci provided Magistrate Judge Cott with a Further Revised Amended Privilege Log (the "July 19 Log") describing the Moss and Volpi documents that remained in dispute in greater detail. Thereafter, on July 23, 2010, the parties submitted supplemental memoranda of law addressing the applicability of the work product doctrine to the Moss and Volpi communications. Dkt. 117-21. Subsequently, by Memorandum and Order

dated July 28, 2010 (Dkt. 122), Magistrate Judge Cott directed Gucci to submit the documents listed on the July 19 Log for *in camera* review.

Finally, by Memorandum and Order dated September 23, 2010 (Dkt. 126) (the "September 23 Order"), Magistrate Judge Cott (i) granted in part and denied in part Gucci's motion for a protective order against the disclosure of Moss' communications, finding that certain Moss documents were work product-protected, and certain others were attorney-client privileged, in whole or in part, because they involved or related to communications with outside counsel; and (ii) granted in part and denied in part Gucci's motion for a protective order against the disclosure of Volpi's communications, finding that certain Volpi documents were attorney-client privileged, and others were work product-protected. Magistrate Judge Cott further ordered Gucci to produce certain Moss and Volpi documents that were neither attorney-client privileged nor work product-protected.

Gucci's instant objections are directed to Magistrate Judge Cott's June 29 Order and the issue of Gucci's ability to invoke the attorney-client privilege as to Moss and his communications. For all the reasons set forth below, the June 29 Order is contrary to law, and Gucci's Rule 72(a) objections should be sustained.[3]

---

[3] While Gucci does not object to the Magistrate Judge's September 23 Order, we note that to the extent this Court overturns the June 29 Order, the Moss communications which the Magistrate Judge ordered Gucci to produce would be attorney-client privileged and not subject to disclosure. Such documents include Document Nos. 1, 5, 34, 35 and 37. Dkt. 126 at Schedule "A". Accordingly, to the extent necessary under the September 23 Order, Gucci hereby seeks a stay of that Order pending the Court's determination of the instant objections.

# ARGUMENT

## I.  Standard of Review

Rule 72(a), permitting a party to "serve and file objections" to a Magistrate Judge's order regarding non-dispositive matters, provides that the District Court Judge to whom objections are made "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."  FRCP 72(a); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 220 F.R.D. 235, 237 (S.D.N.Y. 2004) ("[t]he issue raised by the defendants' Objections is whether the Magistrate Judge's orders were clearly erroneous or contrary to law").  A Magistrate Judge's order is considered "contrary to law" when it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *In re Comverse Tech. Inc. Sec. Lit.*, 2007 WL 680779, at *2 (E.D.N.Y. Mar. 2, 2007) (citations omitted).  Further, if "'on the entire evidence,' [the court] is 'left with the definite and firm conviction that a mistake has been committed,' such an order is deemed "clearly erroneous." *Id.* For the reasons discussed below, the June 29 Order is both clearly erroneous and contrary to law, and should be overturned.

## II.  The June 29 Order Is Clearly Erroneous and Contrary to Law

### A.  Moss, a Member of the California Bar and the Bars of the U.S. District Courts for the Southern and Central Districts of California, Was an "Attorney" for Purposes of Invoking the Attorney-Client Privilege

In this Circuit, the elements giving rise to attorney-client privilege are well settled.  The most basic prerequisite is that the client must be communicating with an "attorney."  Under the prevailing test in this Circuit, articulated in *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 138 (S.D.N.Y. 2004) ("*Beacon Hill*"), an "attorney" is defined as "a member of the bar of a

court."[4]  Neither Magistrate Judge Pitman in *Beacon Hill* nor Judge Wyzanski in *U.S. v. United Shoe Mach. Corp.*, 89 F. Supp. 357 (D. Mass. 1950) ("*United Shoe*"), the famous case from which the *Beacon Hill* formulation was derived, nor any of *United Shoe's* progeny, have required more.  In particular, no formulation recognized in this Circuit requires that the attorney be "authorized to practice law," or that the attorney's bar status be "active."  Rather, so long as the purported attorney was "a member of the bar of a court" at the time he was communicating with his client, the communication may be attorney-client privileged.

As noted above, the purpose of the attorney-client privilege is clear — so that clients can protect their most critical communications from disclosure.  That is why the *Beacon Hill* standard is so elemental.  Under *Beacon Hill*, as long as the client is communicating with a bar member, that is, a person who has been qualified as an attorney by a state or federal bar, the communication may be privileged.  Since the purpose of the privilege is to protect the client, it is not up to the client to ensure his attorney has maintained proper bar status — that is the attorney's responsibility — and under no circumstances should the client be penalized for the attorney's technical failure to do so.

---

[4]  As fully articulated in *Beacon Hill*, the test for invoking the attorney-client privilege is as follows:

> The [attorney-client] privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom communication was made (a) ***is a member of the bar of a court***, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Beacon Hill*, 231 F.R.D. at 138 (S.D.N.Y. 2004) (emphasis added) (quoting *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 441 (S.D.N.Y. 1995)).

In the June 29 Order, the Magistrate Judge acknowledged, and agreed with Gucci, that *Beacon Hill* sets out the correct test in this Circuit for the application of the attorney-client privilege. Indeed, the Magistrate Judge stated that the *Beacon Hill/United Shoe* test "has been cited with approval in the Second Circuit and remains good law." Dkt. 112 at 7 (citations omitted). The Magistrate Judge further acknowledged that Moss was, at all times, a member of the California bar, even while on inactive status — "Moss 'remained a member of the California bar when he became voluntarily inactive'" (Dkt. 112 at 9) — citing the Ninth Circuit's opinion in *Tyree v. Dance*, 1990 WL 40298, at *2 (9th Cir. Apr. 4, 1990). Without any support, however, and for no good reason, the Magistrate Judge went on to impose a further requirement — that the attorney be "authorized to engage in the practice of law." Dkt. 112 at 9.

The Magistrate Judge's so-called "authorized to practice law" requirement, advocated by Guess below, appears nowhere in the *Beacon Hill* formulation, or in any test recognized in this Circuit. Rather it is derived from Supreme Court Standard 503, which defines a "lawyer," for purposes of applying the attorney-client privilege, as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." *See* Supreme Court Standard 503(a)(2), 56 F.R.D. 183, 235–36 (1973). Acknowledging that such an "authorized to practice law" requirement appears only in Supreme Court Standard 503, and noting that the Supreme Court Standard has never been codified in the Federal Rules of Evidence (Dkt. 112 at 8), the Magistrate Judge first appears to reject that test, instead favoring Gucci's "member of a bar" test under *Beacon Hill*. Dkt. 112 at 8-9.[5] Then, inexplicably, the Magistrate

---

[5] It is worth noting that even if Supreme Court Standard 503 is good law, quite likely its "authorized to practice law" requirement is no different than the *Beacon Hill* requirement that the communication be with "a member of the bar of a court." In both instances, the issue is the same — whether an individual has met the bar's qualifications to practice law. Were it otherwise, the literal application of Supreme Court Standard 503 would lead to absurd results, as one could

Footnote continued on next page

9

Judge reverses field and adopts Guess' argument that the attorney's bar membership "must be of

a type that licenses one to practice law" (Dkt. 112 at 9), now imposing the very requirement he

previously eschewed.[6]  In support of his "authorized to practice law" requirement, the Magistrate

Judge cites three treatises and one District Court decision, none of which have ever been cited

for that proposition by any court.[7]

---

Footnote continued from previous page

imagine any number of circumstances under which a bar member, even for a short time, is not
"authorized to practice law" in the location in which he finds himself.

[6]  Although it appears the Magistrate Judge, in imposing his "authorized to practice law"
requirement, improperly conflated the *Beacon Hill* test with Supreme Court Standard 503, it is
also possible he derived this interpretation from an erroneous reading of the additional *Beacon
Hill* provision that the putative attorney be "acting as a lawyer."  The *Beacon Hill* requirement
that the attorney be "acting as a lawyer," however, refers to the distinction between a
communication where the attorney was wearing his legal hat, in which case the communication
would be privileged, as opposed to another hat, such as where he is discussing business strategy,
in which case the communication would not be privileged.  *See, e.g., Status Time Corp. v. Sharp
Elec. Corp.*, 95 F.R.D. 27, 29–30 (S.D.N.Y. 1982) (applying the *United Shoe* standard and
noting that "attorneys do not 'act as lawyers' when . . . 'not primarily engaged in legal activities
[, for example,] when largely concerned with technical aspects of a business or engineering
character . . . .'" (citing *Zenith Radio Corp. v. Radio Corp. of Am.*, 121 F. Supp. 792 (D. Del.
1954) and *Georgia-Pacific Plywood Co. v. U.S. Plywood Corp.*, 18 F.R.D. 463, 464–65
(S.D.N.Y. 1956)); *U.S. v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 206, 211–12 (S.D.N.Y. 1974)
(applying the *United Shoe* standard, *id.* at 211, and then holding: "'Acting as a lawyer'
encompasses the whole orbit of legal functions.  When he acts as an advisor, the attorney must
give predominantly legal advice to retain his client's privilege of non-disclosure, not solely, or
even largely, business advice.'" (citing *Zenith Radio Corp.*, 121 F. Supp. at 794)).  In any event,
the Magistrate Judge's "authorized to practice law" requirement — one that permeates the entire
June 29 Order — is not and has never been part of the *Beacon Hill/United Shoe* formulation, and
the Magistrate Judge's imposition of that requirement is contrary to law.

[7]  The three treatises are Wright and Graham's *Federal Practice and Procedure*,
Weissenberger's *Federal Evidence*, and *Wigmore on Evidence*.  *Id.*  Notably, however, the cited
reference in Wright and Graham is a discussion of Supreme Court Standard 503, which, as the
authors note, has been rejected and never codified.  *See* 24 Charles A. Wright & Kenneth W.
Graham, *Federal Practice and Procedure*, § 5480 (1st ed. 1986).  Weissenberger does state that
the putative attorney should "be authorized to practice law in some jurisdiction," but none of the
cases he cites for that proposition — *Paper Converting Co. v. FMC Corp.*, 215 F. Supp. 249
(E.D. Wis. 1963), *Georgia-Pacific Plywood Co. v. U.S. Plywood Corp.*, 18 F.R.D. 463 (S.D.N.Y.
1956), and *Zenith Radio Corp. v. Radio Corp. of America*, 121 F. Supp. 792 (D. Del. 1954) —
turn on the issue of "authorization to practice."  Rather, all three cases rely on the *United Shoe*

Footnote continued on next page

In fact, there has never been any case, and certainly not one in this Circuit, that imposes an "authorized to practice law" requirement, or supports the Magistrate Judge's finding that an attorney who has been admitted to the bar and has always maintained his bar membership, but failed to pay an extra $300 to maintain active status, was not an "attorney" for purposes of applying the attorney-client privilege.[8] There are, however, several cases that stand very clearly for the proposition that a client should be protected from its attorney's indiscretions at all costs, and not penalized or deprived of the benefit of its attorney's representation simply because the attorney neglected to write the right-sized check, or failed to meet some other technical requirement relating to his bar status. For example, in the aforementioned *Tyree v. Dance,* an Assistant U.S. Attorney who was a member of the Utah Federal District Court, but, as was the case with Moss, had voluntarily changed his California bar membership to "inactive," and was not yet a member of the Utah bar, swore out a warrant for the arrest of the plaintiff. Following his conviction, the plaintiff attempted to have it overturned on the basis that the warrant was unenforceable because the AUSA was not an active member of the California bar at the time he swore out the warrant. The Ninth Circuit, however, rejected the plaintiff's appeal, ruling that

---

Footnote continued from previous page

formulation, which, as noted above, imposes only a "member of a bar" requirement. *See* Glen Weissenberger & James J. Duane, *Weissenberger's Federal Evidence* § 501.5, fn 65 (6th ed. 2009). Finally, *Wigmore* actually supports Gucci's position. *Wigmore* states that "[t]here is no ground for encouraging the relation of client and legal adviser except when the adviser is one who has been formally *admitted to the office of attorney or counselor as duly qualified to give legal advice.*" Dkt. 112 at 9, quoting 8 John Henry Wigmore, *Wigmore on Evidence* § 2300 (McNaughton rev. 1961) (emphasis in original). Moss satisfied this requirement.

[8] Indeed, the lone decision relied upon by the Magistrate Judge for this proposition — *Malletier v. Dooney & Burke, Inc.,* 2006 WL 3476735 (S.D.N.Y. Nov. 30, 2006) — also supports Gucci's position. In that case, the plaintiff sought to assert the attorney-client privilege with respect to communications between its in-house counsel and other personnel concerning trademark applications in the U.S. Trademark Office. *Malletier,* 2006 WL 3476735, at *17. None of the counsel in question, however, was a member of any bar, so when the *Malletier* court speaks of "authorization to practice law," it is talking about a total absence of bar membership, not some technical issue as to the status of an admitted bar member.

even though the AUSA's California "state bar membership was the predicate upon which [he] was admitted to the [Utah] federal court," his inactive status "would not have determined his status as a member of the federal bar."[9] *Tyree*, 1990 WL 40298, at *2. In other words, the Ninth Circuit did not believe it was appropriate to penalize the AUSA's clients — the United States and the people of Utah — for his failure to pay the California bar an extra $300.

In another nearly identical case, *Applebaum v. Rush Univ. Med. Ctr.*, 231 Ill. 2d 429 (Ill. 2008), also argued extensively below (but ignored by the Magistrate Judge), the Illinois Supreme Court denied a defendant's attempt to nullify a civil complaint on the ground that the plaintiff's attorney was on inactive status in the Illinois bar when he signed the pleading, a status he, like Moss, could have corrected at any time by writing a larger check:

> [I]t is a fundamental error to equate such a status change ["active" to "inactive"] with stripping the attorney of his or her license to practice law. A change in an individual's ARDC [Attorney Registration and Disciplinary Commission] *registration status* has no relation to, and does not call into question, that person's skill, fitness or competency to practice law, which is assured through his or her initially meeting the requirements to obtain - and thereafter to retain - a valid *license* to practice law.

*Applebaum*, 231 Ill. 2d at 441 (emphasis in original). Similarly, even though he was on inactive status, Moss' fitness to practice law had been assured by his admission to the California bar, so he was at all times an "attorney" for purposes of invoking the attorney-client privilege.[10] Once

---

[9] Indeed, the result would likely have been the same even if the AUSA in *Tyree* had been disbarred at the state level. *See, e.g.*, *U.S. v. Steele*, 53 M.J. 274, 276 (C.A.A.F. 2000) ("Though admission to practice before a federal court is derivative from membership in a state bar, disbarment by the State does not result in automatic disbarment by the federal court. Though that state action is entitled to respect, it is not conclusively binding on the federal courts.") (quoting *In re Ruffalo*, 390 U.S. 544, 547 (1968)).

[10] *See also* *Bulko v. Morgan Stanley DW Inc.*, 450 F.3d 622, 626–27 (5th Cir. 2006) (finding that an arbitrator's inactive bar membership did not affect her status as an attorney with a history of practicing in the securities industry, and was at most a trivial departure); *People v. Pope*, 944 P.2d 689, 691 (Colo. App. 1997) (finding that an inactive member of the Colorado bar was still a

Footnote continued on next page

again, as in *Applebaum*, only he — not the client — should suffer the consequences of any technical indiscretions relating to his bar status.

Similar examples exist in the area of the Sixth Amendment, involving a criminal defendant's right to representation.  In these cases, courts have also distinguished between individuals who have never been admitted to any bar, and those "who satisfied the court of their legal skills but later run afoul of some technical rule.  Lawyers who do not pay their dues violate a legal norm, ***but not one established for the protection of clients***."  *Reese v. Peters*, 926 F.2d 668, 670 (7th Cir. 1991) (emphasis added).[11]  Indeed, when asked to comment on this case, Fordham Law School Professor Daniel Capra pointed to the many Sixth Amendment cases holding that people with adequate legal skills qualify as counsel, regardless of their compliance with technical bar fee requirements, stating "[i]t's no different for attorney-client privilege."[12]

Here, at all times that he was communicating with his client, Moss was a member of not one but three bars — the State of California; the U.S. District Court for the Central District of California; and the U.S. District Court for the Southern District of California.[13]  Dkt. 63 at ¶¶2-4,

---

Footnote continued from previous page
"lawyer" under the law governing juror challenges, in part because "the transfer to active status is based solely upon the satisfaction of certain administrative requirements and does not involve the reinstatement of a lawyer's license to practice law").

[11]  *See also U.S. v. Hoffman*, 733 F.2d 596, 598–601 (9th Cir. 1984) (rejecting a defendant's argument that his right to counsel was violated due to his representation by an attorney whose state bar membership had been suspended, because the suspension did not automatically result in disbarment in the federal court or a denial of right to counsel).

[12]  *See* Ben Hallman, *Head Spinning Yet? If Gucci's Lawyer Isn't a Lawyer, Does Privilege Work?*, THE AMERICAN LAWYER (Apr. 14, 2010), http://www.law.com/jsp/cc/PubArticleCC. jsp?id=1202447984398&Head_Spinning_Yet_If_Guccis_Lawyer_Isnt_a_Lawyer_ Does_Privilege_Work_ (hereinafter, "Hallman, *Head Spinning Yet?*").

[13]  In applying the *Beacon Hill/United Shoe* test for purposes of invoking the attorney-client privilege, Courts in this District have recognized that the "bar membership" requirement is satisfied by membership at either the state or federal level. *See, e.g., In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 74 (S.D.N.Y. 2006) (noting that "[a] legal professional generally must be

Footnote continued on next page

Exs. A, B, C.  The fact that he was an inactive member of the California bar during his seven

year tenure as Gucci's in-house counsel did not, under California law, impact Moss' status at the

bar — he continued to be a member at all times.[14]  In fact, the only way an attorney who has

been admitted to the California bar can be suspended or disbarred is by order of the California

Supreme Court.  *In re Rose*, 993 P.2d 956, 956 (Cal. 2000); *see also Hustedt v. Workers' Comp.

Appeals Bd.*, 636 P.2d 1139, 1139 (Cal. 1981).  Further, an attorney admitted to a federal court

bar based on a state bar membership is not automatically disbarred or suspended by virtue of a

change in his state bar status where the change in status was brought about by a failure to pay

adequate dues.[15]  As Moss was, at all times, a member of all three bars, under the *Beacon*

---

Footnote continued from previous page

admitted to the bar of a state *or* federal court to qualify as an attorney") (emphasis added), citing *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL 31385824, at *4 (S.D.N.Y. Oct. 21, 2002).

[14]  The California bar has two membership classes: active and inactive.  Cal. Bus. & Prof. Code, § 6003.  Bar members can elect either and still retain membership.  *Id.* at § 6005; *Rules and Regulations of the State Bar of California* ["*Rules*"], Art. I, § 2(a).  Further, an inactive member may transfer to active status any time upon written request, simply by paying the full annual membership fee (the difference between $125 and $410).  Cal. Bus. & Prof. Code, § 6006; Rules, Art. I, § 3.  According to the California bar website, "[i]nactive members have chosen this status voluntarily and may transfer to active at any time upon request."  Dkt. 62 ¶8, Ex. G (California Bar "Member Status Definitions").  Thus, the change in status is purely ministerial — there is no waiting period and no "reapplication" process, nor is the transfer subject to any discretion on the part of the California bar.  Dkt. 63 ¶9, Ex. H (California Bar "Request to Transfer to Active Status" Form noting that a "[s]tatus change will be effective upon receipt of this form and payment in full").  Indeed, after he was placed on administrative leave, Moss paid the additional fee and immediately went on active status with the California bar on February 5, 2010.  *Id.* ¶2, Ex. A.

[15]  "While a lawyer is admitted into a federal court by way of state court, he is not automatically sent out of the federal court by the same route.  The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included."  *Theard v. U.S.*, 354, U.S. 278, 281 (1957), *cited with approval in In re Kandekore*, 460 F.3d 276, 279 (2d Cir. 2006).  *See also Reese*, 926 F.2d at 670 (rejecting a nullification argument because "[f]ederal courts do not collect annual dues, and a state may not hold membership in the federal bar hostage to extract its own tribute."); *U.S. v. Dumas*, 796 F. Supp. 42, 46 (D. Mass. 1992) (distinguishing between individuals who had never been a member of any bar and those who were suspended for failure

Footnote continued on next page

*Hill/United Shoe* formulation he was an "attorney" for purposes of applying the attorney-client privilege.

Notwithstanding this, and while acknowledging that Moss was a bar member at all times, the Magistrate Judge nevertheless found that Moss' bar memberships were entitled to no credit. As for Moss' California bar membership, the Magistrate Judge points out that Moss was committing a misdemeanor by practicing law while on inactive status. Dkt. 112 at 11. He further notes that Moss' memberships in both California District Courts were predicated on his active membership in the California bar. Dkt. 112 at 11-12. Therefore, even though Moss met the *Beacon Hill* "bar membership" requirement times three, the Magistrate Judge held these memberships counted for nothing in determining whether Gucci may invoke the attorney-client privilege. What the Magistrate Judge overlooked, however, is that just as in *Tyree*, *Applebaum*, and the Sixth Amendment cases, the client is entitled to be protected in these situations, not penalized for the attorney's oversights.[16] The fact remains, as Moss was a member of the California bar and two Federal Court bars, at all times he was an "attorney" under the *Beacon Hill* test. On that basis alone, Gucci should be entitled to invoke the privilege.

---

Footnote continued from previous page
to pay bar dues, whose violation is not "a matter which would introduce doubt about his competence").

[16] Indeed, the Ninth Circuit in *Hoffman* explicitly recognized that an attorney's indiscretions with respect to bar membership should not be visited upon his client: "Before addressing [the] issue [of the attorney's status], . . . we wish to make it clear that we in no way condone [the attorney's] failure to inform the court of his [state bar] suspension. [However, a]ny discipline for that act would occur in a separate proceeding. We are confronted here only with [the defendant's] sixth amendment claim and not consideration of the proper sanctions to be imposed on [the attorney]." *Hoffman*, 733 F.2d at 599.

**B.      The Magistrate Judge Misapplied the "Reasonable Belief" Exception**

Even if Moss were not an attorney, that is, a member, at all relevant times, of three bars,

nevertheless, as the Magistrate Judge acknowledged, Gucci is still entitled to invoke the

attorney-client privilege if it "reasonably believed" he was.  Here, however, the Magistrate Judge

compounded his error by misapplying the "reasonable belief" exception, which provides that

even if the putative attorney turns out not to be an attorney, the client may still maintain the

privilege if it reasonably believed, under all the facts and circumstances, that he was.  In this

case, all facts point to a finding that Gucci's belief that Moss was an attorney was reasonable.

The "reasonable belief" exception has long been followed in the federal courts, including

those in this Circuit.  *See, e.g., U.S. v. Rivera*, 837 F. Supp. 565, 568 n.1 (S.D.N.Y. 1993) ("It is

common ground among the parties that the attorney-client privilege attaches to confidential

communications made to an individual in the genuine, but mistaken, belief that he is an

attorney."); *U.S. v. Ostrer*, 422 F. Supp. 93, 97 (S.D.N.Y. 1976) (the attorney-client privilege "is

applicable where the client entertains good faith beliefs (even if erroneous) that the person

consulted is a lawyer, and is acting as such on his behalf").[17]  Further, a party's "reasonable

belief" is to be determined on a case-by-case basis, taking into account the facts and

circumstances of each case.  *See Upjohn Co. v. U.S.*, 449 U.S. 383, 396 (1981), citing S. REP.

No. 93-1277, p. 13 (1974); *Trammel v. U.S.*, 445 U.S. 40, 47 (1980); *U.S. v. Gillock*, 445 U.S.

360, 367 (1980) (discussing the case-by-case treatment of privilege issues).  As a result, in

---

[17] *See also In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 923 (8th Cir. 1997) ("courts
have found the privilege applicable where the client reasonably believed that a poseur was in fact
a lawyer"); *U.S. v. Mullen & Co.*, 776 F. Supp. 620, 621 (D. Mass. 1991) ("[T]he attorney-client
privilege may apply to confidential communications . . . when the client is under the mistaken,
but reasonable, belief that the professional from whom legal advice is sought is in fact an
attorney.").

determining whether Gucci's belief was reasonable, this Court must consider the unique facts and circumstances of this case.

In reviewing this portion of the June 29 Order (Dkt. 112 at 12-16), once again the Court should not lose sight of the reason why the "reasonable belief" exception exists — to do everything possible to preserve "one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). Therefore, if, under the facts and circumstances of this case, all indications were that Moss was an attorney, then Gucci's belief that he was an attorney should be deemed reasonable.

Ignoring these well-established principles and the singular facts and circumstances of this case — including the fact that Moss was recommended by Gucci's outside counsel, was hired as a non-lawyer, presented himself as a lawyer, and, after being promoted to legal counsel, handled legal matters competently — the Magistrate Judge nevertheless concluded that Gucci's belief that Moss was "authorized to practice law" was not reasonable. In reaching that conclusion, the Magistrate Judge's lone rationale was that Gucci, being a corporation, "was obligated to conduct *some* due diligence to confirm [Moss'] professional status as an attorney to ensure that [Moss] faced no disciplinary or administrative impediment to engaging in the practice of law." Dkt. 112 at 14-15 (emphasis in original). In other words, in determining whether Gucci's belief was "reasonable," the Magistrate Judge imposed a due diligence obligation that exists nowhere in federal jurisprudence. In reaching this conclusion, the Magistrate Judge misapplied clear federal case law, ignored the unique circumstances of this case, and improperly interpreted the decision of Magistrate Judge Ellis in *Fin. Tech. Int'l, Inc. v. Smith*, 2000 WL 1855131 (S.D.N.Y. Dec. 19, 2000).

In *Fin. Tech.*, a ten year-old decision never followed by any court, Magistrate Judge Ellis

applied **New York** attorney-client privilege law in addressing the question whether "the New

York Court of Appeals would recognize the [attorney-client] privilege for communications

between a putative attorney and her client." *Id.* at *1. Unlike the Magistrate Judge here,

Magistrate Judge Ellis was not attempting to formulate federal common law on this issue.[18]

Under his interpretation of New York law, Magistrate Judge Ellis opined that the New York

Court of Appeals would only consider whether a client's "belief" was "reasonable" in cases

where the client was an individual — he rejected the notion that a corporation could ever avail

itself of the "reasonable belief" exception. *Id.* at *6. Instead, Magistrate Judge Ellis determined

that "even if New York would apply the reasonable belief exception to individuals, *corporations*

*would have to make sure their attorneys are in fact attorneys.*" *Id.* at *7 (emphasis added). In

other words, under his interpretation of New York law, Magistrate Judge Ellis sets out a

subjective "actual knowledge" test for corporations, finding they can only invoke attorney-client

privilege when they have "made sure" their attorney was, in fact, an attorney, no matter what

their "belief" was, or whether it was "reasonable."

     In his June 29 Order, however, not only does the Magistrate Judge ignore the fact that

Magistrate Judge Ellis was applying New York law, but he misinterprets Magistrate Judge Ellis'

"actual knowledge" test for corporations, conflating this with the "reasonable belief" exception.

Accordingly, the Magistrate Judge incorrectly found that Magistrate Judge Ellis imposed a bright

---

[18] While *Fin. Tech.* was a diversity case involving New York law, the instant case, as the
Magistrate Judge recognized, involves a federal question, and "Rule 501 of the Federal Rules of
Evidence provides that federal common law governs privilege issues in federal question cases
such as this one." Dkt. 112 at 6. Nevertheless, the Magistrate Judge incorrectly believed that
Magistrate Judge Ellis was applying federal law, or assumed that New York and federal law on
this issue were the same. Dkt. 112 at 15.

line rule that "because the corporation [in *Fin. Tech.*] conducted no investigation into in-house

counsel's qualifications as an attorney, it did not have a reasonable basis to believe that he was

an attorney authorized to practice law." Dkt. 112 at 13-14.  Once again, this is not what

Magistrate Judge Ellis held at all, and in any event there is no bright line rule that a corporation

may not avail itself of the "reasonable belief" exception unless it conducts due diligence.[19]

Rather, the issue is, and continues to be, whether, under all the circumstances, the client —

individual or corporate — reasonably believed its putative attorney was an attorney.  Here, Gucci

did.

It should also come as no surprise that in *Fin. Tech.*, and in every case in federal

jurisprudence finding the client's "belief" to be "not reasonable," the putative attorney was a

*poseur* — someone who, unlike Moss, had never been admitted to any bar — and in addition, the

client failed to heed clear warning signs that he was not an attorney.  For example, in *U.S. v.*

*Boffa*, 513 F. Supp. 517 (D. Del. 1981), a case on which the Magistrate Judge relied (Dkt. 112 at

12-14), and to which Guess refers in prior briefing as "[t]he leading case on the issue of

reasonable belief in the attorney-client privilege context" (Dkt. 80 at 7), the Court found that the

client had ignored overt signs that his putative attorney was not an attorney.  In that case, the

"attorney" turned out to be a con man with an extensive criminal record, his only prior "legal"

experience having come as a "jailhouse lawyer" during his 15 years of incarceration.  Further,

---

[19]  Further, to the extent Magistrate Judge Ellis was attempting to articulate such a bright line
rule, there is no support for this in cases that have applied the "reasonable belief" exception to
corporations; to the extent the issue has been addressed, courts have held that a corporation is
subject to the same test of reasonableness as an individual.  *See, e.g., Freeman v. Indian Spring*
*Land Co.*, 2007 WL 127699 (Conn. Super Ct. Jan. 8, 2007) (finding sufficient for attorney-client
privilege a corporation's reasonable belief that its in-house counsel was a licensed attorney
where the putative attorney was a law school graduate and former member of the Massachusetts
bar).

the communications in question involved planned future crimes.  In these circumstances, it is not surprising the *Boffa* court found that the client's belief that he was communicating with an attorney was not reasonable.  *Boffa*, 513 F. Supp. at 523, Dkt. 112 at 13; *see also Dabney v. Inv. Corp. of Am.*, 82 F.R.D. 464, 465–66 (E.D. Pa. 1979) (the fact that a corporation's president knew that a law student was not an attorney meant that he was not "genuinely mistaken as to the attorney's credentials" and therefore attorney-client privilege did not attach).

In contrast, Gucci is not claiming that Moss was a *poseur*, and there were never any signs that Moss was anything other than what he purported to be (and was) — an attorney.[20]  *First*, Moss was referred to Gucci for potential employment by Gucci's then-outside counsel, Patton Boggs LLP of Washington, D.C., who informed Gucci that Moss was a lawyer who had practiced law. Dkt. 66, ¶¶4-6; Dkt. 68, ¶¶5, 8; Dkt. 67, ¶6; Dkt. 64, Decl. ¶¶2-8; Dkt. 65, ¶¶5-6. *Second*, Moss was hired to fill a non-lawyer role. Dkt. 66, ¶9; Dkt. 68, ¶6.[21]  *Third*, even while

---

[20]  To be clear, Gucci has never claimed that Moss deliberately tried to mislead Gucci as to his bar status — in fact, he was who he said he was, a bar member who had been qualified to practice law (albeit one who also, apparently, mistakenly believed his status with the California bar did not prevent him from serving as Gucci's in-house attorney). Dkt. 79, ¶4.  However, it remains the case that Moss never disclosed to Gucci that he was on inactive status, even though he was fully aware of that. Indeed, Moss' own affidavit, submitted by his counsel without notice to the parties, and received into the record (and relied on) by the Magistrate Judge (Dkt. 112 at 2, 3-4), confirms that Moss never disclosed his bar status, telling Gucci only that he was a bar member (which he was) who had met all the requirements to practice law (which he had). Further, to the extent Moss suggested in his affidavit — a suggestion the Magistrate Judge seemingly credited (Dkt. 112 at 15) — that Gucci nevertheless should have been aware of his bar status because he processed his bar renewal payments through the company, there is no evidence that Moss ever called these renewals to anyone's attention, that they were processed by anyone but him, or that Gucci would not have (happily) paid the additional $300 a year to place him on active status. It was, therefore, clear error for the Magistrate Judge to have credited Moss' affidavit to this extent.

[21]  The fact that Moss was hired into a non-legal position is an important consideration here, the likes of which is unprecedented in "reasonable belief" cases. It makes sense that Gucci would not have inquired into Moss' bar status when he was initially hired, because he was not being brought in to perform legal work. In his affidavit, Moss appears to be disputing this, in

Footnote continued on next page

Moss was working in a non-lawyer capacity, he frequently told others at Gucci that he was a lawyer. Dkt. 68, ¶10; Dkt. 67, ¶¶2-5, 7; Dkt. 69, ¶¶5-9. *Fourth*, throughout the period Moss was employed by Gucci as a non-lawyer, he fulfilled all of his responsibilities. Dkt. 66, ¶10; Dkt. 68, ¶8; Dkt. 67, ¶7; Dkt. 69, ¶¶6-7. *Fifth*, after Moss assumed the position of Legal Counsel, he took on numerous legal responsibilities and handled them well. Dkt. 68, ¶¶9-10; Dkt. 67, ¶¶3-5; Dkt. 69, ¶¶5-9. *Sixth*, Moss was in fact, at all times, an attorney, that is, a member of a bar. Under these circumstances, unique in federal jurisprudence, Gucci's belief that Moss was a duly qualified attorney (which he was) was more than reasonable.[22]

The Magistrate Judge further erred in considering the relative ease or difficulty with which Gucci could have discovered that Moss was on inactive status at the California bar, and

---

Footnote continued from previous page

testimony the Magistrate Judge apparently credited to some extent, pointing to his starting salary level. Dkt. 112 at 14. However, Moss' starting salary at Gucci says nothing about whether he was hired as a lawyer, as he was initially hired for the business expertise he acquired in high-level non-legal positions at PricewaterhouseCoopers and McKesson, so his starting salary would have been reflective of that expertise. Rather, the overwhelming evidence, including the testimony of the Gucci executive who hired Moss, Arthur Leshin, and that of the Patton Boggs lawyers who referred him to Gucci, Timothy Chorba and George Borababy, is that Moss was hired into a non-legal position. It was not until a year later, after Moss had served Gucci well and become a trusted employee, that he was elevated to a legal position, so under these circumstances, Gucci's failure to inquire as to his bar status at that time was not unreasonable.

[22] Leading experts agree that Gucci's belief was "reasonable," rejecting the notion that Gucci should have investigated Moss' bar status. In an article appearing in the *American Lawyer*, Professor Capra, presented with the circumstances faced by Gucci, stated "[t]hat is so lame . . . . How is the client supposed to know if someone is licensed in California?" *See* Hallman, *Head Spinning Yet?*.

Professor Gillers was even more emphatic:

> The [June 29 Order] is wrong. Gucci officers acted reasonably. . . . Moss had originally been referred to Gucci in 2002 as an inhouse hire by an outside firm (Patton Boggs) and had been practicing at Gucci since, rising to vice president and director of legal services. So he acted and sounded like a real lawyer and except for the stupidity of practicing while inactive in the only state where he had been admitted, he could have fooled anyone.

*See* Gillers, *Gucci, Guess?, Moss*.

making this part of his "reasonable belief" analysis. In the June 29 Order, the Magistrate Judge, picking up on an argument that was the focus of Guess' opposition, points to the "fact" that if Gucci had only accessed the California State Bar website when it promoted him to a legal position, it would have learned that Moss was inactive. Dkt. 112 at 15. However, how easily Moss' bar status could have been discovered has nothing at all to do with the question whether Gucci "reasonably believed" he was an attorney, and should not have been part of the Magistrate Judge's analysis. As Professor Gillers stated, "[t]he fact that they COULD easily have discovered his inactive status (stressed in the opinion and by Guess?) doesn't mean they were unreasonable in accepting that he was a lawyer under the facts of the case. And a lawyer can be inactive one place and active elsewhere." *See* Gillers, *Gucci, Guess?, Moss.*[23]

Under federal common law, then, the operative test for "reasonable belief" remains clear — the issue is simply whether the client's belief was reasonable under all the circumstances. No case applying federal common law has ever imposed a bright line rule that a corporation cannot avail itself of the reasonable belief exception unless it has conducted due diligence, much less subjected a corporation to a "make sure" requirement, as Magistrate Judge Ellis did under New

---

[23] Moreover, even if Gucci had checked the websites of the three bars of which Moss was a member, what would it have learned? In the case of the California bar, there is no competent evidence that in 2002 and 2003, the years Moss was first hired and subsequently promoted to a legal position, Gucci would have learned anything other than that Moss was a bar member. Guess' "evidence" on this point (Dkt. 80 at 9), namely, that the California bar website would have indicated that Moss was on inactive status, is rank hearsay. As for the two federal court bars, if Gucci had checked their websites, all it would have learned was that Moss was a member in good standing. The Magistrate Judge, while on the one hand buying into Guess' "all Gucci had to do was click the mouse" argument (Dkt. 112 at 15), attempts to explain this away, holding that even though Moss would have shown up on the federal court websites as a full-fledged bar member, "[b]y operation of law, Moss was constructively suspended from practicing in California federal courts because of his inactive status with the California State Bar." Dkt. 112 at 12. How anyone at Gucci would have known this from accessing these federal court websites — which is, apparently, all the Magistrate Judge would have required Gucci to do (Dkt. 112 at 15) — is not explained anywhere in the record.

York law in *Fin. Tech.*[24]   Under the circumstances of this case, Gucci's belief that Moss was an attorney was reasonable.

### C.      If Upheld, the Magistrate Judge's Decision Has Far-Reaching Implications

Finally, if upheld, the Magistrate Judge's decision sets a dangerous, far-reaching precedent.  This is, quite simply, the first decision in the history of jurisprudence — federal or state — in which a client has been deprived of the attorney-client privilege where its attorney was a bar member at all times.  No client should suffer the loss of this sacred privilege simply because its otherwise duly qualified counsel failed to send in the correct bar fee.  If this critical privilege is threatened because an attorney, otherwise qualified to practice, fails to pay his bar dues on time, sends in the wrong-sized check, or goes inactive for whatever reason, there will be a strong chilling effect on the attorney-client relationship.  As Professor Gillers stated, "[a] lawyer can let his status lapse anytime.  Active today, inactive tomorrow.  Is there an ongoing need to periodically check status?"[25]  Therefore — and it cannot be said too many times — when this Court considers the propriety of the Magistrate Judge's decision, it should be mindful of the underlying purpose of the privilege — to protect the client — and not penalize the client for the attorney's indiscretion.

---

[24]  Indeed, in a subsequent New York federal court decision, the Northern District of New York "rejected" the "Plaintiff's plaintive argument that we should follow [Judge Ellis'] rule . . . .  Considering New York's ambiguity on this principle of law, we will rely upon the content, context and form of the communication" — in other words, the Court considered all the circumstances. *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 129 n.23 (N.D.N.Y. 2007).

[25]  *See* Gillers, *Gucci, Guess?, Moss.*

## CONCLUSION

For all the foregoing reasons, this Court should sustain Gucci's objections to the June 29 Order, find that Moss was, at all times he was employed by Gucci, an attorney for purposes of applying the attorney-client privilege and/or that Gucci's belief that he was an attorney was reasonable under the circumstances, and issue a protective order against the disclosure of Moss' communications.

Dated: New York, New York         ARNOLD & PORTER LLP
      October 7, 2010

By: _Louis S. Ederer_
      Louis S. Ederer
      louis.ederer@aporter.com
      399 Park Avenue
      New York, New York 10022
      (212) 715-1000

      *Attorneys for Plaintiff*
      *Gucci America, Inc.*