**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUCCI AMERICA, INC., | Civil Action No. 09cv4373 (SAS) |
| Plaintiff, | |
| -against- | |
| GUESS?, INC., MARC FISHER FOOTWEAR LLC, THE MAX LEATHER GROUP/CIPRIANI ACCESSORIES, INC., SEQUEL AG, K&M ASSOCIATES L.P., VIVA OPTIQUE, INC., SIGNAL PRODUCTS, INC. and SWANK, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF GUESS?, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE SURVEYS OF DR. MICHAEL RAPPEPORT, GEORGE MANTIS, AND DR. MICHAEL B. MAZIS**

O'MELVENY & MYERS LLP
DANIEL M. PETROCELLI
ROBERT C. WELSH
ANDREW J. FRACKMAN
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., and Swank, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT .............................................................................................................3

I.   LEGAL STANDARD.........................................................................................3

II.   THE SURVEY BY DR. MICHAEL RAPPEPORT SHOULD BE EXCLUDED.............4

    A.   The Rappeport Survey Failed To Use A Control And Thus Is Not
        Probative Of Likelihood Of Confusion In Any Context........................................6

    B.   The Rappeport Survey Failed To Approximate Real World Conditions...............11

III.   THE SURVEY BY GEORGE MANTIS SHOULD BE EXCLUDED...........................14

    1.   The Mantis Survey Tested An "Imaginary Product"...............................................14

    2.   By Eliminating The GUESS Name From The Test Bag, Mantis's Survey
        Is Irrelevant To 99% Of The Guess Quattro G Handbags.....................................16

    3.   The Mantis Survey's Analysis Improperly Inflated The Confusion Level...........17

    4.   The Mantis Survey Used An Inadequate Control That Artificially Inflated
        The Net Confusion Level Even Further.................................................................18

IV.   THE SURVEY BY DR. MICHAEL B. MAZIS SHOULD BE EXCLUDED
    AND/OR GIVEN LITTLE OR NO WEIGHT ....................................................20

    1.   The Mazis Survey Is Not Probative Of Actual Dilution Or Likelihood Of
        Dilution. ................................................................................................................21

    2.   The Mazis Survey Employed A Flawed Control....................................................24

    3.   The Mazis Survey Improperly Inflated Its Results By Including Single-
        Component Responses As Evidence Of Association Regarding Gucci's
        Multi-Element Trade Dress...................................................................................24

CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*,
  447 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................................... 10

*Am. Footwear Corp. v. General Footwear Co. Ltd.*,
  609 F.2d 655 (2d Cir. 1979)........................................................................... 11, 17

*Beverage Mktg. USA, Inc. v. S. Beverage Corp.*,
  No. 00-9578, 2002 WL 1162789 (2d Cir. June 3, 2002) ........................................ 17

*Bourjaily v. United States*,
  483 U.S. 171 (1987)........................................................................................... 6

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ........................................................................ 8

*Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for
  So. Cal.*, 508 U.S. 602 (1993) ............................................................................ 6

*Cumberland Packing Corp. v. Monsanto Co.*,
  32 F. Supp. 2d 561 (E.D.N.Y. 1999) ...........................................................*passim*

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)........................................................................................ 3, 6

*Hermes Int'l v. Lederer de Paris Fifth Avenue*,
  50 F. Supp. 2d 212 (S.D.N.Y. 1999)...................................................................... 1

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04cv7203, 2006 WL 1012939 (S.D.N.Y. April 19, 2006)............................... 17

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ............................. 23

*Kellogg Co. v. Exxon Mobil Corp.*,
  192 F. Supp. 2d 790 (W.D. Tenn. 2001)............................................................... 24

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................................................... 3

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
  No. 08 C 242, 2010 WL 3397358 (N.D. Ill. 2010)................................................. 5

*Major League Baseball Props. v. Sed Non Olet Denarius, Ltd.*,
  817 F. Supp. 1103 (S.D.N.Y. 1993)...................................................................... 7

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Malletier v. Dooney & Bourke, Inc.*,
   500 F. Supp. 2d 276 (S.D.N.Y. 2007).................................................................................. 21

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)...........................................................................*passim*

*Malletier v. Dooney & Bourke, Inc.*,
   561 F. Supp. 2d 368 (S.D.N.Y. 2008).................................................................................... 3

*Moseley v. V Secret Catalogue*,
   537 U.S. 418 (2003)............................................................................................................ 22

*Nike, Inc. v. Nikepal Int'l, Inc.*,
   No. 2:05-cv-1468, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) ......................................... 24

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010).................................................................................... 5

*Pharmacia Corp. v. Alcon Labs., Inc.*,
   201 F. Supp. 2d 335 (D.N.J. 2002) ...................................................................................... 23

*Procter & Gamble Pharms., Inc. v. Hoffmann–LaRoche Inc.*,
   No. 06–0034, 2006 WL 2588002 (S.D.N.Y. Sept.6, 2006)...................................................... 8

*Simon Property Group L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................................ 11

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009).................................................................................................... 1

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010)..........................................................................*passim*

*Trouble v. Wet Seal*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001).................................................................................. 11

*U.S. Polo Ass'n v. PRL USA holdings, Inc.*,
   No. 09cv9476, 2011 WL 1842980 (S.D.N.Y. May 13, 2011).................................................. 9

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984)................................................................................................... 4

*Wawa Dairy Farms v. Haaf*,
   40 U.S.P.Q.2d 1629 (E.D. Pa. 1996) ................................................................................... 24

*WE Media, Inc. v. General Elec. Co.*,
   218 F.Supp.2d 463 (S.D.N.Y. 2002).................................................................................... 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

4 McCarthy on Trademarks and Unfair Competition § 23:2.50 ..........................................11

4 McCarthy on Trademarks and Unfair Competition § 24:115 ........................................ 22

4 McCarthy on Trademarks and Unfair Competition § 24:131 ........................................ 21

6 McCarthy on Trademarks and Unfair Competition § 32:187 .......................................... 7

Dr. Jacob Jacoby, *Experimental Designs and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 Trademark Rptr. 890 (2002) .................................. 9

M. Rappeport, *Litigation Surveys: Social Science as Evidence*, 92 Trademark Rptr. 957 (2002) ...................................................................................................... 7

**RULES**

Fed. R. Civ. P. 26(a)(2)(D)(ii) .............................................................................. 5

Fed. R. Evid. 702 ................................................................................................3, 6

**PRELIMINARY STATEMENT**

These facts are not in dispute.  For the last 6 to 15 years, defendants have sold over

6 million Guess-branded handbags, shoes, belts, and small leather goods that Gucci America,

Inc. ("Gucci") contends are infringing.  Gucci acknowledges that during all that time, it is not

aware of a single instance of a customer ever confusing Guess and Gucci products in the

marketplace.  That Gucci and Guess products have co-existed peacefully for all these years and

over all these millions of purchases is itself a "'powerful indication' that there is no confusion or

likelihood of confusion." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d

Cir. 2009).[1]  This peaceful co-existence in the marketplace is also evidence that Gucci's

trademarks have not been diluted.

Lacking any evidence of actual confusion or dilution, and having admitted it is not

asserting the existence of any point-of-sale confusion, Gucci has proffered three surveys—two

initial surveys by George Mantis and Dr. Michael B. Mazis, and a so-called rebuttal survey by

Dr. Michael Rappeport—in an attempt to create evidence at odds with years of real world

experience.[2]  The real world evidence shows that consumers readily distinguish between Guess

and Gucci products,[3] and that Gucci's brand and trademarks have not been diluted.

The results of Gucci's surveys, by contrast, are all based on blatant distortions of the real

---

[1] Internal citations are omitted and emphases are added unless otherwise noted.

[2] These surveys concern only Guess's Quattro G Pattern.  Gucci has not even attempted to present any survey evidence concerning the other challenged marks—Guess's Square G and the Script Guess design.

[3] Indeed, it is inconceivable anyone could genuinely confuse the two brands.  As this Court knows, purchasers of high fashion women's handbags products are sophisticated consumers. *See, e.g., Hermes Int'l v. Lederer de Paris Fifth Avenue*, 50 F. Supp. 2d 212, 226 (S.D.N.Y. 1999).  Additionally, Gucci and Guess products are sold in distinct channels of trade, through dedicated Guess and Gucci retail stores or through largely distinct third-party department stores and ecommerce retailers.  Finally, Guess is one of the most famous fashion brands in the world and it is well known for distributing accessory products and apparel that prominently display the GUESS name.

world created by flawed and improper survey methods.  Indeed, the methodological flaws in Gucci's surveys are the same ones that led the Court to exclude surveys in recent trademark cases.  Specifically,

- The Rappeport survey, which erroneously refers to itself as a "rebuttal survey,"[4] distorts reality by failing to conduct a control test to weed out guessing and other noise.  A survey without a control cannot provide scientifically reliable results.  The Rappeport survey also distorts reality by asserting, without any evidence, that a representative "post-sale" scenario is one in which persons view *only* the back side of a Guess handbag (where the GUESS name and other indicia of the Guess brand do not typically appear), even though empirical evidence and common sense show that the far more likely scenario is that women wear their handbags with the front side (where most brands, including Guess, place their name and other source-identifying indicia) facing out.

- The Mantis survey distorts reality by materially altering the Guess product that is the subject of the survey, and instead tests an "imaginary product" that consumers would never encounter in the real world.  Additionally, the Mantis survey distorts reality by using an ineffective and improper control that, by lowering the incidence of "Gucci" references, artificially inflated the claimed level of net confusion.

- Finally, the Mazis "likelihood of association" survey distorts reality by using, as did the Mantis survey, a control stimuli that is not sufficiently similar to the test stimuli so as to yield a reliable indication of the level of claimed "association" attributable solely to the trade dress at issue.  Regardless of whether the Court excludes the Mazis survey on this ground, its conclusions should not be given any weight because the *de minimis* level of

---

[4] As discussed at Section II, *infra*, the Rappeport survey is also excludable on the ground it is not proper rebuttal testimony to the survey conducted by Guess's expert, Dr. Myron Helfgott.

prompted "association" (12%), without any showing of dilution or tarnishment, is simply

irrelevant to and insufficient to support Gucci's dilution claims.

As this Court has stated, "where there is a claim of consumer confusion [as] to the

association of a product or service with another person's trademark, the central inquiry is

whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled

as to the source or sponsorship of the product or service in question." *Malletier v. Dooney &*

*Bourke, Inc.*, 561 F. Supp. 2d 368, 378 (S.D.N.Y. 2008).  The flawed Rappeport and Mantis

surveys are the ***only*** purported evidence of confusion Gucci has been able to muster in two and a

half years of litigation.  Neither survey comes close to providing scientifically reliable evidence

of what this Court has recognized as the "central inquiry" of Gucci's infringement claims.  The

Mazis survey is equally unreliable for purposes of showing dilution.

## ARGUMENT

## I.      LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, an expert opinion is admissible only if

it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell*

*Dow Pharms.*, 509 U.S. 579, 597 (1993).  Rule 702 requires that an expert "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Expert survey testimony is properly excluded under Rule 702 "when it is invalid or

unreliable." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231, 235-41 (S.D.N.Y. 2010)

(excluding plaintiff's trademark survey because it was "not a reliable indicator of consumer

confusion" where the methodology failed to use an adequate control and failed to replicate actual

marketplace conditions); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563

(S.D.N.Y. 2007) (survey evidence may be excluded under Rule 403 but also under Rule 702

"where flaws are deemed to cumulatively undermine its relevance and reliability").  Even in

cases involving bench trials, courts give no weight on summary judgment to trademark surveys

that are patently unreliable.  Thus, in *Universal City Studios, Inc. v. Nintendo Co.*, the Second

Circuit made clear that even though the court may ultimately be the trier of fact, that does not

justify the admission of survey evidence that is "so badly flawed that it [could not] be used to

demonstrate the existence of a question of fact on the likelihood of consumer confusion."  746

F.2d 112, 118 (2d Cir. 1984).

Gucci has the burden of establishing the admissibility of its surveys by a "preponderance

of proof."  *THOIP*, 690 F. Supp. 2d at 229.  Gucci cannot shoulder this burden here.

## II.   THE SURVEY BY DR. MICHAEL RAPPEPORT SHOULD BE EXCLUDED

Dr. Rappeport claims to have "replicated" in a "reasonable post-sale context" a point-of-

sale survey conducted by Guess's expert, Dr. Myron Helfgott.  Using a standard method for

measuring likelihood of confusion in a marketplace setting, Dr. Helfgott found no likelihood of

confusion between a Guess handbag bearing Guess's Quattro G Pattern on a beige fabric and

Gucci's claimed trade dress.  (Welsh Decl. ¶ 4, Ex. 3, Initial Survey Report of Dr. Myron

Helfgott ("Helfgott") at 13.)  Significantly, Dr. Rappeport does not dispute Dr. Helfgott's

conclusion regarding the absence of any measurable point-of-sale confusion.  Instead, Dr.

Rappeport opines that his post-sale "replication" of the Helfgott survey shows that "the

proportion of respondents who exhibit a likelihood of confusion would be significantly greater"

than was found in Dr. Helfgott's study.  (Welsh Decl. ¶ 5, Ex. 4, Rebuttal Survey Report of Dr.

Michael Rappeport ("Rappeport") at 2-3.)

At the outset, it is clear that Dr. Rappeport's study does not qualify as a proper rebuttal

survey under the Federal Rules of Civil Procedure because it does not "contradict or rebut" the

survey conducted by Dr. Helfgott.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).  While Dr. Helfgott's

study tested point-of-sale confusion, the Rappeport survey purported to test post-sale

confusion—a separate and distinct theory of trademark infringement.  Moreover, the two surveys

tested different stimuli subject to clearly dissimilar survey conditions and instructions.  (*See*

Welsh Decl. ¶ 8, Ex. 7, 8/24/11 Rebuttal Report of Dr. Shari Seidman Diamond ("8/24/11

Diamond") at ¶ 9 n. 2.)  Indeed, Dr. Rappeport admitted that he wasn't challenging "Dr.

Helfgott's methodology as a measure of point of sale confusion."  (Rappeport at 9 n.13.)

Accordingly, the Rappeport study should be excluded as improper rebuttal testimony.  *See*

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d

448, 467-68 (S.D.N.Y. 2010) (rebuttal expert could not go beyond the scope of testimony offered

by affirmative expert); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL

3397358, at *13 (N.D. Ill. 2010).

  Even more problematic, because his survey lacks any control, Dr. Rappeport's results do

not provide scientifically reliable evidence as to whether the net confusion level in any post-sale

setting would be higher, "significantly higher" (as he suggests)—or, alternatively, the same or

lower—than the *de minimis* level found in the Helfgott study.  Additionally, the Rappeport

survey should be excluded because it fails to "approximate marketplace conditions."  *THOIP*,

690 F. Supp. 2d at 235-41.  Gucci has proffered no evidence showing the scenario tested by Dr.

Rappeport, in which the respondent is shown only the back side of the handbag, is a

representative replication of the real world.  Guess, by contrast, has investigated this issue and

found that the vast majority of women—4 out of 5 to be exact—hold their handbags in public in

***precisely the opposite way as tested by Dr. Rappeport***.  That is, the overwhelming majority of

women hold their handbags the way they were intended to be held by the designers who created

them, with the ***front side of the handbag facing outward toward the public***.  (Welsh Decl. ¶ 9,

Ex. 8, Observational Study and Report of Dr. Carol Scott ("Scott") at 8.)[5]

As the proponent of the survey, Gucci bears the burden of demonstrating that

Dr. Rappeport's results are truly "representative" of the likely level of confusion that exists in the

real world.  *See THOIP*, 690 F. Supp. 2d at 229 (*citing Bourjaily v. United States*, 483 U.S. 171,

175-76 (1987) and *Daubert*, 509 U.S. at 592 & n.10).  Gucci cannot shoulder that burden

because, as Dr. Scott's observational study shows, the type of "post-sale confusion" that Dr.

Rappeport purports to be measuring simply will not arise in the vast majority of cases.  Thus,

even if Dr. Rappeport's findings were scientifically reliable (which they are not), they are

nonetheless meaningless because the scenario he tested is not representative of real life

conditions.

**A.** **The Rappeport Survey Failed To Use A Control And Thus Is Not Probative Of Likelihood Of Confusion In Any Context**

"A survey designed to estimate likelihood of confusion must include a proper control."

---

[5] Upon reviewing Dr. Rappeport's so-called "rebuttal" survey, Guess learned for the first time that Gucci's theory of post-sale confusion was based solely on the improbable scenario posited by Dr. Rappeport in his report—where respondents see only the back side of any Guess handbag.  Guess then commissioned Dr. Scott to conduct an observational study concerning how women hold their handbags in public settings.  Dr. Scott's study shows that Dr. Rappeport's scenario is not representative of the way Guess handbags will appear in public.

To be clear, Guess is not asking this Court to find, and indeed this Court need not find that a particular percentage of women wear their handbags with the front side facing toward the public.  Rather, Guess respectfully submits that the Scott observational study should be admitted for what it is, namely, evidence that Dr. Rappeport's assumptions are factually incorrect.  Gucci, of course, has the burden of establishing the admissibility of the Rappeport survey by a "preponderance of proof," including that the survey "is based upon sufficient facts or data." *THOIP*, 690 F. Supp. 2d at 229; Fed. R. Evid. 702.  As the Supreme Court has held, "[b]efore any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe and Prods. of Cal., Inc. v. Construction Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 622 (1993).  As Gucci has offered no "raw evidence" to support the scenario tested by Dr. Rappeport, coupled with the evidence provided from Dr. Scott's careful observational study, Gucci cannot shoulder its burden of proof and the Rappeport survey is therefore inadmissible.

*THOIP*, 690 F. Supp. 2d at 240.  The use of a proper control is "crucial" to estimate the degree of background "error" or "noise" in a survey, such as "false positive" confusion responses arising out of legally irrelevant elements of a party's trade dress.  *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75 (E.D.N.Y. 1999).  In *THOIP*, this Court observed that "[w]ithout a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology."  690 F. Supp. 2d at 240 (citing 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:187).  (*See also* 8/24/11 Diamond at ¶¶ 9-10.)

Dr. Rappeport knows this.[6]  He has urged courts to exclude surveys because they lacked a control.  In *Major League Baseball Props. v. Sed Non Olet Denarius, Ltd.*, Dr. Rappeport criticized plaintiff's trademark survey, referring to the lack of a control as the "central problem." Dr. Rappeport explained:

> Because [plaintiffs' survey] failed to use any controls, they have no measure of what percentage of respondents are reacting to the particular stimuli and what [percentage] would be confused no matter what they were asked. Thus the interpretation of their data is impossible, and any conclusions drawn from their data must be seen as meaningless.

817 F. Supp. 1103, 1123 (S.D.N.Y. 1993) (vacated pursuant to settlement).  Yet despite his clear understanding of the importance of having a control, Dr. Rappeport inexplicably failed to conduct a control test here.  Nor does he offer any justification for not using a control.

In the absence of any explanation from Dr. Rappeport,[7] Gucci has articulated several *post*

---

[6] Dr. Rappeport has used the following analogy to explain the inherent unreliability of surveys lacking controls:  "Just as, in most circumstances, no one would trust the results of a 'lineup' in which witnesses were shown only the suspect, the results in a litigation survey, without any controls, are strongly suspect." M. Rappeport, *Litigation Surveys: Social Science as Evidence*, 92 TRADEMARK RPTR. 957, 986 (2002).

[7] This absence is especially troubling given that several of Dr. Rappeport's prior surveys have been excluded because they lacked a proper control.  *See, e.g., Cumberland Packing*, 32 F. Supp. 2d at 574-75 (finding that Dr. Rappeport's survey used improper controls which failed to

*hoc* rationalizations for his otherwise unexplained lack of a control. First, Gucci contends Dr.

Rappeport's survey is not being offered as a survey but as a "rebuttal" to Dr. Helfgott's survey.

Even assuming for the sake of argument that Dr. Rappeport's survey qualifies as a "rebuttal,"

this argument misses the point. Dr. Rappeport's survey can only provide rebuttal evidence if it

contains scientifically valid results. Without a control, Dr. Rappeport's survey cannot provide

scientifically valid results of anything; it is, in his own words, "meaningless." As Guess's survey

expert, Dr. Shari Seidman Diamond, observes, because the Rappeport survey contained no

control, "we cannot assess or even estimate how many of the GUCCI responses to the test

stimulus were due to guessing or some other component of noise." (8/24/11 Diamond at ¶¶ 9-

10.) The lack of a control thus prevents the Rappeport survey "from providing reliable

information about likelihood of confusion." (*Id.* at ¶ 8.)

Gucci next attempts to justify the lack of control in the Rappeport survey through expert

testimony offered by Dr. Itamar Simonson. Dr. Simonson argues—in contradiction to opinions

and surveys he has submitted in other cases[8]—that "tentative conclusions" can be reached from

Dr. Rappeport's survey despite the absence of a control. (Welsh Decl. ¶ 7, Ex. 6, Rebuttal

Survey Report of Dr. Itamar Simonson ("Simonson") at 14.) Dr. Simonson asserts that *in this*

---

net out confusion based on at least two irrelevant variables); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 448 (D.N.J. 2009) (finding Dr. Rappeport's survey "unreliable for lack of a control mechanism"); *Procter & Gamble Pharms., Inc. v. Hoffmann– LaRoche Inc.*, No. 06–0034, 2006 WL 2588002, at *25 (S.D.N.Y. Sept. 6, 2006) (same).

[8] In *Larin Corp. v. Alltrade Inc.*, for example, Dr. Simonson opined that a "survey designed to estimate likelihood of confusion or perceived similarity must include a proper 'control'" and concluded plaintiff's survey results were "uninterpretable" based on a lack of control. 2008 WL 2660799, at ¶¶ 29, 44 (No. 06cv01394 (C.D. Cal 2008)); *see also* 2009 WL 6634149, at ¶ 18 (*THOIP v. Walt Disney Co.*, No. 08cv06823 (S.D.N.Y. 2009)) (same); 2005 WL 3782842, at ¶ 34 (*Markwins Beauty Prods., Inc. v. Mirage Cosmetics, Inc.*, No. 05cv04917 (C.D. Cal. 2005)) ("without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects the flaws of the survey methodology). Also, when conducting his own surveys, Dr. Simonson uses controls to filter out "noise." *See, e.g.* 2006 WL 4790153, at ¶ 24 (*Enterprise Rent-A-Car Co. v. U-Haul Int'l*, No. 4:03cv1480 (E.D. Mo. 2007)).

8

*instance* a control is unnecessary because any control producing a meaningful level of

confusion—*i.e.* that would dramatically reduce the 24% test confusion rate and thus the net

confusion level—should be assumed to be scientifically improper.  (*Id*. at 13-15.)

Dr. Simonson claims to have found support for this proposition in the recent decision of

*US Polo Ass'n v. PRL USA holdings, Inc.*, No. 09cv9476, 2011 WL 1842980, at *15 (S.D.N.Y.

May 13, 2011).  (Simonson at 15.)  It is simply not there.  The court in *U.S. Polo* clearly states it

gave no weight to the survey offered by plaintiff because the controls in that instance contained

the "very element [of the trademark] being assessed" in the case.  2011 WL 1842980, at *15.

The court did not exclude the survey because the control yielded confusion rates of over 10%.

Moreover, the article by Dr. Jacob Jacoby cited in *U.S. Polo* does not champion, much less

provide scientific evidence supporting a rule that confusion rates among control groups in excess

of 10% are inherently invalid.  Just the opposite.  Dr. Jacoby acknowledges:

> [T]here are times when a control will yield estimates of confusion (or deception)
> that exceed 10 percent.  Thus it is important not to lose sight of the fact that, the
> question of desirability aside, the more important consideration is whether, when
> the control estimate is subtracted from the test estimate, the 'net' exceeds 15
> percent (or whatever value the court believes is appropriate).

Dr. Jacob Jacoby, *Experimental Designs and the Selection of Controls in Trademark and*

*Deceptive Advertising Surveys*, 92 TRADEMARK RPTR. 890, 932 n.76 (2002).

Dr. Diamond explains that "guessing a famous brand is a natural response that can

produce what may appear to be a high level of confusion in both test and control cells."  (8/24/11

Diamond at ¶ 10.)  Thus, it is "incorrect to suggest, as Simonson does, that a 'high' confusion

level in a control group (presumably approaching the 24 percent obtained by Rappeport) by itself

'would have raised concerns about the control.'"  (*Id*.)  It is also impossible to determine whether

Dr. Rappeport's survey demonstrates "net" confusion levels above any particular percentage

because, having no control, Dr. Rappeport has nothing to subtract from the "test estimate."

Finally, Gucci suggests it can use the control results obtained from Dr. Helfgott's point-of-sale survey as a "proxy" for the missing control in Dr. Rappeport's post-sale study. Paradoxically, Gucci also asserts that Dr. Helfgott's surveys must be limited "to the issue of point-of-sale confusion, as opposed to post-sale confusion." (8/9/11 Letter to Court at 1.)

Gucci's suggestion cannot be justified scientifically. It is well-established that an effective control should "share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *THOIP*, 690 F. Supp. 2d at 240 (quoting Shari Seidman Diamond, Reference Guide on Survey Research, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 258). A control that is too different from the test product is ineffective since it is likely to underreport the level of background "noise," and overestimate the net level of confusion. *See Malletier*, 525 F. Supp. 2d at 595-96 (criticizing plaintiff's survey for selecting a control stimulus that was "quite dissimilar in shape and pattern" to the test products); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 280 (S.D.N.Y. 2006) (finding a control comparing "apples to oranges" instead of "apples to apples" to be improper).

The idea that Dr. Helfgott's control results could serve to validate Dr. Rappeport's "control-less" survey is a classic case of comparing "apples to oranges." The differences between the two surveys go well beyond just eliminating "the characteristic whose influence is being assessed." Both in terms of the testing procedures employed and the stimuli used, the surveys by Dr. Helfgott and Dr. Rappeport could not be more different. In Dr. Helfgott's survey, control test respondents were told to look at the handbag "as you would if you were in a store and were seriously considering buying it" and, consistent with those instructions, were allowed

to hold and inspect the actual control bag, including the various places where the GUESS name appeared.  (Helfgott at 11.)  By sharp contrast, in the test procedure used by Dr. Rappeport, respondents were told to look at the handbag "as if you saw somebody carrying the handbag on the street" and were only shown the back side of the Guess handbag in such a manner that none of the several GUESS names that appear on the handbag were visible.  (Rappeport at 5, n.9.)

Given these differences, and especially that the GUESS name was visible in the stimuli used by Dr. Helfgott, but was "covered over" or otherwise eliminated in the test stimuli used by Dr. Rappeport, it clear that Dr. Helfgott's control cannot be used to validate Dr. Rappeport's test results.  (*See also* 8/24/11 Diamond at ¶ 9 n.2 (noting that "the Helfgott data could not provide a valid control" for the Rappeport survey).)  Lacking any valid control, the survey conducted by Dr. Rappeport does not yield scientifically valid results and should be excluded.

**B.      The Rappeport Survey Failed To Approximate Real World Conditions**

Surveys provide useful evidence of actual confusion only when they "mirror[] the real world setting which can create an instance of actual confusion."  4 McCarthy on Trademarks and Unfair Competition § 23:2.50.  A survey's failure to "approximate the manner in which consumers encountered the parties' products" in the real world is grounds for exclusion.  *THOIP*, 690 F. Supp. 2d at 235-41.[9]  Survey evidence "should make some effort to compare the impressions the marks have on potential customers under marketplace conditions."  *WE Media, Inc. v. General Elec. Co.*, 218 F.Supp.2d 463, 474 (S.D.N.Y. 2002); *see also Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1041-1044 (S.D. Ind. 2000) (excluding survey that tested a scenario that "depart[ed] from and distort[ed] th[e] experience in the

---

[9] *See also Trouble v. Wet Seal*, 179 F. Supp. 291, 308 (S.D.N.Y. 2001) ("a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions"); *Am. Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (survey excluded for "failure to conduct it under actual marketing conditions").

marketplace"). Consequently, "[a] survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone." *Malletier*, 525 F. Supp. 2d at 591.

Dr. Rappeport's survey failed to approximate real-world conditions by failing to test a truly representative post-sale condition and instead basing his survey around a scenario—in which passers-by see only the back side of Guess handbags in public settings—that will only rarely, if ever, occur. Neither Dr. Rappeport nor Gucci have offered any evidence whatsoever that the "back-side-only" viewing situation tested in his survey (where the prominent GUESS name is not visible) is representative or typical of how Guess handbags would be seen in public. By contrast, Guess has proffered evidence showing that upwards of 80% of the time, women wear their handbags with the front side facing toward the public.[10] Thus, in the vast majority of real-world circumstances, a handbag such as the test Guess Osaka bag would be carried or displayed with the front side containing the ornamentation and the GUESS name facing outward. (*See* Helfgott at 4 and Welsh Decl. ¶ 6, Ex. 5, 6/27/11 Rebuttal Report of Dr. Shari Seidman Diamond ("6/27/11 Diamond"), Ex. C at 28 for images of the metal "G" hardware with the GUESS name that appeared on Guess Osaka handbags.)

---

[10] Guess asked Dr. Carol Scott, a noted survey expert, to conduct an observational study to determine whether women typically wear their handbags with the front side facing outward or, as Dr. Rappeport asserted, with the back side of the handbag facing outward. Researchers in eight major metropolitan cities positioned themselves in busy locations such as coffee shops during peak traffic time where they could observe women from a distance of four to five feet. (Scott at ¶ 2.) The researchers spent two thirty-minute intervals observing every woman carrying a handbag within the five-feet-or-less range. (*Id.*) Researchers' observations were recorded into four categories: (1) the handbag contains ornamentation and the ornamentation is facing outward; (2) the handbag contains ornamentation and the ornamentation is facing toward the wearer; (3) the handbag does not contain ornamentation; and (4) the observer is unsure or cannot see the handbag with enough detail to make a determination. (*Id.* at ¶ 5.) A total of 637 women were observed. (*Id.* at ¶ 3.) Of those women, 479 carried handbags that the observers could see contained ornamentation. (*Id.* at ¶ 7.) Not surprisingly, the vast majority—over 80%—of women carried their handbags with the ornamentation facing outward. (*Id.* at ¶ 8.)

That women typically wear their handbags with the front side facing outward is consistent with the way Guess handbags are designed—with a discernible front and back side. The front side of a Guess handbag nearly always contains "personalization," which often takes the form of floating letters forming the GUESS name, a metal plate with the GUESS name, and/or a large letter "G" with the GUESS name etched on it—this is the part of the handbag that serves as an identifier of the Guess company.  Data from Guess's handbag licensee, Signal Products, Inc., shows that personalization bearing the GUESS name is clearly visible on 99% of the Guess handbags bearing the Quattro G Pattern.  (6/27/11 Diamond at ¶ 10 & Ex. C.)  As a practical matter, this personalization along with additional decorative features, such as rhinestones, studs, buckles, and zippers, are placed only on the front side of the bag.  This is because having such features on both sides of a handbag would likely result in these items catching on women's clothing or being uncomfortable for the wearer.  (*See* 8/24/11 Diamond at ¶ 11.)

Additionally, as Dr. Diamond concludes, by presenting the tested handbag with the metal "G" hardware on the front side out of view, the Rappeport survey deprived respondents "of access to two important pieces of relevant information."  (*Id.*)  First, the hardware itself "is a design cue that may signal" the handbag is made by Guess since Gucci "tends to be more subtle in its use of hardware."  (*Id.*)  Second, the actual hardware on the bag, which respondents were never shown, "contains direct information that the handbag is a GUESS bag"—the GUESS name.  (*Id.*)  Consequently, not only did the Rappeport survey "fail[] to show respondents the product as they would most often see it in the post-sale context," but "that decision [also] deprived respondents of information that was likely to prevent confusion."  (*Id.*)

Surveys that fail to replicate actual marketplace conditions are inadmissible. As the proponent of the Rappeport survey, Gucci bears the burden of proving by a preponderance of the evidence that the scenario tested by Dr. Rappeport is representative or typical of actual post-sale conditions. Gucci has failed to shoulder its burden of proof and therefore the Rappeport survey can and should be excluded on this ground as well as for lacking any control.

## III.   THE SURVEY BY GEORGE MANTIS SHOULD BE EXCLUDED

The Mantis survey purports to test whether Guess handbags using a beige-colored background and bearing Guess's signature Quattro G Pattern cause any consumer confusion with Gucci's claimed trade dress. Mr. Mantis claims to find a net confusion level of 15.6%. Like the survey by Dr. Rappeport, however, the Mantis survey violates several precepts regarding the conduct of scientifically reasonable survey research and, in the words of Dr. Diamond, "provides no reliable evidence of likelihood of confusion." (6/27/11 Diamond at ¶ 18.) The Mantis survey suffers from a number of serious methodological flaws, any one of which demonstrates that the survey's results provide an unreliable measure of consumer attitudes.

### 1.    The Mantis Survey Tested An "Imaginary Product"

The test stimulus used in the Mantis survey was a photograph of a Guess-branded men's messenger bag that was altered in a fundamental way. Whereas the original bag had a wide multicolored brown-red-brown stripe along the front side, Gucci used an image-editing software tool to edit out the bag's original striping and replace it with a single mono-colored brownish-black stripe that has never appeared on any Guess product. The following side-by-side comparison of the actual Guess handbag and the edited photograph shows the differences between the product consumers would have encountered in the marketplace and the imaginary product used in the Mantis survey.




**Actual Guess Product**                    **Mantis Test Product**

Having examined both the actual Guess product and the altered photograph used by Mr.

Mantis, Dr. Diamond has opined that this alteration "created a significant defect in the design of

the Mantis survey because consumers would never encounter the modified test product."

(6/27/11 Diamond at ¶ 8.)  By testing this "imaginary product," the Mantis survey "provided no

opportunity to evaluate how consumers would respond to an actual product they would ever see,

either in the marketplace or in any other setting."  (*Id.*)  As this Court has recognized, "[a] survey

that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers

in real life may be excluded on that ground alone."  *Malletier*, 525 F. Supp. 2d at 591.

Mr. Mantis seeks to justify the survey's test bag modification on the ground that the

change was a "conservative measure" because Gucci has also alleged the brown-red-brown stripe

infringes its green-red-green stripe design.  (Welsh Decl. ¶ 2, Ex. 1, Initial Survey Report of

George Mantis ("Mantis") at 3 n.3.)  He is wrong on both counts.  First, as Gucci's Rule 30(b)(6)

witness admitted, Gucci does not own and has never applied for any trademark registrations in a

brown-red-brown stripe.  (12/1/2009 Rule 30(b)(6) Depo. at 289:2-9.)  Nor is Gucci claiming

any trademark rights in this lawsuit in a brown-red-brown stripe.  (*See generally* SAC at ¶¶ 14-

41 (although complaint includes picture of Guess's messenger bag, Gucci only alleges

infringement of a green-red-green stripe).)  Guess, on the other hand, has used such striping on its handbags, footwear, wallets, and belts.

Second, Mr. Mantis's characterization of the removal of the brown-red-brown stripe as a "conservative measure" is, in the words of Dr. Diamond, "pure speculation."  (6/27/11 Diamond at ¶ 8.)  As Dr. Diamond explains, "by modifying the test bag, the survey may actually have deprived viewers of a potential cue that the photo of the bag they were looking at was not a photo of a GUCCI bag."  (*Id.*)  As a result, "[w]e simply do not know how viewers would have responded to the real bag because the real bag was never tested."  (*Id.*)[11]  Due to the artificial nature of the test stimulus used in the Mantis survey, it reveals nothing about any purported actual confusion in the real world.

### 2.    By Eliminating The GUESS Name From The Test Bag, Mantis's Survey Is Irrelevant To 99% Of The Guess Quattro G Handbags

The Mantis survey also used an "atypical" test stimulus that was "highly unrepresentative" of the Quattro G handbags at issue in the lawsuit.  (6/27/11 Diamond at ¶ 10.) The Guess men's messenger bag selected for the Mantis survey belonged to a handbag group that sold only 2,333 units, or 0.1%, of the more than two million units of Quattro G handbags that were sold since 2005 in the U.S.  (*Id.*, ¶ 10 & Ex. C.)  Even more significant, of the over two million Quattro G handbags sold, more than 99% displayed the GUESS name directly on the front of the bag.  (*Id.* (displaying images of ornamentation depicting the GUESS name that appeared on Guess Quattro G handbags).)  The messenger bag tested by Mantis, however, did not bear the GUESS name on the front of the bag.  Thus, the Mantis survey omitted a key item of information that identifies 99% of the Quattro G handbags as Guess products.

---

[11] As Dr. Diamond also stated, the appropriate way to design the survey would have been to preserve the brown-red-brown stripe on the test bag and add the stripe to the control, so that the stripe would not factor into any differences in response levels between the test and control stimuli.  (*Id.*)  Mr. Mantis, however, chose not to use this approach.

As this Court has recognized, source-identifying elements such as hang tags and labels are "important sources of information, including brand identification" that do not go "unnoticed by consumers." *THOIP*, 690 F. Supp. 2d at 239.[12]  In *THOIP*, the Court rejected the plaintiff's survey where it failed to include the neck tags and labels that would have been attached to the tested shirts in the marketplace.  *Id.* at 238-39.[13]  This failure, the Court concluded, was "clearly" a "deviation from actual marketplace conditions." *Id.* at 239.  Likewise, here, Mantis's use of a test product that did not include the GUESS name precludes the survey's admission as providing reliable evidence of representative real world post-sale situations.[14]

### 3. The Mantis Survey's Analysis Improperly Inflated The Confusion Level

The Mantis survey purports to show a net confusion level of 15.6%.  However, as Dr. Diamond's analysis of the verbatim responses reveals, Dr. Mantis's confusion level is inflated as

---

[12]  Although the GUESS name appeared on the shoulder straps, the "photoshopped" test and control photographs used in the survey obscured the name so that it was virtually impossible for respondents to discern.  Out of 400 respondents who were shown the test and control photographs, only 5 sharp-eyed respondents mentioned seeing the GUESS name in the photograph of the product.  (Mantis at Tables 8-13.)  Of course, those respondents correctly identified the bag as coming from Guess.

[13]  *See also Am. Footwear*, 609 F.2d at 660, n.4 (survey had "critical defect" where respondents were shown a poster without references to the manufacturer since it was typically displayed in environments that were replete with such references); *Beverage Mktg. USA, Inc. v. S. Beverage Corp.*, No. 00-9578, 2002 WL 1162789, at *14-15 (2d Cir. June 3, 2002) (removing labels from the products in the survey was improper); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04cv7203, 2006 WL 1012939, at *25 (S.D.N.Y. April 19, 2006) (survey failed to replicate marketplace conditions where it did not portray defendant's cosmetics as they typically appeared with signage and packaging identifying Lancome as the source of the products).

[14]  Gucci's own experts have also emphasized the important role that source-identifying information plays in helping consumers determine the source of a product.  In *THOIP*, Dr. Simonson testified that including the Disney name on a tag on the shirt being tested would "approximate marketplace conditions" and "include a key source of information that directly relates to the source of the product." (Ex. 2 (at 203:19-24) to Supp. Decl. of M. Bradley (Nov. 20, 2009), No. 08 Civ. 6823, Dkt. 86-3 (available upon request).)  Similarly, Dr. Pham's declaration states that "[w]hen consumers make inferences about the source of products, they use various pieces of information (sometimes called cues) that are available to them in the environment," including the "marks on the goods." (Ex. 1 (at ¶ 74) to Decl. of D. Cendali (Oct. 23, 2009), No. 08 Civ. 6823, Dkt. 68-2 (available upon request).)

it improperly counts single-component reasons for Gucci responses (*e.g.*, letter "G"s, beige background color) as indicative of confusion with Gucci's multi-element trade dress.  This Court has previously held that such single-component responses are not evidence of trade dress confusion, which necessarily involves some particular combination of elements.  *See Malletier*, 525 F. Supp. 2d at 605 (respondents who referred only to the "D" and "B" lettering on the Dooney & Bourke bag but not the multicolor aspect of the mark should not be classified as confused because "Louis Vuitton has not argued that the mere interlocking initials 'D' and 'B' infringe on any Louis Vuitton mark").

In her analysis of the Mantis survey's verbatim responses, Dr. Diamond identifies nine respondents in the test group who focused solely on "G"s or color, and none in the control group.  (6/27/11 Diamond at ¶ 12.)  Removing these single-component responses reduces the net confusion level to 11.1%.  (*Id.*)  Thus, by including these responses in its tabulation of confusion, the Mantis survey improperly inflated the claimed level of confusion by more than 5%.

### 4.   The Mantis Survey Used An Inadequate Control That Artificially Inflated The Net Confusion Level Even Further

The Mantis survey suffers from yet another fundamental flaw—a defective control—that makes even this recalculated 11.1% confusion level artificially inflated.  The Mantis survey used a control that was flawed in several respects.  First, the control consisted of an edited photograph that presented a Guess men's messenger bag bearing a design that was radically different from the design on the test stimulus.  Specifically, the control modified Guess's Quattro G Pattern by: (1) removing the letter "G"s from the corners of the diagonal line intersections; (2) removing the line intersections; (3) reorienting the repeating Quattro G marks so that they appeared in a horizontal and vertical pattern rather than a diamond-shaped pattern; and (4) placing the modified pattern on a navy blue background.  (Mantis at 3-4 and A26-27.)

The Mantis control further distorted the survey's noise assessment by rotating the Quattro G mark by 45 degrees, making the interlocking "G"s that comprise the mark appear to be interlocking letter "C"s.  (Mantis at A26-A27.)  This modification had a material effect on the results, inflating the claimed net confusion level by producing fewer Gucci responses among respondents who viewed the control.  In her review of the Mantis survey's verbatim responses, Dr. Diamond identifies 30 control group respondents, or 15%, who "explicitly mentioned the non-existent C initials on the control bag to explain their identification of a brand beginning with C."  (Diamond at ¶ 13.)  In the test group, only 10% of respondents provided similar responses, resulting in a measurable net difference of 5% of control respondents who were diverted toward identifying the control product as emanating from a company whose brand name started with the letter "C," as compared with the test group.  (*Id*.)  As Dr. Diamond observes, by diverting control respondents away from brand names beginning with "G" and focusing them on brand names starting with "C," the Mantis survey "tend[ed] to reduce the likelihood that they would guess the GUCCI brand."  (*Id*.)  Since the "ability of the control group to assess guessing [was] artificially depressed," the net confusion level was "artificially inflated."  (*Id*.)

There was no reasonable justification for employing a control that differed so radically from the test bag.  In *THOIP*, this Court criticized the plaintiff's survey for using a control that lacked "key unprotectable elements of the test shirts," making respondents less likely to pick the control shirt or to provide a response that would be coded as evidencing confusion.  690 F. Supp. 2d at 240-41; s*ee also Malletier*, 525 F. Supp. 2d at 595-96.  Likewise, here, several components of the allegedly infringing Quattro G Pattern are clearly not protectable, such as the use of beige fabric or visible letter "G"s.  At the same time, Mantis selected a control stimulus that also completely altered these unprotectable or unchallenged elements.  As Dr. Diamond concludes, to

properly test for likelihood of confusion based on Gucci's claimed trade dress, the Mantis survey

design "should have used a control, or more thoroughly several controls, that had an acceptable

element (e.g., a ''G') or combination of elements, but lacked the combination" that Gucci claimed

was infringing.  (6/27/11 Diamond at ¶ 11.)   By failing to do so, the Mantis survey did not

"provide a test of whether the combination of elements in the claimed trade dress was likely to

cause confusion or whether, for example, any use of a visible G would increase GUCCI

responses."  (*Id.*)  Moreover, by failing to employ a control that sufficiently accounted for the

legally irrelevant elements of Guess's Quattro G Pattern, the Mantis survey "failed to provide a

suitable control for noise."  (*Id.*); *see also THOIP*, 690 F. Supp. 2d at 240-41; *Cumberland*

*Packing*, 32 F. Supp. 2d at 574-75.[15]

## IV.   THE SURVEY BY DR. MICHAEL B. MAZIS SHOULD BE EXCLUDED AND/OR GIVEN LITTLE OR NO WEIGHT

Guess begins by acknowledging this Court's preliminary determination that any

weaknesses in the Mazis survey goes to weight as opposed to admissibility.  Guess respects the

Court's assessment.  Nonetheless, Guess respectfully submits that consideration of all the

survey's methodological flaws, some of which were not discussed at the August 4, 2011 hearing,

---

[15] As Dr. Diamond further opines, the Mantis survey suffers from two additional fatal flaws. First, the survey failed to define an appropriate survey population and select a sample that is representative of that population—both requirements of a proper survey.  (6/27/11 Diamond at ¶ 14); Manual for Complex Litigation § 11.493; *Malletier*, 525 F. Supp. 2d at 632 (criticizing a survey because it used an improper sampling method).  The Mantis survey selected only respondents who said that in the next 12 months they were likely "to purchase or shop for a cross-body bag."  (Mantis at A2.)  This narrowly defined sample excluded potential purchasers of non-cross-body handbags—a group whose perceptions would be clearly relevant to the issue of likelihood of confusion given that millions of the Quattro G handbags sold were not cross-body bags.  Second, the Mantis survey's sampling method lacks fit with the qualification plan that produced eligible respondents as compared to actual purchasers of the bag being tested. (6/27/11 Diamond at ¶ 15.)  The Guess handbag tested was a men's bag—not a product typically marketed to or purchased by women—but the survey's quota sampling method produced a sample consisting of 70 percent women and only 30 percent men.  (*Id.*)  As Dr. Diamond concluded, the "lack of fit between the appropriate population, the screening procedures, and the test product" was a "significant defect[]" in the survey.  (*Id.* at 18.)

also support the conclusion that the survey should be excluded as unreliable.  In any event, these flaws indicate that the survey's results should be given little to no weight.

**1.    The Mazis Survey Is Not Probative Of Actual Dilution Or Likelihood Of Dilution**

The plain language of the federal dilution statute mandates that where a defendant's mark was first used in commerce prior to October 6, 2006, a plaintiff must show ***actual dilution***—and not just a likelihood of dilution—in order to obtain monetary relief.  *Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 282-83 (S.D.N.Y. 2007).[16]  Since the Quattro G Pattern has appeared on Guess-branded products since at least early 2005, the "actual dilution" standard applies to Gucci's dilution claim for monetary relief.

The Mazis survey provides no evidence that Guess's use of the Quattro G Pattern has caused either a reduction in the ability of Gucci or its claimed trade dress to act as source-identifiers of Gucci products (actual dilution by blurring) or harm to Gucci's reputation (actual dilution by tarnishment).  Thus, it offers no evidence of actual dilution.  *See Malletier*, 525 F. Supp. 2d at 569-70, 609-10 (rejecting a survey as "irrelevant to dilution" because it did not show that Dooney & Bourke's mark had "impaired the ability" of Louis Vuitton's mark to serve as a source identifier or tarnished Louis Vuitton's reputation).  The Mazis survey asked only whether any "other" products or brands "come to mind" while respondents viewed photographs of the test and control handbags, and provides no information about respondents' attitudes toward Gucci or its claimed trade dress.  (Welsh Decl. ¶ 3, Ex. 2, Initial Survey Report of Dr. Michael B. Mazis ("Mazis") at ¶¶ 19-22 & Ex. G.)  This line of inquiry is irrelevant to the question of actual

---

[16] *See also* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:131 (intent of the 2006 Trademark Dilution Revision Act's drafters was to limit monetary relief "to diluting marks which were first used after [] October 6, 2006").

dilution.[17]  As the Supreme Court held, "the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable [actual] dilution." *Moseley v. V Secret Catalogue*, 537 U.S. 418, 433 (2003) ("[S]uch mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner").

As Dr. Diamond concludes, since the Mazis survey does not show "whether an association is likely to cause GUCCI's trade dress to be less distinctive in a market environment in which handbags regularly bear the initials of their source in the patterns displayed on their products," the survey "provides no evidence of actual dilution."  (6/27/11 Diamond at ¶ 21.) Therefore, to the extent Gucci intends to offer the Mazis survey to show actual dilution, it must be excluded for lack of "fit" with the substantive law.  *See Malletier*, 525 F. Supp. 2d at 569-70, 572-73, 609-611, 662-64 (excluding expert's opinion and dilution survey where the proffered testimony and results did not fit the substantive law of dilution).

Even under a likelihood of dilution standard applicable to claims for injunctive relief, the results of the Mazis survey are irrelevant.  This "softened" dilution standard does not relieve a litigant of showing some impairment or tarnishment resulting from any claimed association—which the Mazis survey fails to do.  *See* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:115 (even after the 2006 revision to the federal dilution statute, "[t]he famous mark owner must prove both that the required 'association' will be likely and that it is likely that

---

[17] It is equally irrelevant to the likelihood of confusion issue, which turns on whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the ***source*** of the product in question."  *THOIP*, 690 F. Supp. 2d at 228.  The Mazis survey neither asked for nor elicited any responses concerning source, sponsorship, affiliation, or permission.  To the contrary, the imbedded assumption in the survey's questions is that the respondents were already thinking about the Guess brand because unlike Gucci's other surveys, the Mazis study tested a typical Guess handbag in which the GUESS name prominently appears on the front of the bag and asked respondents what "***other***" products or brands came to mind.

that 'association' will 'impair the distinctiveness' of the famous mark.  These two critical

elements **cannot be assumed or presumed to always follow**").[18]

     That the Mazis survey's methodology did no more than prompt respondents to name

various handbag companies is evidenced by the survey results.  In the test group, 70% of

respondents said that another product or brand came to mind when viewing the photographs,

while 23.2% (47) named two or more other products or brands.  (Mazis at Ex. H.)  The

corresponding percentages in the control group were 66% and 17.4% (36).  (*Id.*)  There were also

many respondents who named three or four other products or brands, in response to interviewer

questioning.[19]  (*Id.*)  Indeed, among respondents viewing the test stimulus, Gucci was only the

**third** most mentioned "other brand," taking a back seat to Coach and Louis Vuitton.  (*Id.*)

     In any event, the Mazis survey's finding of a 12% level of association is insufficient as a

matter of law to establish likelihood of dilution.  Courts generally demand percentages of **twice**

**that level—or higher**—in order to find actionable dilution.  *See Pharmacia Corp. v. Alcon Labs.,*

*Inc.*, 201 F. Supp. 2d 335, 380-81 (D.N.J. 2002) ("call to mind" survey showing a dilution level

---

[18] The Mazis survey also fails to provide reliable evidence of any "actual association" that might be relevant under a likelihood of dilution standard.  As Dr. Diamond concluded in her analysis, the Mazis survey merely shows that "[w]hen handbag consumers are asked to think of the names of handbag brands, a substantial majority of them are able to generate examples." (Diamond at ¶ 20(a).)  The survey does not reveal "whether consumers would spontaneously think of the GUCCI brand upon encountering the test GUESS handbags." (*Id.* at ¶ 21.)  The Mazis survey effectively produced "demand effects," which courts routinely find make surveys unreliable.  *See, e.g., Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007).

[19] As further evidence that the Mazis survey was little more than a brand naming test, many of the respondents who mentioned multiple companies (including Gucci) cited the same or similar reasons for doing so.  For example, respondent number 05314 mentioned Gucci "[b]ecause of the way the symbols look on the purse," but then also named Yves St. Laurent, "[a]lso because of the symbols."  Likewise, respondent number 06410 named Louis Vuitton "[b]ecause the insignia looks like the Louis Vuitton and also the pattern," and, in response to further prodding, mentioned Gucci because of "[t]he pattern as well and the handles." (*Id.*)  *See also, e.g.*, respondent numbers 98713, 98727, 98722, 98707, 87013, 82501, 07209, 07202, 05325, 04311, 04307.

of 14% was "insufficient on its face").[20]  Indeed, given his meager findings, not even Dr. Mazis

claims that his survey results show a likelihood of dilution, much less actual dilution.

### 2.      The Mazis Survey Employed A Flawed Control

The Mazis control used a design that was similar to the design on the control in the

Mantis survey.  For the same reasons discussed in Section III(4), *supra*, the Mazis survey should

have used a control, or multiple controls, that included a non-infringing element or combination

of elements.  By using an improper control, the Mazis survey provides no basis for concluding

whether any "associations" with Gucci are a result of Guess's use of the combined elements that

constitute Quattro G Pattern or, alternatively, due to any individual, "legally irrelevant"

elements, such as use of the letter "G."  *Cumberland Packing*, 32 F. Supp. 2d at 574-75.

### 3.      The Mazis Survey Improperly Inflated Its Results By Including Single-Component Responses As Evidence Of Association Regarding Gucci's Multi-Element Trade Dress

Dr. Mazis repeats the same methodological error discussed above regarding the Mantis

survey, namely, the Mazis survey improperly includes single-component responses as showing

---

[20] *See also Wawa Dairy Farms v. Haaf*, 40 U.S.P.Q.2d 1629, 1632 (E.D. Pa. 1996) (survey showing association levels of 29% constitutes proof of blurring); *Kellogg Co. v. Exxon Mobil Corp.*, 192 F. Supp. 2d 790, 806-08 (W.D. Tenn. 2001) (70%); *Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2:05-cv-1468, 2007 WL 2782030, at *8 (E.D. Cal. Sept. 18, 2007) (87%).  Gucci's experts agree, in another case Dr. Simonson argued since "there are many cases in which one mark brings the other mark to mind but there is no confusion between the two," estimates of "likelihood of dilution (based on mere mental association) tend to be much higher, rather than lower, than measures of confusion."  2008 WL 2571703, at ¶ 4 (*Johnson & Johnson Co. v. Actavis Group HF*, No. 06cv8209 (S.D.N.Y. 2008)).  Dr. Simonson continued:  "Thus, if the threshold for likelihood of confusion is about 15% the threshold for likelihood of dilution should be significantly higher."  *Id.*  Here, a 12% survey result does not come close to meeting the minimum level required for showing likelihood of dilution.

purported "association" with Gucci's multi-element trade dress.   By excluding these single-component responses,[21] the net level of claimed "association" is reduced to 7.5%.[22]

## CONCLUSION

For the foregoing reasons, Guess respectfully submits that the surveys by Dr. Michael Rappeport, George Mantis, and Dr. Michael B. Mazis should be excluded.


Dated:  Los Angeles, California
         August 26, 2011

O'MELVENY & MYERS LLP

By: _____

Daniel M. Petrocelli (dpetrocelli@omm.com)
Robert C. Welsh (rwelsh@omm.com)
Andrew J. Frackman (afrackman@omm.com)
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., and Swank, Inc.*

---

[21] Among the 42 respondents in the test group who were coded as indicating appearance-based "association," there were 10 respondents who mentioned only "G"s and two who referred only to color and/or non trade-dress features (*e.g.*, material). (Respondent numbers 98701, 94308, 94304, 90317, 11811, 11807, 10319, 07204, 07005, and 06423; 82511 and 04321.)  In the corresponding control group, there were three respondents who mentioned only "G"s and none who referenced another single or irrelevant trade-dress element. (Respondent numbers 98106, 90309, and 04314.)

[22] The Mazis survey also artificially inflated its results by leaving the photographs in view during the interviews.  As Dr. Diamond points out, the fact that respondents were able to provide "appearance-related explanation[s]" that Dr. Mazis considered relevant in reaching his 12% net association result was "facilitated by the fact that the handbag remained in front of the respondent during the entire interview." (6/27/11 Diamond at ¶ 20(c).)  In other words, leaving the photographs in front of the respondents *increased* the likelihood that they would cite an appearance-related reason for their identifications of brands, including Gucci.  This, in turn, *increased* the likelihood that responses would be coded by Dr. Mazis as evidence of "association," thus improperly inflating his results.