**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUCCI AMERICA, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>GUESS?, INC., MARC FISHER FOOTWEAR LLC, THE MAX LEATHER GROUP/CIPRIANI ACCESSORIES, INC., SEQUEL AG, K&M ASSOCIATES L.P., VIVA OPTIQUE, INC., SIGNAL PRODUCTS, INC. and SWANK, INC.,<br><br>Defendants. | Civil Action No. 09cv4373 (SAS) |

**MEMORANDUM OF LAW IN OPPOSITION TO GUCCI AMERICA, INC.'S MOTION TO EXCLUDE THE EXPERT OPINIONS, TESTIMONY AND SURVEYS OF DR. MYRON J. HELFGOTT AND DR. CAROL A. SCOTT**

O'MELVENY & MYERS LLP
DANIEL M. PETROCELLI
ROBERT C. WELSH
ANDREW J. FRACKMAN
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., and Swank, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 2

    I.     DR. HELFGOTT'S SURVEYS ARE HIGHLY RELEVANT ........................... 2

          A.     Dr. Helfgott's Surveys Show That The Guess Quattro G Designs Tested Are Not Likely To Cause Confusion............................................. 2

          B.     Dr. Helfgott's Survey Results Are Relevant To Showing That Guess Acted In Good Faith......................................................................... 3

          C.     Dr. Helfgott's Survey Results Are Relevant To Rebutting Gucci's Contention Of Post-Sale Confusion.......................................................... 4

    II.    DR. HELFGOTT EMPLOYED RELIABLE SURVEY METHODS AND PRINCIPLES ....................................................................................... 5

             1.     The Control Bag In Dr. Helfgott's "Trade Dress" Survey Was Appropriate .................................................................. 5

             2.     The Qualified Respondent Universe Was Representative Of Guess Handbag Customers ......................................................... 10

             3.     The Survey Design Was Proper................................................... 12

             4.     Dr. Helfgott's Survey Is Not A Reading Test.............................. 13

    III.    DR. SCOTT'S SURVEY IS HIGHLY RELEVANT ....................................... 15

          A.     Dr. Scott's Survey Confirms That Gucci's "Stylized G" Is A Weak Mark.................................................................................................... 15

          B.     Dr. Scott's Survey Provides Strong Evidence On Guess's Laches Defense ............................................................................................. 17

    IV.    DR. SCOTT'S SURVEY USED A PROPER CONTROL ................................ 20

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Am. Footwear Corp. v. Gen. Footwear Co.*,
609 F.2d 655 (2d Cir. 1979)............................................................................. 11

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*,
No. 1:03-CV-278, 2005 WL 2076279 (D. Vt. Aug. 26, 2005)........................... 19

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*,
533 F. Supp. 75 (S.D. Fla. 1981) ..................................................................... 17

*Citizens Banking Corp. v. Citizens Fin. Group, Inc.*,
No. 07–11514, 2008 WL 1995104 (E.D. Mich. May 6, 2008)........................... 17

*Conagra, Inc. v. Hormel & Co.*,
784 F. Supp. 700 (D. Neb. 1992) ..................................................................... 13

*Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*,
535 F. Supp. 2d 347 (W.D.N.Y. 2008)............................................................. 19

*Cumberland Packing Corp. v. Monsanto Co.*,
32 F. Supp. 2d 561 (E.D.N.Y. 1999) ................................................................. 8

*Deere & Co. v. MTD Holdings, Inc.*,
No. 00 civ. 5936, 2004 U.S. Dist. LEXIS 2550 (S.D.N.Y. Feb. 18, 2004) ........ 20

*Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*,
944 F.2d 1235 (6th Cir. 1991) ......................................................................... 16

*Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*,
988 F. Supp. 322 (S.D.N.Y. 1997).................................................................... 13

*Harlequin Enters., Ltd. v. Gulf & Western Corp.*,
644 F.2d 946 (2d Cir. 1981)............................................................................. 19

*Jordache Enters, Inc. v. Levi Strauss & Co.*,
841 F. Supp. 506 (S.D.N.Y. 1993).................................................................... 11

*Malletier v. Dooney & Bourke, Inc.*,
340 F. Supp. 2d 414 (S.D.N.Y. 2004).................................................... 13, 14, 15

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................... 8, 14

*Malletier v. Dooney & Bourke, Inc.*,
561 F. Supp. 2d 368 (S.D.N.Y. 2008).................................................................. 3

**TABLE OF AUTHORITIES**
(continued)

Page

*Nabisco v. Warner-Lambert Co.*,
   32 F. Supp. 2d 690 (S.D.N.Y. 1999)...................................................................... 20

*Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*,
   532 F. Supp. 651 (W.D. Wash. 1982)..................................................................... 16

*Nextel Comm's, Inc. v. Motorola, Inc.*,
   91 U.S.P.Q. 2d 1393 (T.T.A.B. 2009) .................................................................... 19

*Nora Bevs. v. Perrier Group of Am.*,
   269 F.3d 114 (2d Cir. 2001)...................................................................................... 4

*One Indus., LLC v. Jim O'Neal Distrib.*,
   578 F.3d 1154 (9th Cir. 2009) ................................................................................ 22

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
   86 F. Supp. 2d 305 (S.D.N.Y. 2000)...................................................................... 11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961)................................................................................... 18

*RJR Foods, Inc. v. White Rock Corp.*,
   201 U.S.P.Q. 578 (S.D.N.Y. 1978)........................................................................ 16

*Roselux Chem. Co. v. Parsons Ammonia Co.*,
   299 F.2d 855 (C.C.P.A. 1962) ......................................................................... 16, 17

*Sara Lee Corp. v. Kayser-Roth Corp.*,
   No. 6:92CV00460, 1994 WL 16804588 (M.D.N.C. Oct. 13, 1994) ...................... 8

*Spraying Sys. Co. v. Delavan, Inc.*,
   975 F.2d 387 (7th Cir.1992) .................................................................................. 16

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009)................................................................................. 3, 15

*THOIP v. Walt Disney Co.*
   690 F. Supp. 2d 218 (S.D.N.Y. 2010).............................................................*passim*

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   2011 WL 1842980 (S.D.N.Y. May 13, 2011) .................................................. 13, 24

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
   746 F.2d 112 (2d Cir. 1984)................................................................................... 11

*WE Media, Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002).................................................................... 12

**TABLE OF AUTHORITIES**
**(continued)**

Page

<u>**Other Authorities**</u>

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:2.50 ........................................ 12

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32.189 .......................................... 5

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 ...................................... 11

Dr. Jacob Jacoby, *Experimental Designs and the Selection of Controls in
   Trademark and Deceptive Advertising Surveys,*
   92 TRADEMARK RPTR. 890 (2002) ......................................................................... 24

## PRELIMINARY STATEMENT

Gucci seeks to exclude two validly designed and executed confusion surveys conducted by Dr. Myron Helfgott and Dr. Carol Scott on the grounds they are not relevant to Gucci's sole remaining theory of post-sale confusion and suffer from certain claimed methodological flaws. Gucci is wrong on both counts.

Early in this case, Gucci conceded it had no evidence of actual confusion in the marketplace, even though the Guess designs at issue have appeared on literally millions of accessory products sold in the United States over the past six to 15 years.  (Gucci's Responses and Objections to Guess's Substituted First Set of Interrogatories, Response Nos. 2-4, 6 (served 11/16/2009).)  The absence of confusion in the marketplace was further confirmed by the testimony of Gucci's key executives, all of whom stated they were not aware of any real-world instances of consumers confusing Guess and Gucci products.  (12/1/09 J. Moss Rule 30(b)(6) Depo. at 181:10-23, 187:11 - 190:7; 4/8/10 T. Novak Rule 30(b)(6) Depo. at 166:5 – 172:2; 2/9/11 L. Lendrum Depo. at 226:21 – 227:6.)

Additionally, Gucci now concedes it is not asserting any point-of-sale confusion.[1]  As confirmed by the unrealistic scenarios tested in Gucci's unreliable surveys, Gucci's confusion claim is limited to asserting that certain Guess products, when not fully visible or viewed at unlikely angles in public, may cause some claimed "post-sale confusion."  At the same time, Gucci neither claims nor shows that it suffered any damages to its brand or its business as a result of this alleged confusion.  Having limited itself to this peculiarly narrow claim of post-sale confusion, Gucci contends the Helfgott and Scott surveys showing no likelihood of point-of-sale confusion are irrelevant to any issue in this litigation.

---

[1] (8/19/11 L. Ederer Letter to Court at 1.)

In truth, these surveys provide evidence directly relevant to a number of key issues in this case, including: (1) that the Guess designs at issue are not likely to cause any confusion in the manner in which they are actually encountered by consumers in the marketplace; (2) that the manner in which Guess's products were designed and sold was not intended to deceive consumers into believing the products originated from or are associated with Gucci; and (3) that there is no likelihood of confusion in typical situations where the Guess products are viewed in stores and other public settings. Gucci's methodological criticisms are equally misguided and seem predicated on a fundamental misunderstanding of the surveys' purposes. As demonstrated below, Dr. Helfgott's and Dr. Scott's survey methods were consistent with commonly accepted principles of survey research and appropriate to the research issues addressed by the surveys.

## ARGUMENT

## I.    DR. HELFGOTT'S SURVEYS ARE HIGHLY RELEVANT

Gucci says that a "fundamental problem" with Guess's confusion surveys is that "they are directed exclusively to the issue of point-of-sale confusion, and therefore have no bearing on Gucci's claims of post-sale confusion." (Gucci's Memorandum of Law in Support of its Motion to Exclude Defendant Guess?, Inc's Proposed Expert Opinions, Testimony and Surveys of Dr. Myron J. Helfgott and Dr. Carol A. Scott ("Br.") at 3.) Nowhere, however, does Gucci contend that this makes Guess's surveys inadmissible—nor could it. Even though Gucci may have abandoned any claims of point-of-sale confusion as between Guess and Gucci products, the results of Guess's surveys are still directly relevant to other key issues in this lawsuit.

### A.    <u>Dr. Helfgott's Surveys Show That The Guess Quattro G Designs Tested Are Not Likely To Cause Confusion</u>

The results of Dr. Helfgott's surveys corroborate and explain what the real-world experience has already revealed, namely, the longstanding peaceful co-existence of Guess's

Quattro G products and Gucci products.[2]  As Dr. Helfgott's surveys show, this peaceful co-existence results from the fact that when consumers come upon Guess products in the marketplace, they are able to readily and correctly identify those products as coming from, and **only** being associated with Guess.[3]  Under governing Second Circuit law, where products have peacefully co-existed in the marketplace for an appreciable period of time, as is the case here, that is itself a "'powerful indication' that there is no confusion or likelihood of confusion." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009).[4]  Dr. Helfgott's surveys are directly relevant to the likelihood of confusion analysis required by the Second Circuit's *Polaroid* decision.

## B. Dr. Helfgott's Survey Results Are Relevant To Showing That Guess Acted In Good Faith

Dr. Helfgott's survey results also show that Guess acted in good faith and without any intent to deceive consumers in designing and selling its products bearing the Quattro G Pattern. As this Court has recognized, the determination of whether a defendant acted with intent to confuse focuses on whether it "'acted in bad faith in any sense relevant to the Lanham Act, that is, by deceiving consumers into believing that its products [] were related to' the plaintiff." *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 387 (S.D.N.Y. 2008).  Here, Guess's Quattro G products prominently display the GUESS name and other source-identifiers of Guess[5]

---

[2] Guess's complained-of Quattro G Pattern has appeared on Guess products since early 2005.

[3] Respondents were told to look at the handbag "as you would if you were in a store and were seriously considering buying it" and were allowed to hold and inspect the actual bag, including the various places where the GUESS name appeared.  (Dkt. 168, Ex. 3, Expert Report of Dr. Myron Helfgott ("Helfgott") at 11.)  Consistent with the perception of consumers in the real world that Guess and Gucci products are not confusingly similar, Dr. Helfgott's results show no likelihood of confusion.

[4] Internal citations are omitted and emphases are added unless otherwise noted.

[5] These identifiers of Guess include the large square and round single letter "G"s that appear on Guess products.  As discussed in Section III.B., *supra*, one of the key findings of Dr. Scott's

on metal hardware, nameplates, linings, shoe laces, and other like elements.[6]   The serial branding

of Guess Quattro G products with the GUESS name is no accident, but rather intended to clearly

and unequivocally identify Guess as the source of these products.   Dr. Helfgott's survey results

show that Guess's branding efforts have been successful.   Significantly, Dr. Helfgott's surveys

demonstrate that, when consumers are presented with Quattro G products as they actually

appeared in the marketplace, they are unlikely to believe the products come from or are

associated with Gucci.   To the contrary, the vast majority of respondents—83%—easily

identified the tested handbag as a Guess product.   (Helfgott at 13.)   These findings negate any

suggestion that Guess's Quattro G products were made and sold in a manner to deceive

consumers into believing that they were related to Gucci.

### C.      Dr. Helfgott's Survey Results Are Relevant To Rebutting Gucci's Contention Of Post-Sale Confusion

Contrary to Gucci's assertion, Dr. Helfgott's survey results do provide some evidence

relevant to Gucci's claim of post-sale confusion.   In this litigation, Guess has obtained reliable

evidence demonstrating that the GUESS name is observable to consumers in a significant

number of real-world settings, whether at point of sale or post sale.   According to data produced

by Guess's handbag licensee, Signal Products, Inc., the GUESS name is clearly visible on 99%

of Guess handbags bearing the Quattro G Pattern.   (Dkt. 168, Ex. 5, 6/27/11 Rebuttal Report of

Dr. Shari Seidman Diamond ("6/27/11 Diamond") at ¶ 10 & Ex. C.)   Additionally, an

observational study conducted by Guess's survey expert, Dr. Carol Scott, found that 80% of

---

survey is that a significant proportion (45% or more) of consumers associate square- and round-shaped single letter "G"s with Guess.

[6] As additional indicators of Guess's good faith, Guess's Quattro G products also include hangtags, labels, and packaging clearly identifying Guess as the source of the products, and are sold primarily in Guess-only stores or sections of third-party department stores that are dedicated exclusively to Guess.   Such a prominent display of a defendant's own house mark negates any inference of "intent to deceive consumers."   *Nora Bevs. v. Perrier Group of Am.*, 269 F.3d 114, 125 (2d Cir. 2001).

women carry their handbags with the front side (*i.e.*, displaying the GUESS name and other ornamentation) facing outward.  (Dkt. 168, Ex. 8, Observational Study and Report of Dr. Carol Scott at ¶ 8.)  Thus, in a substantial number of post-sale scenarios, the GUESS name will be visible to consumers viewing Guess's Quattro G handbags.  The high incidence of correct Guess identifications in Dr. Helfgott's survey demonstrates that when consumers are able to observe the GUESS name, they are not confused.  Consequently, in the significant number of post-sale settings in which the GUESS name is visible to consumers, no confusion is likely.

## II.   DR. HELFGOTT EMPLOYED RELIABLE SURVEY METHODS AND PRINCIPLES

### 1.   The Control Bag In Dr. Helfgott's "Trade Dress" Survey Was Appropriate

Gucci also criticizes Dr. Helfgott's "trade dress" survey for using what it says is an "improper" control that did not eliminate "a sufficient number of the complained-of trade dress elements."  (Br. at 13-14.)  At the outset, it is unclear—if not downright puzzling—why Gucci contends that this supposed flaw justifies exclusion of the Helfgott survey.  Even if Dr. Helfgott had used an improper control (which, as explained below, he did not), this would not have affected the conclusions of his expert report.  Of the 200 respondents who were shown the test handbag in Dr. Helfgott's survey, only a negligible 5% referenced Gucci.  (Helfgott at 13.)  As a result, even disregarding the responses obtained in the control condition, the highest possible net confusion level is 5%—a percentage that shows no confusion is likely.  *See* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32.189 ("When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely.").

Indeed, Gucci's own expert Dr. Simonson admitted that because of the "insignificant" confusion estimate in the test group, the purportedly "ineffective control did not affect the

[Helfgott] surveys' stated conclusion."  (Dkt. 165, Ex. C, Rebuttal Expert Report of Dr. Itamar Simonson ("Simonson") at ¶ 38.)

At any rate, Gucci's criticism of Dr. Helfgott's control bag is unfounded and misconceives the purpose and design of Dr. Helfgott's confusion surveys.  In this lawsuit, Gucci is complaining about, *inter alia*, Guess's use of two separate but closely related designs.  The first design consists of Guess's registered Quattro G mark surrounded by intersecting lines, with single letter "G"s at the line intersections (the "Quattro G Pattern"):



**Tamara Slim Clutch (SI056851)**

Gucci claims that this Guess design, regardless of the background color on which it appears, infringes Gucci's rights in a pattern consisting of:  (1) Gucci's repeating interlocking GG design mark; (2) set in a repeating diamond-shaped pattern, with the interlocking GG design mark located at the four corners of each diamond shape; and (3) separated by dots forming straight lines.  (SAC ¶ 19.)  Gucci's claim is exceedingly narrow, however.  It does not contend, and offers no evidence showing, that the following variations of the Quattro G Pattern without letter "G"s at the corners or without letter "G"s and line intersections are infringing:[7]

---

[7] *See* 3/2/2010 Hearing Tr. at 35:23 – 36:16 ("Mr. Ederer: "We are complaining about a diamond shape with a quattro G in the middle and Gs in the corner."); 4/8/2010 T. Novak Rule 30(b)(6) Depo. at 161:11 – 163:12 (testimony of Gucci's Rule (30)(b)(6) witness on its infringement contentions that a shoe bearing the Quattro G Pattern without "G"s at the corners was not claimed to be infringing); 4/4/2011 L. Ederer Letter to R. Welsh (identifying Guess

 

Gucci is also claiming ownership in an unregistered "trade dress" comprising the same combination of Gucci elements described above but overlaid on a beige-color background (SAC ¶ 40), a common fabric color found on the products of multiple handbag companies, including Michael Kors, Dooney & Bourke, and Coach. As a separate but clearly overlapping claim, Gucci contends that Guess's use of the Quattro G Pattern on a beige background infringes its claimed trade dress. (SAC ¶¶ 47, 80.)



**Basique Laptop Case (SI081291)**

products "as to which [Gucci] is asserting claims of infringement" and not including styles containing the Quattro G Pattern without letter "G"s and line intersections).

7

The survey that Gucci is seeking to exclude is one of two surveys conducted by Dr. Helfgott in order to test Gucci's infringement claims concerning the two above-mentioned Guess designs—the Quattro G Pattern on its own, and the Quattro G Pattern on a beige-colored background.[8]  Taken together, as intended, the surveys' results show that there is no likelihood of confusion with regard to either design.

Importantly, both of Gucci's claims allege that a specific **combination** of design elements are infringing.  However, Gucci does not—and cannot—claim protection in the individual elements, such as use of letter "G"s and a beige background color.  Consequently, responses in a survey that focus solely on such single, unprotectable elements do not provide evidence of trade dress confusion.  *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 605 (S.D.N.Y. 2007) (respondents who referred only to the "D" and "B" lettering on the Dooney & Bourke bag but not the multicolor aspect of the mark "are not properly classified as showing confusion" because "Louis Vuitton has not argued that the mere interlocking initials 'D' and 'B' infringe on any Louis Vuitton mark").  Moreover, a proper control should account for such legally irrelevant responses.  *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75 (E.D.N.Y. 1999); *Sara Lee Corp. v. Kayser-Roth Corp.*, No. 6:92CV00460, 1994 WL 16804588, at *52 (M.D.N.C. Oct. 13, 1994) (control must "screen for the effect of elements to which the plaintiff has no proprietary rights").

In this case, as Dr. Shari Seidman Diamond stated, to properly test for likelihood of confusion based on Gucci's claimed trade dress, a survey design should use "a control, **or more thoroughly several controls**, that had an acceptable element (e.g., a 'G') or combination of elements, but lacked the combination" that Gucci claimed was infringing.  (6/27/11 Diamond at

---

[8] Gucci is moving only to exclude the survey concerning the Quattro G Pattern on beige, not the survey regarding the Quattro G Pattern on its own.  (*See* Br. at 1 n.2.)

¶ 11 (emphasis added).)  This is precisely what Dr. Helfgott did.  He conducted two separate, yet related, surveys: one to test for confusion related to the specific combination of elements in Guess's Quattro G Pattern, irrespective of the background color; and the other to test for any confusion attributable to the specific combination of Guess's Quattro G Pattern with a beige background color.

For the survey testing confusion regarding the elements of the Quattro G Pattern, Dr. Helfgott used the Daisy Logo handbag, a product identified in Gucci's Complaint that displayed the Quattro G Pattern on a mocha-colored background.  (Helfgott at 5-6.)  The Daisy Logo survey used two separate control bags.  The first was identical to the test bag except that the letter "G"s at the corners of the line intersections in the Quattro G Pattern were removed.  On the second control bag, the letter "G"s and the line intersections were both removed.  (Helfgott at 7-8.)  Notably, Gucci is not challenging the propriety of these controls, nor is it seeking to exclude this survey.  (*See* Br. at 1 n.2.)  The net confusion rates found in the Daisy Logo survey were minimal (0.5% and -1.5%), and also "indicate[d] that the inclusion of the letter 'G's at the line intersections of the Quattro G Design does not create any significant likelihood of confusion." (Helfgott at 14.)

Dr. Helfgott's other survey, which is the only one whose admissibility is being challenged by Gucci, was designed to determine whether the addition of the beige background would cause an appreciable increase in the confusion level.  (Helfgott at 6.)  Because Gucci did not identify any representative, readily available Guess Quattro G handbags with a beige background in its Complaint, the Osaka handbag, which had been sold in the marketplace in beige fabric, was selected for this test.  For a control, this survey used a handbag that was identical to the Osaka except that it featured a pink background instead of a beige one.  (*Id.* at 7.)

The results of the "trade dress" survey showed that only 5% of test respondents and 3% of control respondents mentioned Gucci, for a net confusion level of 2%. (*Id.* at 13.) Based on these findings, Dr. Helfgott concluded that there was "no likelihood of confusion with regard to Guess handbags bearing the Quattro G design in combination with a brown-beige color fabric." (*Id.*) Put another way, there was no statistically significant difference in the confusion level for the Quattro G Pattern on beige as compared with the Quattro G Pattern on pink, a color not claimed as part of Gucci's alleged trade dress.

Viewed in combination, as they were intended to be, the surveys conducted by Dr. Helfgott confirm that there is no likelihood of confusion with regard to both the specific combination of elements that compose Guess's Quattro G Pattern and the specific combination of the Quattro G Pattern on a beige background. Gucci's contention that Dr. Helfgott's "trade dress" survey failed to eliminate "a sufficient number of the complained-of trade dress elements" is wrong. As described above, those complained-of elements were eliminated, and accounted for, in the controls used in Dr. Helfgott's Daisy Logo survey. Accordingly, the control used in Dr. Helfgott's "trade dress" survey was proper, and provides no basis for the survey's exclusion.

### 2. The Qualified Respondent Universe Was Representative Of Guess Handbag Customers

Gucci also criticizes Dr. Helfgott's survey for screening respondents based on whether they had purchased, or would in the future purchase a handbag costing $40 or more, claiming that such a low price cutoff "was likely to lead to an underestimation of the obtained confusion estimate." (Br. at 15.) This criticism also lacks merit.[9]

---

[9] Gucci's criticism is also baffling. In his purported "replication" study of Dr. Helfgott's survey, Gucci's survey expert, Dr. Michael Rappeport, used the same $40 cutoff to qualify respondents without objection. (Dkt. 168, Ex. 4, Rebuttal Report of Dr. Michael Rappeport at 4.) Thus, the obvious implication of Gucci's argument that this cutoff was improper is that Dr. Rappeport knowingly conducted a survey that was flawed.

Where, as here, a plaintiff is asserting forward confusion, "the relevant market consists of the junior user's customers." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322 (S.D.N.Y. 2000); *see also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 ("In a traditional case claiming 'forward' confusion …, the proper universe to survey is the potential buyers of *the junior user's* goods or services.") (emphasis in original).  Guess handbags are sold at a variety of different retail outlets, including Guess retail stores and Guess Factory outlet stores, at a range of different prices.  Financial data produced by Guess shows that, among the handbags that Gucci claims are infringing, the average retail price for bags sold in 2009 and 2010 ranged from a high of $123 to $40 or below.[10]  For example, in 2009 Guess's Logo World crossbody (SKU #: EM085732) sold on average for $40 and in 2010 for an average retail price of $42.  (*See* GSE00105431; SIGE00059939-SIGE00059959.)  Similarly, Guess's Baby Belle hobo handbag (SKU #: SG187824) sold for an average retail price of $42 in 2009.  (*See* GSE00105431; SIGE00052737.)  Thus, Dr. Helfgott's screener question asking whether potential respondents had bought a handbag costing $40 or more in the last 12 months or would do so in the next 12 months captured a universe that was fully reflective of Guess handbag purchasers, which, as noted above, includes individuals who buy handbags in the $40 range.  Accordingly, Dr. Helfgott's screening procedure was proper.[11]

---

[10] New Guess handbags are also sold in the $40-$50 range through third-party websites, such as eBay.  *See, e.g.*, http://www.ebay.com/itm/ws/eBayISAPI.dll?ViewItem&item=120772797873&hlp=false (retrieved Sept. 6, 2011).

[11] The cases cited by Gucci are inapposite.  In *Universal City Studios, Inc.*, *American Footwear Corp.*, and *Jordache Enterprises, Inc.*, the survey universes were deemed flawed because they included only past purchasers of the products at issue, and not potential future purchasers.  *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984); *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660-661 & n. 4 (2d Cir. 1979); *Jordache Enters, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518-519 (S.D.N.Y. 1993).  Here, by contrast, Dr. Helfgott's survey included both past purchasers and potential purchasers.  (Helfgott at 10.)

### 3.    The Survey Design Was Proper

Finally, Gucci criticizes Dr. Helfgott's survey because it allowed respondents to examine the tested handbags "as you would if you were in a store and were seriously considering buying it."  (Br. at 16; Helfgott at 11.)  This criticism should also be rejected.

The survey methodology utilized by Dr. Helfgott here was perfectly consistent with the standard format of *Eveready* surveys, including a survey conducted by Dr. Helfgott and accepted by this Court in the *THOIP v. Walt Disney Co.* case.  *Compare* Helfgott at 4-12, *with* 690 F. Supp. 2d 218, 225-26, 241-42 (S.D.N.Y. 2010).

It is also consistent with how consumers would actually encounter the tested products when shopping for handbags in the real world—a key requirement for survey reliability.  *See* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:2.50 (Surveys provide useful evidence of actual confusion only when they "mirror[] the real world setting which can create an instance of actual confusion."); *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (Survey evidence "should make some effort to compare the impressions the marks have on potential customers under marketplace conditions.")  In the survey, respondents were permitted to examine the bag exactly as it appears in the marketplace, complete with the metal hardware and other brand identifiers (including the large single letter "G") that are affixed to the bag.  As this Court has recognized, such source-identifying elements are "important sources of information, including brand identification" that are not "unnoticed by consumers." *THOIP*, 690 F. Supp. 2d at 239.

As Gucci's expert, Dr. Simonson, similarly opined, purchasers pay close attention to the details on a product, including any brand identifiers:

> Considering that products such as handbags and other fashion items represent the consumer in social settings and may be important to the consumer's identity, purchase decisions are important and are characterized by what is referred to in the consumer

> behavior literature as high-involvement purchases.  Accordingly, *a consumer is likely to pay close attention to the brand name*, the quality, and the design of a handbag (and similar products), making sure it is attractive and will project the desired image to others.  Thus, at the point-of-purchase, the consumer is likely to take the time necessary for making the best choice (given one's budget constraint).

(Simonson at ¶ 22.)  Indeed, the failure to allow respondents to see such source-identifying elements that normally appear on the products in the marketplace is "clearly" a "deviation from actual marketplace conditions" that would justify its exclusion.  *THOIP*, 690 F. Supp. 2d at 239.

### 4.    Dr. Helfgott's Survey Is Not A Reading Test

Finally, Gucci suggests that Dr. Helfgott's survey is nothing more than a reading test.  (Br. at 16.)  Though Gucci cites to cases, including one decided by this Court, in which surveys have been criticized as being no more than reading tests, Gucci makes no attempt to show that the survey flaws identified in those cases are present in Dr. Helfgott's survey.  Gucci's omission is not accidental—the aspects of the surveys that were criticized in the cases cited by Gucci are simply not present here.

This Court's criticism of the Reitter survey submitted by the defendant in *Malletier v. Dooney & Bourke, Inc.*, is illustrative of the procedures that raise concerns that a survey has become nothing more than a "reading test."[12]  In *Malletier*, defendant's survey instructed interviewers to manipulate the placement of a brass name sign (which contained the name "Dooney & Bourke") to ensure that the sign was facing toward the respondent when the handbag was first shown.  After the respondent finished examining the bag, it was placed about five feet

---

[12]  The other cases cited by Gucci are also readily distinguishable.  The courts criticized the surveys in *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 2011 WL 1842980, at *15 (S.D.N.Y. May 13, 2011) and *Conagra, Inc. v. Hormel & Co.*, 784 F. Supp. 700, 734 (D. Neb. 1992) because respondents were allowed to continue to view the product containing the challenged design or mark while responding to the survey questions.  Here, the products were removed from view before questioning began.  *Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 334-336 (S.D.N.Y. 1997), involved the quintessential reading test, in which respondents were asked whether a particular word or name appeared in materials they had just been asked to read.  No such questions were posed by Dr. Helfgott in his survey.

away, but this time with the name sign facing away from the respondent.  Such manipulation of the name sign, the Court concluded, made the survey "essentially a reading test."  340 F. Supp. 2d 414, 445 (S.D.N.Y. 2004).[13]

No such manipulation occurred with Dr. Helfgott's surveys.  Respondents were simply presented with the test and control handbags and told to examine the handbag as if they were "seriously considering buying it."  (Helfgott at 11.)  The handbag was then removed from sight before the questioning began.[14]  Moreover, Dr. Helfgott was conducting an *Eveready* survey to determine whether consumers would confuse Guess handbags bearing the Quattro G Pattern with Gucci's claimed trade dress.  It was therefore crucial that he test a handbag as it actually appeared in the marketplace.  *THOIP*, 690 F. Supp. 2d at 235-41 (A survey's failure to "approximate the manner in which consumers encountered the parties' products" in the real world is grounds for exclusion.); *Malletier*, 525 F. Supp. 2d at 591 ("A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone.").

Gucci's suggestion that all appearances of the GUESS name on the handbags tested should have been covered over or obscured in order to avoid the survey becoming a "reading test"—thereby testing an imaginary product that has never existed—cannot be squared with the well-established methodological requirement that products be tested as they appear in the marketplace.  Indeed, 99% of the handbags bearing the Quattro G Pattern also feature nameplates, hardware and/or other design details with the GUESS name, as do the vast majority

---

[13] It should be noted that the Court did not exclude the Reitter survey on this ground; rather, the court stated "'when the source of the alleged confusion is not just a name, word or phrase,' the survey at issue can still be 'helpful and any shortcomings will simply affects [its] probative value, not destroy it completely.'" *Id.*

[14] Dr. Helfgott conducted a sample test in which the bag was left in view during respondent interviews.  However, the data from that test were not included in the survey results discussed in his report.  (Helfgott at 16.)

of other Guess products at issue in this lawsuit.  Gucci's absurd interpretation of the "reading test" cases would effectively preclude any valid testing of these Guess products as they actually appear in the marketplace.[15]

## III.   DR. SCOTT'S SURVEY IS HIGHLY RELEVANT

### A.   Dr. Scott's Survey Confirms That Gucci's "Stylized G" Is A Weak Mark

The survey conducted by Dr. Scott concerned Guess's use of a Square G mark.  As with Dr. Helfgott's surveys on Guess's Quattro G Pattern, the results of Dr. Scott's survey show no likelihood of confusion, in this instance with Gucci's Stylized G mark.  (*See* Dkt. 165, Ex. B., Expert Report of Professor Carol A. Scott ("Scott") at ¶ 3.a. ("the particular design of the letter G on Guess leather belts that Gucci contends is infringing is not the source of any consumer confusion between the two brands, Guess and Gucci").)  Given that Square G designs have appeared on Guess-branded products since at least 1996 with no evidence that any consumers have ever been confused,[16] Dr. Scott's survey provides further support that no confusion is likely between Guess's Square G and Gucci's Stylized G.  *See Starbucks Corp.*, 588 F.3d at 117 (co-existence of marks for 11 years is a "powerful indication" of no likelihood of confusion).

Dr. Scott's survey results also bear directly on other critical issues raised in this litigation.  One such issue is Gucci's claim that its Stylized G mark is "world famous" and "readily identif[ied]" by consumers as a source-identifier of Gucci.  (SAC ¶¶ 29, 32-33.)  The record developed in this case firmly rebuts this claim, establishing that the Stylized G mark is anything but famous or strong.  Indeed, ***there is no record evidence that a Stylized G has appeared on the***

---

[15] This Court has already noted that "reading test" concerns are less of an issue where, as here, "the source of the alleged confusion is not just a name, word or phrase."  *Malletier*, 340 F. Supp. 2d at 445-46.

[16] Gucci has admitted that it has no evidence of any confusion concerning Guess's Square G mark, and has not submitted any surveys of its own on this topic.

***outside of a Gucci handbag since 1996.***  (9/23/10 S. Risi Depo. at 41:19-42:14.)  In related

product categories, sales of Gucci products where the Stylized G mark was actually displayed on

the outside of the product have been minimal.  In 2009 and 2010, Gucci sold only roughly 1,000

units per year of belts bearing the Stylized G design in the U.S., and no footwear.

(GUCCI024087; GUCCI024088; GUCCI024811.)  Moreover, according to Gucci's Vice

President of Advertising and Marketing, Christine Iacuzzo, Gucci has expended no money on

institutional advertising campaigns or run-of-press advertising for the Stylized G since 2005.

(1/12/10 C. Iacuzzo Depo. at 250:25-251:4; *see also* GUCCI012167.)

Dr. Scott's findings provide additional evidence of the weakness of Gucci's Stylized G

mark.  Of the 199 respondents in the test group who were shown a belt bearing the Square G

mark, only 18.6% (37) identified the belt with Gucci.  (Scott at ¶¶ 10, 16.)  Only one (0.5%) of

those respondents mentioned the specific "squared off" shape as the reason for referencing

Gucci.  (Scott at ¶ 23.)

Based solely on the measures obtained in the test Square G cell (0.5% and 18.6%), Dr.

Scott's survey shows that there is no meaningful consumer association between Gucci and a

square-shaped letter "G."  Courts generally require much higher percentages to establish

secondary meaning or that a mark is strong.  *See, e.g.*, *Spraying Sys. Co. v. Delavan, Inc.*, 975

F.2d 387, 394 (7th Cir.1992) (recognition figure of 38% "marginal" evidence of secondary

meaning, even in a "properly designed survey"); *RJR Foods, Inc. v. White Rock Corp.*, 201

U.S.P.Q. 578, 581 (S.D.N.Y. 1978) (66% association probative of secondary meaning); *Ferrari

S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1240 (6th Cir. 1991)

(73% and 82%); *Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.

Supp. 651, 658 (W.D. Wash. 1982) (55-80%).  *See also, e.g., Roselux Chem. Co. v. Parsons*

*Ammonia Co.*, 299 F.2d 855, 862 (C.C.P.A. 1962) (survey showing that only 10% of actual users associated a name with a single source insufficient to show the name served as a designation of origin)*; Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, No. 07–11514, 2008 WL 1995104, at *5 (E.D. Mich. May 6, 2008) (8% identification of name with plaintiff "is insufficient to demonstrate secondary meaning"); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F. Supp. 75, 81 (S.D. Fla. 1981) (2.7% recognition level "indicates to this Court that the public's association between the 'V' and Brooks Shoe Manufacturing Company is de minimus").

The results from Dr. Scott's control condition further support the conclusion that consumers do not "uniquely associate a Square G design with Gucci."  (Scott at ¶ 25.)  In the control group, 45 of 202 (22.3%) respondents who viewed a Round G belt mentioned Gucci as the source of the product, even though Gucci does not use a single Round G design on its products.  (*Id.* at ¶ 16.)  As Dr. Scott observed, that equivalent percentages of respondents thought the Round G design, which Gucci has never used, and the Square G design, which Gucci claims is "famous," were associated with Gucci, indicates that consumers simply do not associate any particular shape of "G" uniquely with Gucci:

> Since a greater proportion of the respondents mentioned Gucci as a source for the non-accused control belt than for the accused, test belt, there is no evidence that consumers distinguish between the Square G and a non-accused G with a different shape in identifying the source of the belt.

(*Id.* at ¶ 16.)  As Dr. Scott observed, "while consumers may use the 'G' buckle as a clue to the source of the belt, particularly when few other cues are available, they generally do not differentiate between particular shapes of the 'G.'"  (*Id.* at ¶ 24.)

### B.    Dr. Scott's Survey Provides Strong Evidence On Guess's Laches Defense

Dr. Scott's survey is also directly relevant to Guess's laches defense to Gucci's claims regarding the Square G mark.  The laches defense exists because "it cannot be equitable for a

well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished." *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 498 (2d Cir. 1961). That is precisely what Gucci is seeking to do here.

Since at least 1996, Guess has used Square G designs on well over **$120 million** worth of handbags, wallets, belts, footwear, eyewear, sunglasses, watches, and other accessory products sold by Guess and other retailers (*e.g.*, Macy's and Dillards) across the United States. The record in this case establishes that the individuals involved in the protection of Gucci's worldwide and U.S. trademark rights knew or should have known about this widespread, open, and pervasive use of Guess's Square G as early as 1999. (GUCCI024089.) It is undisputed that Allan Tuttle, an employee of Gucci America who supervised Gucci America's trademark enforcement activities,[17] had ***actual knowledge*** of Guess's use of a Square G design by the first part of 2002—***over seven years before Gucci commenced this lawsuit***. (GUCCI024092-94.) Yet, despite Guess's continuous and pervasive use of the Square G design, and Gucci's knowledge of same, Gucci never once sent a warning letter or otherwise communicated any complaints regarding Guess's use of this design. Guess first received notice of Gucci's grievance with the Square G in May 2009, when this lawsuit was filed.

Dr. Scott's survey shows that consumers now associate the Square G mark with Guess and not Gucci. In Dr. Scott's test group, nearly half the respondents—47.2%—identified the Square G belt as being put out by Guess. (Scott at ¶ 16.) In the control group, 45% of

---

[17] 5/4/2011 L. Ederer Letter to R. Welsh (confirming that Mr. Tuttle was "concurrently employed by Gucci America, Inc." from January 1998); 12/20/2010 Decl. of M. Springut at ¶ 4 ("Alan Tuttle . . . became my principal contact and source of legal instructions for trademark enforcement work."); 4/28/2011 J. Moss Depo. at 97:23-99:24; 147:11-19 (Mr. Tuttle continued to supervise Gucci America's trademark enforcement activities in February 2002, when he received an email regarding Guess's use of a Square G design on watches).

respondents shown the Round G belt mentioned Guess as the source of the product.[18]   (*Id.*)

Based on these results, Dr. Scott concluded:

> Consumers are more likely to believe that a belt with the Square G buckle is put out by Guess than by any other brand including Gucci.  Consumers also are more likely to believe that a belt made with a buckle in the shape of an oval "G" is put out by Guess than by any other brand, including Gucci.  ***Thus, to the extent that a single letter "G" buckle, as used on belts, has acquired secondary meaning, that meaning is associated with Guess rather than Gucci.***

(Scott at ¶ 3.d.)  *See also Nextel Commn's, Inc. v. Motorola, Inc.*, 91 U.S.P.Q. 2d 1393, 1403

(T.T.A.B. 2009) (survey showed that, as between the parties, if the claimed sound mark was

associated with any source, it was more likely with the opposer, not the trademark applicant).

The implications of these findings are undeniable.  Based on the 47.2% rate of

identification with Guess in the test group, consumers associate the Square G mark with Guess at

a level that is consistent with what courts rely on to find secondary meaning.  *See, e.g.*,

*Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 n.2 (2d Cir. 1981) (50%

association probative of secondary meaning).  Thus, Guess has acquired a significant amount of

goodwill in the Square G.

The prejudice that Guess would suffer if Gucci were now able to prevent Guess's use of

the Square G design after years of inexcusable delay is precisely the type of prejudice that the

laches doctrine is intended to protect against.  *See Black Diamond Sportswear, Inc. v. Black*

*Diamond Equip., Ltd.*, No. 1:03-CV-278, 2005 WL 2076279, at *5 (D. Vt. Aug. 26, 2005)

(finding laches based on prejudice where the defendant had "concentrated its marketing efforts"

on the allegedly infringing logo and the plaintiff had "fail[ed] to assert its trademark rights

sooner"); *Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 362

---

[18] What is also significant is that 22.3% of respondents associated the Round G design with Gucci (Scott at ¶ 16), even though Gucci has never used that design and has acknowledged that such a round G design does not infringe Gucci's rights.  (*See* 4/8/10 T. Novak Rule 30(b)(6) Depo. at 125:4-16; 128:11-24; 155:11-156:15.)

(W.D.N.Y. 2008) (holding that defendant suffered prejudice "by continuing to develop and promote its Arbor Hill wines"; *held*, laches barred plaintiff's trademark infringement claim); *Deere & Co. v. MTD Holdings, Inc.*, No. 00 civ. 5936, 2004 U.S. Dist. LEXIS 2550, at *60-61 (S.D.N.Y. Feb. 18, 2004) (finding prejudice and laches where, *inter alia*, defendant would lose the goodwill it had created over the previous 10 years in its color scheme). Dr. Scott's survey results, therefore, provide strong evidence supporting a key element of Guess's laches defense—namely, that as a result of its prolonged inaction and/or acquiescence, Gucci has forfeited any ability to deprive Guess of the substantial goodwill that it has developed in a Square G design over these many years of continuous use.

## IV.   DR. SCOTT'S SURVEY USED A PROPER CONTROL

Gucci has apparently abandoned its contention that the Scott survey should be excluded because Dr. Scott covered over the GUESS name that appeared on the inside of the leather belt strap.[19] Instead, Gucci now contends that the single Round G buckle used in Dr. Scott's control cell was improper because it garnered a purportedly "unusually high" level of confusion responses and was confusingly similar to certain of Gucci's own double G designs. (Br. at 17-19.) Gucci's critique is undermined by its own prior conduct and admissions in this case.

A control product is "a non-infringing product which is similar to the products at issue." *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999). An effective control should "share[] as many characteristics with the experimental stimulus as possible, with the key

---

[19] As discussed above, one of the purposes of Dr. Scott's survey was to test whether the Square G design was associated with Guess or Gucci. The inclusion of the Guess name on the belt would have raised concerns whether any survey responses identifying Guess as the source of the belt were made on the basis of the Square G design or the GUESS name on the inside of the belt. By concealing the name, Dr. Scott focused respondents' attention on the Square G design as the only obvious indicator of source on the product. Dr. Scott's decision to conceal the Guess name was a conservative measure since the only possible result of leaving the name uncovered would be to inflate the Guess mentions.

exception of the characteristic whose influence is being assessed." *THOIP*, 690 F. Supp. 2d at

240 (quoting Shari Seidman Diamond, Reference Guide on Survey Research, *in* REFERENCE

MANUAL ON SCIENTIFIC EVIDENCE at 258).  As Dr. Scott explained, "control products, in general,

should be as similar to the alleged infringing product as possible except for the particular alleged

infringing feature."  (Scott at ¶ 11.)

     For her survey's control, Dr. Scott carefully selected a Guess belt that, consistent with the

principles noted above, was similar to the test belt except that the feature Gucci claimed was

infringing—the Square G buckle—was replaced with a round-shaped G.  In making her

selection, Dr. Scott examined Gucci's website and found that Gucci was not offering a similar,

single round G belt design.  (*Id.*)  Indeed, in 2005, Gucci filed an Intent To Use trademark

application for a round-shaped G design for belts, and then abandoned it in 2009 due to non-

use.[20]  This provided additional evidence that Gucci was not using a single, round-shaped G on

its products.  (Scott at ¶ 11.)

     If that were not enough, Gucci's Rule 30(b)(6) witness on its infringement contentions,

Terilyn Novak, testified that Gucci was not disputing Guess's use of "rounded" Gs because she

did not "feel that that is confusing for consumers."  (4/8/10 T. Novak Rule 30(b)(6) Depo. at

125:4-16.)  Ms. Novak admitted that the use of various rounded "G"s on Guess footwear were

not infringing.  (*Id.* at 155:11-20; 128:11-24; 156:11-15 & Exs. 74, 77, 85.)  Pasted below are

side-by-side images of the Round G control buckle used by Dr. Scott, Gucci's abandoned round-

shaped G, and one of the rounded G shapes that Gucci concedes does not infringe its rights:

---

[20] *See* July 6, 2009 Notice of Abandonment, Trademark File Documents for Trademark
Application Ser. No. 78/661756 (abandoned), at www.uspto.gov database.





| | | |
|---|---|---|
| **Dr. Scott Survey's Round G Control** | **Gucci's Abandoned Round-shaped G** | **Concededly Non-Infringing Round G** |

Further, Gucci's newly-minted contention that a single round "G" is "confusingly similar" to Gucci's double G designs (Br. at 9) is tantamount to saying that Gucci owns exclusive rights in all rounded letter "G"s, which it clearly does not.  *See One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1165 (9th Cir. 2009) (declining to grant defendant "a virtual monopoly on the use of the letter 'O' on motorcycle helmets" and noting that the mere fact that two companies "happen to use the same letter on their products is not sufficient to show infringement").  It is also contradicted by the results of Dr. Scott's survey.  None of the respondents who identified the Round G control belt as Gucci mentioned the particular shape of the "G" as the reason for their identification.  (Scott at ¶ 23.)  In fact, one respondent who associated the Round G with Guess specifically noted the point of difference that, unlike Guess marks, Gucci's "symbol has two Gs in it."  (*Id.*)

Even a casual visual comparison of the designs on the single Round G used in Dr. Scott's control cell and Gucci's double G marks shows that they are clearly dissimilar.  Guess's Round G consists of a single letter "G" that is elongated horizontally and has a middle bar that extends halfway into the bowl of the "G."  Gucci's designs, by contrast, are made up of two interlocking letter "G"s that are elongated vertically, with no extending arm.



**Dr. Scott Survey's Single Round G Control**



**Gucci Double G Buckle**



**Gucci Double G Buckle**

Gucci also asserts that "a control that results in a confusion level this high cannot be used." (Br. at 18.) Gucci's argument proves too much, as it would effectively create a rule that controls are unnecessary once a survey's test condition reaches a suitably high confusion rate, regardless of the products or markets being tested.

It should therefore come as no surprise that Gucci's argument has not been adopted by any court or accepted within the scientific literature. Gucci's reliance on the recent decision of *U.S. Polo Ass'n*, 2011 WL 1842980, at *15 is misplaced. The court in *U.S. Polo* clearly states it gave no weight to the survey offered by plaintiff because the controls in that instance contained the "very element [of the trademark] being assessed" in the case. 2011 WL 1842980, at *15. The court did not exclude the survey because the control yielded confusion rates of over 10%.

Gucci's contention also finds no support within the scientific community. As Dr. Diamond has explained, "[t]he response pattern obtained in an appropriate control cell will vary with the particular product and testing situation." (Dkt. 168, Ex. 7, 8/24/11 Rebuttal Report of Dr. Shari Seidman Diamond at ¶ 10.) Here, the marks tested in the Scott survey are single letter "G"s, and the relevant companies—Guess and Gucci—are two famous brands that both start with the letter "G." Contrary to Gucci's suggestion, there is nothing "unusual" about the fact that a high number of respondents would guess Gucci in response to seeing a single letter "G" on the control belt. Dr. Diamond observed that "guessing a famous brand is a natural response that can produce what may appear to be a high level of confusion in both test and control cells." (*Id.*) Thus, it is "incorrect to suggest" that a "'high' confusion level in a control group … by itself 'would have raised concerns about the control.'" (*Id.*) Dr. Jacob Jacoby reaches the same conclusion in his article cited in the *U.S. Polo* opinion. Dr. Jacoby says:

> there are times when a control will yield estimates of confusion (or deception) that exceed 10 percent. Thus it is important not to lose sight of the fact that, the question of desirability aside, the more important consideration is whether, when the control estimate is subtracted from the test estimate, the 'net' exceeds 15 percent (or whatever value the court believes is appropriate).

Dr. Jacob Jacoby, *Experimental Designs and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK RPTR. 890, 932 n.76 (2002).

In sum, Gucci's criticisms of the control used by Dr. Scott are meritless, and do not provide a basis for excluding her survey.[21]

## CONCLUSION

For the foregoing reasons, Guess respectfully submits that Gucci's motion to exclude the expert opinions, testimony, and surveys of Dr. Myron Helfgott and Dr. Carol Scott should be denied.

Dated:  Los Angeles, California
       September 12, 2011

O'MELVENY & MYERS LLP

By: _____

Daniel M. Petrocelli (dpetrocelli@omm.com)
Robert C. Welsh (rwelsh@omm.com)
Andrew J. Frackman (afrackman@omm.com)
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., and Swank, Inc.*

---

[21] Even if Dr. Scott's control were improper, this would not, as Gucci suggests, show an actionable level of confusion with regard to Guess's Square G mark.  In order for any confusion rate to be "actionable," it must be based on a net confusion level, which is calculated by subtracting the confusion level in the control cell from the level in the test cell.  Standing alone, Dr. Scott's test cell result does not support any particular net confusion level.  Having conducted no surveys concerning Guess's Square G, Gucci has no evidence with which it can meet its burden of showing a likelihood of confusion.