**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
                                              :

  GUCCI AMERICA, INC.,                    :       Civil Action No. 09cv4373 (SAS)

                Plaintiff,               :

             - against -              :

  GUESS?, INC., MARC FISHER FOOTWEAR   :
  LLC, THE MAX LEATHER GROUP/CIPRIANI   :
  ACCESSORIES, INC., SEQUEL AG, K&M     :
  ASSOCIATES L.P., VIVA OPTIQUE, INC.,    :
  SIGNAL PRODUCTS, INC. and SWANK, INC.,   :

             Defendants.              :

-------------------------------------------------------------- x

 

## GUCCI AMERICA, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO GUESS?, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE SURVEYS OF DR. MICHAEL RAPPEPORT, GEORGE MANTIS, AND DR. MICHAEL B. MAZIS

ARNOLD & PORTER LLP
Louis S. Ederer
John Maltbie
Matthew T. Salzmann
399 Park Avenue
New York, New York  10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Plaintiff Gucci America, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ................................................................................................................. 6

I.   THE MANTIS SURVEY WAS CONDUCTED PROPERLY AND IS HIGHLY
     PROBATIVE OF A LIKELIHOOD OF CONFUSION ........................................................ 6

     A.   The Modification of the Guess Cross-Body Bag Was Proper ............................ 7

     B.   The Mantis Survey Utilized a Proper Control ................................................. 11

     C.   The Guess Name Was Not Eliminated From the Cross-Body Bag .................... 12

     D.   The Mantis Survey Did Not Improperly Inflate the Confusion Level .............. 13

II.  THE MAZIS SURVEY WAS CONDUCTED PROPERLY AND IS HIGHLY
     PROBATIVE OF DILUTION ...................................................................................... 14

     A.   The Mazis Survey Demonstrates Actual Association Between Guess's
          Quattro G Pattern and Gucci and is Highly Relevant to a Finding of Dilution ....... 16

     B.   The Mazis Survey Used A Proper Control ...................................................... 18

III. THE RAPPEPORT REPLICATION STUDY WAS CONDUCTED PROPERLY
     AND SHOULD NOT BE EXCLUDED .......................................................................... 19

     A.   The Rappeport Replication Study Did Not Require a Control ......................... 21

     B.   The Scott Surrebuttal Survey Does Nothing But Establish that Exposure to
          Guess's Infringing Trade Dress is Widespread ............................................... 22

IV.  GUESS'S CRITICISMS, IF CREDITED AT ALL, GO TO THE WEIGHT TO
     BE ACCORDED GUCCI'S SURVEYS, NOT THEIR ADMISSIBILITY ............................ 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*adidas America, Inc. v. Payless Shoesource, Inc.*,
  529 F. Supp. 2d 1215 (D. Or. 2007) ..................................................................9

*adidas-Solomon AG v. Target Corp.*,
  228 F. Supp. 2d 1192 (D. Or. 2002) ..................................................................9

*adidas-Solomon AG v. Target Corp.*,
  2003 WL 25710435 (D. Or. Jan. 29, 2003) .......................................................9

*Am. Footwear Corp. v. Gen. Footwear Co.*,
  609 F.2d 655 (2d Cir. 1979)...........................................................................10

*Beverage Mktg. USA, Inc. v. S. Beverage Corp.*,
  2002 WL 1162789 (2d Cir. June 3, 2002) ......................................................10

*Cartier, a Div. of Richemont North America, Inc. v. Symbolix, Inc.*,
  454 F. Supp. 2d 175 (S.D.N.Y. 2006).............................................................23

*Gucci America, Inc. v. Dart, Inc.*,
  715 F. Supp. 2d 566 (S.D.N.Y. 1989)...............................................................7

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
  219 F.3d 104 (2d Cir. 2000)............................................................................23

*Hutchinson v. Essence Communications, Inc.*,
  769 F. Supp. 541 (S.D.N.Y. 1991) .................................................................25

*Jada Toys, Inc. v. Mattel, Inc.*,
  518 F.3d 628 (9th Cir. 2008) ..........................................................................17

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)..................................................10

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ...................................................18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  631 F. Supp. 735 (S.D.N.Y. 1985), aff'd, 799 F.2d 807 (2d Cir. 1986)..................9

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)........................................................17, 18

*THOIP v. Walt Disney Corp.*,
  2011 WL 1792585 (S.D.N.Y. May 10, 2011) ...........................................9, 10, 25

*U.S. Polo Ass'n. v. PRL Holdings, Inc.*,
2011 WL 1842980 (S.D.N.Y. May 13, 2011) ........................................................22

## STATUTES/RULES

15 U.S.C. § 1125 ......................................................................................................17

## OTHER AUTHORITIES

Richard E. Nisbett and Timothy DeCamp Wilson, *Telling More Than We Can Know;*
*Verbal Reports on Mental Processes*, 84 PSYCHOLOGICAL REV. 231 (1977).........................11

K.A. Plevan, *Daubert's Impact on Survey Experts in Lanham Act Litigation*,
95 TRADEMARK RPTR. 596 (2005) .............................................................25

Michael Rappeport, *Litigation Surveys: Social Science as Evidence*, 92 TRADEMARK
RPTR. 957 (2002) .............................................................................25

Itamar Simonson, *The Effect of Survey Method On Likelihood of Confusion Estimates:*
*Conceptual Analysis and Empirical Test*, 83 TRADEMARK RPTR. 364 (1993) .......................11

Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*,
98 TRADEMARK RPTR. 739 (2008) ................................................................11

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:170
(4th ed. 2005).................................................................................25

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:178
(4th ed. 2005).................................................................................25

## PRELIMINARY STATEMENT

███████████████████████████████████████████████████

Jason Rimokh, President, Signal Products, Inc., Guess?, Inc.'s handbag licensee[1]

In its moving brief, Guess takes the opportunity to make the same argument Gucci and this Court have heard many times since the outset of this case — "it is inconceivable anyone could genuinely confuse" Gucci and Guess.  Guess Br. at 1, fn3.  However, these facts are not in dispute — Guess has been targeting Gucci for years; indeed, the record is replete with evidence that Guess and its licensees took bold steps, year upon year, adding one iconic Gucci design after another to its arsenal of handbags, small leather goods, footwear and accessories,[2] to the point where, by 2009, multiple Gucci infringements were appearing on the same Guess products —



- **Infringing Script** — 9/29/08 e-mail from Paul Vando, Marc Fisher's lead footwear designer, to Guess — ████████████████████████████ ████████████████████ (Pl. Depo. Ex. 134).

- **Infringing Trade Dress** — 9/5/08 e-mail from Jury Artola, a Marc Fisher designer, to Claser, an Italian sourcing company — ██████████████████████ ██████████████████████████ (Pl. Depo. Ex. 147).

- **Infringing G/R/G Web Design** — 5/2/08 e-mail from Paul Vando to Marc Fisher's Chinese manufacturer — ████████████████████████ ███████████████████████ (Pl. Depo. Ex.136).

---

[1] Pl. Depo. Ex. 306 (10/15/08 e-mail from Signal Products' President, Jason Rimokh, to Signal Products' head of product development).  Emphasis added unless otherwise noted.

[2] Indeed, the record shows that Guess knew exactly what it was doing.  For instance, a senior employee of Guess's footwear licensee told its President, Marc Fisher: █████████████████ ██████████████████████████████████████████████████ Pl. Depo. Ex. 129. At the same time, Guess's licensing design manager, Joy Kramer, gushed about the new women's shoe line: ████████████████████████████ Pl. Depo. Ex. 356.

to the point where even defendants' own executives were starting to get concerned.[3]  It is no coincidence, then, that in late 2008, the President of Guess's handbag licensee, Signal Products, became so worried when his knockoff Gucci messenger bag — with the same repeating diamond pattern trade dress design tested for confusion by Gucci's survey expert, George Mantis — was stopped by U.S. Customs, that he stated: ███████████████████████████████[4]



He then went on to say, ████████████████████████████ obviously because there were so many Guess customers lining up to buy them.

What does this have to do with Guess's motion to exclude?  Well, for the last two years, Guess has been claiming this is a summary judgment case, on the premise that Gucci has not been able to come forward with "a single instance of a customer ever confusing Guess and Gucci products in the marketplace."[5] Guess Br. at 1.  According to Guess (and contrary to the case law), without evidence of actual confusion, Gucci can never prove likelihood of confusion.[6]

---

[3] For example, in a 6/9/08 e-mail, Marc Fisher's then-CEO, Richard Danderline, cautioned a high level Marc Fisher employee that ███████████████████████████████████ ███████████████ Pl. Depo. Ex. 325.

[4] Pl. Depo. Ex. 300 (12/3/08 e-mail from Jason Rimokh, to Guess's Senior Men's Buyer, among others).  Notably, when asked about his "Customs" remark at his deposition, Rimokh testified that his email was ███████████. 9/16/10 Depo. of J. Rimokh at 100:15-101:12.

[5] Notably, however, when suit was filed, numerous fashion bloggers immediately praised Gucci for bringing suit, and commented that Guess's copies of Gucci were clearly aiming to confuse post-sale observers.  One prominent legal commentator observed that "Guess seems to be almost taunting its higher-priced competitor."  See GUCCI007551–GUCCI007574.

[6] This tortuous reading of the Lanham Act was rejected by this Court nearly two years ago, where, at a pre-motion conference, Guess made the same argument.  Gucci then pointed out that in this classic case of post-sale confusion, Gucci would likely not even hear about instances of

Footnote continued on next page

2

However, now, after Gucci has built a mountain of evidence supporting all other key confusion factors (not the least of which is evidence of Guess's deliberate efforts to copy Gucci),[7] Gucci has proffered survey evidence showing that an appreciable number of post-sale observers are indeed confusing Guess's knockoffs with Gucci's iconic Diamond Motif Trade Dress.[8]  Fearing Gucci's surveys support what Gucci has been saying all along — that Guess, an admitted ████ ██████████████████████████████[9] has been deliberately selling Gucci knockoffs for years so that its "Guess Girls" will purchase them hoping to confuse their friends, co-workers and

_____

Footnote continued from previous page

actual confusion, since the individuals being confused were non-purchasers who would have no reason to report their confusion.  The Court, agreeing with Gucci, stated ". . . I think the case law is pretty clear in the Second Circuit that even in the absence of actual confusion you can prove what you need to prove for the infringement", and urged Guess, for the first of many times, to forego its summary judgment motion.  1/11/10 Conference Tr. at 4:9-15.  This Court also recently stated: "[I]t is well-established that a plaintiff seeking to prevail under the Lanham Act need not prove the existence of actual confusion, 'since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source.'"  *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 229 (S.D.N.Y. 2010) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

[7] Indeed, the record is filled with evidence that Guess and its licensees have been deliberately replicating Gucci designs, colors and fabrics.  These are just some examples: (i) 10/14/08 e-mail from Jury Artola (Marc Fisher designer) to Paul Vando (Marc Fisher head designer): ████████████ ████████████████████████████████████████████████ (Pl. Depo. Ex. 148); (ii) 4/10/06 e-mail from Claser (fabric supplier) to Lori Becker (Marc Fisher): ██████████████████ ███████████████████████████████████████████████████ (Pl. Depo. Ex. 159); and (iii) 11/20/07 e-mail from Jury Artola to Marc Fisher's manufacturer: ████████████ ████████████████████████████████████████ (Pl. Depo. Ex. 141).

[8] Gucci defines its Diamond Motif Trade Dress as follows:  (i) Gucci's REPEATING INTERLOCKING GG design mark; (ii) set in a repeating diamond-shaped pattern, with the INTERLOCKING GG design mark located at the four corners of each diamond shape; (iii) separated by dots forming straight diagonal lines; and (iv) overlaid on a beige canvas fabric.  *See* Second Amended Compl., ¶ 40.

[9] 1/13/11 Depo. of S. Faulkner at 228:3-6; *see also* Pl. Depo. Ex. 345 (Suesan Faulkner, Creative Director at Signal Products, writes: ██████████████████████████████████████████████████ ████████████████████████████████████████████████).

passersby into believing they are wearing Gucci — Guess seeks to exclude Gucci's surveys on technical grounds, attacking them as "at odds with years of real world experience", "blatant distortions" and "artificially inflated."  Indeed, Guess goes so far as to submit a new, out-of-time surrebuttal survey, purporting to show how women carry handbags, which proves nothing other than that countless post-sale observers have been exposed to Guess's knockoffs.

Thus, Guess attacks the survey conducted by Gucci's expert, George Mantis, claiming that because Mantis, in testing Guess's accused trade dress, chose to obscure a second indicator of Gucci on the Guess handbag, the entire survey should be discarded.  However, as discussed in Point I below, aside from the fact that Guess's own survey expert, Dr. Carol Scott, did exactly the same thing, for the very same reason, when she tested for, and found, that Guess's knockoff of Gucci's Square G design was actually confusing, what Mantis did is consistent with industry practice, and has been accepted as proper methodology by the courts.  Guess also attacks Mantis for using an improper control, even though what he used not only followed the law, but was modeled after Guess's own trademark registration for its repeating Quattro G pattern.

Guess also criticizes the association study performed by survey expert, Dr. Michael Mazis.  As discussed in Point II below, Guess is seeking to exclude Mazis' study on the grounds that, while it demonstrates an association between Guess's infringing trade dress and Gucci, it does not show how Gucci's reputation was harmed by such association, and therefore does not prove actual dilution.  Unable to cite a single case where an association study was excluded on that basis, Guess ultimately concedes that whatever criticism it is leveling at Mazis goes to weight, not admissibility — a principle that applies to all of Guess's criticisms on this motion.

Further, Guess lambastes a rebuttal report submitted by recognized survey expert, Dr. Michael Rappeport, for not meeting the requirements of a confusion survey.  Contrary to Guess's

position, however, Rappeport's study never purported to be a confusion survey, but was conducted for a discrete purpose — to show that the trade dress confusion survey performed by Guess's expert, Dr. Myron Helfgott, did not test for post-sale confusion, and that had Helfgott tested his Guess handbag in a post-sale context, he would have experienced a higher incidence of "Gucci" responses (which turned out to be the case, by the count of 24% to 5%).  Then, at the August 4, 2011 conference (and again on this motion), Guess conceded that Helfgott was not testing for post-sale confusion, so the issue Rappeport addresses is essentially moot.

Nevertheless, Guess makes Rappeport's study the focus of its motion, arguing, first, that it should be excluded because it fails to use a control, even though, as discussed in Point III below, the Rappeport study was not a likelihood of confusion survey, and therefore did not need one.  Guess further criticizes Rappeport for having shown his respondents only the back side of the Guess handbag — the side that does not have the "Guess" name on it — even though, as Rappeport explains, all he was trying to do was replicate the test portion of Helfgott's survey in a reasonable post-sale environment (in this instance, where a post-sale observer would not see the Guess name on the bag), to see what responses Helfgott would have received if he had done the same.  Guess even offers a new, out-of-time "study" conducted by Scott, purporting to provide "empirical evidence" that only up to 20% of all women hold their handbags back side outward.  Aside from the fact that Scott's "study" suffers from technical and methodological flaws too numerous to mention, all it shows, if credited, is that hundreds of thousands of women have worn the Guess knockoff handbags the same way Rappeport displayed the Helfgott bag to his respondents, and countless post-sale observers have viewed these bags carried this way.

Finally, as discussed in Point IV below, the case law makes clear that Guess's instant motion is futile.  This is a bench trial, and Guess cites no case where a Court has excluded a

trademark confusion survey in a non-jury case on any of the grounds advanced here.  Rather, Guess's criticisms, to the extent they have any validity at all, go to the weight to be accorded Gucci's surveys, not their admissibility.

**ARGUMENT**

## I.   THE MANTIS SURVEY WAS PROPERLY CONDUCTED AND IS HIGHLY PROBATIVE OF A LIKELIHOOD OF CONFUSION

The objective of the Mantis Survey[10] was to "assess the likelihood of post-sale confusion among relevant observers of a Guess cross-body bag [with the accused trade dress, a bag] that is beige in color, and bears a repeating diamond-shaped pattern with the letter "G" in the corners of the diamonds, and an interlocking G design (the Guess 'Quattro G Design') in the center of each diamond."  Welsh Decl. Ex. 1, at 1.  Respondents in the test cell of the Mantis Survey "were shown photographs of the front and back of a beige Guess cross-body bag bearing a repeating diamond-shaped pattern with the letter 'G' in the corners of the diamonds, and the Guess Quattro G Design in the center of each diamond."  *Id.* at 3.  Mantis modified the test stimulus by obscuring another indicator of Gucci on the bag, "changing the brown-red-brown stripe design that appears on the Guess cross-body bag to a solid brown stripe", to focus his respondents on the accused trade dress design being tested.  *Id.*  Respondents in the control cell were "shown photographs of the front and back of the same [Guess cross-body bag] product, with the background color changed from beige to blue, and the solid brown stripe changed to blue, and the repeating diamond shaped pattern changed to the Guess Quattro G Design arranged in a pattern of horizontal and vertical lines.  Further the diamond-shaped pattern, separated by dashes

---

[10] George Mantis has over 40 years of experience in marketing research design, execution and interpretation, and holds a Bachelor of Science in Economics from Carroll college, a Master of Business Administration from Indiana University, and a Juris Doctor from Illinois Institute of Technology – Chicago-Kent School of Law.  *Id.* at A20.

forming straight diagonal lines, was removed."  *Id.* at 3-4.

| Guess Cross-Body Bag | Mantis "Test" Cross-Body Bag | Mantis "Control" Cross-Body Bag |
|---|---|---|
|  | | |

Based on his study, Mantis concluded that, "[a]fter adjusting for survey noise, at a minimum, 15.6% of all respondents mistakenly believe that the Guess cross-body bag tested is made or put out by or with the approval or sponsorship of Gucci, or the maker of this product is connected to or affiliated with Gucci."  *Id.* at 12.

## A.     The Modification of the Guess Cross-Body Bag Was Proper

Guess's primary attack on the Mantis Survey is that it failed to test the Guess cross-body bag as it appears in the marketplace, since the brown-red-brown stripe that runs vertically down the center of the bag was digitally altered.  As Mantis explains, however, this was done because his purpose was to measure whether Guess's accused trade dress, the repeating diamond-shaped design appearing on many Guess handbags and other products, was being confused with Gucci's Diamond Motif Trade Dress.  Since the brown-red-brown stripe, while not part of the accused trade dress, is obviously similar to Gucci's famous, federally-registered green-red-green "web" design,[11] both in appearance and in the manner used on Guess product (in a vertical orientation

---

[11] *See, e.g., Gucci America, Inc. v. Dart, Inc.*, 715 F. Supp. 2d 566, 566 (S.D.N.Y. 1989) ("The Gucci [green-red-green stripe mark] ha[s] come to have secondary meaning indicative of origin, relationship, sponsorship and association with Gucci, and ***[is] among the most well-known trademarks in the fashion field***.").  Moreover, a number of Guess witnesses, including Paul Marciano, its Chairman and Design Director, and Theresa McManus, Guess's In-House IP

Footnote continued on next page

on handbags), the stripe design was eliminated to ensure that the responses accurately reflected confusion only as to the accused trade dress design that was the subject of the survey.

| Example of **Gucci's** Use Of **Gucci's** **Brown-Red-Brown** "Web" Design | Example of **Gucci's** Use Of **Gucci's** **Green-Red-Green** "Web" Design | Example of **Guess's** Use of **Gucci's** **Brown-Red-Brown** "Web" Design |
| --- | --- | --- |
| | | |

To confirm that Mantis' approach is accepted industry practice, one need look no further than the survey conducted by Guess's own survey expert, Dr. Carol Scott. When Scott tested Guess's Square G belt for confusion, in order to focus her respondents' attention on the Square G design she was testing, and to get a true measure of confusion just as to the Square G design, she covered up the name "Guess" appearing on the belt with a piece of tape. Remarkably, Mantis and Scott provided virtually identical explanations for what they did:

> **Mantis**:  As a *conservative* measure – since the purpose of the study was to measure confusion with respect to Gucci's Diamond Motif Trade Dress – the brown-red-brown stripe design which I understand is also alleged to infringe a Gucci design trademark (Gucci's green-red-green "web" design), was changed so as to capture only trade dress confusion.  Welsh Decl. Ex. 1, at 3, fn3.

> **Scott**:  For purposes of this study, a piece of black tape was placed over the "Guess" name.  This ensured that the G logos would be the only or predominant indicator of source.  To the extent that the Guess name is visible on products actually sold, my results are thus *conservative* with respect to consumers' identification of Guess as to the source. Dkt. No. 165, Ex. B, at ¶10.

Further, in the context of post-sale confusion, courts have found Mantis' methodology to be acceptable practice, and have declined to exclude surveys on this basis.  For example, in

---

Footnote continued from previous page
Counsel, have ██████████████████████████████████████████████. *See* 2/17/10 Depo. of Paul Marciano at 202:3-12; 203:20-204:7; Pl. Depo. Ex. 292.

*adidas-Solomon AG v. Target Corp.*, 228 F. Supp. 2d 1192 (D. Or. 2002), adidas' survey expert,

attempting to test for confusion only as to an accused stripe design appearing on many of

defendants' sneakers, obscured a second infringing design mark on defendants' shoes — adidas'

famous stylized rubber toe design known as the "shell toe" — because the survey was designed

only to test the impact of the *stripes* on the defendants' shoes:



The *Target* court rejected multiple attempts to exclude adidas' survey on this basis, both on

defendant's motion for summary judgment (holding that the adidas survey "supports a finding of

likelihood of confusion," while acknowledging that, "[t]o focus on the stripes, the shell toe was

digitally removed."), *Target Corp.*, 228 F. Supp. 2d at 1212; and on adidas' motion for partial

summary judgment (holding that to the extent any of defendants' objections were valid, they

went to the weight to be accorded to the survey, not its admissibility). *adidas-Solomon AG v.

Target Corp.*, 2003 WL 25710435, *8 (D. Or. Jan. 29, 2003). Later, in another highly publicized

case in the District of Oregon, *adidas America, Inc. v. Payless Shoesource*, *Inc.*, 529 F. Supp. 2d

1215 (D. Or. 2007), adidas proffered the same survey, and the *Payless* court admitted it into

evidence over objection. *Id*. at 1226-27.[12]

   The cases cited by Guess (Guess Br. at 14-17), including this Court's decision in *THOIP*

---

[12] *See also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 744 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 807 (2d Cir. 1986) (the court similarly refused to exclude Levi's post-sale confusion survey on the grounds that Levi's had obscured all designs appearing on the rear pocket of the plaintiff's jeans, including the famous Levi's "red tab" design, except for the "arcuate" pocket stitch design it was testing for confusion, indicating that plaintiff's objection to this methodology goes to the weight to be accorded the survey, not its admissibility).

*v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010), holding a survey may be excluded where a product is altered to the point that it deviates from its actual marketplace appearance, are inapposite.  These cases involve claims of point-of-sale confusion, where the alterations were designed to ***increase*** the level of confusion, rather than ***decrease*** it, by removing brand identifiers that may be noticed by consumers at the point of sale.  That is not the case here.[13]

Guess also argues that the brown-red-brown stripe design should not have been altered, since Gucci does not claim any trademark rights in that design.  Gucci, however, is claiming that in addition to having counterfeited Gucci's green-red-green "web" design, Guess's use of a brown-red-brown stripe design is a deliberate infringement of Gucci's rights in its green-red-green design.  Second Amended Compl. Ex. L.  There is also ample evidence that Gucci is well known for using variations of its green-red-green design, including over 60 products with the very brown-red-brown motif Guess knocked off here:[14]



| Gucci | Guess |
|-------|-------|

As for Guess's argument that the brown-red-brown stripe may be seen as an indicator of Guess, not Gucci (Welsh Decl. Ex. 5, ¶8), Guess's expert offers no support for this, because there is

---

[13] *See, e.g., Am. Footwear Corp. v. General Footwear Co., Ltd.*, 609 F.2d 655, 660, n.4 (2d Cir. 1979) (survey criticized for removing poster being tested from environment that included numerous references to the source of the product, and in which the poster was always shown); *Beverage Mktg. USA, Inc. v. S. Beverage Corp.*, 2002 WL 1162789, at *14-15 (2d Cir. June 3, 2002) (rejecting point-of-sale confusion survey involving bottle designs where the labels were removed from the bottles prior to testing); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (survey criticized for being simply a word association test, where participants were shown cards bearing the names of products instead of being shown actual products, and therefore not testing for either point-of-sale or post-sale confusion).

[14] For other Gucci products with a brown-red-brown stripe design, see Ederer Reply Decl. Ex. A.

none — it is obvious Guess intended to copy Gucci when it chose to use the brown-red-brown stripe design on its cross-body bag exactly as Gucci uses it, just as Guess intended to copy Gucci when it changed Gucci's brown-red-brown stripe to green-red-green in the shoes depicted above.

Guess further argues that the decision to obscure the brown-red-brown stripe was unnecessary.  According to Guess and its expert, Mantis could have left the infringing stripe on the bag and still measured confusion as to the accused trade dress alone by not counting those respondents who referred to the stripe design as the reason why they mentioned Gucci.  Guess Br. at 16, fn11.  The problem with this argument, as Guess's own expert, Dr. Shari Diamond, and many other experts on surveys and consumer behavior have acknowledged, is that consumers are not always capable of articulating precisely why they answered a question about a product's appearance or qualities the way they did.[15]  Therefore, if the brown-red-brown stripe was left on the test bag, it would have been impossible to accurately measure confusion as to the trade dress alone, since consumers reacting to the stripe design may not have clearly articulated this.

### B.     The Mantis Survey Utilized a Proper Control

Guess asserts that the Mantis Survey should be excluded because the survey utilized an improper control.  In particular, Guess claims that Mantis went too far in removing any semblance of a diamond pattern from his control, instead reorienting Guess's Quattro G design into vertical and horizontal lines, giving the Guess trade dress design the appearance of a

---

[15] *See* Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TRADEMARK RPTR. 739, 741, fn13 (2008) ("Dr. Shari Diamond is of the opinion (and I concur) that 'why' questions may no longer be necessary."); *see also* Itamar Simonson, *The Effect of Survey Method On Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test*, 83 TRADEMARK RPTR. 364,  365 (1993) ("in many cases, consumers are unlikely to have the self-insight necessary to answer such a question"); Richard E. Nisbett and Timothy DeCamp Wilson, *Telling More Than We Can Know; Verbal Reports on Mental Processes*, 84 PSYCHOLOGICAL REV. 231 (1977) (consumers may have difficulties in expressing "higher order processes").  Moreover, a "why" question is not a scientific assessment of causation — only a control cell serves that function.

repeating square pattern.  Guess also argues that this reorientation was designed to make Guess's Quattro G logo look like "C's" instead of "G's".

There is more than a little irony in Guess's argument.  As Mantis explains, he reoriented the diamond pattern to remove any semblance of the many design variables being tested, including the appearance of a diamond pattern, stating that "[t]he best control is one that holds constant every variable that may affect respondents' answers, except for the variable being tested . . . . [h]ere, the control product utilized holds constant every variable except the trade dress at issue."  Welsh Decl. Ex. 1, at 4.  Moreover, the square orientation Guess now complains of is exactly how it presented its repeating Quattro G pattern to the U.S. Trademark Office in 2004:[16]



Even more ironic is Guess's claim that Gucci deliberately reoriented Guess's Quattro G design to make the "G's" look like "C's".  Guess Br. at 19.  As Guess well knows, Gucci did not change the orientation or appearance of Guess's interlocking G design.  Accordingly, if Guess's "G's" look like "C's", Guess has itself to ask why that is the case.

### C.    The Guess Name Was Not Eliminated From the Cross-Body Bag

Guess next attacks the Mantis Survey for "eliminating," "omitt[ing]," or "obscur[ing]" the "Guess" name from the test and control bags.  However, the photographs used in the survey demonstrate that this is not true.  Indeed, the Guess bags were deliberately positioned so the

---

[16] As stated in Guess's U.S. Trademark Reg. No. 3,308,152: "[T]he mark consists of a repeating pattern of four letter "G's" with a border.  A pair of interlocking "G's" are facing outwards above a second pair of inverted interlocking "G's" facing outwards.  The interlocking "G's" are bordered by a ***square*** composed of a dashed line."

12

embossed Guess name on the strap could be seen by respondents.[17]  Had Gucci wanted to engage

in "sleight of hand," the strap could have been rotated so the Guess name was not visible.[18]

Guess also criticizes the Mantis Survey for failing to include "source-identifying

elements such as hang tags and labels."  Guess Br. at 17.  Guess's criticism, however, ignores the

fact that the Mantis Survey tested for post-sale confusion, not point of sale.  In the post-sale

context, consumers are unlikely to encounter elements such as hang tags and labels.  *See Lois*

*Sportswear*, 799 F.2d at 873 ("Clearly, in this post-sale context appellants' labels, most of which

having been long since discarded, will be of no help.").  Also, the ordinary post-sale observer is

less likely to notice such indicia than an individual looking to purchase the product.  *See* Welsh

Decl. Ex. 6, ¶¶15-32.  It was entirely appropriate, therefore, to show the product in the manner in

which it may have been seen post-sale.

### D.    The Mantis Survey Did Not Improperly Inflate the Confusion Level

Guess further criticizes Mantis for improperly inflating the confusion level by failing to

exclude "Gucci" responses that identified only a single design element.  Once again, however,

Guess's criticism places unrealistic expectations on how a consumer responds to open-ended

questions about his or her perceptions of a multiple-component trade dress (like "Why did you

say that?").  As noted above, a lay consumer cannot be expected to parse out all the design

---

[17] As Guess acknowledges, a number of respondents saw the Guess name.  Guess Br. at 17, fn12.

[18] As for Guess's claim that Gucci used an "atypical" Guess product, and tried to rig the survey by using a Guess bag that did not have a Guess nameplate on the front or rear side of the bag, aside from the fact that Gucci did not hide the Guess name on the strap of the cross-body bag, Gucci would have been happy to use such a bag if only Guess had provided one.  As the Court may recall, Gucci encountered many difficulties in obtaining sample handbags from Guess.  Indeed, at a November 9, 2010 conference, the Court ordered Guess to comply with Gucci's requests for sample products, but despite the Court's order, Guess ultimately provided Gucci with only **8** of the **60** bags requested, and notably, only one — the Guess cross-body bag used by Mantis — contained all the elements of Guess's accused trade dress.

components of a trade dress.  Accordingly, as the commentators, including Guess's expert

Diamond, have stated, when asked an open ended question like "Why did you say that?", lay

consumers cannot be expected to recite all the design elements that remind them of Gucci, often

offering only the first one that comes to mind.  Indeed, that is why Diamond has advocated

eliminating "Why do you say that" questions from confusion surveys altogether.  *Supra* at fn15.

    As for Guess's remaining criticisms of Mantis, these, too, go to the weight to be accorded

his survey.[19]  Accordingly, Guess's motion to exclude the Mantis Survey should be denied.

## II.   THE MAZIS SURVEY WAS CONDUCTED PROPERLY AND IS HIGHLY PROBATIVE OF DILUTION

    The objective of the Mazis Survey[20] was "to assess the degree of association, if any,

between Guess' use of the diamond motif[21] and Gucci . . . in a post-sale context."  Welsh Decl.

Ex. 2, ¶7.  Respondents in the test portion of the Mazis Survey "were shown photographs of the

front and of the back of the Guess 'Basique Bowler' handbag."  *Id.* at ¶¶8, 10.  Respondents in

the control cell were "shown [] photographs of the same handbag modified to remove allegedly

---

[19]  For example, Guess criticizes the Mantis Survey because (i) the survey universe was too narrowly defined by excluding potential purchasers of non-cross-body bags; and (ii) the survey's "sampling method lacks fit with the qualification plan that produced eligible respondents as compared to actual purchasers of the bag being tested."  Guess Br. at 20, fn15.  Both of these criticisms are unfounded.  First, the criteria for identifying potential respondents must be consistent with the product being studied, here a cross-body bag.  Accordingly, the Mantis Survey population consisted of all individuals likely to purchase or shop for a cross-body bag — men and women — as certainly women purchase cross-body bags, both for men and for themselves.  Welsh Decl. Ex. 1, at A2.  Further, the Mantis Survey was designed to assess post-sale confusion, so the appropriate respondent may be a man or a woman, and may include Gucci as well as Guess customers.  Accordingly, as described in the Mantis Survey (*id.* at 3), based on qualification rates, quotas were established to ensure a representative sample of all prospective purchasers of cross-body bags.

[20]  Dr. Michael Mazis is Professor Emeritus of Marketing at American University's Kogod School of Business.  Mazis has conducted marketing research surveys for over 30 years and has published over 60 articles in academic journals.  Welsh Decl. Ex. 2, at ¶¶2-4.

[21]  Mazis defines "diamond motif" as "a repeating diamond pattern with G's in the corners of the diamond on a beige background."  *Id.* at ¶1.

infringing elements."[22]  *Id.* at ¶8:

| Mazis "Test" Handbag | Mazis "Control" Handbag |
|---|---|
|  | |

 "Respondents in both cells were asked to look at the handbag 'as if you saw someone carrying it.'"  *Id.* at 8.  As explained by Mazis, "[t]he purpose of this approach was to present the handbag in a post-sale context."  *Id.* at 10.

Once respondents indicated their readiness, they were asked:  "If you have an opinion, does or doesn't any other product or brand come to mind when you look at the overall appearance of this handbag?"  *Id.*  Those respondents indicating that another product or brand came to mind were then asked:  "What other product or brand comes to mind when you look at the overall appearance of this handbag?  Any others?"  *Id.*  For each product or brand mentioned, respondents were further asked:  "Why do you say that (PRODUCT OR BRAND MENTIONED) comes to mind when you look at the overall appearance of this handbag?  Any other reasons?"  *Id.*  Based upon the results of his survey, Mazis concluded "that, adjusting for 'noise,' 12% of [respondents] associated the Guess Basique Bowler handbag with Gucci . . . because of relevant appearance-related reasons."  *Id.* at ¶25.

_____

[22] Specifically, "[f]or the control handbag, (1) the script font 'Guess' on the name plate was changed to a block font 'Guess' on the name plate; (2) the color was changed from beige background/brown lettering to a blue background/white lettering similar to what Guess is currently using on its 'Sheer Bliss Crossbody Hobo' handbag; and (3) the Guess repeating Quattro G logo was changed by i) removing the single letter G's from the corners of the diamonds; ii) removing the dashed lines forming the diamond pattern; and iii) aligning the Quattro G design elements in horizontal and vertical lines on the surface of the bag."  *Id.* at ¶10.

As for Guess's attack on the Mazis Survey, Guess has ignored this Court's admonition, at the August 4, 2011 conference, not to move to exclude it — "I would probably take that survey for whatever weight it's worth when I try the case.  So I'm trying to save you people time and money.  This is the way this is going.  ***That one is coming in*** . . . ".[23]  Guess nonetheless asks the Court to exclude the Mazis Survey or "give[it] little to no weight" (Guess Br. at 21), on the grounds that it: (i) does not, itself, demonstrate actual dilution; (ii) achieved an insufficient level of association; and (iii) employed an improper control.  As the Court anticipated at the August 4 conference,[24] however, Guess's criticisms at best impact the weight to be accorded the Mazis Survey, especially in a non-jury case like this.  Indeed, Guess's attack on Mazis amounts to little more than a preview of its summary judgment motion on Gucci's dilution claim.

A.    **The Mazis Survey Demonstrates Actual Association Between Guess's Quattro G Pattern and Gucci and is Highly Relevant to a Finding of Dilution**

Guess's principal criticism of the Mazis Survey is that it only measures the respondents' level of association of an accused Guess handbag with Gucci, but fails to measure a second element of dilution, the reputational harm to Gucci.  That, however, is no reason to exclude Mazis' study — all Mazis purported to do was "assess … association", not prove dilution.  The fact that his study shows that an appreciable number of "consumers associate the diamond motif pattern appearing on the Guess Basique Bowler handbag with Gucci" (Welsh Decl. Ex. 2, ¶25) is by no means "irrelevant" to Gucci's claim of dilution, actual or likely.[25]  Guess Br. at 22.

---

[23] 8/4/11 Conference Tr. at 22:14-17.

[24] The Court also admonished counsel not to move to exclude when their criticisms go to weight, not admissibility.  *See id.* at 11:25-12:2 ("if you don't think you're going to win exclusion, you think it goes to -- your arguments go to weight, don't do that, don't make exclusion motions").

[25] In other words, while the demonstrated association between Guess's Quattro G Pattern and Gucci may not, by itself, establish actual dilution, there is no rule that says that Gucci must prove all the elements of actual dilution through a survey, much less the same survey.  With the

Footnote continued on next page

The Trademark Dilution Revision Act (the "TDRA") defines "dilution by blurring" as an "***association*** arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B). Indeed, the TDRA places a significant emphasis on the level of consumer association between the parties' marks, and instructs courts to consider "[a]ny ***actual association*** between the mark or trade name and the famous mark."[26]  15 U.S.C. § 1125(c)(2)(B)(vi).  The Mazis Survey demonstrates that "12% of [respondents] associated the Guess Basique Bowler handbag with Gucci for relevant reasons relating to the appearance of the handbag."  Welsh Decl. Ex. 2, at ¶9.  There could be no more relevant evidence of "actual association".[27]

As for the level of association measured by Mazis, Guess conspicuously cites no Second Circuit authority to support its contention that a 12% association level "is insufficient as a matter of law to establish likelihood of dilution."  This absence of authority is not surprising, since federal courts have found association levels significantly lower than 12% sufficient to establish likelihood of dilution.  *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 (9th Cir. 2008) (a reasonable trier of fact could conclude that a 7% level of association "was sufficient to establish

---

Footnote continued from previous page

requisite consumer association having been established, Gucci is free to demonstrate that such association has impaired the distinctiveness of its trade dress, or caused it reputational harm, by any other means.

[26] Another highly relevant factor enumerated by the TDRA is "[w]hether the user of the mark or trade name intended to create an association with the famous mark."  *See* 15 U.S.C. § 1125(c)(2)(B)(v).  As explained above, Gucci has developed this evidence in spades.

[27] Further, on the issue of relevance, Guess's reliance on *Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) is misplaced.  The survey in *Malletier* addressed whether a participant was "more likely to want to buy the [defendant's bags] in light of the availability in the marketplace of the [plaintiff's] bags."  *Id.* at 607.  This Court correctly noted that this was not relevant to a finding of dilution.

the existence of a likelihood of dilution"). And, once again, this argument is beside the point,

since this is an exclusion motion, not a motion for summary judgment.

> ### B.    The Mazis Survey Used A Proper Control

Guess further criticizes the Mazis Survey on the grounds that it "should have used a

control, or multiple controls, that included a non-infringing element or combination of

elements." Guess Br. at 24. As Mazis explains in his Report, however, his control did just that

— the test handbag was only "modified to remove allegedly infringing elements." Welsh Decl.

Ex. 2, at ¶8. Accordingly, for the same reasons explained above (*see* Point I(B)), the Mazis

control was proper. Further, even if there were any merit to Guess's position, as this Court

acknowledged in *Malletier*, "[t]he flawed choice of a control bag is probably not on its own

dispositive of the admissibility of the survey." *Malletier*, 525 F. Supp. 2d at 596. Therefore, the

Mazis Survey should not be excluded on this basis.[28]

---

[28] Guess also criticizes the Mazis Survey on the grounds that its "methodology did no more than
prompt respondents to name various handbag companies," in essence claiming that Mazis'
questions had a "demand effect" on the respondents. Guess Br. at 23. Guess's criticism
demonstrates a fundamental misunderstanding of "demand effects." As explained in *Kargo
Global, Inc. v. Advance Magazine Publishers, Inc.*, a "'demand effect results when the
interviewer's questions or other elements of the survey design influence participants' responses
by suggesting what the 'correct' answers might be or by implying associations that might not
otherwise occur to participants.'" *Kargo*, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007).
For example, "'[t]he question about whether [] two [specific] items are put out by the same or a
related source is likely to generate so-called demand effects that bias the survey by suggesting to
respondents, at least implicitly, that they should believe there is at least some sort of relationship
between the different items when the possibility might not even have occurred to the vast
majority of consumers who see the items.'" *Id.* As the Mazis Survey improperly did not suggest
any association between the Guess products being tested and Gucci, the concept of "demand
effects" is inapplicable here. Further, Guess's criticism of Mazis' inclusion of "single-
component" responses falls short, for the same reasons discussed above (*see* Point I(D)).

**III.    THE RAPPEPORT REPLICATION STUDY WAS CONDUCTED PROPERLY AND SHOULD NOT BE EXCLUDED**

The objective of the Rappeport Replication Study[29] was to replicate the test portion of Helfgott's trade dress survey, "to determine whether, if Dr. Helfgott's methodology was modified only to the extent that it measured likelihood of confusion in a reasonably anticipatable post-sale situation, the proportion of respondents who will exhibit a likelihood of confusion would be significantly greater than 5%" — the percentage of Helfgott respondents who identified Gucci as the company that put out, was associated with, or approved the Guess "Osaka" handbag being tested.  Welsh Decl. Ex. 4, at 2-3.  Respondents in the Rappeport Study "were shown the same Test Guess Osaka handbag Helfgott used [in his point-of-sale trade dress survey], but the bag was presented in one of two ways, neither of which revealed the name 'Guess' to the respondents" — "one-third of the respondents were shown the back side of the Test Osaka handbag, while the other two-thirds of the respondents were shown an 8-1/2" x 11" color photograph of the backside of the same handbag." *Id.* at 5.  Once qualified, respondents were instructed:  "I'd like you to look at [the handbag] as if you saw somebody carrying the handbag on the street.  Take as much time as you'd like.  Please do not touch the handbag. After you have had the time to look at it I will ask you some questions.  If your response to any question that I ask is that you Don't Know, please say so." *Id.*  When the respondent indicated her readiness, the stimulus was removed, and "[t]he interviewer then asked precisely the same series of questions that Dr. Helfgott used in his [point-of-sale] study." *Id.*

Rappeport's study revealed that "24% of the respondents identified Gucci as the company that put out, was associated with or approved the Test Guess Osaka handbag (nearly all of whom

---

[29] Dr. Michael Rappeport has over 40 years of experience in market and survey research, and has made more than 200 appearances as an expert witness in legal case.  Among other degrees, he holds a Ph.D in Statistics from New York University.  *Id.* Ex. D.

identified Gucci as the company that puts out the handbag)." *Id.* at 9.  Based on these findings, Rappeport concluded that the "data strongly confirms that if Dr. Helfgott's methodology is extended to a reasonably anticipatable post-sale situation, the proportion of respondents who exhibit a likelihood of confusion would be significantly greater than the 5% found in Dr. Helfgott's point of sale study." *Id.*

Now, even though the sole point of Rappeport's study — to rebut Helfgott's point-of-sale survey and establish that it says nothing about post-sale confusion — has been conceded by Guess, it has not only moved to exclude Rappeport's study, but made that the centerpiece of its exclusion motion.  Guess attacks Rappeport's study on two principal grounds — *first*, that it lacks a control (even though it was not a confusion survey, and therefore did not need one), and *second*, that it "distorts reality" by showing respondents only the back side of the Helfgott test bag, where the "Guess" brand name does not appear (even though Gucci has never claimed this is the only way the handbag is seen post-sale).  In an attempt to manufacture support for its second argument, Guess has also commissioned an "empirical" study by Dr. Carol Scott on "how women wear hand bags", which is so technically flawed that it is evidence of nothing.

Before examining Guess's purported grounds for excluding Rappeport, it is important for the Court to recognize what Rappeport's study was (and was not), and understand the context in which it was presented.  Once again, Rappeport's study was pure rebuttal — it was designed simply to respond to any suggestion on Guess's part that Helfgott's trade dress survey had any relevance to Gucci's claims of post-sale confusion.  Accordingly, Rappeport merely replicated the test portion of Helfgott's trade dress survey, which purported to show no confusion at the point of sale between Guess's repeating diamond Quattro G trade dress and Gucci's Diamond Motif Trade Dress, his aim being simply to determine whether, in one reasonable post-sale

context, Helfgott's test bag would have yielded a higher incidence of "Gucci" responses.  And, it certainly did — 24% versus Helfgott's 5% — which is not surprising, since this time respondents were not allowed to handle and physically inspect the bag inside and out.[30]

### A.    The Rappeport Replication Study Did Not Require a Control

Guess's first objection to Rappeport's Replication Study is that it cannot be admitted as a likelihood of confusion survey, because it had no control.  The problem with this argument is that neither Gucci nor Rappeport ever claimed his study was a confusion survey, or that it says anything about the likelihood that consumers would confuse Guess's accused trade dress with Gucci's Diamond Motif Trade Dress.  Rather, once again, all Rappeport did was test the Helfgott trade dress handbag in one reasonable post-sale context, and measures the number of "Gucci" responses, which were significantly higher than the numbers Helfgott achieved.

Indeed, Gucci's main rebuttal expert, Dr. Itamar Simonson, in discussing Rappeport's findings, specifically acknowledges that "the Rappeport survey did not include a separate control group."  Welsh Decl. Ex. 6, ¶35.  Accordingly, Simonson affirms that any conclusions to be drawn from Rappeport's study about the level of post-sale confusion are "tentative".  Indeed, Simonson is careful to say that the only conclusions to be drawn from Rappeport's study are (i) that Helfgott's survey has nothing to do with post-sale confusion, because if Helfgott had tested for post-sale confusion, the incidence of Gucci responses would have been higher, and (ii) that if Rappeport had performed a complete post-sale confusion study with a proper control, *i.e.*, one

---

[30] Guess's position that Rappeport's Replication Study was anything but rebuttal of Helfgott is puzzling.  Rappeport did not construct his own survey model, and never purported to conduct a complete confusion survey.  Rather, Rappeport simply replicated the test portion of Helfgott's trade dress study — changing only two variables, the instruction on how the respondent should evaluate the handbag, and the presentation of the bag — to see if the number of "Gucci" responses would be different.  Once again, he did this, at Gucci's request, merely to prove a point — that Helfgott's survey was not relevant to Gucci's claims of post-sale confusion.

that yielded an acceptable level of "noise" (such as 8.5% in the Mantis trade dress survey), the results might well support a finding of likelihood of post-sale confusion.  *Id.* at ¶¶33-37.[31]

**B.**     **The Scott Surrebuttal Survey Does Nothing But Establish that Exposure to Guess's Infringing Trade Dress is Widespread**

Guess further criticizes Rappeport's study on the grounds that Rappeport chose to show respondents only the back side of Helfgott's test handbag, so that they would not see the name "Guess" appearing on the front side.  Guess claims this is a "distortion of reality," since in certain post-sale contexts the Guess name would be visible to observers.  In support of this argument, Guess offers the out-of-time, impermissible,[32] and completely unscientific Scott study, purporting to show how many women carry their handbags with the brand name facing *outward*.  Aside from being unreliable, all Scott's survey tends to prove is that every day, hundreds of thousands of women are wearing their knockoff Guess handbags with the brand name facing *inward*, and countless observers are being exposed to these knockoffs in the post-sale market, in precisely the manner Rappeport presented the Guess handbag to his respondents.

The first point that needs to be made about the Scott survey is that it has no bearing on Guess's motion to exclude Rappeport's study.  Gucci does not take the position that the brand

---

[31] As for Guess's argument that the Rappeport replication study did not contain its own separate control cell, that is, of course, true.  However, given the limited scope of Rappeport's test, and the fact that he replicated all variables of Helfgott's test cell except one, that is, the manner in which Helfgott displayed the bag to his respondents, it can be said that Helfgott's test bag, and the manner in which he displayed it to his respondents, was, in effect, Rappeport's control, and a proper one at that.  *See U.S. Polo Ass'n. v. PRL Holdings, Inc.*, 2011 WL 1842980 at *13-14 (S.D.N.Y. May 13, 2011) (control should share as many characteristics with test as possible, with exception of characteristics whose influence is being assessed).

[32] In addition to the Scott survey, which Guess has had in hand since August 3, 2011, the accompanying August 24, 2011 surrebuttal report of Dr. Shari Diamond (Welsh Decl. Ex. 7) is also out of time, since it, too, was not submitted prior to the expert cutoff of June 27, 2011 (Dkt. No. 143), and in addition, the Court specifically ordered that the parties not include any new expert material in these motion papers (Dkt. No. 160).  Accordingly, while Diamond does get one thing right (stating that the Rappeport study "is not a test of likelihood of confusion" (Welsh Decl. Ex. 7, ¶7)), neither report should be considered by the Court.

name appearing on Guess's knockoff handbags is never visible to post-sale observers.  Rather, all Rappeport was trying to do, in replicating the Helfgott study in a post-sale context, was test his respondents' reaction to the Helfgott handbag in one reasonable post-sale situation where the Guess brand name would not be seen.  Notably, even Guess does not argue that the bag is never seen this way in the post-sale environment, and Scott's study proves that.

Second, the Scott survey is not relevant to any issue in this case, as it does not test how women carry the Guess handbags at issue.  This is significant, because Gucci is claiming post-sale confusion, where Guess customers are purchasing Guess's knockoff bags so they can confuse their friends and other observers into believing they are wearing a luxury designer bag.[33]  Accordingly, consumers who purchase these Guess handbags are unlikely to wear them with the Guess nameplate facing outward, since they would not want anyone to know the bag comes from Guess.  Scott's study completely fails to take this into account.

Third, having reviewed the instructions and tabulations of the Scott survey, one could not conceive of a less scientific study.  Aside from the fact that the observers recording the results of the survey are not identified, and do not purport to have any expertise in determining how women carry handbags, they were given only four categories to choose from in recording their results, none relating to the location of the brand name: a) where the front side of the bag (defined as the side with "ornamentation") is facing outward; b) where the front side of the bag is facing inward; c) where neither side of the bag contains ornamentation; and d) where the observer could not tell one way or another.  Not surprisingly, the results differ wildly from

---

[33] Indeed, this is the principal reason why consumers purchase knockoffs of luxury goods.  *See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 108 (2d Cir. 2000) (knock-off luxury goods "allow[] a buyer to acquire the prestige of owning what appears to be the more expensive product"); *Cartier, a Div. of Richemont North America, Inc. v. Symbolix, Inc.*, 454 F. Supp. 2d 175, 182 (S.D.N.Y. 2006) ("most people who purchase a knock-off [luxury good] hope to benefit from the cachet of [a luxury good] without having to pay premium prices").

observer to observer,[34] but Scott would still have the Court believe she has definitively found that only 12.2% of all women hold the front side of their handbags inward (which increases up to 20% when she eliminates handbags supposedly having no ornamentation on either side).[35]

Indeed, Scott's survey is so unreliable that the only reasonable conclusion to be drawn from it is that the problem with Guess's knockoff handbags in the post-sale market is even bigger than Gucci thought. According to Guess's own sales numbers, Guess has sold over two million handbags containing the complained-of Guess trade dress. Welsh Decl. Ex. 5, Ex. C. Therefore, even assuming only one million of these bags are still in use, and only 20% of all women wear them with the Guess name facing inward, this means that, on a typical day, 200,000 women are carrying the infringing bags with the Guess name concealed. In other words, on an average day, hundreds of thousands of observers are being exposed to the knockoff bags in the post-sale market in ways even Scott admits are consistent with Rappeport's methodology. If only 15% of them are being confused, as Mantis finds, that is more than an "appreciable" number.

## IV. GUESS'S CRITICISMS, IF CREDITED AT ALL, GO TO THE WEIGHT TO BE ACCORDED GUCCI'S SURVEYS, NOT THEIR ADMISSIBILITY

As this Court has acknowledged, "there is no such thing as a 'perfect' survey", and "[i]t is notoriously easy for one survey expert to appear to tear apart the methodology of a survey

---

[34] For example, in Boston, women carried their bags "front facing out" 79% of the time, and with "no ornamentation" 10% of the time, while in San Francisco the corresponding percentages were 21% and 71%. Welsh Decl. Ex. 8, Ex. 4; s*ee also* Ederer Reply Decl. Ex. B.

[35] Scott's 20% figure is probably much higher, even using her own results. For example, while Scott reports that 21.7% of women carry handbags with no ornamentation at all, she fails to explain how her observers were able to figure out what was on the side of those bags facing inward. As for the remaining 60% of women, once again does not explain how she determined they were not holding the brand name inward. Further, Scott failed to record the number of times the brand name was facing outward, but was obscured. In any event, even if the majority of women hold their bags brand name side out, this does not mean Guess is free to mislead the countless number of observers who see the bags carried the other way, brand name side in.

taken by another." *THOIP*, 690 F. Supp. 2d at 230 (citing 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:178 at 32-380 to 32:381). Moreover, "excluding expert testimony is the exception rather than the rule." *Malletier*, 525 F. Supp. 2d at 561-63 (citations omitted); *see also* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (a "review of case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule"). This is the case because "even imperfect surveys, generally speaking, can and do clarify the issues in the case." M. Rappeport, *Litigation Surveys: Social Science as Evidence*, 92 TRADEMARK RPTR. 957, 961 (2002).

Further, as Professor McCarthy points out, "[t]he majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence. ***This is especially true in a non-jury case.***" 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:170; *see also Hutchinson v. Essence Communications, Inc.*, 769 F. Supp. 541 (S.D.N.Y. 1991) (holding that in a non-jury case it is appropriate for the court to admit survey data into evidence and afford it whatever weight it deems appropriate); K.A. Plevan, *Daubert's Impact on Survey Experts in Lanham Act Litigation*, 95 TRADEMARK RPTR. 596 (2005) (finding that of 44 trademark surveys presented between 1997 and 2004, none were excluded in non-jury cases). Indeed, Guess cites no case, before or after 2004, where a trademark survey was excluded in a non-jury case. As McCarthy further states:

> [t]he proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the result out-of-hand.

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:178, at 32-386.

Accordingly, in this non-jury case, this Court should deny Guess's motion and admit Gucci's surveys into evidence, giving them whatever weight it deems appropriate.

Dated: New York, New York
      September 12, 2011

ARNOLD & PORTER LLP

By:    _____

Louis S. Ederer
399 Park Avenue
New York, New York  10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Plaintiff Gucci America, Inc.*