**REDACTED FOR PUBLIC FILING**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUCCI AMERICA, INC., | Civil Action No. 09cv4373 (SAS) |
| Plaintiff, | |
| -against- | |
| GUESS?, INC., MARC FISHER FOOTWEAR LLC, THE MAX LEATHER GROUP/CIPRIANI ACCESSORIES, INC., SEQUEL AG, K&M ASSOCIATES L.P., VIVA OPTIQUE, INC., SIGNAL PRODUCTS, INC. and SWANK, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

O'MELVENY & MYERS LLP
DANIEL M. PETROCELLI
ROBERT C. WELSH
ANDREW J. FRACKMAN
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., and Swank, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ................................................................................. 2

I.    GUCCI'S INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW .................... 2

II.   GUCCI'S FAILURE TO SHOW ANY IMPAIRMENT OR TARNISHMENT OF ITS MARKS BARS ITS CLAIMS FOR DILUTION ...................................... 7

    A.   Gucci Cannot Establish "Actual Dilution." ............................. 8

    B.   Gucci Cannot Establish A "Likelihood Of Dilution." ................. 10

    C.   The Mazis Survey Does Not Satisfy Gucci's Burden Of Establishing Dilution Concerning Guess's Quattro G Pattern ................. 11

    D.   Gucci's Dilution Claim Regarding The Square G Also Is Barred Because Its Mark Was Not "Famous" Before Guess Introduced The Square G In 1996.................................................................. 12

III.  GUCCI'S CLAIMS REGARDING GUESS'S SQUARE G MARK ARE BARRED BY LACHES ............................................................ 14

    A.   Gucci Had Both Actual And Constructive Knowledge Of Guess's Use Of The Square G Design More Than Seven Years Before Commencing This Lawsuit.................................................................. 14

    B.   Gucci's Delay Was Inexcusable ...................................... 18

    C.   Gucci's Inexcusable Delay Prejudiced Defendants ................. 20

IV.  DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO GUCCI'S INFRINGEMENT CLAIMS FOR MONETARY RELIEF ............ 22

    A.   The Undisputed Evidence Precludes Gucci From Obtaining An Award Of Damages Or Profits Regarding Defendants' Use Of The Square G, Script Guess, And Green-Red-Green Stripe................................. 22

        1.   There Is No Evidence That Defendants Sought To Copy Gucci's Stylized G When The Square G Design Was Adopted in 1996, Let Alone To Confuse Consumers ............................... 22

        2.   There Is No Evidence That The Script Guess Design Was Copied From Gucci, Nor That It Was Intended To Deceive Consumers............ 23

        3.   Defendants Had No Role In The Design Of The Green-Red-Green Stripe And Took Corrective Action Once It Was Discovered Prior To This Litigation ...................................... 23

**TABLE OF CONTENTS**
**(continued)**

Page

B.   Even Assuming Gucci Could Establish A Presumption Of Confusion
     Regarding The Quattro G Pattern, Its Actual Damages Claims Would
     Nonetheless Fail As A Matter of Law ................................................................. 24

C.   Gucci Is Legally Precluded From Seeking Defendants' Profits Derived
     From The Sale Of Products Bearing The Quattro G Pattern ............................. 27

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armco, Inc. v. Armco Burglar Alarm Co.*,
693 F.2d 1155 (5th Cir. 1982) ................................................................ 14

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*,
718 F.2d 1201 (1st Cir. 1983) ................................................................ 4

*Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*,
984 F. Supp. 768 (S.D.N.Y. 1997) ........................................................ 21

*Banff Ltd. v. Colberts, Inc.*,
996 F.2d 33 (2d Cir. 1993) ..................................................................... 28

*Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*,
2005 WL 2076279 (E. Vt. Aug. 26., 2005) ...................................... 21, 23

*Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*,
2007 WL 2914452 (2d Cir. Oct. 5, 2007) ......................................... 14, 16

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.*,
2011 WL 1131385 (N.D. Ill. Mar. 28, 2011) ........................................ 13

*Bridgeport Music, Inc. v. Robert Hill Music*,
2006 WL 3720349 (M.D. Tenn. Dec. 14, 2006) ................................... 17

*Calvin Klein Co. v. Farah Manuf. Co.*,
1985 WL 3953 (S.D.N.Y. Nov. 26, 1985) ............................................ 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................. 1

*Chandon Champagne Corp. v. San Marino Wine Corp.*,
335 F.2d 531 (2d Cir. 1964) ................................................................... 14

*Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*,
535 F. Supp. 2d 347 (W.D.N.Y. 2008) .................................................. 21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ................................................................................... 3

*Deere & Co. v. MTD Holdings, Inc.*,
2004 U.S. Dist. LEXIS 2550 (S.D.N.Y. Feb. 18, 2004) ....................... 21

*Dreyfus Fund, Inc. v. Royal Bank of Canada*,
525 F. Supp. 1108 (S.D.N.Y. 1981) ........................................................ 8

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co. Establishment*,
89 F. Supp. 2d 483 (S.D.N.Y. 2000) .......................................... 18, 20, 21

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
696 F. Supp. 2d 368 (S.D.N.Y. 2010) ..................................................... 9

*Gap, Inc. v. G.A.P. Adventures Inc.*,
2011 WL 2946384 (S.D.N.Y. June 24, 2011) .................................. 10, 11

**TABLE OF AUTHORITIES**
(continued)

Page

*George Basch Co. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992) ................................................................ 22, 27, 30

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
  82 F. Supp. 2d 136 (S.D.N.Y. 2000) ........................................................... 30

*Grotrian Helferich, Schulz, Th. Stenweg Nachf v. Steinway & Sons*,
  523 F.2d 1331 (2d Cir. 1975) ...................................................................... 3

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
  270 F.3d 298 (6th Cir. 2001) ..................................................................... 16

*Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*,
  50 F. Supp. 2d 212 (S.D.N.Y. 1999) ........................................................... 20

*Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*,
  1999 WL 108739 (S.D.N.Y. March 3, 1999) .................................................. 29

*Jaret Int'l, Inc. v. Promotion in Motion, Inc.*,
  826 F. Supp. 69 (E.D.N.Y. 1993) ............................................................... 25

*Joint Stock Society v. UDV North Am., Inc.*,
  53 F. Supp. 2d 692 (D. Del. 1999) .............................................................. 20

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  2006 WL 1012939 (S.D.N.Y. April 19, 2006) ................................................. 20

*Kellogg Co. v. Exxon Mobil Corp.*,
  192 F. Supp. 2d 790 (W.D. Tenn. 2001) .................................................. 11, 12

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) .................................................................. 29

*Lang v. Retirement Living Pub. Co.*,
  949 F.2d 576 (2d Cir. 1991) ........................................................................ 4

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986) ........................................................................ 3

*M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*,
  250 F. Supp. 2d 91 (E.D.N.Y. 2003) ........................................................... 26

*Malletier v. Dooney & Bourke, Inc.*,
  561 F. Supp. 2d 368 (S.D.N.Y. 2008) .................................................... *passim*

*Malletier v. Dooney & Bourke, Inc.*,
  500 F. Supp. 2d 276  (S.D.N.Y. 2007) ........................................................... 8

*McGregor-Doniger, Inc. v. Drizzle, Inc.*,
  599 F.2d 1126 (2d Cir. 1979) ..................................................................... 26

*Mele v. Davidson & Assocs., Inc.*,
  2004 WL 2285111 (W.D.N.Y. Oct. 7, 2004) ............................................ 27, 28

*Moseley v. V Secret Catalogue*,
  537 U.S. 418 (2003) .............................................................................. 9, 12

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Mushroom Makers, Inc. v. R. G. Barry Corp.*,
  580 F.2d 44 (2d Cir. 1978)........................................................................ 5

*Nabisco, Inc. v. PF Brands, Inc.*,
  191 F.3d 208 (2d Cir. 1999)..................................................................... 26

*Nalpac, Ltd. v. Corning Glass Works*,
  784 F.2d 752 (6th Cir. 1986) .................................................................. 24

*Nartron Corp. v. STMicroelectronics, Inc.*,
  305 F.3d 397 (6th Cir. 2002) .................................................................. 20

*Nike, Inc. v. Nikepal Int'l, Inc.*,
  2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) ...................................... 12

*Nora Bevs. v. Perrier Group of Am.*,
  269 F.3d 115 (2d Cir. 2001)..................................................................... 29

*Org. Tech., Inc. v. Dun & Bradstreet Corp.*,
  1997 U.S. Dist. LEXIS 14653 (S.D.N.Y. Sep. 25, 1997)..................... 30

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................ 11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961)..................................................................... 20

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
  2010 WL 5151233 (2d Cir. Dec. 15, 2010) ........................................... 14

*Reebok Int'l Ltd. v. K-Mart Corp.*,
  849 F. Supp. 252 (S.D.N.Y. 1994)............................................................ 3

*Riverbank, Inc. v. River Bank*,
  625 F. Supp. 2d 65 (D. Mass. 2009) ......................................................... 4

*Saratoga Vichy Spring Co., Inc. v. Lehman*,
  625 F.2d 1037 (2d Cir. 1980) .................................................................. 14

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
  627 F. Supp. 2d 1096 (N.D. Cal. 2008) ............................................ 14, 21

*Savin Corp. v. Savin Group*,
  391 F.3d 439 (2d Cir. 2004)..................................................................... 13

*Skechers U.S.A., Inc. v. Vans, Inc.*,
  2007 WL 4181677 (C.D. Cal. Nov. 20, 2007)....................................... 29

*Sly Magazine, L.C.C. v. Weider Publs. L.L.C.*,
  529 F. Supp. 2d 425 (S.D.N.Y. 2007)........................................................ 4

*Starbucks Corp. v. Wolfe Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)................................................................. 25, 26

*Strange Music, Inc. v. Strange Music, Inc.*,
  326 F. Supp. 2d 481 (S.D.N.Y. 2004)........................................................ 4

## TABLE OF AUTHORITIES
### (continued)

Page

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) ........................................................ 25

*Sunstar, Inc. v. Alberto-Culver Co.*,
    586 F.3d 487 (7th Cir. 2009) ........................................................ 8

*V Secret Catalogue, Inc. v. Moseley*,
    558 F. Supp. 2d 734 (W.D. Ky. 2008) ........................................ 10

*V&S Vin Sprit Aktiebolag (Publ) v. Absolute Publ'g USA Inc.*,
    2005 U.S. Dist. LEXIS 35899 (S.D.N.Y. Nov. 22, 2005) ............ 4

*W.E. Bassett Co. v. Revlon, Inc.*,
    435 F.2d 656 (2d Cir. 1970) ........................................................ 28

*W.W.W. Pharm. Co. v. Gillette Co.*,
    984 F.2d 567 (2d Cir. 1993) ........................................................ 29

*W.W.W. Pharm. Co. v. Gillette Co.*,
    808 F. Supp. 1013 (S.D.N.Y. 1992) ............................................ 4

*Wanlass v. General Elec. Co.*,
    148 F.3d 1334 (Fed. Cir. 1998) .................................................. 17

*Wawa Dairy Farms v. Haaf*,
    40 U.S.P.Q.2d 1629 (E.D. Pa. 1996) .......................................... 11

*Windsor, Inc. v. Intravco Travel Centers, Inc.*,
    799 F. Supp. 1513 (S.D.N.Y. 1992) ............................................ 26

**STATUTES**

15 U.S.C. § 1125(c) .......................................................................... 10, 13

**OTHER AUTHORITIES**

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:5 ............ 8

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:113 ........ 25

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:131 .......... 9

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:99 .......... 11

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:103 ........ 13

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104 ........ 13

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:115 ........ 10

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:119 ........ 10

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:58 ........ 27

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:12 ........ 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:38 ......................................... 14

REST. 3D OF UNFAIR COMPETITION, § 31 ........................................................................... 14, 21

Rebecca Tushnet, *Running the Gamut from A to B: Federal Trademark and False Advertising Law*, 159 U. PENN. L. REV. 1305, 1336-37 (2011)............................................... 3

## PRELIMINARY STATEMENT

In its recent Opinion and Order regarding the parties' *Daubert* motions, the Court set forth the basic legal parameters that govern Gucci's infringement claims against Guess and certain of its licensees[1] (collectively "Defendants").  These legal parameters, coupled with the undisputed evidence (or lack thereof) in this case, doom Gucci's claims as a matter of law.

*First*, the Court's determination not to consider Gucci's two purported post-sale confusion surveys means that Gucci has **no evidence**[2] showing the Guess designs at issue are likely to cause post-sale confusion—which is the only basis for its infringement claims. (11/16/11 Opinion ("Op.") at 29 (Gucci is "proceeding solely on a theory of post-sale confusion").)  Also, the particular type of post-sale confusion that Gucci asserts (but for which it fails to provide any evidentiary support) is simply not actionable under the Lanham Act.  Gucci merely asserts "that a casual observer in a post-sale environment" may be confused "when they see ornamentation (bearing the Guess name) in passing on a bag in a typical post-sale environment."  (Op. at 45.)  As demonstrated below, Gucci has no evidence showing that such confusion is likely to have any impact on customers' purchasing decisions in the marketplace. This is fatal to Gucci's infringement claims as the Lanham Act only reaches post-sale confusion that has or likely will affect consumers' purchasing decisions.

*Second*, Gucci's dilution claims fail because Gucci has **no evidence** that any of Guess's marks have caused, or are likely to cause, a reduction in the ability of Gucci or its alleged

---

[1] Those licensees are Signal Products, Inc. (handbags), The Max Leather Group/Cipriani Accessories, Inc. (belts), and Swank, Inc. (small leather goods).

[2] A proper ground for summary judgment is the non-moving party's failure to proffer admissible evidence on issues where that party bears the burden of proof.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)  ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

trademarks to act as source-identifiers of Gucci products or have tarnished Gucci's reputation. The undisputed evidence shows that Gucci's brand value has increased significantly despite the presence of Guess's designs in the marketplace.  Moreover, Gucci's survey conducted by Dr. Michael Mazis—despite its many flaws—reported only a 12% level of association between Guess's Quattro G Pattern and Gucci.[3]  Such a low association level is legally insufficient to support a finding of likelihood of dilution.

*Third*, Gucci's infringement and dilution claims concerning Guess's Square G mark, which constitutes 60% of the Guess products at issue, are barred by the doctrine of laches.  The undisputed facts demonstrate that senior attorneys at Gucci, who were directing Gucci America's trademark enforcement activities in the U.S., were on notice of Guess's widespread use of the Square G at least ***seven years before*** commencing this lawsuit.  Despite this knowledge, Gucci sat on its rights while Defendants built valuable businesses and goodwill based on the Square G design.  The laches defense is intended to prevent such inequity.

*Finally*, Defendants are entitled to partial summary judgment precluding Gucci from recovering monetary damages or Defendants' profits.  Second Circuit law requires a showing of actual confusion or "willful deceit" in order to obtain any monetary recovery.  Gucci cannot obtain an award of damages or profits because, based on the undisputed evidence, it cannot satisfy either requirement.

## ARGUMENT[4]

## I.    GUCCI'S INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW

The U.S. Supreme Court has instructed lower courts that "[t]he words of the Lanham Act

---

[3] Gucci has offered no evidence of any association between the other Guess designs and Gucci.

[4] The relevant undisputed facts are set forth in Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SF"), which accompanies this Memorandum.

should not be stretched to cover matters that are typically of no consequence to purchasers."

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32-33 (2003).[5]  In this Circuit,

the Supreme Court's admonition finds recognition in the limited type of post-sale confusion that

is deemed to be cognizable.  Specifically, the Second Circuit has recognized that to be

actionable, the claimed post-sale confusion ***must affect consumers' purchasing decisions***.  The

Second Circuit's "leading post-sale confusion case,"[6] *Lois Sportswear, U.S.A., Inc. v. Levi*

*Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986), states:

> The confusion the Act seeks to prevent in th[e post-sale] context is that a consumer
> seeing [the defendant's] pattern will associate [the product] with the [defendant] ***and that***
> ***association will influence his buying decisions***.

*Id*. at 872-73 (citing *Grotrian Helferich, Schulz, Th. Stenweg Nachf v. Steinway & Sons*, 523 F.2d

1331, 1342 (2d Cir. 1975)).[7]  As one district court, relying on *Lois Sportswear*, put it:

> [A] claim of post-sale confusion requires ***the additional steps*** of showing that consumers
> will perceive something about the product, ***and that what they observe will affect a later***
> ***purchasing decision.***

*Reebok*, 849 F. Supp. at 272-73.

That trademark claims are limited to confusion affecting consumers' purchasing

decisions derives from the policies underlying the Lanham Act:

> The Lanham Act seeks to prevent consumer confusion that enables a seller to pass "off
> his goods as the goods of another."  *Programmed Tax Systems, Inc. v. Raytheon Co*., 439
> F. Supp. 1128, 1132, 197 U.S.P.Q. (BNA) 509 (S.D.N.Y. 1977) … In *Programmed Tax*
> *Systems*, the court explained that the relevant confusion is that which affects "the
> purchasing and selling of the goods or services in question."  *Id*.  The Restatement

---

[5] Important policies support the conclusion that "not all types of consumer confusion are
worth guarding against."  Rebecca Tushnet, *Running the Gamut from A to B: Federal Trademark*
*and False Advertising Law*, 159 U. PENN. L. REV. 1305, 1336-37 (2011).  These policies include
"free competition, preservation of the freedom to copy uncopyrighted and unpatented articles
guaranteed by the copyright and patent laws, and free expression."  *Id*.  These policies also
support summary judgment for Defendants.

[6] *Reebok Int'l Ltd. v. K-Mart Corp*., 849 F. Supp. 252, 271 (S.D.N.Y. 1994).

[7] Internal citations are omitted and emphases added unless otherwise noted.

> concurs, citing to Judge Lasker's opinion in *Beneficial Corp. v. Beneficial Capital Corp.*,
> 529 F. Supp. 445, 450, 213 U.S.P.Q. (BNA) 1091 (S.D.N.Y. 1982), for the proposition
> that "trademark infringement protects only against mistaken purchasing decisions and not
> against confusion generally." *Restatement* [*(Third) of Unfair Competition*] § 20
> reporter's note at 179.

*Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 582-83 (2d Cir. 1991).  The *Lang* Court's

recognition that trademark laws only protect against confusion causing "mistaken purchasing

decisions and not against confusion generally" was central to its decision granting summary

judgment in favor of defendants.  As the *Lang* Court explained, plaintiff's infringement claim

failed because there was "no evidence link[ing] the confusion evinced . . . to any potential or

actual effect on consumers' purchasing decisions."  *Id.*[8]

This Court has indicated the showing Gucci must make in order to prevail on its post-sale

infringement claims:

> In the post-sale environment, the concern is that the public in general will be deceived
> into thinking that the allegedly infringing product is authentic, and that some consumers
> interested in purchasing the authentic product will instead choose to purchase the
> allegedly infringing product, on the grounds that they can obtain the same prestige for
> less money.  That is, the harm in post-sale confusion is that potential purchasers will

---

[8] Courts following *Lang* have also required a link between the alleged confusion and consumers' purchasing decision in order to find infringement.  *See, e.g., Riverbank, Inc. v. River Bank*, 625 F. Supp. 2d 65, 74 (D. Mass. 2009) (rejecting evidence of alleged confusion as commercially irrelevant because it did not result in any mistaken purchases by consumers) (citing and applying *Lang*); *Sly Magazine, L.C.C. v. Weider Publs. L.L.C.*, 529 F. Supp. 2d 425, 440-41 (S.D.N.Y. 2007) ("The relevant confusion is 'that which affects the purchasing and selling of the goods or services in question.'") (*quoting Lang*, 949 F.2d at 582); *V&S Vin Sprit Aktiebolag (Publ) v. Absolute Publ'g USA Inc.*, 2005 U.S. Dist. LEXIS 35899, at *24-25 (S.D.N.Y. Nov. 22, 2005) ("Furthermore, V&S has presented no evidence that the confusion has had any impact on consumers' choices to the detriment of the company.  While evidence of actual mistaken transactions is not necessary, the kind of consumer confusion which the law protects against is 'that which affects the purchasing and selling of the goods or services in question.'"); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 494 (S.D.N.Y. 2004) ("As the Second Circuit noted in *Lang* 'trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.'"); *W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1020-21 (S.D.N.Y. 1992) ("The relevant confusion is confusion that affects the purchasing decisions of actual or prospective purchasers of the plaintiff's product."). *Accord, Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983) ("There is no evidence that any temporary confusion that may have occurred … had any effect whatever on the ultimate decision of a purchaser whether to buy a particular product.").

knowingly choose the infringing product over the authentic one in order to obtain the status of the latter at the price of the former.  (Op. at 47.)[9]

Hence, in order to make out a *prima facie* case of trademark infringement based on post-sale confusion, Gucci must shoulder its burden of showing that customers knowingly "choose to purchase" Guess-branded handbags and other accessories over Gucci products for the intended purpose of "passing them off" as, and to "obtain the status of," Gucci products.

Gucci cannot make such a showing.  Gucci concedes it has no evidence showing that any consumers have ever been induced to purchase Guess products because they believe they can "pass them off" as Gucci products to friends and acquaintances.  (SF ¶ 31.)

Moreover, the evidence that does exist refutes the possibility that the Guess products at issue could ever be "passed off" as Gucci products so as to mislead an "appreciable number of ordinarily prudent purchasers."[10]  *First*, Guess is one of the strongest global brands in the fashion industry.  Guess consistently places among the top 30 well-known fashion brands as ranked by fashion-conscious women.  (SF ¶ 33.)  Indeed, Guess consistently outranks Gucci in the *Women's Wear Daily* annual rankings of prominent fashion brands.  (SF ¶ 34.)  Guess and the other Defendants spend over $35 million annually to advertise and promote Guess products and the Guess brand in magazine advertisements and marketing materials.  (SF ¶ 35.)  Fashion-conscious consumers are sophisticated shoppers who recognize that Gucci and Guess products,

---

[9] As this Court explained in *Malletier*, "[p]ost-sale confusion 'can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product.'"  *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 384 n.112 (S.D.N.Y. 2008).  A showing that consumers are induced to buy counterfeit products in order to "pass them off" to friends and acquaintances provides the requisite link between the post-sale confusion and consumers' purchasing decisions.

[10] *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) ("It is well settled that the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.").

like the products manufactured by Louis Vuitton and Dooney & Bourke, "are distinct and originate from independent and unaffiliated sources." *Malletier*, 561 F. Supp. 2d at 386-87.

*Second*, Guess products leave no doubt as to their source. As this Court has already noted, "[a]ccording to Dr. Diamond's analysis of the underlying sales data, more than 99 percent of bags bearing the allegedly infringing trade dress also bore 'either the GUESS name on the front of the bag, or the GUESS name on large G-shaped hardware on the handbag, or both.'" (Op. at 39.) Given the prominent display of the GUESS name and other signifiers of Guess brand, consumers simply would never be prompted to purchase Guess products for the purpose of "passing them off" as Gucci products.[11]

*Third,* Guess's sales figures refute any suggestion that consumers purchase Guess products bearing the designs at issue in order to pass them off as Gucci products. Defendants' damages expert, Dr. Alan Goedde, conducted a comparison of pricing and sales data for Guess products bearing the designs at issue (which he refers to as the "accused designs") with similar Guess products that do not contain the accused designs.[12] (SF ¶ 40.) The purpose of the comparison was to determine whether the accused designs "had any incremental value beyond their value as [identifiers] of the Guess brand" (*e.g.*, due to any claimed association with Gucci). (SF ¶ 41.) Utilizing Guess handbags that were offered for sale in 2008 and 2009, Dr. Goedde identified 12 Guess handbags containing the accused designs and 51 comparable handbags with similar product characteristics that contained other designs not challenged by Gucci. (SF ¶ 42.) Dr. Goedde's analysis focused on price and total number of units sold. Dr. Goedde's results showed "no discernable incremental value attributable to the [handbags] containing the accused

---

[11] Also, as even a cursory review of the products themselves reveals, no reasonable consumer would ever confuse any of these Guess handbags for a Gucci handbag. (*See* SF ¶¶ 36-38.)

[12] In addition to the design at issue, Defendants regularly use a variety of other designs or "signatures" on Guess-branded products that Gucci does not challenge. (SF ¶ 39.)

design on the basis of price." (SF ¶ 43.) In 76% of the comparisons, Guess handbags containing the accused designs were priced at or below handbags bearing the unchallenged designs. (SF ¶ 44.) Likewise, in comparing sales volume, Dr. Goedde found that among the 12 Guess handbags bearing accused designs, only two outsold comparable non-accused handbags. (SF ¶ 45.)

The results of Dr. Goedde's analysis are plainly inconsistent with Gucci's passing off theory. If Guess or consumers truly believed the products bearing the designs at issue possessed special "passing off" attributes, then one would expect these products to command higher prices and/or sell significantly more units than comparable handbags that did not contain those designs. Guess's financial records show customers do not regard the designs at issue as more desirable than comparable Guess products containing different, unchallenged designs.[13]

In short, without any evidence linking its claimed post-sale confusion to any consumers' purchasing decisions, Gucci has failed to make out its *prima facie* case of trademark infringement. Gucci's infringement claims thus fail as a matter of law.

## II.    GUCCI'S FAILURE TO SHOW ANY IMPAIRMENT OR TARNISHMENT OF ITS MARKS BARS ITS CLAIMS FOR DILUTION

Two separate—yet related—dilution standards apply to Gucci's dilution claims. Since the Square G mark, the Quattro G Pattern, and the Script Guess design were first used in commerce prior to October 6, 2006, Gucci's claims for dilution damages concerning these designs are governed by the 1995 Federal Trademark Dilution Act's ("FTDA") "actual dilution" standard. Gucci cannot establish actual dilution because it has ***no evidence*** that these Guess designs actually tarnished Gucci's marks or lessened their capacity to identify Gucci products.

---

[13] This point is tellingly illustrated by the sales figures for the Guess messenger bag that was used by Mr. Mantis in his survey and which has been repeatedly referred to by Gucci in its communications with the Court. Defendants collectively sold a grand total of 2,333 units of the handbag group that contained the messenger bag. (SF ¶ 47.)

Gucci is therefore foreclosed from obtaining any monetary relief from its dilution claims regarding Guess's Square G, the Quattro G Pattern, and the Script Guess.

The "likelihood of dilution" standard codified by the 2006 Trademark Dilution Revision Act ("TDRA") applies to Gucci's request for injunctive relief regarding all the designs at issue, as well as its claim for monetary relief for the green-red-green stripe design (which was first used in commerce after October 6, 2006). Even under this less stringent standard, Gucci must establish that its allegedly famous marks are likely to be impaired as source identifiers or to suffer reputational harm. Once again, Gucci has ***no evidence***. Accordingly, Gucci fails to make out its *prima facie* case of "likelihood of dilution," and summary judgment on these claims should be entered for Defendants.

### A. Gucci Cannot Establish "Actual Dilution."

Undisputed evidence establishes that prior to October 6, 2006, Defendants used in commerce the Square G mark and the Quattro G Pattern, including the Quattro G Pattern on a beige background that Gucci claims infringes its trade dress. (SF ¶¶ 21, 49-50.) Defendants have also submitted evidence showing that they used the Script Guess design prior to October 2006. (SF ¶¶ 18, 51.)[14] The use of these Guess designs prior to October 6, 2006 means that the FTDA applies to Gucci's damages claims and that Gucci must establish "actual dilution" as a prerequisite to any monetary relief. *Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276,

---

[14] Although the letters "G" and "S" in the Script Guess design have varied slightly since its first use in mid-1980s, these minor typeface variations are not sufficient to alter the first use in commerce date of the Script Guess. *See Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1115 (S.D.N.Y. 1981) (change of logo from realistic lion to stylized lion does not affect its first use in commerce because it creates a continuing commercial impression and continuity of use); *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 496 (7th Cir. 2009) ("[i]n U.S. law, a change in a trademark's typeface is not considered a material alteration" sufficient to affect the date of first use); 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:5 ("a minor change in the format and appearance of a mark will not break the chain of priority").

282-83 (S.D.N.Y. 2007).[15]  Thus, to recover dilution damages, Gucci must prove that these designs actually tarnished Gucci's marks or "reduce[d] [their] capacity" to identify Gucci products.  *Moseley v. V Secret Catalogue*, 537 U.S. 418, 433 (2003) ("actual dilution" is an "essential element" of a violation of the FTDA).

There is no record evidence that any Gucci marks have been impaired or tarnished because of any alleged "association" with Guess's Square G mark, Quattro G Pattern, or Script Guess design.  (SF ¶ 52.)  At the same time, it is undisputed that the value of the Gucci brand has increased significantly between 2001 and 2010.  (SF ¶ 53.)  Annual studies conducted by the global consultancy firm Interbrand[16] reveal that during that ten-year period, the value of the Gucci brand increased from $5.36 billion to $8.35 billion, or 56%.[17]  (*Id.*)  Thus, the presence of Guess's designs in the marketplace, dating back to 1996, has caused no apparent impairment or injury to Gucci's brand or trademarks.  *Malletier*, 561 F. Supp. 2d at 392 (no actual dilution where there was a "complete absence" of evidence that the capacity of Louis Vuitton's marks to act as source identifiers had been eroded and Louis Vuitton's reputation had increased).  Gucci is not entitled to dilution damages from Guess's use of the Square G, Quattro G, and Script Guess designs.

---

[15] *See also Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 390 (S.D.N.Y. 2010); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:131 (intent of the 2006 TDRA's drafters was to limit monetary relief "to diluting marks which were first used after [] October 6, 2006").

[16] These are the same studies that Gucci's parent company, Pinault-Printemps Redoute, regularly cites in its annual reports, and that Gucci's former CFO, Sandro Risi, relied on to calculate the value of the Gucci brand in the U.S.  (SF ¶¶ 54-55.)

[17]
Likewise, Gucci America's Rule 30(b)(6) witnesses testified repeatedly that they were not aware of any sales that Gucci lost due to any Guess products.  (SF ¶¶ 57-58.)

9

### B.   Gucci Cannot Establish A "Likelihood Of Dilution."

In order to prevail under the TDRA's "likelihood of dilution" standard,[18] Gucci bears the burden of proving two separate elements.  As Prof. McCarthy has summarized, a plaintiff must "prove both that the required 'association' will be likely and it is likely that that 'association' will 'impair the distinctiveness' of the famous mark.  ***These two critical elements cannot be assumed or presumed to always follow.***"  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:115.[19]

Courts in this and other districts are in accord.  To make out a *prima facie* case of dilution, a plaintiff must produce admissible evidence demonstrating that "[the defendant's] use of its marks is likely to cause dilution by blurring by creating a likelihood of association with [the plaintiff's] marks, as a result of similarity between the marks, and a likelihood of impairment of the distinctiveness of [the plaintiff's] marks."[20]  *Gap, Inc. v. G.A.P. Adventures Inc.*, 2011 WL 2946384, at *16-17 (S.D.N.Y. June 24, 2011); *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 748-49 (W.D. Ky. 2008) (rejecting likelihood of dilution by blurring where there was no evidence that distinctiveness of the plaintiff's mark was impaired).

Gucci cannot meet its burden of establishing either element.  There is no record evidence

---

[18] As noted above, Gucci's request for injunctive relief regarding all the designs at issue and its claim for monetary relief for the green-red-green stripe design (which was first used in commerce after October 6, 2006) are governed by the TDRA's "likelihood of dilution" standard. 15 U.S.C. §§ 1125(c)(1) & (5).

[19] *See also id.* § 24:99 (elements of *prima facie* case for dilution by blurring include "a likelihood of association … that is likely to impair the distinctiveness of the plaintiff's famous mark").  The dilution statute enumerates six factors that courts "may consider" in assessing the likelihood of dilution by blurring. 15 U.S.C. § 1125(c)(2)(B).  Prof. McCarthy has concluded that "the list of factors is both incomplete and misleading because none of the factors directs attention to the crucial issue … of whether there is a likelihood of damage to the famous mark."  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:119.

[20] *See* Op. at 30 n.88 ("Dilution exists if an 'association arising from the similarity between a mark … and a famous mark' either 'impairs the distinctiveness of the famous mark' or 'harms the reputation of the famous mark,'" (*quoting and citing* 15 U.S.C. § 1125(c)(2)).)

10

of *any* consumer association between Guess's Square G mark, the Script Guess design, or the green-red-green stripe and Gucci, let alone evidence sufficient to support a likelihood of such association.  (SF ¶ 59.)  The same is true for the Quattro G Pattern; as outlined below, the Mazis survey's results are insufficient to prove a level of association to make out a *prima facie* case of dilution.  The survey's flawed methods also render its results unreliable.

Equally fatal to its likelihood of dilution claim, Gucci has no evidence showing any likelihood of impairment or harm to its marks or trade dress attributable to Guess's designs.  Gucci cannot make out a *prima facie* case of dilution.  Gucci's likelihood of dilution claim thus fails as a matter of law.  *Gap,* 2011 WL 2946384, at *16; 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:99.[21]

### C.   The Mazis Survey Does Not Satisfy Gucci's Burden Of Establishing Dilution Concerning Guess's Quattro G Pattern.

The Mazis survey is Gucci's only evidence presented in support of its dilution claims.  The survey purports to show a 12% likelihood of association between Guess's Quattro G Pattern and Gucci's marks.[22]  These results are entitled to little or no weight.

*First*, the 12% level of association found by the survey is insufficient as a matter of law to establish likelihood of dilution.  Courts generally demand percentages of *twice that level—or higher*—in order to find actionable dilution.  *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 380-81 (D.N.J. 2002) (survey showing a dilution level of 14% was "insufficient on its face").[23]  Gucci's expert, Dr. Itamar Simonson, agrees.  As he stated under oath in another

---

[21] Gucci's failure to make out its *prima facie* case obviates the need to address the statutory likelihood of dilution by blurring factors.

[22] Gucci submitted no surveys or other dilution evidence concerning Guess's Square G, Script Guess or green-red-green designs.

[23] *See also Wawa Dairy Farms v. Haaf*, 40 U.S.P.Q.2d 1629, 1632 (E.D. Pa. 1996) (survey showing association levels of 29% constitutes proof of blurring); *Kellogg Co. v. Exxon Mobil*

case, "[estimates of] likelihood of dilution (based on mere mental association) tend to be much higher, rather than lower, than measures of confusion. . . .  Thus, if the threshold for likelihood of confusion is about 15% the threshold for likelihood of dilution should be significantly higher." 2008 WL 2571703, at ¶ 4 (*Johnson & Johnson Co. v. Actavis Group HF*, No. 06cv8209 (S.D.N.Y. 2008)).  A 12% survey result does not come close to meeting the minimum level required for showing likelihood of dilution.

*Second*, the survey suffers from numerous methodological flaws, which have been discussed extensively in Guess's *Daubert* motion.  (Guess's 8/29/11 *Daubert* motion at 20-25.) As a result, its claimed finding of a 12% level of association should be given little or no weight.

*Finally*, the Mazis survey provides no evidence of impairment or harm to Gucci's marks, a required element of Gucci's claim under both the "actual dilution" and "likelihood of dilution" standards.[24]  The Mazis survey only asked respondents whether any "other" products or brands "come to mind."  (SF ¶ 61.)  It made no attempt to inquire into whether any claimed "association" between the Guess handbag and Gucci had any effect, positive or negative, on respondents' perceptions of the Gucci brand, much less whether such claimed "associations" resulted in any impairment or injury to Gucci.  (SF ¶ 62.) [25]

**D.     Gucci's Dilution Claim Regarding The Square G Also Is Barred Because Its Mark Was Not "Famous" Before Guess Introduced The Square G In 1996.**

A threshold requirement for Gucci's dilution claim is that the use of Guess's accused

---

*Corp.*, 192 F. Supp. 2d 790, 806-08 (W.D. Tenn. 2001) (70%); *Nike, Inc. v. Nikepal Int'l, Inc.*, 2007 WL 2782030, at *8 (E.D. Cal. Sept. 18, 2007) (87%).

[24] Tellingly, Dr. Mazis does not claim his survey results show a likelihood of dilution.  (SF ¶ 63.)

[25] The "association" purportedly found in the Mazis survey is also irrelevant to the question of actual dilution.  As the Supreme Court held, "the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable [actual] dilution."  *Moseley*, 537 U.S. at 433 ("[S]uch mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner").

marks began "*after* [Gucci's] mark [became] famous."  15 U.S.C. § 1125(c)(1).[26]  To be

"famous," a mark must be "widely recognized by the general consuming public of the United

States as a designation of source of the goods or services of the mark's owner."  *Id.* at

§ 1125(c)(2)(A).  With regard to its Stylized G mark, Gucci cannot meet this "difficult and

demanding requirement."  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104

("a mark must be truly prominent and renowned" to be famous).[27]

     Guess began using its allegedly infringing Square G mark at least as early as 1996.

(SF ¶¶ 21, 66.)  At that time, Gucci had only been using its Stylized G mark for no more than a

year.  (SF ¶¶ 67-68.)  Gucci has presented no evidence that, between its first use of the Stylized

G in 1995 and the appearance of Guess's Square G in 1996, the Stylized G mark had gained any

fame, let alone on a national level.  (SF ¶ 69.)  There is no record evidence from that period

concerning the amount and extent of any sales or advertising for Gucci products bearing the

Stylized G, or the degree of any actual consumer recognition of the mark.  (SF ¶ 70.)  Moreover,

Gucci did not obtain its first trademark registration for the Stylized G until 1997 (SF ¶ 71), *after*

Guess had begun using its Square G mark, further showing that Gucci's Stylized G was not

famous.  *See* 15 U.S.C. § 1125(c)(2)(A)(iv).  Gucci cannot show that its Stylized G mark was

widely recognized by U.S. consumers when Guess began using the Square G mark in 1996.  This

is an additional basis for dismissing Gucci's dilution claim concerning the Square G.  *Bobak*

*Sausage Co. v. A & J Seven Bridges, Inc.*, 2011 WL 1131385, at *17 (N.D. Ill. Mar. 28, 2011).

---

[26] As Prof. McCarthy observes, "[t]his rule reflects the fair and equitable principle that one should not be liable for dilution by the use of a mark which was legal when first used." 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:103.

[27] *See also id.* ("The fame requirement is so important that the Second Circuit advised trial courts to determine the fame question as an initial gateway issue before going further to analyze a dilution claim.") (citing *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004)).

## III.   GUCCI'S CLAIMS REGARDING GUESS'S SQUARE G MARK ARE BARRED BY LACHES

Undisputed evidence establishes that Gucci's claims concerning Guess's Square G design are barred by laches.  Under Second Circuit law, laches bars a trademark claim where:  (1) "the plaintiff had knowledge of defendant's use of its marks"; (2) the plaintiff "inexcusably delayed" in taking action; and (3) the defendant "will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."  *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980).  Either actual or constructive knowledge is sufficient for laches to apply. *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964) (a claim "may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered").[28]  The constructive knowledge standard imposes on a trademark owner the "duty to police its rights against infringers."  *Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*, 2007 WL 2914452, at *3 (2d Cir. Oct. 5, 2007).[29]  All three conditions for laches are present here.

### A.   Gucci Had Both Actual And Constructive Knowledge Of Guess's Use Of The Square G Design More Than Seven Years Before Commencing This Lawsuit.

There is no genuine issue of material fact that senior Gucci attorneys with direct

---

[28] *See also RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 2010 WL 5151233, at *2 (2d Cir. Dec. 15, 2010) ("Actual knowledge of [the defendant's] allegedly infringing conduct is not required: the applicable limitations period is triggered once [the plaintiff] 'should have known' about it."); 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:38 ("a 'reasonably prudent person' standard may be used to impute notice to a plaintiff who claims ignorance of defendant's past conduct"); REST. 3D OF UNFAIR COMPETITION, § 31 cmt. c. ("Proof of actual knowledge of the defendant's use … is not necessary in order to establish laches.  Proof that the trademark owner should have known of the infringing conduct can be sufficient, particularly when the potential prejudice to the defendant is substantial.").

[29] *See also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:18; *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1109 (N.D. Cal. 2008) ("The constructive knowledge standard imposes on a trademark owner the duty to police its rights against potential infringers."); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161-62 (5th Cir. 1982) ("The objective standard of 'knew or should have known' is a logical implementation of the duty to police one's mark.").

14

oversight of and involvement in Gucci America's trademark enforcement matters in the U.S. had actual knowledge of Guess's Square G mark **_over seven years before Gucci commenced this lawsuit_**.  One of those attorneys was Alan Tuttle.  Tuttle was employed by Gucci America while acting as General Counsel for Gucci America's parent company (Gucci Group N.V.).  (SF ¶¶ 73-74.)  During the first part of 2002, Tuttle was directly overseeing the company's trademark enforcement activities in the U.S.   (SF ¶ 75.)  The other attorney was Iolanda Tursi.  Tursi was Gucci Group's Assistant General Counsel, who reported to Tuttle.  (SF ¶ 76.)  Tursi also communicated with Gucci America's outside counsel about U.S. trademark matters.  (SF ¶ 77.)[30]

---

[30]

Numerous documents and privilege log entries produced by Gucci provide additional confirmation of Tuttle's and Tursi's involvement in Gucci's U.S. trademark activities in the 1999-2004 period.  (SF ¶ 83.)

At that point, Gucci's knowledge of the use of Guess's Square G design was sufficient to trigger the duty to investigate.  Courts have consistently held that upon discovering even small quantities of allegedly infringing products, a trademark owner has a duty to investigate and is charged with knowledge of all allegedly infringing products it would have discovered upon due inquiry.  In *Black Diamond*, the plaintiff became aware in 1990 that the defendant was using the allegedly infringing mark on ski equipment.  2007 WL 2914452, at *3.  Noting that "the possibility of [defendant] expanding into [the plaintiff's product area of] skiwear was hardly far-fetched," the Second Circuit held that had the plaintiff investigated any of the "obvious distribution channels" from 1990 onward, it would have learned about the defendant's infringing products well before the six-year presumptive laches period.  *Id.*  Accordingly, the Second Circuit charged the plaintiff with knowledge of what it would have learned upon due inquiry and affirmed the district court's grant of summary judgment on the basis of laches.  *Id.* at **3-4.

Likewise, in *Herman Miller*, the plaintiff became aware of plaintiff's allegedly infringing "potato chip chair" in 1990 but claimed ignorance of other furniture items until 1994, outside the presumptive laches period.  *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321 (6th Cir. 2001).  The Sixth Circuit held that because the plaintiff was aware the defendant was making "some" allegedly infringing furniture plaintiff was "on notice to conduct further investigation, such as obtaining [defendant's] product catalogs or visiting its New York showroom."  *Id.* at 322.  Either action would have revealed the existence of the other allegedly infringing furniture items in 1990.  *Id.*  The Court concluded:  "Given that [plaintiff] was on

notice of [defendant's] marketing of reproductions of Eames-designed furniture in 1990, its lack

of diligence in not discovering that [defendant] was reproducing the lounge chair and ottoman

until 1994 is inexcusable." *Id*.[32]

There is no genuine issue of material fact that had Gucci conducted any reasonable

investigation, it would have quickly discovered the extent of Guess's use of the Square G mark

in 2002, and certainly before the presumptive laches period ran in 2003.  Undisputed evidence

shows that the Square G design appeared on Guess products at least as early as 1996.  (SF ¶¶ 21,

84.)  Defendants can no longer show the Court the full extent of their use of the Square G design

prior to 2003 because much of that data is no longer available.[33]  (SF ¶ 85.)  Nonetheless, the

records that remain establish that before 2003, the Square G mark appeared on at least Guess-

branded handbags, belts, footwear, wallets, eyewear, and watches.  (SF ¶ 89.)  Existing records

also show that between 2000 and 2003 at least 1.17 million units of Guess-branded Square G

products were sold in the U.S., totaling over $30 million in sales.[34]  (SF ¶¶ 90-81.)

Defendants have produced documents showing that Gucci's investigation needed to be no

more elaborate than walking by a Guess storefront or visiting a Guess store.  (SF ¶¶ 92-93.)  In

---

[32] *Cf. Wanless v. General Elec. Co.,* 148 F.3d 1334, 1339 (Fed. Cir. 1998) (in a patent case "upon discovering one infringing work, plaintiff had a duty to monitor the defendant's additional published works"); *Bridgeport Music, Inc. v. Robert Hill Music,* 2006 WL 3720349, at *5 (M.D. Tenn. Dec. 14, 2006) (in a copyright case "[u]pon it's discovery [of] the alleged infringement in 2001, Bridgeport should have exercised reasonable diligence to discover all products, then existing and those released after filing, containing this alleged infringement").

[33] For example, Signal Products, the handbag licensee, has no sales data prior to 2002; Max Leather, the belt licensee, has no sales data prior to 2005; and Sequel AG, the watch licensee, has no sales data prior to 2000.  (SF ¶¶ 86-88.)  The loss of such records is part of the prejudice that Defendants have suffered as a result of Gucci's unreasonable delay in bringing its claims.  *See* Section III.C., *infra.*

[34] These sales figures are alone enough to establish Gucci's constructive knowledge of the Square G mark.  *See Calvin Klein Co. v. Farah Manuf. Co.*, 1985 WL 3953, at **5-6 (S.D.N.Y. Nov. 26, 1985) (rejecting plaintiff's claim that it was ignorant of defendant's mark where the mark appeared on 1.5 million pairs of jeans over an 8-year period).

that period, Square G products were displayed in the standardized window dressings that adorned Guess storefronts.  (SF ¶ 92.)  Products bearing the Square G were also on display in Guess stores and sold in third-party retailers, such as Dillard's and Macy's.  (SF ¶ 93.)  Additionally, Square G products were featured in the catalogs and sales materials distributed by Defendants. (SF ¶ 94.)  Based on this evidence, Guess's investigative expert, Michael Kessler, concluded that the "use of a Square G design on [Guess] accessory products in the period prior to May 2003 was highly public, very prevalent, and geographically widespread."  (SF ¶ 95.)  As a result, "had Gucci America been exercising reasonable diligence in protecting its trademarks in the 2003 and earlier period, it would have and should have known of Guess's use of the Square G design prior to May 2003."  (SF ¶ 96.)

Thus, over seven years before commencing this lawsuit, Gucci had ample notice of the use of the Square G mark on Guess-branded watches and other accessories.  This awareness was more than sufficient to trigger Gucci's duty to investigate, and it is chargeable with what it would have learned upon due inquiry—that the use of the Square G on Guess products was pervasive and widespread.  Laches is therefore presumed.  *Eppendorf-Netheler-Hinz GmbH v. Enterton Co. Establishment*, 89 F. Supp. 2d 483, 486 (S.D.N.Y. 2000).

### B.      Gucci's Delay Was Inexcusable.

Once laches is presumed to apply, the burden shifts to Gucci to show why it should not. *Eppendorf*, 89 F. Supp. 2d at 486.  Gucci cannot shoulder this burden.  Gucci has presented ***no evidence*** showing its delay was remotely reasonable.  *Id.*  (8-year delay inexcusable where plaintiff "introduced no evidence to suggest that it was somehow prevented from asserting its rights prior to" suing).  Just the opposite.  Gucci has steadfastly maintained that the reasons why it elected not to bring suit earlier are shrouded in secrecy under the attorney-client privilege.  As a result, Gucci cannot show its delay was reasonable.

Gucci's various privilege logs document no fewer than 50 communications between 1999-2007 concerning Guess's products and designs—including the Square G—between members of the legal departments of Gucci America, Guccio Gucci, Gucci Group, and/or their outside trademark counsel.[35]  (SF ¶ 93.)  During all that time, Gucci never once raised any objection, formal or informal, to Defendants' use of the Square G design.  During this same period, Gucci was actively enforcing its intellectual property rights against hundreds of others in the U.S.  Between 1997 and 2009, Gucci brought at least 78 trademark lawsuits or opposition proceedings and sent more than 54 cease and desist letters.  (SF ¶ 107.)

Gucci's failure to object during this period takes on added significance because, in April 2007, Gucci sent Guess a letter complaining about Guess's use of the name "Twirl" in connection with a particular watch.[36]  (SF ¶ 103.)  Even though Gucci was fully aware of Guess's use of the Square G mark at the time it sent this letter to Guess (see n.35), it never bothered to mention any concerns with that design.  (SF ¶ 105.)  That Gucci made a conscious decision not to raise any concerns with Guess regarding its continuing use of the Square G is supported by the testimony of Vanni Volpi, the author of the April 2007 letter to Guess.  Mr. Volpi testified that after Guess agreed to discontinue use of the "Twirl" name, Gucci "had no other issues or concerns about Guess."  (SF ¶ 106.)

---

[35] For example, in 2004, Gucci America's paralegal, Jessica Murray, wrote to the company's Legal Counsel, Jonathan Moss, opining that a Guess product bearing a "G" design might infringe a Gucci trademark, and requested Moss's opinion.  (SF ¶ 99.)

In 2006, Mr. Moss, Ms. Murray, and Mr. Imo communicated with one another and outside counsel (including Gucci's counsel in this lawsuit, Mr. Ederer) regarding an "investigation" into a handbag that contained the Square G.  (SF ¶ 101.)  And in 2007, Mr. Moss, Ms. Murray, and Mr. Volpi communicated with one another and Mr. Ederer regarding several products that featured, *inter alia*, the Square G.  (SF ¶ 102.)

[36] Guess speedily resolved Gucci's complaint within a matter of weeks by changing the name of the watch in question.  (SF ¶ 104.)

19

It is thus patently unreasonable for Gucci to "change its mind" years later and now seek

Defendants' profits for the sales that occurred during the many years in which Gucci elected not

to raise any concerns with Guess.  As Judge Friendly declared 50 years ago in his landmark

*Polaroid* opinion, "it cannot be equitable for a well-informed merchant with knowledge of a

claimed invasion of right, to wait to see how successful his competitor will be and then destroy

with the aid of a court decree, much that the competitor has striven for and accomplished."

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 498 (2d Cir. 1961).

## C.     Gucci's Inexcusable Delay Prejudiced Defendants.

Gucci also cannot meet its burden of showing that its unjustifiable delay has not

prejudiced Defendants.  *Eppendorf*, 89 F. Supp. 2d at 486.  The undisputed evidence shows that

Defendants have suffered substantial prejudice.[37]  *First*, Defendants are being economically

prejudiced as Gucci is seeking to deprive them of all profits derived over the years from the sale

of Square G products—which amounts to the potential loss of millions of dollars that Defendants

could have easily avoided had Gucci timely objected.[38]

*Second*, allowing Gucci to pursue its stale claims would compound Defendants'

economic prejudice by destroying the substantial commercial interest and goodwill that

Defendants have developed in the Square G mark.[39]  The survey conducted by Dr. Carol Scott

---

[37] Though Guess has suffered substantial prejudice, even a slight prejudice would have been sufficient to bar Gucci's claims.  *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 50 F. Supp. 2d. 212, 224 (S.D.N.Y. 1999) ("a long delay with little prejudice will suffice" to support a laches defense); *see also* 5 McCarthy on Trademarks and Unfair Competition § 31:12.

[38] *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 411-12 (6th Cir. 2002) (defendant experienced "considerable prejudice" where the "potential damages increase during each year that the claimed mark is used"); *Joint Stock Society v. UDV North Am., Inc.*, 53 F. Supp. 2d 692, 717 (D. Del. 1999) (economic prejudice arises when a defendant will "incur significant monetary penalties as a result of conduct which could have been altered by an earlier lawsuit").

[39] *See Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *34 (S.D.N.Y. April 19, 2006) (prejudice "clearly established" where defendant made a "substantial commitment of

shows that Guess has acquired significant consumer goodwill in the Square G mark—with nearly

half (47.2%) —of the survey respondents identifying the Square G mark with Guess.  (SF ¶ 108.)

As this Court has already concluded, the Scott Survey,

> provide[s] evidence that consumers, at the point of sale, associate the "Square G" buckle
> with Guess more than any other brand, including Gucci.  This in turn implies that Guess
> would be harmed if it were forced to stop using the "Square G" buckle as a result of the
> instant suit.  (Op. at 50.)

Defendants also have suffered evidentiary prejudice.  Documents and financial records

from the mid-to-late 1990s at both Guess and Gucci are no longer available.  (SF ¶¶ 85-88, 110-

111.)[40]  Additionally, the Gucci in-house lawyers who knew about Guess's Square G mark in

1999 and 2002 are deceased or no longer employed by Gucci.[41]  (SF ¶ 113.)  Because there are

no genuine issues of material fact that Gucci knew or should have known about the use of the

Square G mark on Guess products at least seven years before this lawsuit was filed, that Gucci's

delay was inexcusable, and that Defendants were prejudiced by this delay, summary judgment is

appropriate on Gucci's claims concerning the Square G.

---

corporate talent and money" to the development of the products in question); *Eppendorf*, 89 F. Supp. 2d at 487 (prejudice resulted from the defendant's "substantial expenditure of resources and effort to develop their business in the United States"); *Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 362 (W.D.N.Y. 2008); *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2005 WL 2076279, at *5 (D. Vt. Aug. 26, 2005); *Deere & Co. v. MTD Holdings, Inc.*, 2004 U.S. Dist. LEXIS 2550, at *60-61 (S.D.N.Y. Feb. 18, 2004).

[40] The few relevant documents that Gucci was able to locate from that era are admittedly incomplete.  As Ms. Lombardo, Gucci's former legal coordinator, testified, "we were not very good on file keeping."  (SF ¶ 112.)

[41] *See Zaentz*, 627 F. Supp. 2d at 1118 (finding evidentiary prejudice where defendant could not present complete financial records or logs concerning its allegedly infringing Website and could not learn "potentially important information" from plaintiff's now-deceased trademark counsel); *Eppendorf*, 89 F. Supp. 2d at 487; *Black Diamond*, 2005 WL 2076279, at *5; *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 799 (S.D.N.Y. 1997).  *See also* REST. 3D OF UNFAIR COMPETITION, § 31 cmt. a ("Delay by a trademark owner in asserting its rights after it knew or should have known of an infringement can prejudice the defendant by increasing the amount of the plaintiff's loss, by aggravating the burden that the requested remedy would impose on the defendant, or by undermining the ability of the court to ascertain the facts.  In such instances, if the delay is unreasonable, the imposition of a particular remedy may be inequitable.").

IV.    **DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO GUCCI'S INFRINGEMENT CLAIMS FOR MONETARY RELIEF**

In order to recover actual damages for trademark infringement, a plaintiff "must prove either actual consumer confusion or deception resulting from the violation" or "that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).  In order to obtain an award of profits, a plaintiff must show that the defendant acted with "willful deceptiveness." *Id.* at 1537-40.[42]  Gucci cannot satisfy these requirements.

A.    **The Undisputed Evidence Precludes Gucci From Obtaining An Award Of Damages Or Profits Regarding Defendants' Use Of The Square G, Script Guess, And Green-Red-Green Stripe.**

Gucci has no evidence of actual confusion or bad faith on the part of the Defendants regarding three of the four designs at issue—the Square G, the Script Guess, and the green-red-green stripe.  Accordingly, Gucci cannot satisfy the requirements for obtaining either actual damages or Defendants' profits.

1.    **There Is No Evidence That Defendants Sought To Copy Gucci's Stylized G When The Square G Design Was Adopted in 1996, Let Alone To Confuse Consumers.**

The Square G mark at issue has appeared on Guess products since 1996—before Gucci even obtained a federal trademark registration for its Stylized G mark.  (SF ¶¶ 21, 71, 114.) Indeed, in 1996, Gucci had only been using its Stylized G mark in commerce for a year at most, and had not yet used the mark on certain products including eyewear and sunglasses.  (SF ¶ 115.) Gucci has adduced no evidence that Guess was even aware of Gucci's Stylized G when it adopted the Square G mark, let alone that Guess began using the Square G mark to deceive consumers.  Nor has Gucci produced any evidence that in 1996 its Stylized G mark enjoyed an

---

[42] *See also Malletier*, 500 F. Supp. 2d at 280-82 (holding that *Basch*'s willfulness requirement remains good law).

extensive reputation or goodwill that Guess could have sought to capitalize on when it introduced its own Square G mark.  (SF ¶ 116.)  Courts have found no bad faith where, as here, the plaintiff's and defendant's marks "came into existence at about the same time."[43]

Moreover, Defendants have promoted the Square G mark as a source identifier of Guess by typically placing the "GUESS" house mark prominently on or in close proximity to the "G." (SF ¶¶ 37, 117.)  As Dr. Scott concluded "[c]onsumers are more likely to believe that a belt with the Square G buckle is put out by Guess than by any other brand including Gucci."  (SF ¶ 118.)

### 2. There Is No Evidence That The Script Guess Design Was Copied From Gucci, Nor That It Was Intended To Deceive Consumers.

Guess's use of a script-format "Guess" name dates back to the mid-1980s and Gucci can point to no evidence showing that the development of the mark was related in any way to Gucci's script-format "Gucci."  (SF ¶¶ 18, 119.)  The elements of the specific script-format "Guess" that Gucci complains about—namely the loop at the top of the "G" and the underline— also have been used for years in prior script "Guess" marks.  (SF ¶¶ 120-121.)  Additionally, the Guess and Gucci "G"s are visually distinct in that the Gucci "G" is a capital letter that sits above the line, whereas the Guess "G" is a lower case letter that extends below the line.  (SF ¶¶ 122-123.)  Finally, and most significantly, the Guess Script design clearly and unambiguously spells out the name "Guess," thereby leaving no doubt as to the source of the product.

### 3. Defendants Had No Role In The Design Of The Green-Red-Green Stripe And Took Corrective Action Once It Was Discovered Prior To This Litigation.

Only two Guess men's footwear styles containing a green-red-green stripe were ever sold in Guess stores.  (SF ¶¶ 28, 124.)  Both styles shipped in November 2008.  (*Id.*)  In late

---

[43] *Black Diamond*, 2005 WL 2076279, at **1, 5 (plaintiff's first use of "Black Diamond" mark was in 1986 and defendant's first use was in 1989; court found no bad faith and held that, given that both marks "came into existence at about the same time, it is difficult to understand how [defendant] could have fraudulently capitalized on [plaintiff's] good will and reputation").

November 2008, Guess's Intellectual Property Counsel, Theresa McManus, discovered one of the styles on the Guess website, ordered a recall, and directed Guess's footwear buyer to cease all orders for products with a green-red-green stripe.[44]  (SF ¶¶ 29, 125.)  Guess also instructed Marc Fisher, the footwear licensee, to remove the green-red-green stripe from its Guess-branded footwear and to stop selling all such products.  (SF ¶¶ 30, 126.)  Thus, six months ***before*** Gucci filed this lawsuit in May 2009, Guess already had taken corrective action to ensure that the green-red-green stripe, which had appeared on only a few styles in any case,[45] was eliminated from the Guess men's footwear line.  *See Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 756 (6th Cir. 1986) (no proof of bad faith where defendant did not seek to exploit plaintiff's trademark after obtaining knowledge of it and sold off its remaining inventory).[46]

Absent any evidence of bad faith, coupled with the admitted absence of any marketplace confusion, Gucci is precluded from obtaining any actual damages or profits regarding the Square G, the Script Guess, and the green-red-green stripe.

> **B.**     **Even Assuming Gucci Could Establish A Presumption Of Confusion Regarding The Quattro G Pattern, Its Actual Damages Claims Would Nonetheless Fail As A Matter of Law.**

With regard to the Quattro G Pattern, Gucci apparently believes it has evidence showing that Defendants sought to copy elements of Gucci's trademarked designs.  Gucci is wrong.  In any event, Gucci's tortured interpretations of a handful of emails (many of which do not even involve Defendants) are irrelevant to the ultimate determination of whether Defendants are entitled to summary judgment precluding an award of damages.  Gucci cannot satisfy the very

---

[44] Guess did not participate in the selection of the green-red-green stripe.  (SF ¶ 127.)

[45] One such style, the Mette, was only in Guess stores for two weeks before it was recalled, and sold fewer than 100 units.  (SF ¶ 128.)

[46] The other Defendants bringing this motion—Signal Products, Max Leather, and Swank— had no role in the design of the green-red-green stripe, and never manufactured or sold any products bearing that design.

high standard of egregiousness that courts have required for monetary damages awards. *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 74 (E.D.N.Y. 1993) (granting defendant's summary judgment on plaintiffs' claim for monetary damages where there was no evidence of "patently fraudulent" or "egregious" conduct).

The Lanham Act draws a sharp distinction between an intent to copy and an intent to deceive. *Starbucks Corp. v. Wolfe Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) ("[T]he 'only relevant intent is intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive.'" (quoting and citing 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:113)).[47]  As a result, even if there were triable issues regarding an intent to copy, this would not establish an intent to deceive.  Moreover, even assuming the Court were to find some intent to deceive, that could do no more than create a rebuttable presumption of confusion under the Second Circuit's standard for awarding actual damages.

But a presumption of confusion is not the same thing as a determination of confusion—especially here.  Among other things, the undisputed facts establish that the vast majority of products bearing the Quattro G Pattern also prominently feature the GUESS name and other indicia of the Guess brand.  (Op. at 39 (noting that the Guess handbags bearing the designs at issue "bore 'either the GUESS name or large G-shaped hardware on the handbag, or both'").)  It is also undisputed that, since 2005, more than *2.4 million Guess-branded products* bearing the Quattro G Pattern have been purchased by consumers across the nation, totaling over *$56 million* in sales. (SF ¶¶ 133-134.)  In the seven years since the Quattro G Pattern was introduced, and despite millions of product sales, there have been *no reports of marketplace confusion.*

---

[47] Indeed, copying may indicate nothing more sinister than an intent to compete, which is fully protected under the law. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product.").

(SF ¶ 135.)[48]

Under Second Circuit law, such an unblemished record of peaceful co-existence is a

"'powerful indication' that there is no confusion of likelihood of confusion."  *Starbucks*, 588

F.3d at 117.  As the Court of Appeal explained:

> The presence or absence of actual confusion can be highly effective in showing a high, or a low, likelihood of confusion if there has been ample opportunity for consumer confusion.  If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999).[49]

By any measure, consumers' "exposure" to Guess products in the marketplace has been

more than "adequate" to reveal any likelihood that the Quattro G Pattern would cause confusion.

The products at issue were sold in Guess stores across the country, on Guess's ecommerce site,

and at national department stores such as Macy's and Dillard's.  (SF ¶¶ 2, 132.)  Defendants also

spend millions of dollars each year advertising and promoting the Guess brand as well as specific

products bearing the designs at issue.  (SF ¶¶ 35, 130.)  As noted above, Guess is one of the most

well-known fashion brands in the U.S., and consistently outranks Gucci in polling conducted by

*Women's Wear Daily*.  (SF ¶¶ 33-34, 129.)  Under these circumstances, if the Quattro G Pattern

had any likelihood of causing confusion, it would have done so by now.  As a result, any

---

[48] Indeed, Gucci witnesses have repeatedly admitted that they are not aware of any instances of actual confusion between Guess and Gucci products.  (SF ¶ 136.)

[49] *See also, M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 104 (E.D.N.Y. 2003) ("[T]he complete absence of actual confusion after a lengthy period of time creates an inference that future consumers will not be confused…"); *Malletier*, 561 F. Supp. 2d at 386 ("no reasonable juror could find that actual confusion exists" where the accused products were on the market for four and a half years and generated $145 million in sales); *Windsor, Inc. v. Intravco Travel Centers, Inc*., 799 F. Supp. 1513, 1525-26 (S.D.N.Y. 1992) (no actual confusion where there was a "significant volume of sales" during six years of concurrent business operations); *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979) (holding that it is proper for a court to infer from the absence of actual confusion after six years of sales that there is no likelihood of confusion).

presumption of confusion must be rebutted by the unbroken seven-year absence of marketplace confusion.  Otherwise, the "rebuttable" presumption would really be "irrebuttable."

   In short, Gucci has no evidence of actual confusion concerning the Quattro G Pattern, and even if Defendants' actions could be interpreted as "deceptive" (which they cannot), any resulting presumption of confusion is necessarily rebutted by the absence of marketplace confusion during the many years that millions of Quattro G products have been sold.  Defendants are therefore entitled to summary judgment on Gucci's claims for monetary damages for the Quattro G Pattern.

   **C.     Gucci is Legally Precluded From Seeking Defendants' Profits Derived From The Sale Of Products Bearing The Quattro G Pattern.**

   The showing a plaintiff must make to obtain an award of a defendant's profits is necessarily a strict one.[50]  As the Court of Appeal stated in *Basch*:

> Thus, a defendant who is liable in a trademark or trade dress infringement action may be deemed to hold its profits in constructive trust for the injured plaintiff.  However, this results only when the defendant's sales 'were attributable to its infringing use' of the plaintiff's mark,… and when the infringing use was at the plaintiff's expense…. In other words, a defendant becomes accountable for its profits ***when the plaintiff can show that, were it not for defendant's infringement, the defendant's sales would otherwise have gone to the plaintiff.***  968 F.2d at 1538

   Not surprisingly, "[c]ourts have insisted on a relatively egregious display of bad faith for a finding of willfulness."  *Mele v. Davidson & Assocs., Inc.*, 2004 WL 2285111, at *13

---

[50] As Professor McCarthy has observed:

> Perhaps one explanation for judicial uncertainty as to monetary awards in these cases is the view that while injunctive relief is largely a matter of strict liability, monetary relief should require "something more." That is, injunctive relief is generally granted upon a strong showing of a "likelihood of confusion" and neither proof of actual confusion nor proof of intent or willfulness is required.  However, when it comes to making an award of monetary relief for past acts of infringement, judges are hesitant to do so, whether it is labeled "damages," "profits" or "attorney's fees," without that indefinable "something more."  Monetary liability in trademark cases without fault or knowingly performing illegal acts seems to give most judges considerable pause.

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:58.

(W.D.N.Y. Oct. 7, 2004) (granting summary judgment dismissing plaintiff's claims for monetary relief because plaintiff could make no such showing); *Banff Ltd. v. Colberts, Inc.*, 996 F.2d 33, 35 (2d Cir. 1993) (holding that a claim for defendant's profits was properly dismissed because there was no evidence of willfulness). The degree of willfully deceptive conduct required for an award of profits is illustrated by the defendant's conduct in *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970). There, the Second Circuit ordered an accounting of defendant's profits after finding defendant had: (1) fraudulently procured a stay of a preliminary injunction; (2) violated the Second Circuit's modification of that preliminary injunction; (3) began using the infringing mark after unsuccessfully trying to acquire the plaintiff's business and trademarks; and (4) used the infringing mark after the USPTO twice refused to grant it a trademark registration on the basis of a likelihood of confusion. *Id.* at 662, 664.

Here, there are at least two separate reasons why, as a matter of law, Gucci cannot establish the "egregious" level of bad faith required to make a showing of willful deception. *First*, it is undisputed that the vast majority of products bearing the Quattro G Pattern also prominently display the GUESS name and other indicia of the Guess brand. (SF ¶¶ 36, 137.) These Guess products are sold in Guess stores or on Guess's ecommerce site, which only sell Guess-branded products. (SF ¶ 2.) These products also are sold at certain national department stores, such as Macy's and Dillard's, in specially designated Guess "shop-in-shops" that contain signage and displays making clear the products in question come from Guess. (SF ¶ 138.) It also is undisputed that Guess sought and obtained a trademark registration for the Quattro G Pattern and, in support of that registration, submitted exemplars to the USPTO that bore the Quattro G Pattern that Gucci claims is infringing. (SF ¶¶ 139-140.) At no time during the registration process did either Gucci or the Trademark Examiner ever raise a concern that the

design was similar to any Gucci design.  (SF ¶ 141; *see also* SF ¶ 142 (Expert Report of Gary D.

Krugman, Esq.) (concluding that "Guess acted forthrightly and in good faith throughout the

prosecution of the application" for the Quattro G Pattern trademark.")).  As a matter of law, these

undisputed facts preclude any finding that Defendants' conduct was willfully deceptive or

fraudulent.  *See, e.g., Nora Bevs. v. Perrier Group of Am.*, 269 F.3d 115, 125 (2d Cir. 2001)

(prominent display of a defendant's house mark negates any inference of "intent to deceive

consumers as to the source of its products").[51]  Significantly, these same factors also negate any

claim of confusion in the post-sale context.[52]

The Court of Appeal's decision in *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger

U.S.A., Inc.*, 1999 WL 108739 (S.D.N.Y. March 3, 1999), *aff'd*, 2000 WL 220504 (2d. Cir.

2000) is instructive.  There, the Court of Appeal upheld the district court's determination **not** to

the defendant's profits because the plaintiff failed to make out its case of "willful deception."

Affirming the district court's ruling, the Court of Appeal pointed to,

> "the sales of [Hilfiger's] garments were driven by the prominent use of defendant's name,
> initials and crests, which identified the garments as [Hilfiger's] products, and not the
> words 'Star Class.'"… From this fact the [district court] inferred that "there would be
> little, if any, motivation for bad faith appropriation" of [plaintiff's] mark by Hilfiger in
> order to confuse or deceive consumers or to profit from the [plaintiff's] reputation.

2000 WL 220504, at *1.  Likewise here, the undisputed evidence shows, as Guess's damages

expert concluded, "the entirety of the value of the accused designs derive from the designs'

---

[51] *Accord W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) (Labeling of products with a defendant's house mark "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.").

[52] *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677, *8 (C.D. Cal. Nov. 20, 2007) ("[t]he clear labeling of the accused shoes with Skechers' brand negates any inference of intent to trade on Vans' mark"; "Skechers may have intended to copy the appealing look of Vans, but it is the intent to profit by confusing customers that is actionable under trademark law, not the intent to copy."). *Cf. L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1132 (Fed. Cir. 1993) (applying Second Circuit law) (labeling dispels confusion at post-sale "[b]ecause the labeling is permanent, the likelihood of post-sale consumer confusion is avoided").

association with Guess, not Gucci." (SF ¶¶ 46; *see also* SF ¶ 144 (Guess promoted the designs at issue solely as "signatures" or indicators of Guess).)

*Second*, Gucci cannot show that Defendants were unjustly enriched at Gucci's direct expense such that, as the *Basch* Court requires, "were it not for the defendant's infringement, the defendant's sales would otherwise have gone to plaintiff." 968 F.2d at 1538; *Org. Tech., Inc. v. Dun & Bradstreet Corp.*, 1997 U.S. Dist. LEXIS 14653 (S.D.N.Y. Sep. 25, 1997) (profit disgorgement was unwarranted because defendant's infringement was not willful.).

As discussed above, Dr. Goedde's analysis of the pricing and sales volumes of Guess products containing the accused designs demonstrates that Guess received "no incremental value attributable to an association between the . . . designs [at issue] and Gucci that is over and above the value of the designs as indicators of Guess." (SF ¶¶ 46, 143.) Finally, it defies credulity to contend that Defendants willfully intended to deceive consumers, yet despite the millions of purchases of Quattro G products over the last seven years, Defendants never managed to deceive a single one. In short, there can be no finding of "willful deceptiveness" concerning Defendants' use of the Quattro G Pattern on this record as a matter of law. Gucci is thus precluded from obtaining an accounting of profits based on Defendants' use of the Quattro G Pattern.[53]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Gucci's claims, with prejudice.

---

[53] Because Gucci cannot prove willful deceit, Defendants are also entitled to summary judgment with respect to Gucci's infringement claims for damages based on New York state law. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 136, 145 (S.D.N.Y. 2000). Gucci is also precluded from obtaining dilution damages under state law. The "sole relief" available under the New York dilution statute is "injunctive relief, rather than monetary damages." *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 848 (S.D.N.Y. 2000).

Dated: Los Angeles, California
      December 9, 2011

O'MELVENY & MYERS LLP

By: _____

Daniel M. Petrocelli (dpetrocelli@omm.com)
Robert C. Welsh (rwelsh@omm.com)
Andrew J. Frackman (afrackman@omm.com)
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Attorneys for Defendants Guess?, Inc., The
Max Leather Group/Cipriani Accessories, Inc.,
Sequel AG, K&M Associates L.P., Viva
Optique, Inc., Signal Products, Inc., and
Swank, Inc.*

John T. Williams (jwilliams@hww-law.com)
Craig W. Mandell (cmandell@hww-law.com)
HINKHOUSE WILLIAMS WALSH LLP
180 N. Stetson Ave., Suite 3400
Chicago, Illinois 60601
Tel.: (312) 784-5400
Fax: (312) 784-5491

*Co-counsel for Defendants The Max Leather
Group/Cipriani Accessories, Inc. and Signal
Products, Inc.*

Paul Fields (fields@leasonellis.com)
LEASON ELLIS LLP
81 Main Street, Suite 503
White Plains, NY 10601
Tel.: (914) 821-9077
Fax: (914) 288-0023

*Co-counsel for Defendant Swank, Inc.*

31