UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

GUCCI AMERICA, INC.,

               Plaintiff,

           - against -

GUESS?, INC., MARC FISHER
FOOTWEAR LLC, THE MAX
LEATHER GROUP/CIPRIANI
ACCESSORIES, INC., SEQUEL AG,
J&M ASSOCIATES L.P., VIVA
OPTIQUE, INC., SIGNAL PRODUCTS,
INC., and SWANK, INC.,

               Defendants.

------------------------------------------------- X

**AMENDED
OPINION AND ORDER**

09 Civ. 4373 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  6/18/12

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

        1.    This is a trademark infringement case between two global

fashion companies.  On May 6, 2009, Gucci America, Inc. ("Gucci") filed a

complaint against Guess?, Inc. ("Guess"), Marc Fisher Footwear LLC ("MFF"),

the Max Leather Group/Cipriani Accessories, Inc. ("Max Leather/Cipriani"),

Sequel AG ("Sequel"), K&M Associates L.P. ("K&M"), Viva Optique, Inc.

("Viva"), Signal Products, Inc. ("Signal"), and Swank, Inc. ("Swank") (collectively

"Defendants"), pursuant to Section 1114 and 1125 of Title 15 of the United States Code, Section 360-1 of the New York General Business Law, and the common law of New York.  Gucci claims that Defendants have infringed or counterfeited four of its trademarks, and one trade dress on over one thousand stock keeping units ("SKUs") in an attempt to "Gucci-fy" their product line:

> 1)    the Green-Red-Green Stripe mark ("GRG Stripe");
>
> 2)    the Repeating GG Pattern,
>
> 3)    the Diamond Motif Trade Dress, which is the Repeating GG Pattern with a pair of inverted Gs in each corner rendered in a brown/beige color combination,
>
> 4)    the Stylized G Design mark ("Stylized G"), and
>
> 5)    the Script Gucci Design mark ("Script Gucci").

Gucci also seeks cancellation of Guess's "4G Square Repeating Logo" trademark on the basis of abandonment.

2.    Defendants answered the Second Amended Complaint on June 3, 2010, denying all of Gucci's claims, while also raising more than a dozen affirmative defenses as well as a counterclaim seeking partial cancellation of the Gucci Stylized G registration on the basis of abandonment.[1]  Gucci answered and

---

[1]    *See* Answer to SAC ("Answer") at 16-19. MFF filed its own answer on the same day.  It did not assert any counterclaims.

denied the counterclaim on June 23, 2010.

3.    On February 14, 2012, I held that Gucci was not entitled to monetary relief on its dilution claims relating to Defendants' use of the Square G mark and Quattro G Repeating Pattern, and granted Defendants partial summary judgment on those claims.[2]

4.    I held a bench trial from March 28, 2012 to April 19, 2012. The parties submitted post-trial proposed findings of fact and conclusions of law on April 27, 2012.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law. In reaching these findings and conclusions, I heard the evidence, observed the demeanor of the witnesses, and considered the arguments and submissions of counsel.

5.    Due to certain mathematical errors and oversights in identifying infringing styles, the Court is revising its original opinion to adjust the damage award.  However, the legal analysis is unchanged from the initial Opinion and Order.  Accordingly, the original opinion is now withdrawn and replaced by this Amended Opinion and Order.

## II.    FINDINGS OF FACT

### A.    Parties

---

[2]    *See Gucci America, Inc. v. Guess?, Inc.*, No. 09 Civ. 4373, 2012 WL 456519, at *12 (S.D.N.Y. Feb. 14, 2012).

6.     Gucci is organized under the laws of New York, with its principal place of business located at 685 Fifth Avenue, New York, New York.

7.     Guess is a organized under the laws of Delaware, with its principal place of business at 1444 South Alameda Street, Los Angeles, California.

8.     MFF is organized under the laws of Delaware in 2004.  Its principal place of business is located at 777 Putnam Road, Greenwich, Connecticut.  It also maintains a showroom at 725 Fifth Avenue, New York, New York and a distribution center in Edison, New Jersey.

9.     Max Leather/Cipriani is organized under the laws of New York. Its principal place of business is located at 366 Fifth Avenue, New York, New York.

10.     Signal is organized under the laws of California.  Its principal place of business is located at 320 West 31st Street, Los Angeles, California.

11.     Swank is organized under the laws of Delaware.  Its principal place of business is located at 90 Park Avenue, New York, New York.

**B.     History of the Brands**

**1.     Guess**

12.     Guess was founded in 1981 by the Brothers Marciano –

Georges, Maurice, Paul, and Armand.[3]  Over the next three decades, it grew into an internationally recognized brand.[4]

13.    Guess sells branded apparel and accessories, both on its own and with select licensees.[5]  It operates hundreds of its own retail stores, and places its products in more than one thousand department stores nationwide.[6]

14.    Guess has developed a distinctive and unique brand image over the past thirty years.[7]  It has established itself as a mid-market lifestyle brand, somewhere below the "haute couture" fashion houses, but nonetheless above low-end retail discounters like Target or Wal-Mart.[8]

15.    The ideal Guess customer is the "Guess Girl," a brand-conscious young woman between the ages of fifteen and thirty who identifies with the sexy, trendy, flashy image of the Guess brand.  She is willing to pay a premium

---

[3]    *See* 4/11/12 Declaration of Paul Marciano ("Marciano Decl."), CEO of Guess,  ¶¶ 3-5.

[4]    *See id.* ¶¶ 14, 15

[5]    *See id.* ¶ 13.

[6]    *See* Defendants' Exhibit ("DX") 540 at 6.

[7]    *See* DX1416; DX1419; DX1420; Marciano Decl. ¶ 26; 3/29/12 Trial Tr. at 310:2-4 (Pham).

[8]    *See* Marciano Decl. ¶ 16; 4/12/12 Declaration of Daniella Vitale ("Vitale Decl."), former CEO of Gucci, ¶¶ 2, 4.

above unbranded products to display that image through Guess-branded products.[9]

16.     Between 2008 and 2010 alone, Defendants spent more than ninety million dollars advertising the Guess brand in various media channels, including magazines such as Vogue, Vanity Fair, In Style, Allure, Elle, and People,[10] as well as billboards and buses.[11]

17.     The Guess style makes frequent use of "loud" colors, exaggerated fabric details, and embellishments such as rhinestones.  These act as indicators that Guess is the source of the product.[12]  Based on the results of surveys conducted by Women's Wear Daily identifying the thirty most well-known brands, consumers understand that the Guess brand and style is not the same as Gucci's.[13] The Guess brand has come to be identified with such celebrity "Guess Girls" as

---

[9]     See 4/9/12 Declaration of Suesan Faulkner ("Faulkner Decl."), Creative Director at Signal, ¶¶ 7, 8; 4/9/12 Declaration of Michael Alexander ("Alexander Decl."), Executive Vice President of Sales at Signal, ¶ 13; 4/17/12 Trial Tr. at 2872:22-24 (Ringwood).

[10]     See 4/5/12 Trial Tr. at 1234:1-15 (Marciano).  Gucci advertises in many of the same magazines, including Vanity Fair, Elle, and Allure.  See 3/29/12 Trial Tr. at 191:22-192:3 (Vitale).

[11]     See DX285 at 48.

[12]     See Alexander Decl. ¶ 14; Faulkner Decl. ¶¶ 8, 48; 4/10/12 Trial Tr. at 1739:5-16 (Diamond).

[13]     See DX526 (2005 survey); DX504 (2006 survey); DX505 (2007 survey); DX506 (2008 survey).

Anna Nicole Smith and Claudia Scheiffer.

### 2.    Gucci

18.    Guccio Gucci established his eponymous brand in Florence,
Italy in 1921.  In the decades that followed, Gucci became famous for its fine
leather goods, and then built on its reputation to become one of the largest luxury
goods, fashion and accessory brands in the world.[14]

19.    Gucci opened its pioneering New York City store in 1953,
introducing Americans to Italian fashion.  Since then it has expanded its presence
into twenty-two states and now operates more than ninety U.S. stores.  Over the
years it has sold under the Gucci brand name everything from watches to cars.[15]

20.    Gucci considers the designs at issue in this case to be among its
"icons," and places them on products to enable its customers to communicate that
they are members of the "exclusive club" that the Gucci brand signifies.[16]  Over the
past twenty years, seventy-five percent of the products have borne at least one of

---

[14]    *See* 4/9/12 Declaration of Lisa Argentino ("Argentino Decl."), Vice President and General Merchandise Manager at Gucci, ¶ 9; Plaintiff's Exhibit ("PX") 97.

[15]    *See* Argentino Decl. ¶¶ 9, 11.

[16]    *See* Vitale Decl. ¶ 3; 4/8/12 Declaration of Terilyn Novak ("Novak Decl."), eBusiness Director for Gucci, ¶ 23.

these designs.[17]   Sales data show that they are tremendously successful, with

approximately $1.3 billion worth of product sold between 2004 and 2009 alone.[18]

21.    In addition to "lifestyle" consumers – wealthy individuals who

wear Gucci products regularly – Gucci also targets "aspirational" consumers, who

are younger and less wealthy, but nonetheless aspire to the exclusivity that the

Gucci brand represents.  Because these consumers are less well-off than the

"lifestyle" consumer, they tend to purchase Gucci's more popularly priced articles,

such as canvas products bearing the Diamond Motif Trade Dress and/or the

Repeating GG Pattern.[19]

22.    Gucci spends millions of dollars on advertising each year,

including more than twenty million dollars in the period from 2001 to 2009 on the

marks at issue.[20]  It advertises in fashion magazines such as Vogue, Vanity Fair,

and Elle, as well as "lifestyle" magazines like Town & Country, and even teen-

oriented magazines such as Lucky or Teen Vogue, all in an effort to reach a broad

---

[17]    *See* Argentino Decl. ¶ 44.

[18]    *See* 4/8/12 Declaration of Matteo Mascazzini ("Mascazzini Decl."),
Associate President and COO of Gucci, ¶ 12.

[19]    *See* Argentino Decl. ¶¶ 47-49.  *See also* 3/29/12 Trial Tr. at 527:24-
529:5 (Vitale).

[20]    *See* 4/8/12 Declaration of Christine Iacuzzo ("Iacuzzo Decl."), Vice
President of Advertising and Marketing for Gucci, ¶ 21.

range of consumers.[21]

23.     In addition to magazine and newspaper ads, Gucci advertises on billboards, on buses, in malls, and in a variety of online media.[22]  It also receives unpaid editorial coverage in the fashion press, which a third-party service assessed at a value of approximately twenty-five million dollars per year for the period from 2006 to 2009.[23]  Additional media exposure comes from celebrities ranging from Charlize Theron to Nicole "Snooki" Polizzi, who are often photographed wearing Gucci products.

24.     As a result of its advertising and commercial success, Gucci is consistently recognized as one of the top luxury brands in the world by a variety of publications.[24]  It has also been recognized as one of the top global brands, irrespective of "luxury" status.[25]

### C.     The Marks at Issue

25.     As noted above, this case involves five Gucci designs: the GRG Stripe, the Repeating GG Pattern (along with the Diamond Motif Trade Dress), the

---

[21]     *See id.* ¶ 5.

[22]     *See id.* ¶¶ 6, 7.

[23]     *See id.* ¶ 24.

[24]     *See id.* ¶ 26.

[25]     *See* PX100.

Stylized G, and the Script Gucci.  Gucci imposes strict quality standards on all of

its products, including those bearing these marks.  Over the years, it has vigorously

enforced its trademark rights, with a particular focus on the problem of

counterfeiting.[26]

### 1.    The GRG Stripe

26.    Gucci has used the GRG Stripe since the 1960s.[27]  It consists of

outside green stripes flanking a center stripe rendered in red.  Gucci obtained

registrations for the GRG Stripe in 1979 (for handbags, luggage, small leather

goods, and the like) and in 1988 (for footwear).[28]

27.    The GRG Stripe has appeared on approximately twenty percent

of all Gucci accessories in the past two decades.[29]  From 2005 to 2009, sales of

such products totaled approximately $250 million.[30]  During the nine-year period

beginning in 2001 and ending in 2009, Gucci spent approximately $3.7 million on

---

[26]    *See* Mascazzini Decl. ¶¶ 5-11.

[27]    *See* Argentino Decl. ¶¶ 24, 25.

[28]    *See* PX1.

[29]    *See* Argentino Decl. ¶ 30.

[30]    *See* Mascazzini Decl. ¶ 12.

advertisements that featured the GRG Stripe.[31]

28.    At trial and during depositions, Defendants acknowledged that the GRG Stipe is a key identifier of Gucci.[32]  Gucci also views the GRG Stripe as an essential part of its brand image.[33]

29.    Based on its extensive nationwide sales and publicity, its recognition as an identifier of Gucci, and the fact that it was first registered more than thirty years ago, I find that the GRG Stripe is a famous mark within the meaning of the Trademark Dilution Revision Act ("TDRA") of 2006.

### 2.    The Repeating GG Pattern and the Diamond Motif Trade Dress

30.    Gucci has used the Repeating GG Pattern – a pair of inward facing, inverted G's set at the corners of a repeating, diamond-shaped pattern connected by two dots forming straight diagonal lines – since 1966.  Gucci obtained a registration for this design in 2003 (for jewelry) and 2006 (for

---

[31]    *See* Iacuzzo Decl. ¶ 17.  If other colored stripe variations are included, the total advertising expenditure rises to approximately $4.6 million.  *See id.*

[32]    *See* 4/4/12 Trial Tr. at 1044:23-1045:3 (Marciano); 9/13/10 Deposition of Ariane Klein, former Licensing Manager at Guess, at 129:6-15; 3/3/10 Deposition of Patrick Mochnaly, Guess's Merchandising Manager for Men's Apparel and Accessories, at 64:14-18.

[33]    *See* Argentino Decl. ¶¶ 24-30.

handbags, luggage, small leather goods, neckties, scarves, footwear, etc.).[34]  The

Diamond Motif Trade Dress is this pattern executed on canvas in a brown/beige

colorway, with pinpoint "shading" within the Gs.[35]  Products bearing the Diamond

Motif Trade Dress account for approximately eighty percent of canvas products

bearing the Repeating GG Pattern.[36]

      31.    Gucci has sold billions of dollars worth of products bearing the

Repeating GG Pattern/Diamond Motif Trade Dress.[37]  It has become a key visual

identifier for Gucci, and one that it believes motivates customers to buy other

Gucci products.[38]  To support sales of products with these marks, Gucci spent more

than thirteen million dollars on advertising in the U.S. between 2001 and 2009.[39]

      32.    At trial and during depositions, Defendants acknowledged that

the Repeating GG Pattern is a key identifier of Gucci that transmits the brand's

---

[34]     *See* PX2.

[35]     SAC ¶¶ 39-41.

[36]     *See* Argentino Decl. ¶ 19.

[37]     *See* Mascazzini Decl. ¶ 12.

[38]     *See* Argentino Decl. ¶ 23.

[39]     *See* Iacuzzo Decl. 21.

characteristic qualities of heritage, quality, and exclusivity.[40]  Because of the

mark's popularity, Gucci merchandisers spend more than half of their accessory

budget on products bearing the Repeating GG Pattern or the Diamond Motif Trade

Dress.[41]

      33.    For the same reasons as noted in the discussion of the GRG

Stripe in paragraph 29 above, I find that the Repeating GG Pattern is a famous

mark within the meaning of the TDRA.  While the Diamond Motif Trade Dress is

not registered, I find that the other factors weigh sufficiently in Gucci's favor to

support a finding that it, too, is famous.

### 3.    The Stylized G

      34.    Gucci began using the Stylized G in 1994.  It obtained U.S.

trademark registrations in 1997 (for handbags, belts, gloves), 1999 (for watches

and clocks) and 2006 (for eyeglass frames and sunglasses).[42]

      35.    From 2004 through 2009, Gucci sold approximately fifteen

million dollars worth of products bearing the Stylized G, combined wholesale and

---

[40]    *See* 4/4/12 Trial Tr. at 1060:9-24 (Marciano); 4/16/12 Trial Tr.  at 2551:21-24 (McManus); 4/17/12 Trial Tr. at 2796:24-2797:10 (Ringwood); 4/2/12 Trial Tr. at 662:24-663:5 (Faulkner).

[41]    *See* Argentino Decl. ¶ 17.

[42]    *See* Mascazzini Decl. ¶ 10; PX3.

retail.[43] Over the period from 2001 to 2009, it spent approximately $1.3 million

advertising such products in the U.S..[44]

36.     Gucci increased its use of the Stylized G in 1995 and 1996, and

the mark became the focus of an entire ready-to-wear collection in 1998.

However, after a controversial, pornographic advertisement created by Tom Ford

featuring the Stylized G ran in Spring 2003, Gucci scaled back on its use.[45]

Nonetheless, Gucci witnesses testified at trial that it still uses the Stylized G on the

interior of handbags, as well as on belts and wallets.[46]

37.     As discussed in paragraph 78 below, Guess designed it own

Square G at some time during 1995, and first used it in commerce in 1996, if not

earlier.  At that time, Gucci had not yet registered the Stylized G in the U.S., and it

---

[43]     *See* Mascazinni Decl. ¶ 12.  Gucci presented no evidence of sales of Stylized G products prior to 2004.  Moreover, Gucci has not sold handbags with the Stylized G on the outside since at least 2000.  *See* 4/18/12 Trial Tr. at 3076:12-3077:21 (Risi).

[44]     *See* Iacuzzo Decl. ¶ 19.  However, the evidence shows that Gucci spent no money on magazine or newspaper advertisements for the Stylized G after 2005.  *See* PX108 and PX109.

[45]     *See* Argentino Decl. ¶ 38.

[46]     *See* 4/2/12 Trial Tr. at 629:6-17, 643:9-14 (Novak). I note, however, that the pictures that Gucci offers in support of this statement do not actually depict the Stylized G mark, as they have a short tab extending downward from the top stroke of the G that is not present in the mark as registered.  *See* Argentino Decl. ¶ 39.

had only sold and advertised it for a few years at most. Furthermore, Gucci has not

shown that consumers actually recognized the Stylized G as an indicator of Gucci.

Accordingly, even if the Stylized G did eventually become famous, I find that it

was not famous when Guess commenced use of its Square G in 1996.[47]

### 4.  The Script Gucci

38.    The Script Gucci mark was developed from the signature of

Guccio Gucci, the brand's founder. Gucci began using the mark in 1967 and has

used it ever since.[48] Gucci obtained a U.S. trademark registration for this mark in

2006 for use on various kinds of bags and cases.[49] Gucci does not have a

registration for the mark for use on footwear.

39.    Approximately five percent of all Gucci products sold in the

last two decades have borne the Script Gucci Mark.[50] Gucci sold fifty-eight

million dollars worth of products bearing this mark at retail between 2004 and

2009. For the period from 2005 to 2009, it sold $195 million at wholesale.[51] Over

---

[47]    Based on the foregoing, it is unsurprising that Gucci does not consider the Stylized G to be one of its "icons." *See* 3/30/12 Trial Tr. at 572:11-19; 4/2/12 Trial Tr. at 641:13-15 (Novak).

[48]    *See* Argentino Decl. ¶¶ 31-34.

[49]    *See* PX4.

[50]    *See* Argentino Decl. ¶¶ 32, 34.

[51]    *See* PX122 through PX125.

the period from 2001 to 2009, Gucci spent approximately $450,000 on advertisements visibly featuring the mark.[52]

      40.    As discussed in more detail in the Conclusions of Law below, I do not reach the question of whether the Script Gucci mark is famous because I find that, even if it were famous, the Script Guess mark does not dilute it, either by tarnishment or by blurring.

### D.    Defendants' Design Processes

      41.    Guess uses various licensees to produce its accessory products.[53]  In anticipation of each selling "season," Guess's in-house design team researches trends in the fashion industry, and creates apparel designs consistent with the carefully cultivated Guess brand.[54]  Guess's in-house counsel checks these designs for compliance with intellectual property laws.[55]

      42.    Guess provides its licensees with "trend inspiration" via semi-

---

[52]    *See* Iacuzzo Decl. ¶ 18.

[53]    *See* DX261 (Cipriani – belt licensee since 2001 ); DX264 (Swank – small leather goods licensee since 2001); DX265 (Max Leather – belt licensee since 1999); MF1 (Marc Fisher – footwear licensee since 2005); PX186 (Signal – handbag/luggage licensee since 1992).  *See also* 4/9/12 Declaration of Theresa McManus ("McManus Decl."), Senior Intellectual Property Counsel at Guess, ¶ 10.

[54]    *See* Marciano Decl. ¶¶ 29, 30.

[55]    *See* McManus Decl. ¶ 9.

annual trend design meetings.  At these meetings, Guess distributes "trend design books" that include cuttings from magazines, trend watch services, and the results of shopping trips, amongst other things, all in an attempt to create a cohesive look and feel across all Guess-branded products.[56]  Guess's reliance on these materials shows that it is a trend follower, not a trend leader.

43.    The accessory licensees use the trend design materials as a starting point for their own design process, which culminates in products that Guess reviews and approves for aesthetics and brand cohesion.[57]  Guess's licensing department monitors the licensees' products and works with them to achieve a consistent and coherent style for each season. This department is also responsible for monitoring the licensees' use and modification of Guess's intellectual property, including its trademarks and signature logos.[58]  However, due to the small volume of sales for men's footwear, the Guess men's buying team handled this review process for that category from 2007 to 2010.[59]

---

[56]    *See* 4/9/12 Declaration of Joy Kramer ("Kramer Decl."), Senior Licensing Design Manager at Guess, ¶¶ 6-8.

[57]    *See* Faulkner Decl. ¶¶ 12-14.

[58]    *See* Kramer Decl. ¶¶ 5-19.  *See also* 4/11/12 Trial Tr. at 1963:5-24 (Kramer).

[59]    *See* 4/11/12 Trial Tr. at 1999:24-2000:13, 2003:15-20, 2003:24-2004:20 (Kramer) and 4/12/12 Trial Tr. at 2050:2-6, 2059:8-22 (Kramer).

17

44.     After designs are approved, the licensees produce sample products for physical review, resulting in approval, rejection, or requests for modification.  These "line reviews" are typically attended by Mr. Paul Marciano and at least one member of the Guess licensing department.  As in the preliminary approval stages, the focus is on brand cohesion and aesthetics.[60]

45.     Due to the volume of products involved, Guess does not individually clear each approved product for intellectual property conflicts. Instead, the licensees are obligated to do so by the terms of their licensing agreements.[61]  Nonetheless, Guess's licensing department will raise issues with Guess's legal department if it thinks any of the products come too close to the intellectual property of another brand.  By way of example, approximately fifty designs were brought to the attention of the legal department in 2011, approximately twenty percent of which were disapproved on intellectual property grounds.[62]

---

[60]     *See* 4/4/12 Trial Tr. at 1037:16-1039:12 (Marciano); Kramer Decl. ¶¶ 20-22.

[61]     *See* McManus Decl. ¶ 12.

[62]     *See id*. ¶¶ 13-15.  Another example involved Katherine Ringwood, Design Director at MFF, sending a sample of the Quattro G pattern with hearts in the corners to McManus for approval.  McManus approved the design on May 5, 2008, several months before Gucci came out with a version of its Repeating GG pattern with hearts in the corners.  *See* DX1444 and PX52.

46.    Despite these efforts, Guess does not have an unblemished record when it comes to complying with intellectual property laws.  During the last decade, Guess has received approximately one dozen trademark complaints from other fashion companies complaining about Guess products that allegedly infringed on the trademark rights of the senior user. In each instance, Guess either immediately stopped using the mark or amicably resolved the matter with the competitor.[63]

47.    Guess has also frequently received complaints about footwear products developed by MFF.  From October 2007 to August 2008, either Guess or MFF received four cease-and-desist letters from national brands including Jimmy Choo, Coach, Adidas, and Yves Saint Laurent.  Guess warned MFF that this was unacceptable and claims to have sent a license agreement violation letter, but was unable to produce it during discovery or trial.[64]  Guess also did nothing to follow up on its demand that MFF put an effective intellectual property clearance procedure into place.[65]

---

[63]    *See* McManus Decl. ¶¶ 16-17.  One such occasion involved a complaint from Gucci about the use of the name "Twirl" on a watch.  The relevant Guess licensee promptly stopped using the term.  *See id.* ¶ 18.

[64]    *See* 4/4/12 Trial Tr. at 1157:12-16 (Marciano).

[65]    *See id.* at 1159:3-22 (Marciano).

48.     Like Gucci, Guess actively protects its intellectual property rights, using more than one hundred law firms to do so.[66]  By way of example, Guess has enforced its registered Quattro G Pattern against such companies as Aldo and Wal-Mart.[67]  Guess also works with U.S. Customs and Border Protection to prevent counterfeits from entering the country.[68]

### E.     Development of the Allegedly Infringing Guess Marks

49.     Gucci asserts that Guess and its Licensees "knowingly and slavishly replicat[ed] Gucci's world famous design elements and designations [in order to] take advantage of the markets and demand Gucci has created for such designs without having to incur the developmental, promotional and advertising expenses that Gucci has incurred."  In order to determine whether Gucci has proved this allegation, I must examine each mark in turn.

### 1.     Defendants' Use of the GRG Stripe

50.     Seven men's shoe models designed and manufactured by MFF in 2008 bore a GRG Stripe.[69]  Prior to that time, there is no evidence that Guess or

---

[66]     *See id.* at 1177:23-25 (Marciano).

[67]     *See* DX497 (Aldo); DX483 and DX487 (Wal-Mart).

[68]     *See* McManus Decl. ¶ 9.

[69]     *See* 4/12/12 Declaration of Mark Parsley ("Parsley Decl."), Vice President of Men's Division Sales at MFF, ¶ 12.

any of its Licensees used a GRG Stripe on any other category of products, whether it be apparel, handbags, belts, wallets, or shoes.

51.    Ample evidence shows that the GRG Stripe on these shoes was intentionally copied from Gucci.  In a November 20, 2007 e-mail discussing the Melrose 2 men's shoe, Jury Artola – assistant to the head designer of men's footwear, Paul Vando – instructed MFF's manufacturer that the striping detail should be "Green/Red/Green like the GUCCI. . . ."[70]  On May 2, 2008, Vando instructed his factory to "please reference the GUCCI sneaker" for the stripe color of one shoe, and that the "webbing whould [sic] be Green/Red/Green as on [the Gucci] sample."[71]  The very next day, when discussing the Deacon men's shoe, Vando instructed his sample manufacturer to "follow the Gucci colorway" for the GRG Stripe, and even offered to follow up by sending a Gucci shoe as an example.[72]

52.    With respect to the Melrose men's shoe, Marciano admitted at

---

[70]    PX350.

[71]    PX371.

[72]    PX365.  Fisher and Vando both testified at trial that they did not understand the GRG Stripe to be exclusive to Gucci because they saw similar striping on shoes from other companies.  In light of the fact that Guess witnesses admitted that the GRG Stripe is a key identifier of Gucci, and in light of the fact that MFF has no record evidence showing that it ever referenced another brand for the GRG Stripe, this testimony is not credible.

trial that it was too close to the Gucci shoe that "inspired" it, and that he would have brought it to the attention of the legal department had he seen it beforehand.[73] Marc Fisher, CEO of MFF, made similar admissions, with particular reference to the Mette shoe style.[74]

53.    Departing from the standard "trend inspiration" process, the evidence shows that MFF used individual Gucci products to create Guess-branded shoes bearing the GRG Stripe on several occasions.[75]  Indeed, in at least one case, MFF included a picture of a Gucci shoe on a "spec sheet" that it sent to its factory, which was intended to describe the shoe in great detail.[76]

54.    In November 2008, a Guess-branded shoe with the GRG Stripe came to the attention of Theresa McManus, Senior Intellectual Property Counsel at Guess.  In response, she sent an e-mail to MFF's outside counsel, instructing MFF to stop using the "Gucci red and green ribbon detail found in the Mette style."[77] Although Gucci had not complained about the footwear, McManus immediately

---

[73]    *See* 4/4/12 Trial Tr. at 1165:19-1166:3 (Marciano).

[74]    *See* 4/11/12 Trial Tr. at 1880:13-22 (Fisher).

[75]    *See* 4/5/12 Trial Tr. at 1293:17-1296:23, 1303:9-1308:19, 1314:14-1317:5, 1335:24-1338:2 (Vando).

[76]    *See* PX345.

[77]    PX306.

ordered the shoes withdrawn from Guess's website and stores.[78]

55.   Nonetheless, a Gucci investigator was able to purchase a Guess shoe bearing the GRG Stripe on November 29, 2008, more than a week after McManus's recall instructions went out.[79]  Indeed, on December 8, 2008 – more than two weeks after the recall was ordered, MFF's CFO told McManus that MFF intended to continue production and sale of GRG Stripe shoes at wholesale.[80]  The next day, MFF instructed its factory to make a "running change" to a brown-red-brown stripe on the advice of McManus.[81]

56.   Despite its apparent agreement to stop using the GRG Stripe on shoes, MFF continued to ship such shoes until February or March 2009.  Mark Parsley – Vice President of Sales for MFF's men's division – testified that MFF did so because it had not yet received shoes with the modified stripe from its factory, and in order to preserve delicate customer relationships in a highly competitive marketplace.[82]

57.   The evidence also shows that third-party retailers were still

---

[78]   *See* 4/16/12 Trial Tr. at 2588:24-2590:4, 2607:16-2608:6 (McManus).

[79]   *See* PX185.

[80]   *See* PX442.

[81]   *See* MF428, Parsley Decl. ¶ 13.

[82]   *See* 4/17/12 Trial Tr. at 2756:21-2757:23 (Parsley).

selling shoes bearing the GRG Stripe in April 2009.[83]  McManus was unable to explain why this was so, and testified that Guess left the task of third-party recalls to MFF.[84]  There is also evidence indicating that at least three shoes bearing the GRG Stripe were not fully removed from Guess's own e-commerce site until June 2009.[85]

      58.    Based on the foregoing, I find that MFF intentionally copied the GRG Stripe from Gucci, and that Guess's licensing department approved of its use on men's shoes designed by MFF despite recognizing the GRG Stripe as an identifier of Gucci.   Nonetheless, I find that Guess's recall of products bearing the GRG Stripe design – imperfect as it may have been – when they came to the attention of its legal department is indicative of its good faith.  Because MFF made the conscious decision to continue shipping and selling shoes after it was directed to stop doing so, I find that it acted in bad faith.

      59.    I further find that a brown/red/brown stripe is visually dissimilar from the GRG Stripe and will not cause confusion, even in the post-sale context.  Gucci has produced no evidence of actual confusion or association

---

    [83]    *See* SAC ¶ 46.

    [84]    *See* 4/16/12 Trial Tr. at 2608:13-18, 2624:20-2625:11 (McManus).

    [85]    *See* PX299.

stemming from Guess's use of a brown/red/brown stripe, either through anecdotal consumer complaints or survey evidence.

### 2. Guess's Use of the Quattro G Pattern

60.     The use of all-over logo patterns is common in the fashion industry, especially on handbags.  Such logos are often based on initials of the brand.  Examples include Fendi, Michael Kors, Givenchy, Coach, and Louis Vuitton.[86]

61.     Guess had used several different logos by the early- to mid-2000's,[87] when the logo trend began to pick up steam.[88]  In 2003, in order to capitalize on the logo trend, a designer at Guess began experimenting with multiple G logos, eventually coming up with the standalone Quattro G.[89]  There is no evidence that he referenced or copied Gucci or any other company in doing so. Marciano liked the design and personally approved it.[90]

62.     Later that year, Guess engaged outside counsel – the Los Angeles firm of Christie, Parker, and Hale – to register the standalone Quattro G

---

[86]     *See* 4/2/12 Trial Tr. at 663:1-12 (Faulkner); Marciano Decl. ¶¶ 62, 63.

[87]     *See* Kramer Decl. ¶ 26.

[88]     *See* DX246, 4/2/12 Trial Tr. at 653:10-645:1 (Faulkner).

[89]     *See* McManus Decl. ¶ 34.

[90]     *See* 4/5/12 Trial Tr. at 1219:7-1220:8 (Marciano).

design as a trademark in a vertical orientation.[91]  Gucci did not oppose or object to Guess's application for the standalone Quattro G trademark, and Gucci does not contend that the standalone Quattro G infringes any Gucci mark.[92]

63.  In late 2003, the same designer used the standalone Quattro G to develop various patterns.  Eventually, Guess selected a pattern with the Quattro G rotated 45 degrees clockwise and surrounded by a stitched diamond-shaped border without G's in the corners.  Guess sought a registration for this mark in 2004.  However, the accompanying artwork depicted the design in a square shape rather than a diamond, and did not mention that it would be a repeating pattern.[93]

64.  Prior to applying for registration, McManus – who had recently graduated from law school – conducted a trademark search, through which she determined that Gucci's Repeating GG Pattern was registered only for use on jewelry.  Other registrations for use on handbags, belts, and footwear had expired as of 2003.[94]  It was not until September 2004 that Gucci applied to reactivate its

---

[91]    *See* McManus Decl. ¶ 40.  The trademark was issued on July 10, 2007.  *See* DX313.

[92]    *See* 2/22/10 Deposition of Vanni Volpi, In-house Counsel at Gucci Group N.V., at 185:19-22 (designated as trial testimony).

[93]    *See* McManus Decl. ¶ 37.

[94]    *See* 4/16/12 Trial Tr. 2613:13-2614:7 (McManus).

lapsed Repeating GG Pattern registrations, which did not re-issue until 2006.[95]

65.    Several Guess witnesses testified that they had never seen the Quattro G Pattern used in a square orientation without Gs in the corners, and that Guess never intended that use.[96]  Nonetheless, after having seen the Gucci Repeating GG Pattern registration, McManus registered the Quattro G Pattern, which consisted of the standalone mark "bordered by a square composed of a dashed line."  At trial, she gave conflicting reasons for why she did so.  First, she testified that the vertical/square orientation was selected in order to achieve maximum protection against infringers.[97]  Later, she testified that the orientation of the mark and the orientation of the border was "irrelevant" to the scope of protection afforded by the registration.[98]

66.    The evidence shows that the PTO Examiner did not limit his comparative search to repeating square patterns. Instead, as explained by Guess's expert Gary Krugman, and as indicated by the Examiner's notes on file at the PTO,

---

[95]    *See* SAC ¶¶ 19, 24; PX2; 4/16/12 Trial Tr. at 2613:13-2614:7 (McManus).

[96]    *See* 4/4/12 Trial Tr. at 1093:4-14 (Marciano); 4/2/12 Trial Tr. at 799:13-800:11 (Faulkner); 4/13/12 Trial Tr. at 2468:12-16 (McManus).

[97]    *See* 4/13/12 Trial Tr. at 2456:17-23 (McManus).

[98]    *See id.* at 2458:21-24.

he performed a comparative search for registered trademarks bearing a "G" or "GG."[99]  However, the entry in the Official Gazette did not mention Gs in the corner or a diamond-shaped pattern, making it less likely that the application would come to Gucci's attention.

67.     The history of the application in the PTO is also somewhat suspect.  Originally, the Examiner rejected the application based on the finding that the Quattro G Pattern was merely ornamental.[100]  Months later, Guess argued that the pattern was either inherently distinctive, or that it had acquired distinctiveness through secondary meaning.  The Examiner rejected this argument and noted that the pattern as described "does not appear on any of applicant's evidence."[101]  Three weeks later, however, the Examiner reversed himself and accepted the mark for registration.[102]  At trial, Krugman said that he was told by Guess's counsel the day before his testimony that this reversal was a result of a phone call to the Examiner by Guess's counsel.[103]

68.     Based on all of the foregoing and the other evidence in the

---

[99]     *See* 4/16/12 Trial Tr. at 2638:23-2641:19 (Krugman).

[100]    *See* DX328.

[101]    DX331 at 3.

[102]    *See* DX333.

[103]    *See* 4/16/12 Trial Tr. at 2668:1-22 (Krugman).

record, I find that Guess described the Quattro G Pattern as a square in order to avoid having the Repeating GG Pattern cited against its application, and in order to prevent Gucci from taking notice of the application when it was published for opposition.

69.     Guess first provided the Quattro G Pattern fabric to Signal in 2004. According to Suesan Faulkner, Creative Director at Signal, the corner Gs all faced in the same direction and were then noticeably smaller than those in the standalone Quattro G.[104]  However, when the pattern was first used in the Spring of 2005 in the "Quatro [sic] G" collection, it was already altered so that every other row of Gs was inverted and turned backwards.[105]  After Lori Becker of MFF complained to Guess's licensing department in early 2005 that she had received both versions of the pattern, she was told to use the modified version, and that the change was made for technical and aesthetic reasons.[106]

70.     As can be seen in the "Quatro G" handbag group from 2005, the Quattro G Pattern did not originally feature a two-tone weave or use shading inside the G's. In order to achieve a two-tone woven canvas look and a brown-

---

[104]     *See* Faulkner Decl. ¶ 27.

[105]     *See* DX90.

[106]     *See* PX454.  *See also* 3/12/12 Declaration of Katherine Ringwood ("Ringwood Decl."), Design Director at MFF,  ¶ 17.

beige color scheme, Becker sent clippings of Gucci fabrics to Claser, its Italian fabric agent, in April 2006.[107]  When she received "as Gucci" fabrics back from Claser in May 2006, all of the Gs were shaded in.[108]

71.    Ringwood, who spearheaded the effort to create the two-tone weave,[109] and who prepared dozens of detailed specifications for women's shoes using the Quattro G Pattern, testified that she never noticed the shading in the Gs until the legal proceedings began.[110]  Likewise, Marc Fisher, who has ultimate responsible for the design of women's shoes at his namesake company, testified that he never focused on the shading.[111]  The testimony of these witnesses on this subject is not credible.

72.    After MFF began using the Quattro G Pattern with shading in the Gs, Stephane Labelle of Guess Europe instructed Faulkner to use the same fabric in order to co-ordinate with MFF.[112]  Faulkner then used the fabric in several

---

[107]    *See* PX459.

[108]    *See* PX461.

[109]    *See* Ringwood Decl. ¶ 19.

[110]    *See* 4/17/12 Trial Tr. at 2878:2-11 (Ringwood).

[111]    *See* 4/10/12 Trial Tr. at 1767:21-1768:19 (Fisher).

[112]    *See* 4/2/12 Trial Tr. at 714:11-25 (Faulkner).

handbag groups.[113]

73.     The Quattro G Pattern on a two-tone brown/beige canvas with shading in the Gs was so successful that Guess's licensing department arranged for Guess's wallet and belt licensees to begin using the fabric.[114]  Ultimately, the Quattro G Pattern – with and without shading – was a hit, and Guess used it across various styles of handbags and shoes for several seasons.[115]

74.     The evidence also shows that Guess and its licensees attempted to replicate other features of the Gucci fabric.  For example, in September 2006, Ringwood asked Claser to replicate a Gucci embossing technique, and Joy Kramer of Guess's licensing department asked for a swatch of the resulting fabric to share with the licensees.[116]  E-mail records show that Signal was attempting to copy the Gucci brown/beige color scheme, of which Jason Rimokh – CEO of Signal –

---

[113]     *See* DX1534.

[114]     *See* PX258 and PX340.

[115]     *See* 4/2/12 Trial Tr. at 678:7-10 (Faulkner); 4/12/12 Trial Tr. at 2033:17-2034:16 (Kramer); 4/13/12 Trial Tr. at 2546:1-2547:20 (Rimokh); 4/17/12 Trial Tr. at 2845:9-12 (Ringwood).

[116]     *See* PX555 and PX219.  The evidence also shows that a fabric supplier was working on an embossed fabric for Signal that was based on a Gucci embossing in 2007.  *See* PX546.  Faulkner also sent that supplier an embossed Gucci fabric for use in developing an embossed Quattro G Pattern in 2008.  *See* PX557.  Finally, MFF referenced Gucci embossings when developing fabric for shoes using the Quattro G Pattern.  *See* PX472.

testified that he was enamored.[117]  MFF tried to replicate other Gucci colors on

several occasions in 2008,[118] while both Signal and MFF attempted to mimic

coatings used on Gucci fabrics.[119]

      75.   On several occasions, individuals associated with Guess and its

licensees noted that the Quattro G Pattern looked similar to Gucci.  For example,

Kramer of Guess's licensing department stated in a June 2006 e-mail noted that a

Guess shoe with the Quattro G Pattern with shading "looks so similar to Gucci but

it is nice. . . ."[120]  Richard Danderline, the former CFO of MFF, wrote to another

MFF executive in June 2008 that "the 'quattro G' pattern is pretty close to the

Gucci pattern."[121]  He also forwarded the design to outside counsel for review, but

MFF asserted attorney-client privilege over the response.  At his deposition,

Danderline admitted that the Quattro G Pattern and the Repeating GG Pattern were

similar from "a layman's perspective."[122]

---

[117]   *See* PX213, PX566, and PX567; 9/16/10 Deposition of Jason Rimokh at 221:2-12.

[118]   *See* PX400, PX468.

[119]   *See* PX586, PX460, PX399.

[120]   PX561.

[121]   PX512.

[122]   9/23/10 Deposition of Richard Danderline, former CFO at MFF, at 130:15-132:2.

76.    On the basis of the foregoing and other evidence in the record, I find that Guess intended to copy the upscale look of the Repeating GG Pattern and the Diamond Motif Trade Dress.  This was intended to make the customer happy by giving him or her  "the feeling of having something 'designer-ish' without it being the actual one, just similar."[123]

### 3.    Guess's Use of a Square G

77.    Guess first sold products bearing the Square G in 1996.  Based on the design-to-market time line, this means that it developed the Square G at some point during 1995.[124]  Additionally, the evidence shows that Guess has used square-shaped Gs in its name since the 1980s.[125]  Nothing in the record shows that Guess ever referenced Gucci in developing this mark.

78.    Guess sold more than 4.2 million units of products bearing allegedly-infringing variants of the Square G.[126]  Between 1999 and 2001 alone,

---

[123]    PX202 (4/27/6 e-mail from David Stamberg, former Vice President of Guess Men's Footwear at MFF, to Vando and Fisher).

[124]    *See* Marciano Decl. ¶ 47; 4/4/12 Trial Tr. at 1070:17-1071:1 (Marciano).  Guess witnesses also testified that they recalled the Square G being used before then, but admitted that they had no evidence other than their recollection.  *See* Alexander Decl. ¶ 21, 4/9/12 Trial Tr. at 1482:11-22 (Rimokh).

[125]    *See* DX520 at 48, 57; DX251 at 42, 65.

[126]    *See* DX181 through DX183; DX888; DX1445; MF-500. Additionally, Guess sold nearly 1.2 million units of such products between 2000

the mark appeared on approximately fifty handbag style groups offered for sale. According to Guess witnesses, this means that handbags with Square G designs would have been available in nearly every one of Guess's 1400 then-existing distribution points in the United States.[127]

79.     Gucci asserts that a wide variety of square- or rectangle-shaped Gs used by Defendants infringe on the registered Stylized G.  After exhaustively reviewing the photos and exemplars of accused products submitted post-trial, I find that only three Guess-branded products bear a Square G that is substantially identical in shape, such that they will convey the same overall commercial impression as the Stylized G:  the belt with SKU number 913019,[128] the Misty shoe,[129] and the Scraps shoe.[130]  While the Square Gs on the shoes have the word "Guess" on them, I find that a casual observer in a typical post-sale setting is not likely to notice such markings.

80.     The remainder of the Square Gs do not convey the same overall

---

and 2003.  *See id.*

[127]     *See* Alexander Decl. ¶¶ 22-25; DX239 through DX241.

[128]     This belt has no exhibit number, but is found on a page with the Bates Number MAXCIP00000014.

[129]     GSE00094245.

[130]     GSE00094254.

commercial impression as the Stylized G for at least two reasons. *First*, the majority of them are not the same shape as the Stylized G, either because they are elongated, have non-uniform vertical and horizontal line widths, or have a tab extending downward from the top horizontal line. *Second*, a large perecentage of the Square Gs have rhinestones and other adornments not present on the Stylized G.

81.    Based on the forgoing and other evidence in the record, I find that Guess did not act in bad faith in the development or sale of products bearing any Square G design. I also find that those Square G's that are substantially identical in overall appearance to the Stylized G were not intentionally copied from Gucci, but merely happened to use the same minimally-stylized shape as found in the Stylized G.

### 4.    Guess's Use of the Script Guess Mark

82.    It is undisputed that Guess has announced its brand name in a script-font on products since the early 1980s. It is also undisputed that Guess has used a "loop" in the letter "G" at the beginning of the Guess name and/or an underline under the Guess name since the same time.[131] Gucci concedes that the complained-of Script Guess mark, depicted below, is the only allegedly infringing

---

[131]    For examples of such products see McManus Decl. ¶ 49.

mark, and that it was not used until 2008.  Gucci admits that without the "iconic underlining," the Script Guess would not infringe its trademark Script Gucci.[132]



Allegedly Infringing
Script Guess (2008)

83.    Faulkner testified that she developed the Script Guess logo by referencing previous script-font Guess logos, as well as 1950s era collegiate-style fonts on various products from other brands.[133]  I find this testimony credible.

84.    Gucci charges that Marciano's purchase of the book "Gucci by Gucci" in 2006 contradicts Ms. Faulkner and shows that the Script Guess was copied from the Script Gucci.  Marciano, however, testified that he never showed Faulkner the book, or directed anyone to use it as a source of design inspiration.[134]  This testimony is also credible.

85.    Furthermore, after careful consideration of the two marks, by themselves and on products, on physical specimens and in representative

---

[132]    3/30/12 Trial Tr. at 575:17-576:1 (Novak).

[133]    *See* Faulkner Decl. ¶¶ 39, 40; 4/2/12 Trial Tr. at 745:11-748:15 (Faulkner).

[134]    *See* 4/5/12 Trial Tr. at 1201:6-19 (Marciano).

photographs, from various distances and different angles, I find that the two marks are decidedly dissimilar, and that they do not create the same overall commercial impression. Rather, I find that the complained-of Script Guess creates the same overall commercial impression as the non-infringing script-font "Guess" logos that Guess has used for the past three decades.

86.    Viewing all the evidence, I find that Guess did not copy Script Gucci – intentionally or otherwise – and that Guess did not intend to deceive consumers as to the source of products bearing the Script Guess. I also note that Gucci introduced no evidence of confusion, either via survey or in any other way.

### F.    Gucci's Knowledge of Guess's Use of the Allegedly Infringing Marks

87.    Guess introduced overwhelming evidence of its open, pervasive, and continuous promotion, sale, and advertising of its branded products, including millions of products bearing one or more of the marks at issue in this case. Indeed, from 2003 to 2010, Guess sold nearly seven million units of accused products, for an average of nearly one million accused products per year.[135]

88.    Many of Guess's stores are located near Gucci stores; in some

---

[135]    *See* DX852; DX869; DX888; MF500.

instances, they are even in the same mall.[136]  Guess prominently displayed its products – including allegedly infringing products – at these stores.[137]  Allegedly infringing products were also openly for sale through Guess's website, and the websites of third-party retailers.[138]

89.    Gucci and Guess both have large advertising budgets, and the evidence shows that they often advertise in the same magazines.  At trial, Christine Iacuzzo – Gucci's Director of Advertising – admitted that Gucci specifically monitored where Guess placed advertisements, and that some of those advertisements featured the designs at issue in this case.[139]  For example, Gucci and Guess both ran advertisements in Elle in August 2005, in Interview in December 2005/January 2006, and Allure in April 2007.[140]  Daniella Vitale – Gucci's former

---

[136]    *See* 3/30/12 Trial Tr. at 458:20-460:25 (Vitale); 4/5/12 Trial Tr. at 1248:6-1249:6 (Marciano).

[137]    *See* DX234.

[138]    *See* DX472; DX524.

[139]    *See* 3/28/12 Trial Tr. at 170:3-9, 172: 17-21 (Iacuzzo).  *See also* PX117.

[140]    *See* 3/30/12 Trial Tr. at 466:1-471:20 (Vitale).  Guess also had a large billboard featuring a product with the accused Quattro G Pattern in the Piazza della Republica in Florence, Italy in 2005, within walking distance of two Gucci stores.  *See* 4/5/12 Trial Tr. 1243:8-1245:22 (Marciano).  Vitale testified that she stayed at a hotel in the same plaza during that time, but did not specifically recall seeing the billboard.  *See* 3/30/12 Trial Tr. at 483:5-487:2 (Vitale).

CEO – also testified to a similar effect.[141]  Nonetheless, Vitale insisted that she was

unaware of any issue regarding the Guess products at issue in this case until

2008.[142]  This testimony is not credible.

        90.    When pressed at trial, Vitale could not offer any explanation as

to why not a single Gucci employee had ever notified any Gucci executive or

attorney with concerns about the allegedly infringing Guess products.[143]  Jonathan

Moss – former Legal Counsel for Gucci – similarly testified that he did not recall

knowing anything about Guess's use of the allegedly infringing marks until 2006,

although he has a remarkably clear memory of the events surrounding Guess's use

of the word "twirl" to describe a watch.  He also testified that he was not aware of

"any conduct on Guess's part that [he] deemed worthy of a response by Gucci

America."[144]  His testimony on these matters is not credible.

        91.    Moss and Vitale both testified that their concerns about Guess

did not begin until they visited a mall in Paramus, New Jersey, where they were

considering opening a Gucci store. While at the mall, they went into a Guess store,

---

[141]    *See* 3/29/12 Trial Tr. at 466:2-9 (Vitale).

[142]    *See* 3/30/12 Trial Tr. at 464:1-11, 473:16-21, 494:9-23 (Vitale).

[143]    *See* 4/2/12 Trial Tr. at 492:18-494:23 (Vitale).

[144]    Moss Decl. ¶¶ 12-16.  *See also* 4/3/12 Trial Tr. at 828:20-829:3; 885:17-19 (Moss).

where they claimed to have seen five hundred SKUs of alleged Gucci knock-offs. Nevertheless, Gucci elected not to send a cease and desist letter to Guess and waited fourteen months before filing this lawsuit.[145]

92.    When asked at trial why Gucci allowed Guess to sell so many products Gucci claimed were harming its brand, Moss responded that the reason was "budgetary,"[146] and that the majority of Gucci's legal budget was taken up by combating counterfeiters.[147]  This was corroborated by Milton Springut (outside IP counsel for Gucci from 1984 to 2007), who testified that he never provided legal advice concerning possible infringement by Guess because such issues never arose, despite employing a team of investigators nationwide, including in cities where Guess had stores.[148]

93.    Gucci's behavior with respect to Guess is not consistent with its conduct towards other brands.  Over the years, Gucci has sent out hundreds of cease and desists letters to entities ranging from national companies such as Bebe,

---

[145]    *See* Moss Decl. ¶ 13; Vitale Decl. ¶¶ 5-12.

[146]    4/3/12 Trial Tr. at 934:4-14 (Moss).

[147]    *See* 3/12/12 Declaration of Jonathan Moss ("Moss Decl."), former Legal Counsel for Gucci, ¶ 12.  *See also* 3/9/12 Declaration of Jessica Murray, former trademark paralegal for Gucci,¶ 1; 3/30/12 Trial Tr. 563:9-11 (Murray).

[148]    *See* DX1132; 4/16/12 Trial Tr. at 2521:3-2522:19 (Springut).

Juicy Couture, and Williams-Sonoma, all the way to small-time infringers, such as a counterfeiter working out of her Los Angeles apartment and a rabbi in New York, who they suspected might sell counterfeit Gucci products to benefit his synagogue.[149]

94.    In addition to the incident involving the Guess "twirl" watch noted above, the evidence also shows that Moss discussed products that Gucci has put at issue in this case in 2006[150] and 2007.[151]  Despite his clear memory of the "twirl" incident, Moss testified that he could not recall these e-mails or the surrounding circumstances at trial.[152]  This testimony is not credible.

95.    In light of the foregoing, and all the other evidence admitted at trial, I find that Gucci knew or should have known about Guess's use of the Quattro G Pattern by 2006 at the very latest.  It should have known about Guess's use of the Square G before 2000.  While the particular complained-of Script Guess

---

[149]    *See* PX136.

[150]    *See* DX1151 at 2 (privilege log entry indicating e-mail from then-outside Gucci counsel Louis Ederer to Jonathan Moss (Guess Counsel) discussing a product at issue in this case).

[151]    *See* DX215 at 21-26 (privilege log entries indicating several e-mails exchanged between Jonathan Moss and Vanni Volpi, in-house counsel for Gucci Group N.V., regarding several products at issue).

[152]    *See* 4/3/12 Trial Tr. at 850:10-17, 851:8-22, 863:5-18, 909:17-910:3 (Moss).

mark was not used until 2008, Gucci should have been aware of highly similar Script Guess marks in the 1990s, if not the 1980s.

96.    As a result of Gucci's delay in bringing suit or otherwise contacting Guess about its infringement concerns, I find that Guess has suffered evidentiary prejudice in the following ways:

1)    It has no sales records before 2004, either for its own sales or for Gucci's.

2)    It has lost evidence to corroborate the earliest uses of the Square G recalled by its witnesses.

3)    It has lost details about the early development of the Quattro G Pattern.

4)    It has been unable to interview witnesses due to their death or departure from the companies.

97.    However, I find that Guess will not be prejudiced if it is prevented from using any of the allegedly infringing marks.  It has already begun using the Quattro G Pattern without G's in the corners – about which Gucci does not complain – without any ill effect.[153]  As noted above, it has also ceased using the GRG Stripe.  Furthermore, Faulkner testified that if she were forced to stop

---

[153]    *See* 4/12/12 Trial Tr. at 2037:15-21 (Kramer).

using the Square G, any harm would be minimal since she would have many other G designs to choose from.[154]  Additionally, the data show that the accused products make up roughly one percent of Guess's overall business, and no more than eight percent of the business of any given licensee.[155]

### G.    Expert Testimony

98.    Plaintiff and Defendants both called expert witnesses on various topics.  Guess called Gabrielle Goldaper to testify about the design process in the fashion industry, while MFF called Bonnie Smith on the design processes specific to footwear.  On confusion, Gucci called George Mantis as a survey expert, while Guess called Dr. Shari Diamond[156] and Dr. Carol Scott.  On dilution, Gucci called Dr. Michael Mazis as a survey expert to explain association, and Dr. Michel Pham to discuss blurring and tarnishment, while Guess called Professor Mark McKenna to rebut Dr. Pham.  Finally, Gucci called Basil Imburgia as a damages expert, while Guess called Dr. Alan Goedde and MFF called Ronald Vollmar.  Although some of these experts have been mentioned above, I make specific findings as to each group in detail below.

---

[154]    *See* 4/2/12 Trial Tr. at 801:2-11 (Faulkner).

[155]    *See* 4/13/12 Trial Tr. at 2325:18-2328:12, 2329:6-17 (Goedde).

[156]    Dr. Diamond also gave testimony regarding Dr. Mazis's association survey.

### 1.    Design Process Experts

99.    Smith and Goldaper testified that copying the designs of other companies is accepted practice in the fashion world.[157]  Both also testified as to the importance of following trends.[158]  While the law allows emulation of successful product features in order to spur competition and benefit consumers, it prohibits emulation from crossing over into copying that causes consumer confusion. Accordingly, Goldaper and Smith, if anything, add support to the finding that I have already made above, namely, that Guess and its licensees crossed the line and intentionally copied certain Gucci designs. However, the fact that Guess and its licensees acted according to accepted industry practices does not mean that they acted in good faith, or that their actions are permissible under New York or Federal trademark laws.

### 2.    Confusion Experts[159]

100.    In support of its trade dress infringement claim, Gucci

---

[157]    *See* Expert Report of Gabrielle Goldaper ("Goldaper Rep.") ¶ 98; 4/12/12 Trial Tr. at 2207:5-10 (Smith).

[158]    *See* 4/12/12 Trial Tr. at 2229:21-2230:22 (Smith); 4/12/12 Trial Tr. at 2203:4-25 (Goldaper).

[159]    Because Guess's confusion experts are offered largely to rebut or re-contextualize Mantis's findings, discussion of the reports of those experts will be interspersed with the discussion of the Mantis survey.

submitted the Mantis survey, which tested a Guess men's cross-body bag using the Quattro G Pattern executed in a brown/beige colorway. The survey claims to find a net confusion level of 15.6%.

101.    The Court originally excluded this survey due to a variety of flaws, but then admitted it upon reconsideration on the narrow issue "of post-sale consumer confusion allegedly caused by Guess Quattro G bags in those post-sale situations where the casual observer will not see" Guess ornamentation.[160]  Based on the observational study by Guess's expert Dr. Carol Scott, I find that thirty-seven percent of women, at most, carry handbags on which no source-identifying ornamentation can be seen in the post-sale context, either because it does not exist or is obscured by the way in which the handbag is held.  Combining Mantis's survey with Scott's study, I find that the maximum level of confusion amongst casual observers in the post-sale setting is 5.8 percent.[161]

102.    In addition to the flaws identified in the *Daubert* opinion,

---

[160]    Docket No. 186 at 9.

[161]    Gucci vigorously cross-examined Scott on her observational study at trial, drawing out criticisms of her definition of "ornamentation" and the fact that her study did not address whether outward-facing ornamentation might be obscured based on the way a woman carries her bag.  *See* 4/12/12 Trial Tr. at 2110:7-2111:3, 2119:24-2120:12, 2121:17-2124:9 (Scott). Even if I were to fully credit these concerns and find the observational study unreliable – which I do not – the Mantis Survey would still be entitled to reduced weight for the reasons explained in this section.

testimony at trial revealed several other reasons to give reduced weight to the conclusions in the Mantis survey.  *First*, he tested a cross-body bag, even though cross-body bags represented a maximum of three percent of bags sold during the period for which Gucci claims damages.[162]  *Second*, the results of his survey cannot be extrapolated to bags in other colorways,[163] which account for more than seventy-five percent of Guess-branded bags bearing the Quattro G Pattern.[164]  *Third*, it is unreasonable to apply Mantis's findings to those bags that feature the "slightly garish kind of hardware" and loud coloration that are key features of the Guess brand.[165]

103.   Based on the foregoing, I find that the Mantis Survey –  when viewed in light of the Scott observational study and the testimony of all the confusion experts at trial – is not entitled to significant weight, and therefore provides only weak evidence in support of Gucci's trade dress claims.  I also find that it provides no evidence to support Gucci's confusion claims based on the

---

[162]     *See* 4/11/12 Trial Tr. at 1931:7-1931:14 (Alexander).

[163]     *See* 4/10/12 Trial Tr. at 1743:1-1746:2 (Diamond).

[164]     *See* Alexander Decl. ¶¶ 33-37.

[165]     4/10/12 Trial Tr. at 1738:23-1739:16 (Diamond).  Indeed, Mantis testified that his survey did not provide any information about the vast majority of handbags that bore this kind of hardware.  *See* 3/29/12 Trial Tr. at 294:11-23 (Mantis).

Repeating GG Pattern rendered in alternative colorways.

### 3.    Dilution Experts

104.    In support of its dilution claim, Gucci submitted a survey by Dr. Mazis that claims to show a twelve percent level of a likelihood of association between Guess's Quattro G Pattern on a beige background and Gucci.  At trial, Dr. Diamond criticized the Mazis Survey for asking what "products or brands" came to mind, instead of merely "what came to mind."  According to Dr. Diamond, this led consumers to mention brands and products, instead of giving "top of mind" responses.[166]

105.    Dr. Mazis was also criticized for not using multiple controls to parse out the various elements of the trade dress.[167]  At trial, Dr. Mazis explained that he did not use multiple controls because he was testing the effect of a combination of elements, rather than each element discretely.[168]  I find this testimony credible.  While multiple controls may have been helpful in further parsing the results Dr. Mazis found, his failure to use them does not affect the validity of his results.

---

[166]    4/10/12 Trial Tr. at 1730:5-25 (Diamond).

[167]    *See* 6/27/11 Diamond Decl. ¶ 20(e).

[168]    *See* 3/29/12 Trial Tr. 217:16-218:2, 222:12-225:13 (Mazis).

106.    Based on the forgoing, I find that Dr. Mazis's survey – while somewhat flawed because it used questions that primed respondents to answer with brands and products – provides valid, relevant evidence as to the likelihood that consumers will associate the Quattro G Pattern with Gucci when rendered in a brown/beige colorway.

107.    Dr. Pham testified as to the potential blurring or tarnishment that Guess's use of the accused marks would cause to Gucci.  He did so on a brand-wide basis instead of doing a mark-by-mark analysis.[169]

108.    Dr. Pham's analysis is based solely on general propositions derived from marketing research literature, rather than specific studies of consumer attitudes regarding the Gucci marks and Diamond Motif Trade Dress.  Dr. Pham's opinions do not rely on any real-world evidence of any purported blurring or tarnishment of the Gucci marks or the Gucci brand.  Accordingly, although he is well-qualified, and although his testimony was forthright and credible, I find that Dr. Pham's testimony – even if fully credited – insufficient to establish that the Gucci marks have experienced or are likely to experience any blurring or tarnishment.[170]

---

[169]    *See* 3/30/12 Trial Tr. at 419:12-23 (Pham).

[170]    Because I find that Dr. Pham's opinions and testimony are insufficient to establish a likelihood of tarnishment or blurring, I need not discuss the report of

### 4.      Damages Experts – Profits from Accused SKUs

109.   All three damages experts agree that profits are properly determined by deducting costs incurred and attributable to the design, manufacture, and sale of the accused products.[171]  The experts disagree, however, about which costs have a nexus sufficient to justify such deductions from profits.

### a.      Profits for All Defendants Except MFF

110.   Based on information obtained from Defendants, Imburgia determined that Defendants sold over $204 million worth of products bearing the accused designs, resulting in profits of approximately eighty million dollars.  He reached this profit figure by deducting costs that he could determine had a close nexus to the design, manufacture, and sale of the products using the data available to him.[172]

_____

Professor McKenna, who was retained solely to rebut Dr. Pham.  *See* Expert Report of Professor Mark McKenna, ¶ 6.

　　　　Gucci also presented customer comments from the Macys.com website relating to the Melrose 2 sneaker that may serve as evidence of actual dilution by blurring.  *See* PX184. The significance of this evidence is discussed in the Conclusions of Law below.

[171]      *See* Expert Report of Ronald Vollmar ("Vollmar Report") at 3; Expert Report of Basil Imburgia Report ("Imburgia Report") at 14; Expert Report of Dr. Alan Goedde ("Goedde Report") ¶ 23.

[172]      *See* Imburgia Report at 15-24.  When sales and profits from MFF are removed, these figures drop by approximately $23.5 million and $5 million, respectively.  *See* Ex. A to 4/27/12 Imburgia Decl.

111.    Dr. Goedde also did a profits calculation for Defendants. However, his nexus analysis was cursory, and not explained in a satisfactory manner.[173]  I find that Dr. Goedde did no real nexus analysis, but simply decided to deduct all company costs, which he admitted to doing on several occasions.[174] Accordingly, I find that Dr. Goedde's opinions are not reliable evidence of what costs ought to be deducted from Defendants' revenue figures.[175]

112.    The only other evidence in the record regarding potential deductions to be taken against Defendants' sales of accused products comes from percipient witnesses.  On behalf of Max Leather/Cipriani, Steve Kahn admitted that he took the same approach as Dr. Goedde – namely, deducting every single business expense incurred.[176]  Also, like Dr. Goedde, he then allocated these costs to the accused SKUs based on the percentage of overall sales represented by those

---

[173]    Goedde explained at trial that he reached his nexus conclusion by "interviewing the people."  4/13/12 Trial Tr. at 2345:24-25 (Goedde).

[174]    *See*, *e.g.*, 4/13/12 Trial Tr. at 2342:19-25, 2345:14-25 (Goedde).

[175]    Goedde's credibility was further harmed by his dubious, unscientific "attribution analysis," through which he claimed that the accused Guess designs added no value beyond their ability to identify the accused products as coming from Guess.  *See* Goedde Decl. ¶¶ 34, 35.  Defendants eventually withdrew this portion of Goedde's report.  *See* 4/17/12 Trial Tr. at 2710:23-2711:9 (Petrocelli).

[176]    *See* 4/13/12 Trial Tr. at 2247:12-19 (Kahn).

50

SKUs.[177]

113.    On behalf of Swank, Inc., Jerold Kassner also testified that his approach was similar to that of Mr. Kahn and Dr. Goedde.  While he deducted merchandise costs and royalty payments on an SKU-specific basis, he deducted all other general business expenses on an allocation basis.[178]  Russell Bowers, on behalf of Guess, testified that he did the same thing.[179]

114.    For the same reason that Dr. Goedde's nexus analysis is unreliable, the calculations of Kahn, Kassner, and Bowers are as well.  However, Imburgia agreed with Bowers's nexus analysis as it related to "store occupancy" costs.[180]

115.    After deducting "store occupancy" costs from Imburgia's analysis, I find that Guess sold $79,822,325 of accused products, and earned a net profit of $41,978,543; it also received a total of $10,807,966 from all of its  non-footwear licensees combined.  Swank sold $193,894 for a profit of $66,459.  Max Leather/Cipriani sold $4,016,682 for a profit of $1,361,904, while Signal sold

---

[177]    *See id.* at 2263:1-21, 2276:15-20.

[178]    *See* 4/13/12 Trial Tr. at 2303:13-2404:12 (Kassner).

[179]    *See* 4/12/12 Trial Tr. at 2128:14-22 (Bowers).

[180]    *See* 4/4/12 Tr. 1001:13-1002:4 (Imburgia).

$94,787,324 for a profit of $22,431,158.

116.    However, for the reasons discussed in the Conclusions of Law below, I find that Gucci is not entitled to profits from every allegedly infringing SKU.  Instead, I find that it is entitled to profits only to those SKUs listed in Appendix A to this opinion.  Using the figures Imburgia provided on June 13, 2012 at my request, I find that: (1) Signal sold $7,956,486 of infringing products, resulting in a net profit of $1,834,503; (2) Max Leather/Cipriani sold $71,558 of infringing products, resulting in a net profit of $24,701; and (3) Swank sold $56,396 of infringing products, resulting in a net profit of $18,791.  I also find that Guess's non-footwear licensees paid it $805,886 in royalties on sales of infringing products.  Further, based on figures Guess provided on June 13, 2012 at my request, I find that Guess realized a profit of $202,598 on its retail sales of infringing belts, wallets and footwear.

117.    Because Guess did not maintain records of retail sales of handbags broken down by color, its profits from retail sales of infringing handbags cannot be calculated with precision.  However, as discussed in the Conclusions of Law below, this number may be approximated by: (1) examining images of products offered for sale on Guess's retail website over time; (2) determining how many of the SKUs listed in Appendix A were sold on Guess's website; (3)

computing the ratio of Signal's sales of the product in each infringing color to Signal's overall sales of the product; and (4) applying that ratio to Guess's retail sales.[181]  I have examined images of products offered for sale on Guess's retail website and determined that fifty-three (53) of the handbags listed in Appendix A were sold on Guess's website.  Based on the method of calculation I just described, I calculate Guess's retail profits from sales of those fifty-three handbags to be $1,018,591.

### b.    Profits for MFF

118.   Vollmar agreed with all of the deductions that Imburgia made. However, because he had more information than Imburgia, he was able to determine that several categories of costs that Imburgia did not deduct in fact met Imburgia's criteria for deduction.  Accordingly, he deducted several more categories that he was able to determine had a close nexus to the design,

---

[181]    For example, Guess sold $152,799 of SKU SI018431 in all colors between 2005 and 2009. 32.632% of Signal's sales of the handbag with SKU SI018431 were in the color Moose.  I multiplied Guess's total sales of SKU SI018431 by 32.632% and approximated that Guess sold $49,861 of SKU SI018431 in the color Moose.  I then applied Imburgia's profit rate for Guess's retail sales of Signal products to calculate Guess's profits from retail sales of SKU SI018431 in Moose.  *See* 6/13/12 Letter from Daniel M. Petrocelli, counsel for defendants Guess, Signal Products, Max Leather/Cipriani, and Swank, to the Court ("6/13/12 Guess Letter"), Ex. A at 15, 19-21.

manufacture, and sale of accused shoes.[182]

119. Gucci argues that Vollmar's calculations, while methodologically sound, should be disregarded because he relied on preliminary data rather than actual MFF financial documents.[183] However, Vollmar testified at trial that he has since reviewed those documents, and that his analysis remains unchanged with one exception – he no longer believes "deferred key money" has a sufficient nexus to the design, manufacture, and sale of accused MFF shoes, and therefore no longer deducts it.[184] With this correction made, Vollmar's figures show that MFF's profits from the accused SKUs was $3,250,255 for the period 2005 through 2010 on sales of $23,523,619.[185] Imburgia's profit figure is $4,988,903.[186] Based on the final list of SKUs at issue – after accounting for those dismissed at trial and those dismissed by agreement between the parities – Imburgia's final revised profit total is $3,272,152.[187] Vollmar's final revised figure

---

[182]    See 4/17/12 Trial Tr. at 2888:6-16 (Vollmar).

[183]    See Gucci PFF ¶ 378.

[184]    See 4/17/12 Trial Tr. at 2884:15-2885:4 (Vollmar).

[185]    See Schedule 1, Vollmar Decl., at 3. MFF did not produce Guess shoes until 2005.

[186]    See Imburgia Decl. at 20.

[187]    See Revised Summary of Total Accused Profits, Ex. A to 4/17/12 Imburgia Decl., at 1.

– based on the SKU-by-SKU data he submitted at my request on May 9, 2012 – is $2,056,020 on sales of $14,584,747.[188]

120.    As with Guess and the other licensees, however, I find that Gucci is not entitled to MFF's profits for every SKU it put in issue.  Instead, only those listed in Appendix B to this opinion are infringing, for the reasons explained in the Conclusions of Law below.  Using the figures Vollmar provided on June 13, 2012 at my request, I find that MFF sold $3,603,220 of infringing products bearing the Quattro G Pattern, of which it paid a royalty of $252,225 to Guess and retained a profit of $427,834.  I find that MFF sold $241,042 of infringing products bearing only the GRG Stripe, of which it paid a royalty of $16,873 to Guess and retained a profit of $28,349.

## C.    Damages Experts – Reasonable Royalty as Actual Damages

121.    Imburgia proposed a hypothetical royalty as a measure of Gucci's actual damages in lieu of making any showing of lost sales or profits. Imburgia admitted that any such royalty should be "economically reasonable" to both the licensor and the licensee.[189]

122.    Matteo Mascazinni, Gucci's Chief Operation Officer, stated that

---

[188]    These figures do not include 2010.

[189]    4/3/12 Trial Tr. at 940:12-16 (Imburgia).

a royalty agreement would "never be advantageous" to Gucci.[190]  To the extent that the hypothetical royalty is based on Gucci producing a lower-priced "diffusion" line – for example, "Gucci Designs by Guess" – the evidence shows that Gucci would never do so.[191]  Guess's current licensees testified that it would not make economic sense for them either.[192]

123.   In addition to the parties's admitted unwillingness to enter into this hypothetical royalty agreement, the speculative nature of Imburgia's analysis is further evinced by two more facts.  *First*, Imburgia assumed, without factual support, that Guess's current licensees would to sell the exact same products at a premium, even if they only licensed the Gucci design marks and not the Gucci name.[193]  *Second*, he did not take into account the possibility that Guess's current licensees could easily avoid paying the royalty by making minor changes to their designs, such as eliminating the underline on the Script Guess or removing the Gs from the corners of the Quattro G Pattern.[194]

---

[190]    3/28/12 Trial Tr. at 119:5-18 (Mascazinni).

[191]    *See* Vitale Decl. ¶ 2.

[192]    *See* 4/13/12 Trial Tr. at 2293:4-21 (Kahn); 4/17/12 Trial Tr. at 2790:10-2791:2 (Parsley).

[193]    *See* 4/3/12 Trial Tr. at 949:14-19 (Imburgia); 4/4/12 Trial Tr. at 1012:10-1013:19, 1025:1-22 (Imburgia).

[194]    *See* 4/3/12 Trial Tr. at 967:8-19, 968:22-970:11 (Imburgia).

124.   In view of the foregoing and all the other evidence in the record, I find that Imburgia's hypothetical royalty analysis is highly speculative, and entitled to no weight.

## III.   APPLICABLE LAW[195]

1.   Gucci seeks injunctive relief and damages for Defendants' alleged acts of trademark infringement, trademark counterfeiting, trade dress infringement, false designation of origin, trademark dilution and unfair competition, in violation of the Lanham Act and New York law. Gucci further seeks cancellation of Guess's Quattro G trademark registration (U.S. Trademark Reg. No. 3,308,152) due to abandonment.

2.   Guess asserts various affirmative defenses, as well as a counterclaim for cancellation of Gucci's Trademark Registration for the Stylized G.

### A.   Trademark Infringement

3.   Gucci's infringement claims relate to its registered Repeating

---

[195]   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), as some of the claims arise under federal law, and pursuant to 28 U.S.C. § 1367, under the principles of pendent jurisdiction for the claims arising under the laws of the State of New York.  This Court has jurisdiction over Defendants by virtue of the fact that their conduct has caused harm in the Southern District of New York, where Gucci's business is located.  *See*, *e.g.*, *Savage Universal Corp. v. Grazier Constr., Inc.*, No. 04 Civ. 1089, 2004 WL 1824102, at * 7-8 (S.D.N.Y. Aug. 13, 2004).

GG Pattern, GRG Stripe, Script Gucci, and Stylized G trademarks (the "Registered Gucci Trademarks") and its unregistered Diamond Motif Trade Dress.

4.    Trademark infringement claims are "analyzed under [a] familiar two-prong test . . . ."[196] This test "looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods."[197] The latter inquiry "turns on whether 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in

---

[196]    *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)). *Accord Starbucks Corp. v. Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton II*"), 454 F.3d 108, 115 (2d Cir. 2006).

[197]    *Virgin Enters.*, 335 F.3d at 146. *Accord Starbucks Corp.*, 588 F.3d at 114 ("To prevail on a trademark infringement and unfair competition claim under [section 32(1) or section 43(a) of the Act], in addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods."); *Vuitton II*, 454 F.3d at 115.

If a mark is not registered, it must be able to identify goods as coming from the user of the mark, either by acquiring secondary meaning or through inherent distinctiveness. *See Star Indus. Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 382 (2d Cir. 2005). Common shapes and basic letters are not inherently distinctive unless they are stylized. Even then, however, they are only entitled to "thin" protection of the exact stylization, so as to prevent a single entity from monopolizing designs that others need to use in order to compete effectively in the market. *See id.* at 383.

question because of the entrance in the marketplace of defendant's mark.'"[198]

       5.     In order to succeed on its claim of trade dress infringement under Section 43(a) of the Lanham Act, Gucci must demonstrate (i) that the Diamond Motif Trade Dress has acquired distinctiveness through secondary meaning; (ii) that there is a likelihood of confusion between Defendants' trade dress and Gucci's; and (iii) that the trade dress is non-functional.[199]

---

[198]    *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996)). *Accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) ("Where there is a claim of consumer confusion [as] to the association of a product or service with another person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question.") (quoting *EMI Catalogue P'ship v. Hill, Holiday, Conors, Cosmopulos, Inc.*, 228 F.3d 56, 61-62 (2d Cir. 2000)).

[199]    *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70 (1992); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997).

       To determine whether the trade dress has secondary meaning, the court considers six factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Cartier Inc. v. Jewelry, Inc.*, 294 Fed. App'x 615, 617 (2d Cir. 2008).

       "[T]rade dress is functional, and thus not protectable, when it is 'essential to the use or purpose of the article.'" *Cartier*, 294 Fed. App'x at 620 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001)). Additionally, "[a] product design is functional when 'certain features of the design are essential to effective competition in a particular market.'" *Id.* (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251, 253 (2d Cir.1995)).

6.    "[A] probability of confusion, not a mere possibility, must be found to exist" in order to support a finding of infringement.[200]  Generally speaking, establishing that probability is the plaintiff's burden,[201] which means that the defendant typically does not need to disprove a likelihood of confusion.[202]

7.    In this case, Gucci's infringement claims are premised solely on post-sale confusion. This type of confusion occurs when "a potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, will choose to purchase that product instead of a genuine one in order to gain the same prestige at a lower price."[203]  In other words, the harm that is addressed by post-sale confusion claims is not a misdirected purchase, but a purchase intended to confuse.

---

[200]    *Gruner+Jahr*, 991 F.2d at 1077.  Moreover, regardless of the name given to the infringement claim – false designation of origin, unfair competition, or simply 'infringement' – the question under the Lanham Act and state law infringement claims is the same: is there a likelihood of confusion?  *See Two Pesos, Inc.*, 505 U.S. at 780.

[201]    *See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)

[202]    *See KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).

[203]    *Gucci Am., Inc. v. Guess?, Inc.*, No. 09 Civ. 4373, 2012 WL 456519, at *2 (S.D.N. Y. Feb. 14, 2012) ("*Gucci II*") (citing *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir. 2000)).

60

8.      As with point-of-sale confusion, a post-sale confusion plaintiff must still establish a likelihood of confusion among an appreciable number of post-sale observers, taking into account all the vagaries involved with post-sale observation.[204]  Indeed, the fact that post-sale observers are removed from purchasing decisions makes post-sale trademark cases inherently difficult to prove, speculative, and subject to increased scrutiny.[205]

9.      "Courts in the Second Circuit look to all of the traditional *Polaroid* factors in analyzing claims of post-sale confusion."[206]  These factors are described below:[207]

> (1) <u>Strength of the Plaintiff's Mark</u>:  "The strength of a particular mark . . . is measured by its distinctiveness or the degree to which it indicates the source as origin of the

---

[204]      *See Gucci Am. Inc. v. Guess?, Inc.*, 2011 WL 5825206, at * 13 (S.D.N.Y. Nov. 16, 2011) ("*Gucci I*").

[205]      *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991).

[206]      *Gucci II*, 2012 WL 456519 at *5 (citing *Estée Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir. 1997)).

[207]      *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, No. 08 Civ. 4483, 2012 WL 1034540, at * 1 (2d Cir. Mar. 29, 2012) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

product,"[208] and should be examined in its commercial

context.[209]  As noted above, minimally stylized "basics" – such

as letters or geometrical shapes – will only be entitled to "thin"

protection, even if they are "strong" marks.

(2) Similarity of Plaintiff's and Defendant's Marks:  This is

judged by "consider[ing] all factors that could reasonably be

expected to be perceived by and remembered" by members of

the relevant population.[210]  In the post-sale setting, two marks

will be considered similar if they create the same overall

commercial impression when viewed serially, taking into

account the various contexts in which the post-sale casual

observer is likely to encounter them.[211]

(3) Competitive Proximity of the Products:  This is measured

---

[208]    *Bristol-Myers  Squibb Co. v. McNeil - P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992).

[209]    *See Centaur Comms., Ltd. v A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1226 (2d Cir. 1987).

[210]    *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir. 1995).

[211]    *See Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000).

by "the nature of the products themselves and the structure of the relevant market,"[212] and must be viewed in light of the first two *Polaroid* factors.[213]  That is, as the strength of the senior mark increases, and as the junior mark becomes more similar, the competitive proximity decreases.

(4) <u>Bridging the Gap</u>:  This factor addresses the question of "whether the two companies are likely to compete directly in the same market."[214]  Where the companies target the same customers, there is no gap to bridge, and this factor leans in favor of the plaintiff.[215]

(5) <u>Actual confusion</u>:  Evidence of actual confusion in the post-sale context is particularly difficult to come by.  The absence of evidence of actual confusion has never been held to foreclose

---

[212]    *Clinique Labs. Inc. v. Dep Corp.*, 945 F. Supp. 547, 553 (S.D.N.Y. 1996).

[213]    *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

[214]    *Charles of the Ritz Group Ltd. v. Quality King Distib., Inc.*, 832 F.2d 1317, 1322 (2d Cir. 1987).

[215]    *See, e.g.*, *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 608 (S.D.N.Y. 1997).

the availability of a post-sale confusion claim,[216] and survey evidence is often considered to show a likelihood of confusion.[217]  Finally, evidence of intentional copying gives rise to a presumption of actual confusion.[218]

(6) Defendant's Intent/Bad Faith:  This factor looks to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."[219] Actual or constructive knowledge of the senior user's mark may be indicative of bad faith.[220]

(7) Quality of Defendant's Product:  This factor is "primarily concerned with whether the inferior quality of a junior user's

---

[216]    *See Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004).

[217]    *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999).

[218]    *See Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 586-87 (2d Cir. 1993).

[219]    *Lang*, 949 F.2d at 583.

[220]    *See Mobil Oil Corp.*, 818 F.2d at 259.  In the post-sale context, a well-known junior user's bad faith is not alleviated by the use of the defendant's own name or house mark.  *See W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970).

goods could jeopardize the senior user's reputation."[221]

However, this factor is less important in this case because "[t]he concern that casual observers will attribute an infringing product's low quality to the owner of the mark is reduced in post-sale confusion cases, as such persons are not in a position to examine a product's construction and materials."[222]

(8) <u>Sophistication of consumers</u>:  While point-of-sale confusion is concerned with confusion among direct purchasers – who, in the fashion market, tend to be sophisticated[223] – post-sale confusion is concerned with confusion among casual observers, who may or may not be purchasers.[224]

None of these factors is dispositive, and the above list is not exhaustive.[225]  Instead, they are intended to act "as a useful guide" in determining if there exists a

---

[221]    *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999).

[222]    *Gucci II*, 2012 WL 456519, at *7.

[223]    *Vuitton II*, 454 F.3d at 378.

[224]    *See id.* at 389.

[225]    *See Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

likelihood of confusion.[226]

10.     The elements of trademark infringement under New York common law mirror the Lanham Act.  However, to succeed on an unfair competition claim, the plaintiff must also show that the defendant acted in bad faith.[227]

**B.     Trademark Dilution**

**1.     Dilution by Blurring Under Federal Law[228]**

11.     Only a famous mark – one that is widely recognized by the national consuming public as a designation of source – is afforded protection against blurring under the Lanham Act.  In determining whether a mark possesses the requisite degree of recognition to be considered famous, courts consider all relevant factors, including the following four that are enumerated by statute:

> [1] the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties, [2] the amount, volume, and geographic extent of sales of goods or services offered under the mark, [3] the extent of actual recognition of the

---

[226]     *Lois Sportswear*, 799 F.2d at 872.

[227]     *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton I*"), 340 F. Supp. 2d 415, 436 (S.D.N.Y. 2004).

[228]     Although Gucci presses a claim of dilution by tarnishment in its post-trial submissions, its Complaint alleges only dilution by blurring.  *See* SAC ¶¶ 91-99.

mark, and [4] whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.[229]

12.    After a showing of fame is made, Gucci must then show the following to succeed on its dilution-by-blurring claims: (1) that Guess has been using the allegedly diluting designs in commerce; (2) that Guess's use of those designs began after each of Gucci's marks became famous; and (3) Guess's use is likely to cause dilution of the authentic Gucci mark by blurring.[230]

13.    In considering the third element – likelihood of dilution by blurring – courts consider all the relevant factors, including the following statutory list:

> (1) [t]he degree of similarity between the mark or trade name and the famous mark; (2) [t]he degree of inherent or acquired distinctiveness of the famous mark; (3) [t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) [t]he degree of recognition of the famous mark; (5) [w]hether the user of the mark or trade name intended to create an association with the famous mark; (6) [a]ny actual association between the mark or trade name and the famous mark.[231]

## 2.    Dilution Under New York General Business Law § 360-L

---

[229]    15 U.S.C. § 1125(c)(2)(A).

[230]    *See id.* § 1125(c).  *See also Gap, Inc. v. G.A.P. Adventures Inc.*, No. 07 Civ. 9764, 2011 WL 2946384, at *16 (S.D.N.Y. Jun. 24, 2011).

[231]    15 U.S.C. § 1125(c)(2)(B).

14.    To succeed on a claim for trademark dilution under New York

General Business Law ("NY GBL") § 360-L, a plaintiff must prove

> (1) that it possesses a strong mark, one which has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood of dilution by either blurring or tarnishment.[232]

15.    Courts look at six factors to determine if there is a likelihood of

dilution by blurring: (1) the similarity of the marks; (2) the similarity of the

products covered; (3) the sophistication of the consumers; (4) the existence of

predatory intent; (5) the renown of the senior mark; and (6) the renown of the

junior mark.[233]   However, if the court finds that the two marks are not

"substantially similar," the analysis need not proceed any further, and the dilution

claim fails.[234]

---

[232]    *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 367 (S.D.N.Y. 2009).

[233]    *See Vuitton II,* 454 F.3d at 382.

[234]    The "substantially similar" test is similar to the traditional infringement analysis, but even more demanding.  That is, the plaintiff must show that the two marks are "at least . . . similar enough that a substantial segment of the target group of customers sees [them] as essentially the same." *Miss Universe, L.P., LLP v. Villegas*, 672 F. Supp. 2d 575, 595-96 (S.D.N.Y. 2009)(internal citations omitted).  *See also Starbucks*, 588 F.3d at 113-14.

### C.    Trademark Counterfeiting

16.    The Lanham Act defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."[235]  It prohibits the use of such a mark to sell, distribute, or advertise any goods, or in connection with such uses.[236]

17.    As Professor McCarthy notes, counterfeiting is the "hard core" or "first degree" of trademark infringement that seeks to trick the consumer into believing he or she is getting the genuine article, rather than a "colorable imitation."[237]  For this reason, courts have uniformly applied this provision to products that are stitch-for-stitch copies of those of another brand.

### D.    Trademark Cancellation

18.    To succeed on its claim to cancel U.S. Trademark Registration No. 3,308,152 – which covers the Quattro G Pattern – Gucci must show that (1) it has a "real commercial interest" in the cancellation – that is, reason to believe it will be harmed absent relief – and (2) valid grounds for cancellation exist.[238]

---

[235]    15 U.S.C. § 1127.

[236]    *See id.* § 1116(d)(1)(A).

[237]    4 McCarthy on Trademarks § 25:10.

[238]    *Citigroup Inc. v. City Holding Co.*, No. 99 Civ. 10115, 2003 WL 282202, at *14 (S.D.N.Y. Feb. 10, 2003).

19.    The first element is satisfied if Gucci can show that it has been using a similar mark on similar products, or that the mark is confusingly similar to its own, earlier-registered mark.[239]  For purposes of this case, the second element will be satisfied if Gucci can show that Guess has abandoned the trademark at issue.[240]  Abandonment is established by showing that the legal owner of the mark (1) does not use it, and (2) does not intend to use it in the reasonably foreseeable future.[241]  Three consecutive years of non-use establishes a *prima facie* case of abandonment,[242] while proof of intent to resume use must be concrete.[243]

### E.    Remedies

#### 1.    Injunctive Relief

20.    A district court has the power to enter injunctive relief "'according to the principles of equity and upon such terms as the court may deem

---

[239]    *See Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1326 (Fed. Cir. 1983).

[240]    *See* 15 U.S.C. § 1064(3).

[241]    *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).

[242]    *See id.*

[243]    *See Imperial Tobacco Ltd. v. Phillip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990).

reasonable'" for violations of the Lanham Act.[244]

21.     Under such principles, a party is entitled to a permanent injunction if it is successful on the merits and if it can "show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."[245]  The court should also consider both the equities between the parties and the public interest, so as to effectively tailor injunctive relief to the specific legal violations at issue in the case.[246]  In trademark cases, irreparable harm is presumed once infringement or dilution has been shown, based on the ensuing loss of goodwill and ability to control one's reputation.[247]

## 2.    Monetary Relief

22.     A district court may also order monetary relief to remedy violations of the Lanham Act.  In order to obtain monetary relief for actual damages stemming from trademark infringement, the owner of a trademark normally must prove "actual consumer confusion or deception resulting from the

---

[244]    *Collins v. Aztar Corp.*, No. 99-7912, 2000 WL 302782, at *1 (2d Cir. Mar. 20, 2000) (quoting 15 U.S.C. § 1116(a)).

[245]    *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

[246]    *See Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 273 (2d Cir. 2011).

[247]    *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 326 (S.D.N.Y. 2010).

violation [of the Lanham Act]."[248]  Damages may include lost sales,[249] a reasonable

royalty,[250] and harm to brand value.[251]

23.    If the plaintiff cannot demonstrate actual consumer confusion, it

may nonetheless obtain monetary relief by proving that the alleged infringer acted

with an intent to deceive, because such an intent gives rise to a rebuttable

presumption of actual confusion.[252]  While an intent to copy is distinct from an

intent to deceive, it nonetheless creates a presumption of an intent to deceive,

unless there is evidence to the contrary.[253]

24.    A plaintiff may also be entitled to monetary relief in the form of

an accounting of profits – as distinct from actual damages – if the infringer acted

with "willful deceptiveness."  Generally speaking, an accounting is only available

if the defendant is unjustly enriched, as a rough proxy for actual damages, or to

---

[248]    *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 646
(S.D.N.Y. 2007) ("*Malletier II*").

[249]    *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540
(2d Cir. 1992).

[250]    *See* 5 McCarthy on Trademarks § 30:85.

[251]    *See id.* at § 30:72.

[252]    *See George Basch Co., Inc.*, 968 F.2d at 1537.

[253]    *See Starbucks Corp.*, 588 F.3d at 118.

deter further willful infringement.[254]   Any one of these justifications is

sufficient.[255]

        25.    Additionally, because an accounting of profits is an equitable

remedy, willful deceptiveness, while a necessary factor, must be considered along

with many others, including "(1) the degree of certainty that the defendant

benefited from the unlawful conduct, (2) [the] availability and adequacy of other

remedies, (3) the role of a particular defendant in effectuating the infringement, (4)

plaintiff's laches; and (5) plaintiff's unclean hands."[256]   If a court does order an

accounting, it should be limited to those profits attributable to the use of the

allegedly infringing marks.[257]   A finding of willfulness is also required to grant

monetary relief for dilution by blurring.[258]

## IV.   AFFIRMATIVE DEFENSES

        26.    Defendants raised the following affirmative defenses:  (1)

laches, (2) equitable estoppel, (3) acquiescence, (4) abandonment, (5) unclean

---

[254]    *See George Basch Co., Inc.*, 968 F.2d at 1537-41.

[255]    *Gucci II*, 2012 WL 456519, at *6 (citing *George Basch Co. Inc.*, 968 F.2d at 1539).

[256]    *George Basch Co., Inc.*, 968 F.2d at 1540.

[257]    *See Gucci America, Inc. v. Daffy's Inc.*, 354 F.3d 228, 242 (3d Cir. 2003); *Malletier II*, 525 F. Supp. 2d at 657.

[258]    *See* 15 U.S.C. § 1125(c)(5)(B)(i).

hands, (6) trademark misuse, (7) prior use, (8) innocent use, (9) aesthetic functionality, and (10) statute of limitations.[259]  MFF does not join in the defenses of abandonment, trademark misuse, prior use, innocent use, or statute of limitations.

### A.    Laches

27.    To succeed on the affirmative defense of laches, the defendant must show three things:  (1) that the senior user knew of the junior user's use of the mark; (2) that the senior user inexcusably delayed taking action; and (3) that the junior user was prejudiced by the delay.[260]  Prejudice does not inhere simply in the fact that the junior user conducted business using the mark.  Instead, prejudice may be found where the junior user took affirmative steps to increase its use of the mark during and in reliance on the senior user's period of delay, and that unwinding those actions would require it "to reorganize its business or reeducate the public as to its product if restrained from using the mark."[261]  Accordingly, prejudice will not

---

[259]    Guess also charged Gucci with failing to mitigate its damages. Because I take that issue into account when assessing Gucci's entitlement to an award of profits, I do not address it here.

[260]    *See Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*, No. 06 Civ. 3508, 2007 WL 2914452, at *1 (2d Cir. Oct. 5, 2007).

[261]    *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 719 (S.D.N.Y. 1973), *aff'd in relevant part*, 523 F.2d 1331 (2d Cir. 1975).

be found where ceasing use of the accused mark is a relatively simple and inexpensive task that has little adverse effect on the junior user's brand.  On the other hand, prejudice may be found where re-branding becomes more and more difficult for the junior user.[262]  Finally, the Second Circuit has made clear that, regardless of the length of the senior user's delay, laches cannot be a defense to intentional infringement, as it is an equitable defense and the defendant asserting it must come to court with clean hands.[263]

## B.   Equitable Estoppel

28.    The defense of equitable estoppel requires that defendants prove three things:  "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice."[264]

## C.   Acquiescence

29.    To establish the defense of acquiescence, defendants must show

---

[262]    *See*, *e.g.*, *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998) (finding no prejudice "where it would cost little to remedy the infringement"); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 753 (S.D.N.Y. 1997) (finding prejudice where the accused mark was defendant's brand name and where plaintiff's delay would force a difficult re-branding effort).

[263]    *See Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000).

[264]    *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

three things: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice."[265]  This defense is similar to laches, except that it implies active consent, rather than a passivity that leads to an inference of consent.[266]

### D.    Abandonment

30.    To succeed on a defense of trademark abandonment, the junior user must show that the senior user (1) has stopped using the mark in question and (2) does not intend to resume use thereof in the reasonably foreseeable future.[267]

### E.    Unclean Hands

31.    Where the defendant can show that the plaintiff has committed an "unconscionable act" that is related to the matter at issue, the court may, in its discretion, deny plaintiff relief based on the doctrine of unclean hands.[268]  The filing of a trademark infringement lawsuit, without more, does not merit the

---

[265]    *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002).

[266]    *See id.*

[267]    *See Silverman v. CBS Inc.*, 870 F.2d 40, 45 (2d Cir. 1989).

[268]    *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933).

application of this doctrine.[269]

### F.   Trademark Misuse

32.    To the extent that courts in this circuit recognize trademark misuse as an independent defense, they have held that it requires a showing that the plaintiff has used its trademark in violation of anti-trust laws.[270]  Courts in other circuits have found that this defense is duplicative and unnecessary where defendants plead the defense of unclean hands.[271]

### G.   Prior Use

33.    The defense of prior use is statutory and requires that the defendant prove that it registered and used its allegedly infringing mark before the plaintiff acquired its registration of the allegedly infringed mark.  The defendant must also show that it has not abandoned the registration on which its assertion of this defense is based.[272]

### H.   Innocent Use

---

[269]    *See* 4 McCarthy on Trademarks § 31:51.

[270]    *See Plus Prods. v. Natural Organics, Inc.*, No. 81 Civ. 1798, 1984 WL 33, at *3 (E.D.N.Y. Feb. 3, 1984).

[271]    *See*, *e.g.*, *Desert European Motorcars, Ltd. v. Desert European Motorcars, Inc.*, No. EDCV 11-197, 2011 WL 3809933, at *8 (C.D. Cal. Aug. 25, 2011).

[272]    *See* 15 U.S.C. § 1115(b)(6).

34.    The defense of innocent use is also statutory, and requires that defendant adopted its allegedly infringing mark without knowledge – actual or constructive – of the senior mark.  It also requires a showing that the junior user used the mark before the senior user registered its own mark, and has done so continuously since then.[273]

## I.    Aesthetic Functionality

35.    The doctrine of aesthetic functionality holds that if  "an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection."[274]  A feature is ornamental if it is added purely for aesthetic reasons and serves no source-identifying purpose.[275]

## J.    Statute of Limitations

36.    Although the Lanham Act does not include a statute of limitations, the Second Circuit has held that the six-year limitations period from

---

[273]    *See id.* § 1115(b)(5).

[274]    *Forschner Group, Inc. v. Arrow Trading Co., Inc.*,  124 F.3d 402, 409-20 (2d Cir. 1997) (internal citation omitted).

[275]    *See Knitwaves Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1009 (2d Cir. 1995).

New York state fraud law applies.[276]   However, as trademark infringement is a

"continuing wrong," the statue of limitations defense only applies to bar monetary

recovery beyond the statutory period, and does not limit the availability of

injunctive relief.[277]

## V.    DISCUSSION OF INFRINGEMENT CLAIMS

### A.    The Registered Gucci Marks Are Valid and Entitled to Protection

37.    As noted above, all four of the Gucci trademarks at issue have

been registered since 2006 at the latest.  Accordingly, they are all incontestible as

to validity, as well as Gucci's ownership and exclusive right to use pursuant to 15

U.S.C. §§ 1065 and 1115(b).  Indeed, other courts have found that the GRG Stripe

and the Repeating GG Pattern are strong, famous marks entitled to the strictest

protection the law affords.[278]

### B.    The Diamond Motif Trade Dress is Entitled to Protection

38.    In light of Gucci's evidence of (1) extensive advertising

---

[276]    *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir. 1996).

[277]    6 McCarthy on Trademarks § 31:33.

[278]    *See Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820, 2009 WL 8531026 at *15 (S.D.N.Y. Aug. 5, 2009); *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1063-64 (S.D.N.Y. 1991).  MFF correctly notes that the Stylized G and the Script Gucci are not registered for use on footwear.

expenditures; (2) unsolicited media coverage; (3) sales success; and (4) exclusive use of the Diamond Motif Trade Dress for over fifty years, I conclude that the Diamond Motif Trade Dress possesses strong secondary meaning, both with consumers and within the trade. The evidence that Defendants meticulously copied the Diamond Motif Trade Dress further supports this conclusion.[279]

39.    The evidence also establishes that the combination of elements comprising the Diamond Motif Trade Dress is not essential to the use or purpose of products on which such elements appear. Accordingly, I conclude that it is not functional.

### C.    The *Polaroid* Factors Generally

40.    Several of the *Polaroid* factors are the same with respect to each mark:

(a) <u>Bridging the Gap</u>: The evidence shows that Gucci and Guess do not, as a general proposition, target the same markets. However, part of Gucci's overall marketing strategy is to target the "aspirational" customer who may be saving up in order to buy his or her first product as an entry ticket into Gucci's "exclusive club." Accordingly, I

---

[279]    *See Centaur Comm. Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979).

conclude that this factor does not weigh in favor of either party.

(b) <u>Quality of Defendants' Products</u>:  Having examined exemplars of products bearing each of the accused designs – side by side and serially, from a distance and from up close, for varying periods of time, and by handling them physically – I conclude that they are of sufficiently high quality that Gucci's reputation in the eyes of the casual observer in the post-sale setting would not be harmed. Therefore, I conclude that this factor weighs in Defendants' favor.

(c) <u>Sophistication of Consumers</u>:  Neither party has presented evidence of the sophistication of the casual observer in the post-sale setting.  This factor therefore favors Guess, as Gucci bears the burden of proof.

With these factors in mind, I proceed to a mark-by-mark analysis of the *Polaroid* factors.

### D.  There Is a Likelihood of Confusion Between Certain Uses of Guess's Quattro G Pattern and the Repeating GG Pattern / Diamond Motif Trade Dress

41.  <u>Strength of Plaintiff's Mark</u>:  The record evidence of sales, advertising, and the importance of the Repeating GG Pattern and Diamond Motif Trade Dress to Gucci is clear.  Accordingly, I conclude that this favor weighs

81

heavily in Gucci's favor.

42.    <u>Similarity of Both Marks</u>:  The Quattro G Pattern is visually dissimilar from the Repeating GG Pattern in at least two ways.  *First*, the diamonds are "anchored" by the standalone Quattro G in the former, whereas they are empty in the latter.  *Second*, the former has single Gs (sometimes inverted, sometimes right side up), whereas the latter has a pair of inward facing inverted Gs at each corner.  These differences can be seen in the depictions of each pattern below:

| **Gucci's Repeating GG Pattern/Diamond Motif Trade Dress** | **Guess's Quattro G Pattern** |
|---|---|
|  | |

43.    Nevertheless, the two patterns share some similarities.  *First*, both patterns are set in a diamond formation with dots or dashes connecting the corners.  *Second*, and perhaps most obviously, both patterns feature the letter G. On balance, I conclude that the Quattro G Pattern is visually similar to the

Repeating GG pattern, although this factor does not weigh very heavily in Gucci's favor.

44.    When rendered in brown/beige colorways on a two-tone canvas background, and with shading inside the G's the Quattro G Pattern is more similar to the Diamond Motif Trade Dress than to the Repeating GG Pattern.  I conclude that when these circumstances coincide, this factor weighs strongly in Gucci's favor.

45.    <u>Competitive Proximity</u>:  As noted above, when the first two factors favor the plaintiff, this one does as well.  That is the case with both the Repeating GG Pattern and the Diamond Motif Trade Dress, though more so for the latter than the former.

46.    Guess argues that the difference between its target market and that of Gucci  – mid-market versus high-end – pushes this factor in its favor.  However, in the post-sale context, the target *selling* market is of decreased importance, as the confusion that exists in the general viewing public is what matters.[280]

47.    Gucci has no plans to move into the mid-market with a "diffusion line." Nonetheless, the idea of such a line is common enough in the

---

[280]    *See Clinique Labs Inc.*, 945 F. Supp. at 553.

fashion industry that consumers unaware of Gucci's strong position against making one may well believe that the Quattro G Pattern represents such an effort.[281]  Based on this and all of the foregoing, I conclude that this factor slightly favors Gucci.

48.    <u>Actual Confusion</u>:  Gucci has no evidence of actual confusion between the Repeating GG Pattern and the Quattro G Pattern. However, as noted above, the Mantis Survey — which can be considered as evidence of actual confusion – provides some support to find that this factor favors Gucci with respect to the Diamond Motif Trade Dress.

49.    Furthermore, as noted in paragraphs 65 through 76 of the Findings of Fact, Guess intentionally copied the Repeating GG Pattern and the Diamond Motif Trade Dress in developing the Quattro G Pattern.  Accordingly, Gucci is entitled to a presumption of actual confusion with respect to both.  With that presumption in mind, this factor weighs in favor of Gucci.

50.    <u>Defendant's Intent/Bad Faith</u>:  The evidence strongly supports the inference that Guess acted in bad faith in copying the Repeating GG Pattern and the Diamond Motif Trade Dress.  Additionally, Guess has received numerous cease-and-desist letters in the past, which provides additional evidence to find that

---

[281]     *See*, *e.g.*, *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1283 (C.D. Cal. 1997).

this factor favors Gucci.[282]

51.    <u>Weighing the Factors</u>:  After considering all of the *Polaroid* factors, I conclude that there is a likelihood of confusion between the Diamond Motif Trade Dress and the Quattro G Pattern, when it is rendered in brown/beige colorways.  To be clear, by "brown/beige colorway," I refer to colorways that give the impression of a dark brown design on a lighter beige background, as depicted in paragraph 42 of the Conclusions of Law.  Accordingly, Gucci has succeeded on its Lanham Act claims for infringement and false designation of origin, as well as its infringement claim under New York common law.  These conclusions apply only to the SKU/color combinations listed in Appendix A.[283]

52.    Despite the presumption of confusion that arises from Guess's intentional copying of the Repeating GG Design and its bad faith, I find that the

---

[282]    *See*, *e.g.*, *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 283-84, 292 (S.D.N.Y. 2002) (holding that evidence of prior cease and desist letters from third parties is probative of intent).

[283]    When I requested submissions from the parties on the calculation of final profits by June 13, 2012, I included an explicit instruction that the parties should not address or comment on any other issue.  In its June 13, 2012 letter, Gucci ignored this instruction and identified a number of SKU/color combinations that it believes the Court inadvertently excluded from Appendix A.  *See* 6/13/12 Letter from Louis S. Ederer to the Court, at 4 n.9.  These SKU/color combinations correspond to products that feature the Quattro G Pattern rendered in brown/beige colorways, but which I find are otherwise so garish or "bling-y" that they are unlikely to cause confusion.  There were no "inadvertent exclusions."  Rather, this list reflects my final determination of infringing products.

overall commercial impression transmitted by products bearing the Quattro G

Pattern in non-brown/beige colorways is substantially different from Gucci.  These

products frequently feature bright and/or neon colors, garish or "bling-y"

hardware, and generally succeed in communicating the "Guess Girl" image that

defendants have been careful to cultivate over the years.  Accordingly, the SKUs

not listed in Appendix A are unlikely to cause confusion with the Diamond Motif

Trade Dress or the Repeating GG pattern, and therefore do not infringe either of

those designs.

### E.  Defendants' Use of a GRG Stripe Causes a Likelihood of Confusion with Gucci's GRG Stripe

53.     Gucci has submitted evidence that MFF knowingly and in bad

faith copied Gucci's GRG Stripe.  This conduct was so egregious that a full

*Polaroid* analysis is not necessary to conclude that there is a likelihood of

confusion with Gucci's GRG Stripe.  Accordingly, I conclude that Gucci has

succeeded on its infringement claims under the Lanham Act and New York

common law, as well as its false designation of origin claim, as those claims relate

to this mark.  Nonetheless, a few additional conclusions are required.

54.     Stripe patterns are "basics" that every brand must be able to use

freely in order to compete – excepting, of course, those instances where a

particular configuration has come to be identified with a particular brand.

The GRG Stripe is one such configuration, and should be given strong protection. However, that protection must be limited to a narrow range.  For example, it covers all reds and all greens, but does not cover a central stripe that is yellow instead of red, or outer stripes that are brown instead of green.

55.    Based on these limitations, and the fact that alternative color combinations are visually dissimilar from Gucci's GRG Stripe, I conclude as a matter of law that the defendants' use of stripes causes a likelihood of confusion with respect to only those SKUs in Appendix B.  The findings of intentional copying and bad faith also apply only to these SKUs.

**F.    Guess's Use of Certain Block G Designs Causes a Likelihood of Confusion With Gucci's Stylized G**

56.    <u>Strength of Plaintiff's Mark</u>:  I have already concluded that the distinctiveness of the Stylized G is incontestible.  The conclusion that a mark is distinctive, however, does not ineluctably lead to the conclusion that it is "strong." Instead, with "basic" marks like letters and geometrical shapes, the protection must be narrow and specific, so as to preserve the ability of various brands to compete in the marketplace and thereby benefit the customer.

57.    Of all of the marks at issue, the Stylized G accounts for the fewest sales dollars, and has been the subject of the least amount of advertising. Furthermore, the primary use of the mark in the post-Tom Ford era – on the lining

87

of Gucci handbags – is only minimally relevant to post-sale confusion, if relevant

at all.  Gucci has failed to conduct a survey to test for consumer recognition of the

Stylized G.  In light of these considerations and the findings of fact above, I

conclude that the Stylized G is a weak mark.

58.    <u>Similarity of the Marks</u>:  I have already found that, except for

the belt with SKU 913019, the "Misty"shoe, and the "Scraps" shoe, Guess's

Square Gs are not similar to Gucci's Stylized G:.  Accordingly, this factor weighs

in Guess's favor.

59.    <u>Competitive Proximity</u>:  Because the Stylized G is a weak

mark, and since Guess's Square Gs are generally dissimilar to it, this factor weighs

in Guess's favor.

60.    <u>Actual Confusion</u>:  Gucci produced no evidence of actual

confusion, whether anecdotal or in survey form.

61.    <u>Defendant's Intent/Bad Faith</u>:  I have already found that Guess

did not intentionally copy Gucci, or act in bad faith in adopting the Square G.

Accordingly, this factor favors Guess.

62.    <u>Weighing the Factors</u>:  Based on all the foregoing, I conclude

that Guess's use of the Square G on the products listed in paragraph 79 of the

Findings of Fact is likely to cause post-sale confusion.  Gucci has successfully

proven its Lanham Act infringement and false designation claims, as well as its

common law infringement claim related the Square G only as to these products.

### G. Guess's Use of the Script Guess Does Not Cause a Likelihood of Confusion

63.  Strength of Plaintiff's Mark:  In light of the fact that the use of

script fonts is extremely common in the fashion industry, the only source-

identifying properties of the Script Gucci mark stem from the fact that it spells out

the word "Gucci."  Additionally, Gucci concedes that the complained-of Script

Guess without the underline would not be infringing.  This demonstrates the

"thinness" of the mark, and shows that this factor decidedly favors Guess.

64.  Similarity of the Marks:  I have already found that the Script

Guess is not similar to the Script Gucci mark, and that it creates a distinct

commercial impression in line with the "Guess Girl" aesthetic.  Accordingly, I

conclude that this factor favors Guess.

65.  Competitive Proximity:  For the same reasons as noted in my

discussion of the Stylized G, this factor favors Guess.

66.  Actual Confusion:  Gucci has produced no evidence of any kind

that any casual observer in the post-sale setting has ever confused the Script Guess

mark for the Script Gucci mark.

67.  Defendant's Intent/Bad Faith:  I have already found that Guess

89

did not act in bad faith in creating or using the Script Guess.

68. <u>Weighing the Factors</u>:  Considering all the *Polaroid* factors and all the record evidence, I find that the Script Guess causes no likelihood of confusion whatsoever.  Accordingly, Gucci's claims for infringement and false designation of origin under the Lanham Act and common law fail.

### H.    Summary of Infringement Conclusions

69.    Gucci has proven that Defendants have infringed its trademarks under the Lanham Act and New York common law as follows:

<u>Repeating GG Pattern/Diamond Motif Trade Dress</u>:  Guess's use of the Quattro G Pattern in brown/beige colorways on the SKUs listed in Appendix A infringes on these marks.

<u>GRG Stripe</u>:  Guess's use of a GRG Stripe on the SKUs noted in Appendix B infringes on Gucci's GRG Stripe trademark.

<u>Stylized G</u>:  Guess's use of its Square G on the belt with SKU 913019, the "Misty"shoe, and the "Scraps" shoe infringe on Gucci's Stylized G trademark.

<u>Script Gucci</u>:  No Guess-branded products infringe on the Script Gucci trademark.

## VI.   DISCUSSION OF DILUTION CLAIMS

70.     The Quattro G Pattern – including executions on a two-tone canvas in brown/beige colorways – and the Square G were first used in commerce before October 6, 2006.  Accordingly, for purposes of dilution, they are assessed under the "actual dilution" standard with respect to Gucci's claims for monetary relief.  As Gucci has no evidence of actual dilution, I granted Defendants summary judgment on those portions of Gucci's dilution claims that related to monetary relief.[284]

71.     Because Defendants first used the Script Guess and the GRG Stripe in commerce in 2008, the less stringent  "likelihood of dilution" standard of the TDRA applies to them.

## A.     Guess's Use of the Quattro G Pattern Gives Rise to a Likelihood of Dilution by Blurring

72.     Degree of Similarity:  For the reasons stated in paragraphs 42 through 44 above, this factor favors Gucci.

73.     Distinctiveness of the Mark:  Based on the discussion in paragraph 44 and the Findings of Fact, I conclude that the Repeating GG Pattern and the Diamond Motif Trade dress are both highly distinctive.

74.     Exclusive Use of the Mark:  The evidence supports the conclusion that Gucci is the sole lawful user of the Repeating GG Pattern and the

---

[284]     *See Gucci II*, 2012 WL 456519, at *11.

Diamond Motif Trade Dress, and that it has aggressively pursued counterfeiters using both either of those marks.

76. <u>Degree of Recognition of the Mark</u>:  As noted in the Findings of Fact, Gucci has spent millions of dollars promoting the Repeating GG Pattern and the Diamond Motif Trade Dress, and sold billions of dollars worth of products bearing both.

76. <u>Intent to Create Association with the Mark</u>:  The evidence shows that Guess intentionally copied the Diamond Motif Trade Dress in developing the Quattro G Pattern in brown/beige colorways.  This leads strongly to the conclusion that Guess intended to create an association with the Diamond Motif Trade Dress in the minds of consumers.

77. <u>Actual Association with the Mark</u>:  The comments on the Macys.com website for the Melrose 2 sneaker show that Guess's use of the Quattro G Pattern in brown/beige colorways has caused some actual dilution of the Repeating GG Pattern's ability to act solely as a Gucci identifier.  However, this evidence is weak, as the authorship of the comments is unknown, and the comments do not conclusively refer to the Quattro G Pattern in drawing comparisons to Gucci.  Accordingly, I conclude that this factor favors Gucci, but only slightly.

78.    <u>Weighing the Factors</u>:  After considering all the factors noted above, I conclude that Guess's use of the Quattro G Pattern in brown/beige colorways is likely to cause dilution by blurring with respect to Gucci's Diamond Motif Trade Dress.  As in the infringement context, however, I conclude that the products executed in other colorways are sufficiently visually distinct such that they will not give rise to an association with Gucci, and are therefore not likely to cause any dilution.

**B.    Guess's Use of the GRG Stripe Gives Rise to a Likelihood of Dilution by Blurring**

79.    <u>Degree of Similarity</u>:  The GRG Stripes used by Gucci and Guess are substantially identical; therefore, this factor favors Gucci.  However, for the reasons noted in paragraphs 53 through 55 of the Conclusions of Law, altenatively colored stripe combinations are sufficiently visually dissimilar from the GRG Stripe that they cannot dilute it.

80.    <u>Distinctiveness of the Mark</u>:  Guess's witnesses admit that the GRG Stripe is a strong mark and a clear identifier of Gucci.  Furthermore, it is incontestible as to distinctiveness, as it has been registered for more than five years.

81.    <u>Exclusive Use of the Mark</u>:  Vando testified that he saw the other companies – including Nike and Dolce & Gabbana – using green/red/green

stripes in the marketplace.[285]   Fisher testified similarly.[286]   However, neither was able to present a physical example of such a shoe, or any other evidence that such use pre-dated the filing of this case.  I therefore conclude that this factor does not weigh in favor of any of the parties.

82.    <u>Degree of Recognition of the Mark</u>:  Based on Gucci's extensive advertisement and sale of product bearing the GRG Stripe over several decades, as well as its substantial unpaid editorial coverage, this factor favors Gucci.

83.    <u>Intent to Create Association with the Mark</u>:  I have already found that MFF intentionally copied the GRG Stripe from Gucci.  Therefore, it is reasonable to infer that MFF intended to create an association with Gucci.  It is also undisputed that Guess's licensing department approved the shoes for production, despite recognizing the GRG Stripe as an indicator of Gucci.  While Guess's good faith can be seen in the later intervention and recall put in place by its legal department, that does not negate the inference that the larger Guess entity intended to create an association with the Gucci GRG Stripe by approving the shoes for manufacture in the first instance.  Accordingly, I conclude that this factor

---

[285]    *See* 4/5/12 Trial Tr. at 1334:17-23 (Vando).

[286]    *See* Fisher Decl. ¶ 39.

favors Gucci.

84.    Actual Association with the Mark:  The presumption of actual dilution is triggered here, as the marks are identical.  This also implies that there a presumption of actual association.  Accordingly, this factor favors Gucci as well.

85.    Weighing the Factors:  Considering all the factors – especially the clear evidence of intentional copying, the substantially identical appearance of the marks, and the degree of recognition that the GRG Stripe has as a Gucci identifier – I conclude that there is a strong likelihood of dilution by blurring caused by Guess's use of the GRG Stripe.  For the reasons already noted, this finding is limited to those SKUs listed in Appendix B.

## C.    Defendants' Use of the Square G and the Script Guess Is Not Likely to Cause Dilution by Blurring

86.    As noted in the Findings of Fact above, Gucci's Stylized G was not famous when Guess introduced its Square G.  Accordingly, Gucci's Lanham Act dilution claims with respect to the Square G fail *ab initio*. Its claim under NY GBL § 360-L also fails, as the evidence does not support the conclusion that the Stylized G is a strong mark.

87.    As in the infringement context, a court need not rigidly analyze every one of the non-exclusive factors to determine whether a likelihood of dilution exists, but may give greater or lesser weight to those factors that it deems

95

more or less important in any given context.  Here, I have already found that the

Script Guess is visually dissimilar from the Script Gucci mark, and that it creates a

different overall commercial impression.  I hold that these two findings alone

support the ultimate conclusion that the Script Guess is not likely to dilute the

Script Gucci by blurring, either under the Lanham Act or NY GBL § 360-L.

### D.    Summary of Dilution Conclusions

88.    Based on the foregoing, I find that Gucci has proven its dilution

claims under the Lanham Act and NY GBL § 360-L as follows:

> Repeating GG Pattern/Diamond Motif Trade Dress:  Defendants' use
>
> of the Quattro G Pattern in brown/beige colorways – limited to the
>
> SKUs in Appendix A – is likely to cause dilution of the Diamond
>
> Motif Trade Dress by blurring.
>
> GRG Stripe:  MFF's use of a GRG Stripe identical to the Gucci mark
>
> is likely to cause dilution by blurring.  This finding also applies to
>
> Guess, by dint of its approval of products bearing the diluting mark.
>
> However, the use of stripes in any other colors is not likely to cause
>
> dilution by blurring.
>
> Stylized G:  Defendants' use of the Square G commenced before this
>
> mark became famous.  Accordingly, as a matter of law, it cannot

dilute this mark under the Lanham Act.  Because this mark is not a strong one, Gucci's dilution claim under NY GBL § 360-L also fails.

Script Gucci:  Guess's use of the visually dissimilar Script Guess mark is not likely to dilute this mark by blurring, under either the Lanham Act or NY GBL § 360-L.

## VII.   DISCUSSION OF COUNTERFEITING AND CANCELLATION CLAIMS

### A.   Gucci's Counterfeiting Claim Is Denied

89.   As noted above, courts have uniformly restricted trademark counterfeiting claims to those situations where entire products have been copied stitch-for-stitch.  I decline to expand this restriction, and conclude that Gucci's counterfeiting claim is more appropriately addressed under traditional infringement principles.

### B.   Gucci's Cancellation Claim Is Granted

90.   Guess does not contest Gucci's standing to bring a claim for cancellation.  Indeed, Gucci's right to bring this claim is clear, as it has been using the Repeating GG Pattern on similar kinds of goods since the 1960s.

91.   Guess has never used the Quattro G Pattern in a square orientation, and the evidence shows that it has no intent to do so.  The only use that Guess *has* made of the Quattro G Pattern is in a diamond orientation, which I find

97

creates a distinct commercial impression from its use in a square orientation.[287]

Accordingly, I conclude that Guess has abandoned its registered Quattro G Pattern, and that registration should be canceled.

## VIII.  DISCUSSION OF REMEDIES

### A.    Gucci Is Not Entitled to Actual Damages in the Form of a Reasonable Royalty

92.    Gucci has no evidence of, and hence can only speculate about, actual damages in the form of lost sales or harm to brand value.  Accordingly, the only possible basis for recovery of actual damages is a reasonable royalty.

93.    Imburgia's calculations are the only evidence that Gucci presented in support of a reasonable royalty.  Because his analysis is highly speculative, I conclude that Gucci has not met its burden of proof on this issue. Accordingly, Gucci is not entitled to actual damages as measured by a reasonable

---

[287]    Guess cites *Paris Glove of Canada, Ltd. v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856,  (T.T.A.B. 2007), *D & J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821 (S.D. Ohio 2002), and *Drexel Enters., Inc. v. Richardson*, 312 F.2d 525 (10th Cir. 1962) for the proposition that changing the orientation of a mark does not constitute abandonment.  *See* Guess Post-Trial PFF ¶ 498.  These cases are all distinguished by the fact that they involved word marks, rather than abstract configurations of letters contained within a geometric shape.

At trial and in their post-trial submissions, the parties spar at length over the issue of whether the trademark registration for the Quattro G Pattern should have issued at all.  As noted in the findings of fact, the history of the application is troubling.  However, that issue need not be resolved in order to reach the conclusion that the registration has been abandoned.

royalty.

> **B.  Gucci Is Entitled to an Accounting of Profits for Defendants' Use of the Quattro G Pattern in Brown/Beige Colorways and the GRG Stripe**

94.     Based on the findings of fact above, I conclude that Defendants intentionally and willfully copied the Quattro G Pattern executed in brown/beige colorways from the Diamond Motif Trade Dress, and that Gucci is thereby entitled to an accounting of profits that Defendants made on the infringing SKUs listed in Appendix A.  As noted in the Findings of Fact, defendants' profits from the infringing products are as follows: (1) Signal's profits total $1,834,503; (2) Max Leather/Cipriani's profits total $24,701; (3) Swank's profits total $18,791; (4) Guess received royalties from its non-footwear licensees in the amount of $805,886; and (5) Guess's profits from retail sales of belts, wallets and shoes total $202,598.  Thus, excluding Guess's profits from its retail sales of handbags, defendants realized a total profit of $2,886,479 on the infringing SKUs listed in Appendix A.

95.     Guess's profits from its retail sales of infringing handbags cannot be calculated with precision because Guess does not maintain sales data for handbags broken down by color.  However, when a defendant's inadequate record-keeping is the cause of uncertainty regarding the amount of profit to be disgorged,

district courts have broad discretion in determining how to calculate a reasonable approximation of those profits.[288]  I conclude that Guess's profits from retail sales of handbags may be approximated by: (1) examining images of products offered for sale on Guess's retail website over time; (2) determining how many of the SKUs listed in Appendix A were sold on Guess's website; (3) computing the ratio of Signal's sales of the product in each infringing color to Signal's overall sales of the product; and (4) applying that ratio to Guess's retail sales.[289]  As noted in the Findings of Fact, I applied this method to Guess's data and approximated Guess's profits from retail sales of handbags to be $1,018,591.

96.     The evidence establishes that MFF acted intentionally and willfully in adopting the GRG Stripe.  Accordingly, I conclude that Gucci is entitled to an accounting of MFF's profits on the infringing SKUs bearing the

---

[288]     *See Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985) ("'[W]here . . . the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of [profits earned] by the deliberate and wrongful infringement.'") (quoting *Deering, Milliken & Co. v. Gilbert*, 269 F.2d 191, 193 (2d Cir. 1959)); *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta, Inc.*, No. 09 Civ. 5517, 2009 WL 4351962, at *3 (S.D.N.Y. Dec. 1, 2009) ("[I]f 'the actual sales cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate record-keeping or failure to produce documentary evidence.'") (quoting *Chloe v. Zarafshan*, No. 06 Civ. 3140, 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009)).

[289]     *See* 6/13/12 Guess Letter at 3.

GRG Stripe, which I calculated in the Findings of Fact to be $28,349.  Because I have already found that Guess acted in good faith by recalling – however imperfectly – shoes bearing the GRG Stripe from its stores and its website, I conclude that Gucci is not entitled to an accounting of Guess's profits on those sales.  The evidence also establishes that MFF sold $3,603,220 of products bearing the Quattro G Pattern, of which it retained a profit of $427,834, and paid $252,225 to Guess under its royalty agreement, which Guess must pay over to Gucci.

97.     In sum, each defendant's profits from sales of infringing products – excepting Guess's profits from sales of shoes bearing the GRG stripe but not the Quattro G pattern – is as follows:

Signal: $1,834,503;

Max Leather/Cipriani: $24,701;

Swank: $18,791;

MFF: $456,183; and

Guess: $2,279,300.

98.     In weighing all of the equities – including the need to deter future willful infringement – I find that Gucci is entitled to all of the profits calculated above.  However, Guess's affirmative defense of innocent use of the Square G, discussed in more detail below, bars Gucci from any monetary recovery

101

based on the use of that mark.  Accordingly, the total amount that Gucci is entitled to receive is $4,613,478.

### C.   Gucci Is Entitled to a Permanent Injunction Barring Guess from Using the Quattro G Pattern, the GRG Stripe, and Certain Square G Marks

99.   The conclusions of infringement and dilution made above give rise to a presumption that Gucci has suffered irreparable harm in that it has lost goodwill towards its unique brand as well as the ability to control its reputation in the marketplace.  Because these injuries cannot be quantified or fully remedied by a monetary award, I conclude that Gucci lacks an adequate remedy at law.

100.   Defendants have been successful with a wide variety of different designs, and it has not been difficult for them or harmful to their brand to stop using certain of the designs at issue during the pendency of this litigation. While they might like to resume use of the other successful designs, the equities favor Gucci, which should not have to suffer another brand's use of marks confusingly similar to its own.  Finally, the public interest would be well-served by an injunction that eliminates the use of confusingly similar marks, thereby enabling both brands to clearly communicate their core characteristics to the public.

101.   Courts in this circuit have long held that a permanent injunction should issue in trademark cases where a defendant asserts that its pre-lawsuit use

was lawful,[290] and that pre-lawsuit behavior may serve as a basis for a permanent injunction, as it may indicate that defendant's intentions are in doubt.[291]  Both of these rationales apply here.  Accordingly, an injunction shall issue against Guess and its licensees as follows:

> (a)  use of the Quattro G Pattern with Gs in the corners – whether shaded or unshaded – on backgrounds of any color is permanently enjoined;
>
> (b)  use of the GRG Stripe is permanently enjoined;
>
> (c)  use of the Square G, when an exact replica of Gucci's registered Stylized G, is permanently enjoined;[292]

Because the Script Guess is neither infringing nor diluting, Guess and its licensees may continue to use it.

---

[290]   *See*, *e.g.*, *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 702 (2d Cir. 1961).  *See also Aztar Corp v. NY Entm't LLC*, 15 F. Supp. 2d 252, 256 n.4 (E.D.N.Y 1998).

[291]   *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 405 (2d Cir. 2004).  *See also* 5 McCarthy on Trademarks § 30.11.

[292]   As noted in the section discussing affirmative defenses, Guess and its licensees have successfully proved their innocent use of the few infringing iterations of the Square G.  They may continue to use it on those SKUs on which it is currently in place.  However, it would violate principles of equity to allow them to expand their use any further.  Accordingly, any expanded use of the infringing Square G's is also enjoined.

## IX.   DISCUSSION OF AFFIRMATIVE DEFENSES

### A.      Defendants Are Not Entitled to Any of Their Equitable Defenses

102.    Defendants have asserted three classic, closely related equitable

defense – laches, acquiescence, and equitable estoppel.  These defenses are

rejected for two reasons.  *First*, equity will not give relief to an intentional

infringer.  Here, Defendants intentionally infringed on the Diamond Motif Trade

Dress by using the Quattro G Pattern in brown colorways, while MFF intentionally

infringed on the GRG Stripe.  *Second*, equity requires that the prejudice be

substantial before these defenses can prevail.  While Defendants have suffered

substantial evidentiary prejudice with respect to some of the allegedly infringing

marks, the evidence shows that it will not be difficult for them to stop using any of

them.  Accordingly, while I will consider the equities of Gucci's delay in

calculating Gucci's entitlement to a monetary award of Defendants' profits, I

conclude that Defendants have not carried their burden of proof on these defenses,

and/or are not entitled to them.

103.    I also conclude that the defense of trademark misuse is

duplicative of other equitable defenses, and that it is inapplicable in this case for

the same reasons just that the other equitable defenses are inapplicable.

104.    While Gucci did not act promptly to pursue its infringement

104

and dilution claims against Defendants, it explained that it did not do so because its intellectual property enforcement budget was consumed by the fight against counterfeiters. I conclude that this was a tactical choice rather than an "unconscionable act," and decline to apply the doctrine of unclean hands to deny Gucci relief.

### B.   Gucci Has Not Abandoned Any of Its Trademarks

105.   The evidence shows that Gucci has not stopped using any of the trademarks or the trade dress at issue in this case. While Gucci has reduced its use of the Stylized G on the outside of products, it still uses it on handbag interiors.

### C.   Guess Has Successfully Established the Defense of Innocent Use With Respect to Its Use of the Square G, But Has Not Established the Defense of Prior Use[293]

106.   The evidence shows that Guess adopted its Square G mark without knowledge – actual or constructive – of Gucci's Stylized G trademark, that it did so before Gucci obtained a registration for that trademark, and that it has continuously used its Square G marks on products since then. Therefore, I conclude that because Guess has successfully asserted the affirmative defense of innocent use, Gucci's claims with respect to Guess's use of the Stylized G are

---

[293]   Guess's post-trial submissions clarify that these defenses apply only to the Square G. *See* Guess Post-Trial PFF ¶¶ 558-564. I limit my discussion here accordingly.

barred.

107.   Guess has not registered any trademarks to protect any of its Square G designs.  Accordingly, the defense of prior use is inapplicable in this case.

### D.   Gucci's Claims Are Not Barred by the Doctrine of Aesthetic Functionality

108.   Guess's post-trial submissions clarify that it raises this defense solely with respect to the Diamond Motif Trade Dress, and, more specifically, to the use of canvas fabrics in brown/beige colorways.[294]  However, Gucci is not claiming trade dress rights in such canvas fabrics.  Instead, it is claiming trade dress rights in such fabrics in combination with th\e use of the Repeating GG Pattern.  Accordingly, Guess's assertion of this defense is misplaced.

109.   Additionally, the record shows that the Diamond Motif Trade Dress is a well-known source identifier of Gucci, which leads to the conclusion that it is used for more than purely aesthetic reasons, and therefore is not ornamental.

### E.   Guess's Statute of Limitations Defense Is Inapplicable

110.   The statute of limitations defense is inapplicable in this case for two reasons.  *First*, it does not affect the availability of injunctive relief in

---

[294]     *See id.*  ¶¶ 565-573.

trademark cases.  *Second*, Gucci does not seek monetary relief outside of the statutory period.  Accordingly, the statute of limitations does not limit Gucci's remedies

## X.    CONCLUSION

111.    Over the past three years, the parties have put in countless hours and spent untold sums of money, all in the service of fashion – what Oscar Wilde aptly called  "a form of ugliness so intolerable that we have to alter it every six months."[295]  With the instant disputes now resolved, and with Gucci's entitlement to the relief noted above, it is my hope that this ugliness will be limited to the runway and shopping floor, rather than spilling over into the courts.

112.    The parties' Motions for Relief from a Judgment or Order under Rule 60(a) are granted to the extent that this Amended Opinion and Order addresses the concerns raised within those motions.  The Clerk of the Court is directed to close the following motions:  Docket Nos. 255, 256, and 257.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

---

[295]    *The Dictionary of Quotations* 67 (M. Kumar, ed., APH Publishing Corp. 2008).

Dated:      New York, New York
            June 18, 2012

## APPENDIX A: INFRINGING PRODUCTS FROM GUESS AND ALL NON-FOOTWEAR LICENSEES BY SKU

| SKU | Color |
|-----|-------|
| 35524-BRN | Brown |
| 91-7144-02 | Brown |
| 91-8994-02 | Brown |
| SP024402 | Brown |
| SP024413 | Brown |
| SP024423 | Brown |
| SP024431 | Brown |
| SP024451 | Brown |
| SP024453 | Brown |
| SP024480 | Brown |
| SP024483 | Brown |
| SP024495 | Brown |
| SP024427 | Brown |
| SP024401 | Brown |
| SP024408 | Brown |
| SP024401 | Pewter |
| SP024402 | Pewter |
| SP024423 | Pewter |
| SP024451 | Pewter |
| SI804407 | Moose |
| SI804415 | Moose |

| | |
|---|---|
| SI804423 | Moose |
| SI605150 | Moose |
| SI605151 | Moose |
| SI605152 | Moose |
| SI605153 | Moose |
| SI081205 | Brown |
| SI081207 | Brown |
| SI081215 | Brown |
| SI081201 | Brown |
| SI081217 | Brown |
| SI081227 | Brown |
| SI081291 | Brown |
| SI081251 | Brown |
| SI081210 | Brown |
| SI081212 | Brown |
| SI081213 | Brown |
| SI081266 | Brown |
| SI081272 | Brown |
| SI081284 | Brown |
| SI201110 | Brown |
| SI201132 | Brown |
| SI502203 | Moose |
| SI502212 | Moose |
| SI502217 | Moose |

| | |
|---|---|
| SI502201 | Moose |
| SI502229 | Moose |
| SI502228 | Moose |
| SI502290 | Moose |
| SI502296 | Moose |
| SI502287 | Moose |
| SI502250 | Moose |
| SI502252 | Moose |
| SI502251 | Moose |
| SI502262 | Moose |
| SI603416 | Camel |
| SI603410 | Camel |
| SI603417 | Camel |
| VY010183 | Brown |
| VY010116 | Brown |
| VY010178 | Brown |
| VY010110 | Brown |
| VY010197 | Brown |
| VY010174 | Brown |
| VY010184 | Brown |
| RH195607 | Stone |
| RH195615 | Stone |
| RH195601 | Stone |
| RH195628 | Stone |

| | |
|---|---|
| SI216301 | Brown |
| SI018407 | Moose |
| SI018405 | Moose |
| SI018417 | Moose |
| SI018426 | Moose |
| SI018402 | Moose |
| SI018431 | Moose |
| SI018413 | Moose |
| SI018453 | Moose |
| SI018472 | Moose |
| SI018494 | Moose |
| SI018484 | Moose |
| SI018451 | Moose |
| SI405401 | Moose |
| SI405404 | Moose |
| SI405417 | Moose |
| SI405451 | Moose |
| SI405462 | Moose |
| SI405490 | Moose |
| SI405401 | Mocha |
| SI405404 | Mocha |
| SI405417 | Mocha |
| SI405451 | Mocha |
| SI405490 | Mocha |

| SI806711 | Moose |
|----------|-------|
| SI806772 | Moose |
| SI806784 | Moose |
| SI806799 | Moose |
| SI806795 | Moose |
| SI806787 | Moose |
| SI806755 | Moose |
| SI806751 | Moose |
| SI806753 | Moose |
| SI806738 | Moose |
| SI806767 | Moose |
| SI806705 | Moose |
| SI806707 | Moose |
| SI806701 | Moose |
| SI806701 | Brown |
| SI806727 | Moose |
| SI806704 | Moose |
| SI206507 | Moose |
| SI206503 | Moose |
| SI206501 | Moose |
| SI206526 | Moose |
| SI206531 | Moose |
| SI206590 | Moose |
| SI206596 | Moose |

| SI206597 | Moose |
|----------|-------|
| SI206550 | Moose |
| SI206551 | Moose |
| SI206561 | Moose |
| SI206562 | Moose |
| PE206507 | Mocha |
| PE206503 | Mocha |
| PE206501 | Mocha |
| PE206526 | Mocha |
| PE206531 | Mocha |
| PE206590 | Mocha |
| PE206596 | Mocha |
| PE206597 | Mocha |
| SI206512 | Moose |
| PE206550 | Mocha |
| PE206561 | Mocha |
| PE206551 | Mocha |
| PE206562 | Mocha |
| SI206566 | Moose |
| SI206572 | Moose |
| SI206574 | Moose |
| SI206584 | Moose |
| SI306617 | Bronze |
| SI306601 | Bronze |

| SI706523 | Brown |
|----------|-------|
| SI706523 | Moose |
| SI706505 | Brown |
| SI706505 | Moose |
| SI706519 | Brown |
| SI706519 | Moose |
| SI706501 | Brown |
| SI706501 | Moose |
| SI706531 | Brown |
| SI706531 | Moose |
| SI706506 | Brown |
| SI706504 | Brown |
| SI706587 | Brown |
| SI706587 | Moose |
| SI706576 | Brown |
| SI706512 | Brown |
| SI706512 | Moose |
| SI706513 | Brown |
| SI706513 | Moose |
| SI706583 | Brown |
| SI706583 | Moose |
| SI706550 | Brown |
| SI706550 | Moose |
| SI706551 | Brown |

| | |
|---|---|
| SI706551 | Moose |
| SI706553 | Brown |
| SI706553 | Moose |
| SX706551 | Brown |
| SX706553 | Brown |
| OS706523 | Moose |
| OS706531 | Moose |
| SI706572 | Moose |
| SI706572 | Brown |
| SI706574 | Brown |
| SI706584 | Moose |
| SI706584 | Brown |
| KEY30 | Moose |

## APPENDIX B: INFRINGING MFF PRODUCTS BY SKU

The following SKUs bear the Quattro G Pattern.  Those in bold also bear the GRG Stripe:

| SKU | Color Code(s) |
|-----|---------------|
| Boris2 | NAMFB |
| Craig2 | NAMFB |
| Curtis | BRFMB |
| Cyrus | NAMFB |
| **DeWayne** | **BRMLE** |
| Donte2 | BRMLE |
| Farley | BRMLE |
| JayJay2 | NAMFB |
| Jerry2 | NAMFB |
| Jerry2-UG | NAMFB |
| **Johnson** | **NAMFB** |
| Johnson2 | BRMFB |
| Kaloon | BRMFB |
| **Macario** | **BRMLE** |
| Melrose2 | NAMFB |
| Melrose4 | NAMFB |
| **Mette** | **BRMFB** |
| Orion | BRMFB |
| Pacific | BRMLE |
| Phreedom2 | NAMFB |

| | |
|---|---|
| Phyre2 | NAMFB |
| Player2 | BRMFB |
| Rogan | BRMFB |
| Silas2 | BRMFB |
| **Turbow** | **NAMFB** |
| Vieno2 | BRMFB |
| Arabella2 | NAMFB |
| Blair2 | BRMFB |
| Effort | BRMLE |
| Gratifia | NAMFB, BRMFB |
| Jerica | NAMFB, GOMFB |
| Kessie | LBRFB, DBRFB |
| Looly | LBRFB, DBRFB |
| Pastrana | BRMFB |
| Peachy | GOMFB |
| Tatyanna | BRMFB |

The following SKU bears only the GRG Stripe:

| SKU | COLOR |
|---|---|
| Dennis2 | NAMFB |
| Melrose | DBRLE |

**-Appearances-**

**For Gucci America:**

Louis S. Ederer, Esq.
John Maltbie, Esq.
Matthew T. Salzmann, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

**For Guess?, Inc., Marc Fisher Footwear LLC, The Max Leather Group/Cipriani Accessories, Inc., Sequel AG, K&M Associates L.P., Viva Optique, Inc., Signal Products, Inc., Swank, Inc.,:**

Robert C. Welsh, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
(310) 553-6700

**For Guess?, Inc.:**

Daniel M. Petrocelli, Esq.
David Marroso, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
(310) 553-6700

Andrew J. Frackman, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
(212) 326-2000

**For Marc Fisher Footwear LLC:**

Darren W. Saunders, Esq.
Mark I. Peroff, Esq.
Alpa V. Patel, Esq.
Manatt, Phelps, & Phillips LLP
7 Time Square
New York, New York 10036
(212) 790-4500

**For The Max Leather Group/Cipriani Accessories, Inc. and Signal Products, Inc.:**

John T. Williams, Esq.
Hinkhouse Williams Walsh LLP
180 North Stetson Street, Suite 3400
Chicago, Illinois 60601
(312) 268-5767

**For Signal Products, Inc.:**

William G. Pecau, Esq.
Steptoe & Johnson, LLP
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-6244

Kristin Marie Darr, Esq.
Steptoe & Johnson, LLP
750 Seventh Avenue, Suite 1900
New York, New York 10019
(212) 506-3900

Michael R. Heimbold, Esq.
Steptoe & Johnson, LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
(310) 734-3200

**For Swank, Inc.:**

Abigail Anne Rubinstein, Esq.
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, District of Columbia 20036
(202) 429-3068

Paul Fields, Esq.
Karin Fromson Segall, Esq.
Leason Ellis LLP
81 Main Street, Suite 503
White Plains, New York 10601
(914) 288-0022

Atul R. Singh, Esq.
Darby & Darby, P.C.
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 527-7700